# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| Barry Adams, Larae Angel, Bobbi Jo Birk-LaBarge, John Colbert, Brian Collins, Dorothy Cooks, Gersen Damens, Joy Davis, James Dean, Dylan DeMoranville, Tiffany Ecklor, Tatiana Gales, Ricky Gerischer, Constanza Gonzalez, Lawrence Graziano, Paul Huitzil, Danny Hunt, Richard Kintzel, James Kneup, Steve Laveaux, Deloras McMurray, Carl Miller, Ravichandran Namakkal, Michael Nearing, Burton Reckles, John Robinson, Donna Ronan, Remigiusz Rundzio, John Sancomb, Dan Sutterfield, and Lore VanHouten, on behalf of themselves and all others similarly situated, | Case No. 2:20-cv-12699 <br><br> **CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |
| Plaintiffs, | |
| v. | |
| ZF Active Safety and Electronics US LLC; ZF Passive Safety Systems US Inc.; ZF Automotive US Inc.; ZF TRW Automotive Holdings Corp.; ZF North America, Inc.; ZF Holdings B.V.; ZF Friedrichshafen AG, STMicroelectronics N.V.; STMicroelectronics International N.V.; STMicroelectronics Inc., Hyundai Motor Co., Ltd.; Hyundai Motor America, Inc.; Hyundai MOBIS Co. Ltd.; Mobis Parts America, LLC; Kia Motors Corporation; Kia Motors America; FCA US LLC; Fiat Chrysler Automobiles N.V.; Toyota Motor Corporation; Toyota Motor North America Inc., Toyota Motor Engineering & Manufacturing North America, Inc.; Toyota Motor Sales, U.S.A., Inc.; Honda Motor Co. Ltd.; American Honda Motor Co., Inc.; Honda of America Mfg., Inc.; Honda R&D Co., Ltd.; | |

Honda R&D Americas, LLC; Mitsubishi Motors Corporation; and Mitsubishi Motors North America, Inc.

Defendants.

# TABLE OF CONTENTS

I.    NATURE OF THE ACTION .......................................................... 1

II.   THE PARTIES ............................................................................ 8

    A.    Defendants ......................................................................... 8

        i.    The ZF TRW Defendants ............................................. 9

        ii.   The STMicro Defendants ............................................ 11

        iii.  The Vehicle Manufacturer Defendants ........................... 12

            a.    The Hyundai-Kia Defendants .................................. 13

            b.    The FCA Defendants .............................................. 16

            c.    The Toyota Defendants ........................................... 17

            d.    The Honda Defendants ............................................ 19

            e.    The Mitsubishi Defendants ..................................... 20

    B.    Plaintiffs ......................................................................... 22

        i.    Hyundai-Kia Plaintiffs .............................................. 23

        ii.   FCA Plaintiffs .......................................................... 35

        iii.  Toyota Plaintiffs ....................................................... 41

        iv.  Honda Plaintiffs ........................................................ 44

        v.   Mitsubishi Plaintiffs .................................................. 46

III.  JURISDICTION AND VENUE ................................................. 50

    A.    Subject Matter Jurisdiction ............................................... 50

    B.    Personal Jurisdiction ........................................................ 50

        i.    Domestic Defendants ................................................. 50

            a.    California Defendants ............................................. 51

            b.    Michigan Defendants ............................................. 51

            c.    STMicroelectronics Inc. ......................................... 52

            d.    Toyota Motor Engineering & Manufacturing North America, Inc. .................................................... 53

            e.    Honda of America Mfg., Inc. .................................. 54

        ii.   Foreign Defendants ................................................... 54

            a.    ZF Holdings B.V. and ZF Friedrichshafen AG ....... 56

            b.    STMicroelectronics N.V. and STMicroelectronics International N.V. .................................................. 61

            c.    Hyundai Motor Co., Ltd., Kia Motors Corporation, and Hyundai MOBIS Co., Ltd. .............................. 64

            d.    Fiat Chrysler Automobiles N.V. .............................. 70

e.    Toyota Motor Corporation......................................... 74

f.    Honda Motor Co., Ltd. and Honda R&D Co., Ltd.. 80

g.    Mitsubishi Motors Corporation ............................... 86

IV.    GENERAL FACTUAL ALLEGATIONS ....................................................90

A.    The Class Vehicles are equipped with defective ZF TRW ACUs. ................................................................................... 90

i.    ACUs detect crashes and control airbags and seatbelts..... 93

ii.    A properly designed ACU can withstand transient electricity.......................................................................... 94

iii.    ZF TRW began making the defective ACUs in or around 2008................................................................................... 94

iv.    The defective ZF TRW ACUs are susceptible to complete failure during a crash because they are vulnerable to EOS from transient electricity. .................................................... 96

v.    ZF TRW and STMicro knew that ACUs with the DS84 ASIC were vulnerable to EOS since 2008....................... 101

B.    Defendants made misleading statements and omissions concerning the ACU defect for years............................................................. 104

i.    The Class Vehicles had labels and stickers stating that they were equipped with working airbags and seatbelts and that failed to disclose the ZF TRW ACU defect.................... 104

ii.    The Vehicle Manufacturer Defendants marketed the safety features of the Class Vehicles but failed to mention the ACU defect. ...................................................................... 110

iii.    The Vehicle Manufacturer Defendants published owners' manuals that failed to mention the ACU defect.............. 111

C.    Defendants knew about the ACU defect for years, yet failed to adequately warn or compensate consumers. ............................. 111

i.    Hyundai-Kia Class Vehicles ............................................ 111

a.    The Definition of the Hyundai-Kia Class Vehicles ............................................................. 112

b.    The ZF TRW ACUs in Hyundai-Kia Class Vehicles are defective......................................................... 113

c.    ZF TRW, STMicro, Hyundai, and Kia have known about the defect in ZF TRW ACUs for years........ 114

d.    Hyundai, Kia, and ZF TRW made misleading statements and omitted material facts about the airbags, seatbelts and ACUs in Hyundai-Kia Class Vehicles. ............................................................... 139

e.    Hyundai-Kia's belated and partial recall did not prevent or remedy the economic harm to consumers. ............................................................. 144

ii.   FCA Class Vehicles ....................................................... 149

     a.   The Definition of the FCA Class Vehicles............ 150

     b.   The ZF TRW ACUs in FCA Class Vehicles are defective................................................................. 151

     c.   ZF TRW, STMicro and FCA have known about the defect in ZF TRW ACUs for years........................ 157

     d.   FCA and ZF TRW made misleading statements and omitted material facts about the airbags, seatbelts, and ACUs in FCA Class Vehicles........................ 164

     e.   FCA's belated and partial recall did not prevent or remedy the economic harm to consumers. ............ 167

iii.   Toyota Class Vehicles.................................................... 173

     a.   The Definition of the Toyota Class Vehicles ........ 173

     b.   The ZF TRW ACUs in Toyota Class Vehicles are defective................................................................. 174

     c.   ZF TRW, STMicro, and Toyota have known about the defect in ZF TRW ACUs for years.................. 179

     d.   Toyota and ZF TRW made misleading statements and omitted material facts about the airbags, seatbelts, and ACUs in Toyota Class Vehicles. .... 190

     e.   Toyota's belated and partial recall did not prevent or remedy the economic harm to consumers. ............ 193

iv.   Honda Class Vehicles .................................................... 195

     a.   The Definition of the Honda Class Vehicles ......... 196

     b.   The ZF TRW ACUs in Honda Class Vehicles are defective................................................................. 197

     c.   ZF TRW, STMicro, and Honda have known about the defect in ZF TRW ACUs for years.................. 200

     d.   Honda and ZF TRW made misleading statements and omitted material facts about the airbags, seatbelts, and ACUs in Honda Class Vehicles..................... 209

     e.   Honda has taken no steps to remedy the defective ZF TRW ACUs or compensate Plaintiffs or the class members................................................................ 215

v.   Mitsubishi Class Vehicles.............................................. 216

     a.   The Definition of the Mitsubishi Class Vehicles .. 217

     b.   The ZF TRW ACUs in Mitsubishi Class Vehicles are defective............................................................. 218

     c.   ZF TRW, STMicro and Mitsubishi have known about the defect in ZF TRW ACUs for years.................. 222

     d.   Mitsubishi and ZF TRW made misleading statements and omitted material facts about the airbags, seatbelts, and ACUs in Mitsubishi Class Vehicles. ............................................................... 224

   e. Mitsubishi has taken no steps to remedy the defective ZF TRW ACUs or compensate Plaintiffs or the class members........................................................... 226

 D. Defendants' material omissions and misrepresentations about the defective ZF TRW ACUs injured Plaintiffs and class members. ............................................................................ 227

V. TOLLING OF THE STATUTE OF LIMITATIONS ..................................228

VI. CLASS ACTION ALLEGATIONS ............................................................229

 A. The Class and Subclasses ......................................................... 230

 B. Numerosity ................................................................................ 233

 C. Predominance of Common Issues ............................................. 234

 D. Typicality................................................................................... 237

 E. Adequacy of Representation ...................................................... 238

 F. Superiority ................................................................................. 238

VII. CLAIMS FOR RELIEF..........................................................................240

 A. Nationwide Claims .................................................................... 240

   i. Nationwide Count 1: Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)-(d), on Behalf of the Nationwide Class Against the ZF TRW and STMicro Defendants ...................................................... 240

   ii. Nationwide Count 2: Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)-(d), on Behalf of the Hyundai-Kia Subclass Against the ZF TRW, STMicro, and Hyundai-Kia Defendants .......................... 252

   iii. Nationwide Count 3: Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)-(d), on Behalf of the FCA Subclass Against the ZF TRW, STMicro, and FCA Defendants ....................................... 269

   iv. Nationwide Count 4: Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)-(d), on Behalf of the Toyota Subclass Against the ZF TRW, STMicro, and Toyota Defendants.................................... 283

   v. Nationwide Count 5: Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)-(d), on Behalf of the Honda Class Against the ZF TRW, STMicro, and Honda Defendants.................................................. 297

   vi. Nationwide Count 6: Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)-(d), on Behalf of the Class Against the ZF TRW, STMicro Defendants, and Mitsubishi Defendants .......................... 309

   vii. Nationwide Count 7: Common Law Fraud on Behalf of the Nationwide Class against the Vehicle Manufacturer

Defendants ...................................................................... 322

    a.    Affirmative Misrepresentations................................ 322

    b.    Fraudulent Concealment: Vehicle Safety Representations...................................................... 323

    c.    Fraudulent Concealment: Installing and Concealing the Defective ACUs............................................. 325

  viii.  Nationwide Count 8: Unjust Enrichment on Behalf of the Nationwide Class against the Vehicle Manufacturer Defendants ...................................................................... 328

B.    State-Specific Claims ............................................................ 330

  i.    Arizona............................................................................ 330

    a.    Arizona Count 1: Breach of Express Warranty (Ariz. Rev. Stat. Ann. §§ 47-2313 and 47-2A210) Against the FCA Defendants ............................................. 330

    b.    Arizona Count 2: Breach of Implied Warranty of Merchantability (Ariz. Rev. Stat. Ann. §§ 47-2314 and 47-2a212) Against the FCA Defendants......... 333

    c.    Arizona Count 3: Violation of the Arizona Consumer Fraud Act (Ariz. Rev. Stat. Ann. § 44-1521, *et seq.*) Against the FCA Defendants................................. 335

    d.    Arizona Count 4: Violation of the Arizona Consumer Fraud Act (Ariz. Rev. Stat. Ann. § 44-1521, *et seq.*) Against the ZF TRW and STMicro Defendants.... 339

  ii.    California ....................................................................... 342

    a.    California Count 1: Breach of Express Warranty (Cal. Com. Code §§ 2313 and 10210) Against the FCA, Kia, and Mitsubishi Defendants .................. 342

    b.    California Count 2: Violations of Song-Beverly Consumer Warranty Act For Breach of Express Warranties (Cal. Civ. Code §§ 1791.2 and 1793.1) Against the FCA, Kia, and Mitsubishi Defendants 346

    c.    California Count 3: Breach of Implied Warranty of Merchantability (Cal. Com. Code §§ 2314 and 10212) Against the FCA, Kia, and Mitsubishi Defendants ............................................................ 350

    d.    California Count 4: Violations of Song-Beverly Consumer Warranty Act For Breach of Implied Warranty of Merchantability (Cal. Civ. Code §§ 1791.1 and 1792) Against the FCA, Kia, and Mitsubishi Defendants............................................ 353

    e.    California Count 5: False Advertising Under the California False Advertising Law (Cal. Bus. & Prof. Code § 17500, *et seq.*) Against the FCA, Kia, and Mitsubishi Defendants........................................... 356

    f.    California Count 6: Violation of the Consumer Legal Remedies Act (Cal. Civ. Code § 1750, *et seq.*)

Against the FCA, Kia, Mitsubishi, ZF TRW, and STMicro Defendants, and Hyundai MOBIS ......... 361

g.  California Count 7: Unlawful, Unfair, or Fraudulent Business Practices Under the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq.*) Against the FCA, Kia, Mitsubishi, ZF TRW, and STMicro Defendants, and Hyundai MOBIS .. 366

iii.  Colorado ........................................................................ 369

a.  Colorado Count 1: Breach of Express Warranty (Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-210) Against the Mitsubishi Defendants ..................................... 369

b.  Colorado Count 2: Breach of Implied Warranty of Merchantability (Colo. Rev. Stat. §§ 4-2-314 and 4-2.5-212) Against the Mitsubishi Defendants......... 373

c.  Colorado Count 3: Violation of the Colorado Consumer Protection Act (Colo. Rev. Stat. § 6-1-101, *et seq.*) Against the Mitsubishi Defendants .......... 375

d.  Colorado Count 4: Violation of the Colorado Consumer Protection Act (Colo. Rev. Stat. § 6-1-101, *et seq.*) Against the ZF TRW and STMicro Defendants ............................................................ 380

iv.  Connecticut ................................................................... 383

a.  Connecticut Count 1: Breach of Express Warranty (Conn. Gen. Stat. Ann. §§ 42A-2-313 and 42a-2A-503) Against the Honda Defendants...................... 383

b.  Connecticut Count 2: Breach of Implied Warranty of Merchantability (Conn. Gen. Stat. Ann. §§ 42a-2-314 and § 42a-2a-504) Against the Honda Defendants 386

c.  Connecticut Count 3: Violation of the Connecticut Unlawful Trade Practices Act (Conn. Gen. Stat. Ann. § 42-110a, *et seq.*) Against the Honda Defendants 389

d.  Connecticut Count 4: Violation of the Connecticut Unlawful Trade Practices Act (Conn. Gen. Stat. Ann. § 42-110a, *et seq.*) Against the ZF TRW and STMicro Defendants.............................................. 392

v.  Florida .......................................................................... 396

a.  Florida Count 1: Breach of Express Warranty (Fla. Stat. §§ 672.313 and 680.21) Against the Kia and Toyota Defendants................................................. 396

b.  Florida Count 2: Breach of Implied Warranty of Merchantability (Fla. Stat. §§ 672.314 and 680.212) Against the Kia and Toyota Defendants................ 399

c.  Florida Count 3: Violation of the Florida Deceptive & Unfair Trade Practices Act (Fla. Stat. § 501.201, *et seq.*) Against the Kia and Toyota Defendants, and Hyundai MOBIS.................................................. 402

d.  Florida Count 4: Violation of the Florida Deceptive

& Unfair Trade Practices Act (Fla. Stat. § 501.201, *et seq.*) Against the ZF TRW and STMicro Defendants ............................................................................ 406

vi.    Illinois ................................................................. 409

a.    Illinois Count 1: Breach of Express Warranty (810 Ill. Comp. Stat. 5/2-313 and 5/2A-210) Against the Hyundai and Kia Defendants.............................. 409

b.    Illinois Count 2: Breach of Implied Warranty of Merchantability (810 Ill. Comp. Stat. 5/2-314 and 5/2A-212) Against the Hyundai and Kia Defendants ............................................................................ 412

c.    Illinois Count 3: Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 Ill. Comp. Stat. 505/1, *et seq.*) Against the Hyundai and Kia Defendants and Hyundai MOBIS .................. 415

d.    Illinois Count 4: Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 Ill. Comp. Stat. 505/1, *et seq.*) Against the ZF TRW and STMicro Defendants.............................................. 420

e.    Illinois Count 5: Violation of the Illinois Uniform Deceptive Trade Practices Act (815 Ill. Comp. Stat. 510/1, *et seq.*) Against the Hyundai and Kia Defendants and Hyundai MOBIS......................... 424

f.    Illinois Count 6: Violation of the Illinois Uniform Deceptive Trade Practices Act (815 Ill. Comp. Stat. 510/1, *et seq.*) Against the ZF TRW and STMicro Defendants ............................................................ 429

vii.    Indiana.................................................................. 432

a.    Indiana Count 1: Breach of Express Warranty (Ind. Code §§ 26-1-2-313 and 26-1-2.1-210) Against the Kia Defendants ................................................... 432

b.    Indiana Count 2: Breach of Implied Warranty of Merchantability (IND. CODE §§ 26-1-2-314 and 26-1-2.1-212) Against the Kia Defendants................. 435

c.    Indiana Count 3: Violation of the Indiana Deceptive Consumer Sales Act (Ind. Code § 24-5-0.5-3, *et seq.*) Against the Kia Defendants and Hyundai MOBIS 437

d.    Indiana Count 4: Violation of the Indiana Deceptive Consumer Sales Act (Ind. Code § 24-5-0.5-3, *et seq.*) Against the ZF TRW and STMicro Defendants .... 442

viii.    Massachusetts.................................................... 447

a.    Massachusetts Count 1: Breach of Express Warranty (Mass. Gen. Laws ch. 106, §§ 2-313 and 2A-210) Against the Kia Defendants.................................... 447

b.    Massachusetts Count 2: Breach of Implied Warranty of Merchantability (Mass. Gen. Laws ch. 106, §§ 2-314 and 2A-212) Against the Kia Defendants ...... 450

        c.     Massachusetts Count 3: Violation of the Deceptive Acts or Practices Prohibited By Massachusetts Law (Mass. Gen. Laws ch. 93a, § 1, *et seq.*) Against the Kia Defendants and Hyundai MOBIS ................... 453

        d.     Massachusetts Count 4: Violation of the Deceptive Acts or Practices Prohibited By Massachusetts Law (Mass. Gen. Laws ch. 93a, § 1, *et seq.*) Against the ZF TRW and STMicro Defendants ....................... 457

  ix.    Minnesota ........................................................................... 462

        a.     Minnesota Count 1: Breach of Express Warranty (Minn. Stat. §§ 336.2-313 and 336.2A-210) Against the Kia Defendants ............................................... 462

        b.     Minnesota Count 2: Breach of Implied Warranty of Merchantability (Minn. Stat. §§ 336.2-314 and 336.2A-212) Against the Kia Defendants ............. 465

        c.     Minnesota Count 3: Violation of the Minnesota Prevention of Consumer Fraud Act (Minn. Stat. § 325F.68, *et seq.* and Minn. Stat. § 8.31, subd. 3a) Against the Kia Defendants and Hyundai MOBIS 467

        d.     Minnesota Count 4: Violation of the Minnesota Uniform Deceptive Trade Practices Act (Minn. Stat. § 325D.43, *et seq.*) Against the Kia Defendants and Hyundai MOBIS................................................... 471

        e.     Minnesota Count 5: Violation of the Minnesota Prevention of Consumer Fraud Act (Minn. Stat. § 325F.68, *et seq.* and Minn. Stat. § 8.31, subd. 3a) Against the ZF TRW and STMicro Defendants.... 475

        f.     Minnesota Count 6: Violation of the Minnesota Uniform Deceptive Trade Practices Act (Minn. Stat. § 325D.43, *et seq.*) Against the ZF TRW and STMicro Defendants............................................. 479

  x.     Missouri ....................................................................... 482

        a.     Missouri Count 1: Breach of Express Warranty (Mo. Rev. Stat. §§ 400.2-313 and 400.2A-210) Against the Kia Defendants .................................................. 482

        b.     Missouri Count 2: Breach of Implied Warranty of Merchantability (Mo. Rev. Stat. §§ 400.2-314 and 400.2A-212) Against the Kia Defendants ............. 485

        c.     Missouri Count 3: Violation of the Missouri Merchandising Practices Act (Mo. Rev. Stat. § 407.010, *et seq.*) Against the Kia Defendants and Hyundai MOBIS................................................... 487

        d.     Missouri Count 4: Violation of the Missouri Merchandising Practices Act (Mo. Rev. Stat. § 407.010, *et seq.*) Against the ZF TRW and STMicro Defendants............................................. 491

  xi.    Montana ........................................................................... 494

a.  Montana Count 1: Breach of Express Warranty (Mont. Code Ann. §§ 30-2-313 and 30-2A-210) Against the FCA Defendants ................................. 494

b.  Montana Count 2: Breach of Implied Warranty of Merchantability (Mont. Code Ann. §§ 30-2-314, 30-2A-212) Against the FCA Defendants .................. 497

c.  Montana Count 3: Violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1973 (Mont. Code Ann. § 30-14-101, *et seq.*) Against the FCA Defendants ............................................. 500

d.  Montana Count 4: Violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1973 (Mont. Code Ann. § 30-14-101, *et seq.*) Against the ZF TRW and STMicro Defendants ................ 503

xii.  New Jersey ...................................................... 507

a.  New Jersey Count 1: Breach of Express Warranty (N.J. Stat. Ann. §§ 12A:2-313 and 12A:2A-210) Against the Kia Defendants ..................................... 507

b.  New Jersey Count 2: Breach of Implied Warranty of Merchantability (N.J. Stat. Ann. §§ 12A:2-314 and 12A:2A-212) Against the Kia Defendants ........... 510

c.  New Jersey Count 3: Violation of New Jersey Consumer Fraud Act (N.J. Stat. Ann. § 56:8-1, *et seq.*) Against the Kia Defendants and Hyundai MOBIS ................................................................. 512

d.  New Jersey Count 4: Violation of New Jersey Consumer Fraud Act (N.J. Stat. Ann. § 56:8-1, *et seq.*) Against the ZF TRW and STMicro Defendants ................................................................. 516

xiii.  New York ....................................................... 519

a.  New York Count 1: Breach of Express Warranty (N.Y. U.C.C. Law §§ 2-313 and 2-A-210) Against the Honda Defendants ........................................... 519

b.  New York Count 2: Breach of Implied Warranty of Merchantability (N.Y. U.C.C. Law §§ 2-314 and 2-A-212) Against the Honda Defendants ................ 522

c.  New York Count 3: Violation of New York General Business Law § 349 (N.Y. Gen. Bus. Law § 349) Against the Honda Defendants ............................... 525

d.  New York Count 4: Violation of New York General Business Law § 349 (N.Y. Gen. Bus. Law § 349) Against the ZF TRW and STMicro Defendants.... 528

e.  New York Count 5: Violation of New York General Business Law § 350 (N.Y. Gen. Bus. Law § 350) Against the Honda Defendants ............................... 531

xiv.  North Carolina.................................................. 535

a.  North Carolina Count 1: Breach of Express Warranty

(N.C. Gen. Stat. §§ 25-2-313 and 25-2A-210) Against the FCA Defendants .................................. 535

b.    North Carolina Count 2: Breach of Implied Warranty of Merchantability (N.C. Gen. Stat. §§ 25-2-314 and 25-2A-212) Against the FCA Defendants ............. 538

c.    North Carolina Count 3: Violation of the North Carolina Unfair and Deceptive Trade Practices Act (N.C. Gen. Stat. § 75-1.1, *et seq.*) Against the FCA Defendants ...................................................... 541

d.    North Carolina Count 4: Violation of the North Carolina Unfair and Deceptive Trade Practices Act (N.C. Gen. Stat. § 75-1.1, *et seq.*) Against the ZF TRW and STMicro Defendants ............................. 544

xv.    Oklahoma ............................................................ 547

a.    Oklahoma Count 1: Breach of Express Warranty (Okla. Stat. Ann. tit. 12A, §§ 2-313 and 2A-210) Against the FCA Defendants .................................. 547

b.    Oklahoma Count 2: Breach of Implied Warranty of Merchantability (Okla. Stat. Ann. tit. 12A, §§ 2-314 and 2A-212) Against the FCA Defendants ........... 550

c.    Oklahoma Count 3: Violation of the Oklahoma Consumer Protection Act (Okla. Stat. Ann. tit. 15, § 751, *et seq.*) Against the FCA Defendants ......... 553

d.    Oklahoma Count 4: Violation of the Oklahoma Consumer Protection Act (Okla. Stat. Ann. tit. 15, § 751, *et seq.*) Against the ZF TRW and STMicro Defendants .......................................................... 557

xvi.    Pennsylvania ...................................................... 560

a.    Pennsylvania Count 1: Breach of Express Warranty (13 Pa. Cons. Stat. §§ 2313 and 2A210) Against the Hyundai and Kia Defendants ................................. 560

b.    Pennsylvania Count 2: Breach of Implied Warranty of Merchantability (13 Pa. Cons. Stat. §§ 2314 and 2A212) Against the Hyundai and Kia Defendants  564

c.    Pennsylvania Count 3: Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (73 Pa. Cons. Stat. §§ 201-1, *et seq.*) Against the Hyundai and Kia Defendants and Hyundai MOBIS ............................................................. 567

d.    Pennsylvania Count 4: Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (73 Pa. Cons. Stat. §§ 201-1, *et seq.*) Against the ZF TRW and STMicro Defendants ............................. 572

xvii.    Tennessee .......................................................... 576

a.    Tennessee Count 1: Breach of Express Warranty (Tenn. Code Ann. §§ 47-2-313 and 47-2A-210) Against the Hyundai Defendants ........................... 576

   b. Tennessee Count 2: Breach of Implied Warranty of Merchantability (Tenn. Code Ann. §§ 47-2-314 and 47-2A-212) Against the Hyundai Defendants ....... 579

   c. Tennessee Count 3: Violation of the Tennessee Consumer Protection Act of 1977 (Tenn. Code Ann. § 47-18-101, *et seq.*) Against the Hyundai Defendants and Hyundai MOBIS ......................... 581

   d. Tennessee Count 4: Violation of the Tennessee Consumer Protection Act of 1977 (Tenn. Code Ann. § 47-18-101, *et seq.*) Against the ZF TRW and STMicro Defendants ............................................ 586

  xviii. Texas ............................................................... 590

   a. Texas Count 1: Breach of Express Warranty (Tex. Bus. & Com. Code Ann. §§ 2.313 and 2A.210) Against the Hyundai and Toyota Defendants ........ 590

   b. Texas Count 2: Breach of Implied Warranty of Merchantability (Tex. Bus. & Com. Code Ann. §§ 2.314 and 2A.212) Against the Hyundai and Toyota Defendants .................................................. 593

   c. Texas Count 3: Violation of the Deceptive Trade Practices-Consumer Protection Act (Tex. Bus. & Com. Code Ann. § 17.41, *et seq.*) Against the Hyundai and Toyota Defendants and Hyundai MOBIS ................................................................. 596

   d. Texas Count 4: Violation of the Deceptive Trade Practices-Consumer Protection Act (Tex. Bus. & Com. Code Ann. § 17.41, *et seq.*) Against the ZF TRW and STMicro Defendants ............................. 602

  xix. Wisconsin .......................................................... 607

   a. Wisconsin Count 1: Breach of Express Warranty (Wis. Stat. §§ 402.313 and 411.210) Against the Mitsubishi Defendants ........................................... 607

   b. Wisconsin Count 2: Breach of Implied Warranty of Merchantability (Wis. Stat. §§ 402.314 and 411.212) Against the Mitsubishi Defendants ...................... 610

   c. Wisconsin Count 3: Violation of the Wisconsin Deceptive Trade Practices Act (Wis. Stat. § 100.18, *et seq.*) Against the Mitsubishi Defendants ........... 612

VIII. PRAYER FOR RELIEF ...................................................... 616

IX. DEMAND FOR JURY TRIAL .................................................. 618

For their complaint against Defendants,[1] Plaintiffs,[2] individually and on

behalf of all others similarly situated, allege as follows:

## I.  <u>NATURE OF THE ACTION</u>

1.     Motor vehicles are a fixture of modern life in the United States. Every

day, millions of Americans drive automobiles. They drive their children to school,

they drive themselves to work, they drive to purchase essentials like food and

medicine, and (especially during this pandemic) they sometimes drive just to enjoy

a sunny day.

---

[1] Defendants are ZF Active Safety and Electronics US LLC; ZF Passive Safety
Systems US Inc.; ZF Automotive US Inc.; ZF TRW Automotive Holdings Corp.;
ZF North America, Inc.; ZF Holdings B.V.; ZF Friedrichshafen AG,
STMicroelectronics N.V.; STMicroelectronics International N.V.;
STMicroelectronics Inc., Hyundai Motor Co., Ltd.; Hyundai Motor America, Inc.;
Hyundai MOBIS Co. Ltd.; Mobis Parts America, LLC; Kia Motors Corporation;
Kia Motors America; FCA US LLC; Fiat Chrysler Automobiles N.V.; Toyota
Motor Corporation; Toyota Motor North America Inc., Toyota Motor Engineering
& Manufacturing North America, Inc.; Toyota Motor Sales, U.S.A., Inc.; Honda
Motor Co. Ltd.; American Honda Motor Co., Inc.; Honda of America Mfg., Inc.;
Honda R&D Co., Ltd.; Honda R&D Americas, LLC; Mitsubishi Motors
Corporation; and Mitsubishi Motors North America, Inc.

[2] Plaintiffs are Barry Adams, Larae Angel, Bobbi Jo Birk-LaBarge, John Colbert,
Brian Collins, Dorothy Cooks, Gersen Damens, Joy Davis, James Dean, Dylan
DeMoranville, Tiffany Ecklor, Tatiana Gales, Ricky Gerischer, Constanza
Gonzalez, Lawrence Graziano, Paul Huitzil, Danny Hunt, Richard Kintzel, James
Kneup, Steve Laveaux, Deloras McMurray, Carl Miller, Ravichandran Namakkal,
Michael Nearing, Burton Reckles, John Robinson, Donna Ronan, Remigiusz
Rundzio, John Sancomb, Dan Sutterfield, and Lore VanHouten.

2.      For most Americans, the purchase or lease of a motor vehicle is their second largest financial investment, following only the purchase or lease of a home.

3.      While cars are a common feature of our daily lives, they also are potentially dangerous. Car crashes kill tens of thousands of people every year. Many more suffer serious injuries.

4.      To prevent injury and death from car accidents, the federal government enacted laws and established regulations that forced manufacturers to include certain safety features in motor vehicles sold in the United States. Seatbelts and airbags are two of these key safety requirements. Since 1997, all passenger vehicles have had to include this critical, life-saving equipment. *See* 49 U.S.C. § 30127.

5.      To lawfully distribute a motor vehicle to car dealers for sale to consumers in the United States, a manufacturer first must place a permanent label on the vehicle that certifies that the vehicle includes functioning airbags and seatbelts. When a vehicle manufacturer learns of a safety defect, federal law requires it to disclose the defect to the National Highway Traffic Safety Administration ("NHTSA") and to the owners, purchasers, and dealers of the vehicle. 49 U.S.C. § 30118(c).

6.      When a safety defect relates to a component part, the component manufacturer has a separate, independent duty to submit public reports on the faulty equipment to NHTSA. 49 C.F.R. § 573.6(a).

7.      Defendants in this case flouted these basic duties by failing to disclose a deadly defect with the passenger safety system in millions of vehicles purchased or leased by Plaintiffs and the Class (the "Class Vehicles").[3] Because of this defect, the airbags and seatbelts in more than 15 million vehicles may fail to activate during a potentially fatal head-on collision—exactly when they are needed most.

8.      Defendant ZF TRW makes Airbag Control Units, or "ACUs," to install in motor vehicles—including vehicles made by the Vehicle Manufacturer Defendants in this case: FCA, Honda, Hyundai, Kia, Mitsubishi, and Toyota. ACUs are effectively computers that control the car's safety systems. They are typically installed in the passenger compartment of the vehicle. ACUs constantly receive and interpret signals from crash sensors in the front of the vehicle. When the sensors detect an imminent crash, they notify the ACU and the ACU commands the safety system to deploy the airbags and tighten the seatbelts. When the ACU fails, the airbags and seatbelts also fail.

---

[3] Specifically, "Class Vehicles" are all vehicles equipped with a ZF TRW ACU containing a DS84 application-specific integrated circuit.

9.      Defendant STMicro makes a specialized microchip called the DS84 application-specific integrated circuit ("ASIC"), a component part of the ACU. It processes the signal from the crash sensors and activates the airbags and seatbelts. ST Micro's DS84 ASIC is the brain of the ZF TRW ACUs at issue in this litigation. STMicro custom-manufactured the DS84 ASIC for ZF TRW, as part of ZF TRW's plan to create a smaller ACU. Upon information and belief, no ACU manufacturer other than ZF TRW uses the DS84 ASIC.

10.      ZF TRW ACUs with the DS84 ASIC have a dangerous defect. These ACUs are much more vulnerable to bursts of electricity than are other ACUs, including other ZF TRW ACUs that do not include the DS84 ASIC. Vulnerability to electricity is dangerous because—as has been common knowledge in the auto industry for decades—some crashes cause large bursts of electricity to discharge in the front of the vehicle. This can happen for a variety of reasons. For example, a front-end collision can cause wiring for other components to tear, which could discharge a stray electrical current, sometimes called a "transient." For this reason, ACUs (and the ASICs within them) must be sufficiently protected from transient electrical currents to ensure they will function during a crash.

11.      In many crashes over the last ten years, transient electricity caused by the crash itself overheated and rendered useless the DS84 ASIC in ZF TRW ACUs. In those crashes, the heat damaged the ASIC, a phenomenon called

electrical overstress or "EOS." EOS is a well-known phenomenon in the auto industry. In the DS84 ASIC, EOS is deadly: it can disable the brains of the ACU and cause the airbags and seatbelts not to activate during a crash.

12.     Defendants have known the defective ZF TRW ACUs with the DS84 ASIC were vulnerable to EOS for at least a decade. For example, ZF TRW's and STMicro's internal testing confirmed the vulnerability as early as 2008. Honda's testing identified similar vulnerabilities in 2012 and 2014.

13.     Between 2009 and 2016, the Vehicle Manufacturer Defendants returned to ZF TRW dozens of ACUs with signs of EOS in DS84 ASICs.

14.     Despite the known risks of EOS in the ZF TRW ACUs, Defendants pushed to market and delayed recalling vehicles with the defective ACUs. Instead of timely and completely warning consumers—who have driven and continue to drive vehicles with these defective ACUs every day—Defendants conspired to conceal the defect. That decision cost lives. Collectively, NHTSA and the Vehicle Manufacturer Defendants have linked multiple airbag and/or seatbelt failures in crashes to ZF TRW ACUs that showed signs of EOS in the DS84 ASIC. To date, they attribute at least eight known deaths to the defect.

15.     In 2011 and 2012, Hyundai, Kia, and ZF TRW discovered at least four airbag failures in crashes involving Hyundai-Kia vehicles with the defective ACUs. FCA and ZF TRW similarly knew of at least ten airbag failures in FCA

vehicles with the defective ACUs by 2016. Upon information and belief, ZF TRW alerted Toyota, Honda, and Mitsubishi to the defect at least as early as early 2016. More recently, NHTSA and Toyota have linked two fatalities to airbag failures in Toyota vehicles with the defective ACUs.

16.    Despite these and other well-documented accidents evidencing the defect, the Vehicle Manufacturer Defendants falsely and misleadingly assured consumers that their vehicles were safe in advertising distributed nationwide.

17.    Now, Defendants effectively admit that ZF TRW ACUs with the DS84 ASIC are defective. For example, Toyota admits:

> This ASIC does not have sufficient protection against negative electrical transients that can be generated in certain severe crashes, such as an underride frontal crash where there is a large engine compartment intrusion before significant deterioration. In these cases, the crash sensor and other powered wiring can be damaged and shorted so as to create a negative electrical transient of sufficient strength and duration to damage the ASIC before the deployment signal is received in the [ACU]. This can lead to incomplete or nondeployment of the airbags and/or pretensioners.

18.    Similarly, Hyundai admits "the ASIC used in the subject ACUs could be susceptible to EOS because it lacks adequate circuit protection. In at least one crash test, damage to the DS84 ASIC from EOS could have caused the loss of the AAS and seat belt pretensioner deployment." Hyundai's affiliate, Kia, parroted this admission: "The ASIC component within the subject ACUs may be susceptible to EOS due to inadequate circuit protection."

19.    FCA also admits:

- 6 -

> The root cause of the failure was determined to be a combination of the relative susceptibility of the subject [ACU] ASIC to negative transients and the front acceleration sensor signal cross-car wire routing in certain crash events. . . . The potential loss of air bag and seat belt pretensioner deployment capability in such crash events may increase the risk of injury in a crash.

20.    Despite these admissions, the Vehicle Manufacturer Defendants have failed to recall approximately 9 million vehicles that have ZF TRW ACUs with the DS84 ASIC. Defendants try to justify this failure by obscuring the nature and scope of the defect. For example, they falsely and misleadingly blame the problem on minor variations in wiring in the front of the vehicle. They also claim adding limited protective components to guard against electrical transients solves the problem. But, in truth, all ZF TRW ACUs with the DS84 ASIC are defective, as demonstrated by confirmed cases of DS84 ASIC EOS across a wide spectrum of different vehicles with different wiring and different combinations of protective components.

21.    In April 2019, NHTSA launched an investigation into the serious safety risk presented by unrecalled vehicles with ZF TRW ACUs. The investigation appears to target all ZF TRW ACUs with the DS84 ASIC. The investigation is ongoing.

22.    Although Defendants should recall and replace the defective ZF TRW ACUs, Defendants' fraud has done harm to Plaintiffs that no recall (or fine by NHTSA) can remedy. When they purchased or leased vehicles with the defective ZF TRW ACUs, Plaintiffs believed—based on Defendants' misleading statements

and material omissions—that the airbag and seatbelt systems in their vehicles functioned properly and had no safety defects. Had Defendants disclosed the ACU defect at the point of sale, Plaintiffs would have seen such disclosures and would not have bought or leased the vehicles or they would have paid a significantly lower price to purchase or lease them.

23.     This lawsuit seeks redress on behalf of Plaintiffs and all other similarly-situated purchasers and lessees of vehicles with defective ZF TRW ACUs for the harm they suffered in paying for vehicles with a safety system they cannot rely on.

## II. THE PARTIES

### A.     Defendants

24.     Defendants are companies from nine different corporate groups: (1) ZF TRW, (2) STMicro, (3) Kia, (4) Hyundai, (5) Hyundai MOBIS,[4] (6) Fiat Chrysler ("FCA"), (7) Toyota, (8) Honda, and (9) Mitsubishi.

25.     Defendants are some of the largest companies in the global automotive industry. Collectively, they reported more than $880 billion in revenue in 2019 alone. The below chart shows Defendants' reported revenue for 2019.[5]

| Defendant Group | Revenue |
| --- | --- |

[4] Although separate corporate groups, Kia, Hyundai, and Hyundai MOBIS are affiliates that own large blocks of each other's stock.

[5] Some groups report revenue in foreign currencies. Plaintiffs converted foreign currencies to USD using recent exchange rates.

| ZF TRW | $39 billion |
|---|---|
| STMicro | $9 billion |
| Kia | $47 billion |
| Hyundai | $86 billion |
| Hyundai MOBIS | $31 billion |
| Toyota | $272 billion |
| Honda | $143 billion |
| Fiat Chrysler | $118 billion |
| Mitsubishi | $137 billion |

   **i.    The ZF TRW Defendants**

   26.    The ZF TRW Defendants are ZF Active Safety and Electronics US
LLC; ZF Passive Safety Systems US Inc.; ZF Automotive US Inc.; ZF TRW
Automotive Holdings Corp.; ZF North America, Inc.; ZF Holdings B.V.; and ZF
Friedrichshafen AG. Plaintiffs refer to these Defendants collectively as "ZF
TRW."

   27.    ZF Active Safety and Electronics US LLC is a Delaware LLC
headquartered in Michigan. It formerly operated under the name "TRW
Automotive U.S. LLC." Upon information and belief, ZF Active Safety and
Electronics US LLC is directly involved in the manufacture and design of ZF TRW
ACUs.

   28.    ZF Passive Safety Systems US Inc. is a Delaware Corporation
headquartered in Michigan. It previously operated under the name "TRW Vehicle
Safety Systems, Inc." Upon information and belief, ZF Passive Safety Systems US
Inc. is directly involved in the manufacture and design of ZF TRW ACUs.

29.    ZF Automotive US Inc. is a Delaware Corporation and the direct parent and 100% owner of ZF Passive Safety Systems US Inc. and ZF Active Safety and Electronics US LLC. It formerly operated under the name "TRW Automotive Inc." It is headquartered in Michigan. ZF Automotive US Inc. admits that it is a manufacturer of the ACUs at issue in this litigation.

30.    ZF TRW Automotive Holdings Corp. is a Delaware Corporation and the direct parent and 100% owner of ZF Automotive US Inc. ZF TRW Automotive Holdings Corp. is headquartered in Michigan.

31.    ZF North America, Inc. is a Delaware Corporation and the direct parent and 100% owner of ZF TRW Automotive Holdings Corp. ZF North America, Inc. is headquartered in Michigan.

32.    ZF Holdings B.V. is a Netherlands corporation and the direct parent and 100% owner of ZF North America, Inc. ZF Holdings B.V.'s head office is in the Netherlands.

33.    ZF Friedrichshafen AG is a German corporation and the direct parent and 100% owner of ZF Holdings B.V. ZF Friedrichshafen AG is headquartered in Germany.

34.    The origins of the relevant business line of the ZF TRW Defendants traces back to an automotive supplier from the early 1900s named the Cleveland Cap Screw Company.

35.     During the relevant time period prior to May 15, 2015, ZF Active

Safety and Electronics US LLC; ZF Passive Safety Systems US Inc.; and ZF

Automotive US Inc. operated as subsidiaries of the ultimate parent company TRW

Automotive Holdings Corp., which was a publicly traded company listed on the

New York Stock Exchange.

### ii.     The STMicro Defendants

36.     The STMicro Defendants (together "STMicro") include

STMicroelectronics N.V.; STMicroelectronics International N.V.; and

STMicroelectronics Inc.

37.     STMicro is a multinational group of companies that manufacturers

and sells semiconductors and electronic chips. STMicro's automotive integrated

circuit and discrete and power transistor line of products is one of its three most

important lines of business.

38.     STMicroelectronics N.V. is a company incorporated under the laws of

the Netherlands, with its principal place of business located at 39, Chemin du

Champ-des-Filles, CH-1228 Geneva – Plan-Les-Ouates, Switzerland. It is the

parent company of the STMicro group, and 100% owner of Defendants

STMicroelectronics International N.V. and Defendant STMicroelectronics, Inc.

39.     STMicroelectronics International N.V. is a company incorporated

under the laws of the Netherlands, with its principal place of business located at 39

Chemin du Champ des Filles, 1228 Plan-les-Ouates, Geneva, Switzerland. Although STMicroelectronics N.V. is the parent company of the STMicro group of companies, the parent company's 2019 Annual Report admits: "we conduct our global business through STMicroelectronics International N.V. and also conduct our operations through service activities from our subsidiaries," and "[o]ur operations are also conducted through our various subsidiaries, which are organized and operated according to the laws of their country of incorporation, and consolidated by STMicroelectronics N.V."

40.     STMicroelectronics Inc. is a Delaware Corporation headquartered in Coppell, Texas. STMicroelectronics also has a permanent office in Livonia, Michigan. The office is within a fifteen-minute drive from ZF Automotive US Inc.'s office there. ZF Automotive US Inc. identified STMicroelectronics Inc.'s Michigan office as the address for the manufacturer of the DS84 ASIC contained in the ZF TRW ACUs at issue in this litigation.

### iii.    The Vehicle Manufacturer Defendants

41.     The Vehicle Manufacturer Defendants are companies that make and sell completed vehicles and their affiliates. The Vehicle Manufacturer Defendants are Hyundai Motor Co., Ltd.; Hyundai Motor America, Inc.; Kia Motors Corporation; Kia Motors America, Inc.; FCA US LLC; Fiat Chrysler Automobiles N.V.; Toyota Motor Corporation; Toyota Motor North America Inc., Toyota Motor

Engineering & Manufacturing North America, Inc.; Toyota Motor Sales, U.S.A., Inc.; Honda Motor Co. Ltd.; American Honda Motor Co., Inc.; Honda of America Mfg., Inc.; Honda R&D Co., Ltd.; Honda R&D Americas, LLC; Mitsubishi Motors Corporation; and Mitsubishi Motors North America, Inc.

42.      Defendants Hyundai MOBIS Co. Ltd. and Mobis Parts America, LLC are affiliates of Hyundai Motor Co., Ltd.; Hyundai Motor America, Inc.; Kia Motors Corporation; and Kia Motors America. They make auto parts for Hyundai and Kia vehicles. Although Hyundai MOBIS Co. Ltd. and Mobis Parts America, LLC are not Vehicle Manufacturer Defendants, Plaintiffs discuss them in this section given their close relationship with Hyundai Motor Co., Ltd.; Hyundai Motor America, Inc.; Kia Motors Corporation; and Kia Motors America.

### a.      The Hyundai-Kia Defendants

43.      The Hyundai Defendants (or "Hyundai") are Hyundai Motor Co., Ltd.; Hyundai Motor America, Inc. The Kia Defendants (or "Kia") are Kia Motors Corporation and Kia Motors America, Inc. Hyundai MOBIS Co. Ltd. and Mobis Parts America, LLC are the Hyundai MOBIS Defendants (together, "Hyundai MOBIS"). The Hyundai-Kia Defendants are Hyundai, Kia, and Hyundai MOBIS.

44.      Hyundai Motor Co., Ltd. is a foreign corporation headquartered in Seoul, South Korea. Hyundai Motor Co., Ltd. is one of the largest automobile

manufacturers in the world. It designs, develops, manufactures, markets, and sells automobiles around the world, including in the United States.

45.    Hyundai Motor America, Inc. is a California corporation doing business throughout the United States and headquartered in Fountain Valley, California. Hyundai Motor Co., Ltd. is the parent company of Hyundai Motor America, Inc. Hyundai Motor America, Inc. makes and/or sells automobiles in the United States.

46.    Kia Motors Corporation is a foreign corporation headquartered in Seoul, South Korea. Kia Motors Corporation's largest shareholder is Hyundai Motor Co., Ltd., which owns roughly 34% of Kia Motors Corporation. Kia Motors Corporation also has a large stake in several Hyundai Motor Co., Ltd. companies. Kia Motors Corporation is one of the largest automobile manufacturers in the world. It designs, develops, manufactures, markets, and sells automobiles around the world, including in the United States.

47.    Kia Motors America, Inc. is a subsidiary of Kia Motors Corporation and was incorporated in the state of California on October 21, 1992 as the American sales, marketing, and distribution arm of Kia Motors Corporation, with its principal place of business in Irvine, California. Kia Motors America, Inc. makes and/or sells automobiles in the United States.

48.     Hyundai MOBIS Co. Ltd. is a foreign corporation headquartered in Seoul, South Korea. Kia Motors Corporation and several Hyundai affiliates own more than 20% of Hyundai MOBIS Co. Ltd.'s stock. Hyundai Mobis Co.'s largest shareholder is Kia Motors Corporation, which owns approximately 16.88% of the shares. Hyundai Mobis Co. Ltd. owns approximately 21% of Hyundai Motor Co., Ltd.

49.     Mobis Parts America, LLC is a Delaware limited liability company with its principal place of business located at 10550 Talbert Ave., 4th Floor, Fountain Valley, California 92708. MOBIS Parts America, LLC is a wholly owned subsidiary of Hyundai Mobis Co. Ltd. and engages in business activities in furtherance of the interests of Hyundai Mobis Co. Ltd. Hyundai Mobis Co. Ltd. is the parent company of Mobis Parts America, LLC.

50.     Hyundai MOBIS manufactures, supplies, and distributes automotive parts to the Hyundai-Kia Defendants, including some of the defective ZF TRW ACUs.[6]

51.     Mobis Parts America, LLC imports, supplies, and provides logistical support for automotive parts for Hyundai and Kia-branded vehicles that are either

---

[6] Upon information and belief, Hyundai MOBIS manufactured the ACUs, derived from ZF TRW designs, for some of the Hyundai and Kia Class Vehicles. The ZF TRW-designed ACUs manufactured by Hyundai MOBIS contain the same defective DS84 ASIC supplied by STMicro and ZF TRW as all of the Class Vehicles.

imported into, or manufactured in, the United States. Additionally, upon information and belief, Mobis Parts America, LLC shares the same headquarters as Hyundai Motors America, Inc. in Fountain Valley, California.

### b.    The FCA Defendants

52.    The FCA Defendants (together, "FCA") are Fiat Chrysler Automobiles N.V. and FCA US LLC.

53.    Fiat Chrysler Automobiles N.V. is a public limited liability company organized under the laws of the Netherlands, with its principal place of business located at headquartered in 25 St. James's Street, London, United Kingdom. Fiat Chrysler Automobiles N.V. is the parent company of a global automotive group engaged in designing, engineering, manufacturing, distributing, and selling vehicles, components, and production systems around the world, including in the United States. Fiat Chrysler Automobiles N.V.'s stock is publicly traded on the New York Stock Exchange.

54.    FCA US LLC is a Delaware limited liability company with its principal place of business and headquarters located at 1000 Chrysler Drive, Auburn Hills, Michigan. FCA US LLC is a wholly owned subsidiary of Fiat Chrysler Automobiles, N.V., and it engages in business activities in furtherance of the interests of Fiat Chrysler Automobiles N.V.

55.     FCA US LLC is in the business of designing, developing, manufacturing, marketing, and selling automobiles in the United States.

### c.     The Toyota Defendants

56.     The Toyota Defendants (together, "Toyota") are Toyota Motor Corporation; Toyota Motor North America Inc.; Toyota Motor Engineering & Manufacturing North America, Inc.; and Toyota Motor Sales, U.S.A., Inc.

57.     Defendant Toyota Motor Corporation is a Japanese Corporation headquartered in Toyota City, Aichi Prefecture, Japan. Toyota is the world's largest automaker and is in the business of designing, developing, manufacturing, marketing, and selling automobiles around the world, including in the United States.

58.     Toyota Motor North America, Inc. is a California corporation and wholly owned U.S. subsidiary of Toyota Motor Corporation with its principal place of business located at 6565 Headquarters Drive, Plano, Texas. It has additional offices in Torrance, California; Georgetown, Kentucky; Washington, DC; Ann Arbor, Michigan; New York City, New York; and San Ramon, California. Toyota Motor North America, Inc. is the holding company for Toyota Motor Corporation's North American operations and engages in business activities in furtherance of the interests of Toyota Motor Corporation, including Toyota Motor Corporation's sales in all 50 states and the District of Columbia.

59.     Toyota Motor Engineering & Manufacturing North America, Inc. is a Kentucky corporation doing business throughout the United States. It is a wholly owned subsidiary of Toyota Motor Corporation with its principal place of business at 25 Atlantic Avenue, Erlanger, Kentucky 41018. It also has major operations in Arizona, California, and Michigan. Toyota Motor Engineering & Manufacturing North America, Inc. provides centralized support to Toyota's North American manufacturing plants in several key areas such as purchasing, production control, production engineering, quality control, environmental, and administration. It shares responsibility for Toyota's engineering, design, research and development, and manufacturing activities with Toyota's fourteen plants in the United States, Canada, and Mexico. Some of those manufacturing plants across the United States include Toyota Motor Manufacturing Alabama, Toyota Motor Manufacturing Indiana, Toyota Motor Manufacturing Kentucky, Toyota Motor Manufacturing Texas, Toyota Motor Manufacturing West Virginia, Toyota Motor Manufacturing de Baja California, and TABC in Long Beach, California.

60.     Toyota Motor Sales, U.S.A., Inc. is a California corporation and wholly owned American subsidiary of Toyota Motor Corporation that engages in business activities in furtherance of the interests of its parent, including marketing, sales, and distribution of Toyota automobiles in all 50 states and the District of Columbia. From the time it was founded in 1957 through 2017, Toyota Motor

Sales, U.S.A., Inc.'s former principal place of business was located in Torrance, California. In 2017, Toyota Motor Sales, U.S.A., Inc. moved to a new campus facility in Plano, Texas. Toyota Motor Sales, U.S.A., Inc. currently has approximately 8,900 employees and sells its vehicles through a network of 1,800 authorized dealerships throughout the United States.

### d. The Honda Defendants

61.    The Honda Defendants (together, "Honda") are Honda Motor Co., Ltd.; American Honda Motor Co., Inc.; Honda of America Mfg., Inc.; Honda R&D Co., Ltd.; and Honda R&D Americas, LLC.

62.    Honda Motor Co., Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan. It is one of the largest automobile manufacturers in the world, and it is in the business of designing, developing, manufacturing, marketing, and selling automobiles around the world, including in the United States.

63.    American Honda Motor Co., Inc. is a California corporation doing business throughout the United States. Its headquarters are located in Torrance, California. American Honda Motor Co., Inc. is a wholly owned U.S. subsidiary of Honda Motor Co., Ltd., and it engages in business activities in furtherance of the interests of Honda Motor Co., Ltd., including the advertising, marketing, lease, and sale of Honda automobiles in all 50 states and the District of Columbia. It has

approximately 31,000 employees in the United States and sells its vehicles through its authorized dealership network.

64.    Honda of America Mfg., Inc. is an Ohio corporation with its principal place of business in Marysville, Ohio. American Honda Mfg., Inc. is a wholly owned subsidiary of Honda Motor Co., Ltd. It manufacturers Honda vehicles in the United States.

65.    Honda R&D Co., Ltd. is a limited company or operating unit within Honda Motor Co., Ltd., with its principal place of business located in Saitama, Japan. Honda R&D Co., Ltd. is a wholly owned Japanese subsidiary of Honda Motor Co., Ltd. It designs, builds prototypes, and tests automobiles and automobile parts.

66.    Honda R&D Americas, LLC is a California corporation within Honda Motor Co., Ltd., with its principal place of business located in Torrance, California. Honda R&D Americas, LLC is a wholly owned U.S. subsidiary of Honda Motor Co., Ltd. and it engages in the development of engines for Honda automobiles, motorcycles, all-terrain vehicles, lawnmowers, boats, and jet engines.

### e.    The Mitsubishi Defendants

67.    The Mitsubishi Defendants (together, "Mitsubishi") are Mitsubishi Motors North America, Inc. and Mitsubishi Motors Corporation.

68.     Mitsubishi Motors Corporation is a Japanese corporation with its principal place of business located at 1-21, Shibaura 3chome, Minato-ku, Tokyo, Japan. Mitsubishi Motors Corporation, along with its subsidiaries, develops, manufactures, and sells automobiles, parts, and powertrains worldwide, including in the United States.

69.     Defendant Mitsubishi Motors North America, Inc. is incorporated in California and has its administrative headquarters located at 3401 Mallory Lane, Franklin, Tennessee 37067. In a June 2019 press release, Mitsubishi touted its roots going back to 1988 in Cypress and Fountain Valley, California before it moved its headquarters to Tennessee in 2019.

70.     Mitsubishi Motors North America, Inc. is a wholly owned subsidiary of Mitsubishi Motors Corporation, and it engages in business activities in furtherance of the interests of Mitsubishi Motors Corporation. Mitsubishi Motors North America, Inc. is responsible for the research and development, marketing, sale, and customer service of Mitsubishi-branded vehicles in the United States.

71.     Until 2015, Mitsubishi Motors North America, Inc. had a manufacturing plant located in Normal, Illinois. This plant closed.

B.    **Plaintiffs**

72.    For ease of reference, the following chart identifies the representative Plaintiffs and the state(s) in which they reside and purchased or leased their Class Vehicles:

| Class Representative | State of Purchase /Lease | State of Residence | Model Year | Make & Model |
|---|---|---|---|---|
| James Kneup | AZ | AZ | 2013 | Jeep Wrangler |
| Remigiusz Rundzio | CA | CA | 2012 | Jeep Wrangler |
| Steve Laveaux | CA | CA | 2014 | Jeep Wrangler |
| Lore VanHouten | CA | CA | 2018 | Kia Optima |
| Donna Ronan | CA | CA | 2017 | Mitsubishi Lancer |
| Tiffany Ecklor | CA | CA | 2013 | Mitsubishi Outlander |
| Michael Nearing | CO | CO | 2014 | Mitsubishi Lancer |
| Paul Huitzil | CT | CT | 2013 | Honda Accord |
| John Colbert | FL | FL | 2016 | Kia Optima |
| Lawrence Graziano | FL | FL | 2018 | Kia Optima |
| Tatiana Gales | FL | FL | 2015 | Toyota Corolla |
| Dorothy Cooks | FL | FL | 2018 | Toyota Corolla |
| Ricky Gerischer | IL | IA | 2018 | Hyundai Sonata |
| Brian Collins | IL | IL | 2018 | Kia Optima |
| Carl Miller | IN | IN | 2016 | Kia Optima |
| Dylan DeMoranville | MA | MA | 2013 | Kia Optima |
| Bobbi Jo Birk-LaBarge | MN | WI | 2015 | Kia Optima |
| Dan Sutterfield | MO | MO | 2013 | Kia Forte |
| Barry Adams | MT | MT | 2011 | Ram 1500 |
| Gersen Damens | NJ | NJ | 2015 | Kia Optima |

| Class Representative | State of Purchase /Lease | State of Residence | Model Year | Make & Model |
|---|---|---|---|---|
| Ravichandran Namakkal | NY | NY | 2014 | Honda Civic |
| Constanza Gonzalez | NC | NC | 2012 | Jeep Wrangler |
| James Dean | OK | OK | 2015 | Fiat 500 |
| Larae Angel | PA | PA | 2013 | Hyundai Sonata Hybrid |
| Richard Kintzel | PA | PA | 2016 | Kia Optima |
| Deloras McMurray | TN | TN | 2014 | Hyundai Sonata |
| John Robinson | TX | OK | 2009 | Ram 1500 |
| Burton Reckles | TX | TX | 2013 | Hyundai Sonata |
| Danny Hunt | TX | TX | 2014 | Toyota Tacoma |
| Joy Davis | TX | OR | 2014 | Toyota Corolla |
| John Sancomb | WI | WI | 2013 | Mitsubishi Lancer Sportback |

### i.    Hyundai-Kia Plaintiffs

73.    Plaintiff Lore VanHouten ("Plaintiff" for the purposes of this paragraph) is an individual residing in Murrieta, California. On or around September 9, 2018, Plaintiff leased a new 2018 Kia Optima (for purposes of Plaintiff's allegations, the "Class Vehicle") from North County Kia, an authorized Kia dealership located in Escondido, California. At the time Plaintiff acquired the Class Vehicle, Plaintiff had a reasonable expectation that the Class Vehicle had working airbags and seatbelts, and Plaintiff had no way of knowing that the Class Vehicle contained a defective ACU that could cause the airbags and seatbelts to not function during a crash. Kia, Hyundai MOBIS, ZF TRW, and STMicro

concealed the existence of the defective ACU from consumers like Plaintiff, and this concealed information would have been material to Plaintiff's decision to acquire the Class Vehicle. Plaintiff has suffered a concrete injury as a result of Kia, Hyundai MOBIS, ZF TRW, and STMicro's misconduct, and did not receive the full benefit of the bargain in acquiring the Class Vehicle. Plaintiff would not have leased the Class Vehicle, or would have paid less for it, if Kia, Hyundai MOBIS, ZF TRW, and/or STMicro did not conceal material information regarding the vehicle's defective ACU.

74.    Plaintiff John Colbert ("Plaintiff" for the purposes of this paragraph) is an individual residing in Crestview, Florida. On or around May 16, 2016, Plaintiff purchased a new 2016 Kia Optima (for purposes of Plaintiff's allegations, the "Class Vehicle") from Kia Fort Walton Beach, an authorized Kia dealership located in Fort Walton Beach, Florida. At the time Plaintiff acquired the Class Vehicle, Plaintiff had a reasonable expectation that the Class Vehicle had working airbags and seatbelts, and Plaintiff had no way of knowing that the Class Vehicle contained a defective ACU that could cause the airbags and seatbelts to not function during a crash. Kia, Hyundai MOBIS, ZF TRW, and STMicro concealed the existence of the defective ACU from consumers like Plaintiff, and this concealed information would have been material to Plaintiff's decision to acquire the Class Vehicle. Plaintiff has suffered a concrete injury as a result of Kia,

Hyundai MOBIS, ZF TRW, and STMicro's misconduct, and did not receive the full benefit of the bargain in acquiring the Class Vehicle. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Kia, Hyundai MOBIS, ZF TRW, and/or STMicro did not conceal material information regarding the vehicle's defective ACU.

75.    Plaintiff Lawrence Graziano ("Plaintiff" for the purposes of this paragraph) is an individual residing in Windermere, Florida. On or around April 10, 2018, Plaintiff leased a new 2018 Kia Optima (for purposes of Plaintiff's allegations, the "Class Vehicle") from Greenway Kia, an authorized Kia dealership located in Orlando, Florida. At the time Plaintiff acquired the Class Vehicle, Plaintiff had a reasonable expectation that the Class Vehicle had working airbags and seatbelts, and Plaintiff had no way of knowing that the Class Vehicle contained a defective ACU that could cause the airbags and seatbelts to not function during a crash. Kia, Hyundai MOBIS, ZF TRW, and STMicro concealed the existence of the defective ACU from consumers like Plaintiff, and this concealed information would have been material to Plaintiff's decision to acquire the Class Vehicle. Plaintiff has suffered a concrete injury as a result of Kia, Hyundai MOBIS, ZF TRW, and STMicro's misconduct, and did not receive the full benefit of the bargain in acquiring the Class Vehicle. Plaintiff would not have leased the Class Vehicle, or would have paid less for it, if Kia, Hyundai MOBIS,

ZF TRW, and/or STMicro did not conceal material information regarding the vehicle's defective ACU.

76.    Plaintiff Ricky Gerischer ("Plaintiff" for the purposes of this paragraph) is an individual residing in Preston, Iowa. On or around November 16, 2018, Plaintiff purchased a new 2018 Hyundai Sonata (for purposes of Plaintiff's allegations, the "Class Vehicle") from Green Family Hyundai, an authorized Hyundai dealership located in Moline, Illinois. At the time Plaintiff acquired the Class Vehicle, Plaintiff had a reasonable expectation that the Class Vehicle had working airbags and seatbelts, and Plaintiff had no way of knowing that the Class Vehicle contained a defective ACU that could cause the airbags and seatbelts to not function during a crash. Hyundai, Hyundai MOBIS, ZF TRW, and STMicro concealed the existence of the defective ACU from consumers like Plaintiff, and this concealed information would have been material to Plaintiff's decision to acquire the Class Vehicle. Plaintiff has suffered a concrete injury as a result of Hyundai, Hyundai MOBIS, ZF TRW, and STMicro's misconduct, and did not receive the full benefit of the bargain in acquiring the Class Vehicle. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Hyundai, Hyundai MOBIS, ZF TRW, and/or STMicro did not conceal material information regarding the vehicle's defective ACU.

77.    Plaintiff Brian Collins ("Plaintiff" for the purposes of this paragraph) is an individual residing in Wheaton, Illinois. On or around July 2, 2018, Plaintiff purchased a new 2018 Kia Optima (for purposes of Plaintiff's allegations, the "Class Vehicle") from Gerald Kia, an authorized Kia dealership located in Naperville, Illinois. At the time Plaintiff acquired the Class Vehicle, Plaintiff had a reasonable expectation that the Class Vehicle had working airbags and seatbelts, and Plaintiff had no way of knowing that the Class Vehicle contained a defective ACU that could cause the airbags and seatbelts to not function during a crash. Kia, Hyundai MOBIS, ZF TRW, and STMicro concealed the existence of the defective ACU from consumers like Plaintiff, and this concealed information would have been material to Plaintiff's decision to acquire the Class Vehicle. Plaintiff has suffered a concrete injury as a result of Kia, Hyundai MOBIS, ZF TRW, and STMicro's misconduct, and did not receive the full benefit of the bargain in acquiring the Class Vehicle. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Kia, Hyundai MOBIS, ZF TRW, and/or STMicro did not conceal material information regarding the vehicle's defective ACU.

78.    Plaintiff Carl Miller ("Plaintiff" for the purposes of this paragraph) is an individual residing in Indianapolis, Indiana. On or around October 22, 2016, Plaintiff purchased a new 2016 Kia Optima (for purposes of Plaintiff's allegations, the "Class Vehicle") from Ray Skillman Kia, an authorized Kia dealership located

in Indianapolis, Indiana. At the time Plaintiff acquired the Class Vehicle, Plaintiff had a reasonable expectation that the Class Vehicle had working airbags and seatbelts, and Plaintiff had no way of knowing that the Class Vehicle contained a defective ACU that could cause the airbags and seatbelts to not function during a crash. Kia, Hyundai MOBIS, ZF TRW, and STMicro concealed the existence of the defective ACU from consumers like Plaintiff, and this concealed information would have been material to Plaintiff's decision to acquire the Class Vehicle. Plaintiff has suffered a concrete injury as a result of Kia, Hyundai MOBIS, ZF TRW, and STMicro's misconduct, and did not receive the full benefit of the bargain in acquiring the Class Vehicle. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Kia, Hyundai MOBIS, ZF TRW, and/or STMicro did not conceal material information regarding the vehicle's defective ACU.

79.     Plaintiff Dylan DeMoranville ("Plaintiff" for the purposes of this paragraph) is an individual residing in East Freetown, Massachusetts. On or around April 14, 2017, Plaintiff purchased a used 2013 Kia Optima (for purposes of Plaintiff's allegations, the "Class Vehicle") from Route 44 Hyundai located in Raynham, Massachusetts. The Class Vehicle was totaled in an accident where the airbags did not deploy on or around February 7, 2020. At the time Plaintiff acquired the Class Vehicle, Plaintiff had a reasonable expectation that the Class

Vehicle had working airbags and seatbelts, and Plaintiff had no way of knowing that the Class Vehicle contained a defective ACU that could cause the airbags and seatbelts to not function during a crash. Kia, Hyundai MOBIS, ZF TRW, and STMicro concealed the existence of the defective ACU from consumers like Plaintiff, and this concealed information would have been material to Plaintiff's decision to acquire the Class Vehicle. Plaintiff has suffered a concrete injury as a result of Kia, Hyundai MOBIS, ZF TRW, and STMicro's misconduct, and did not receive the full benefit of the bargain in acquiring the Class Vehicle. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Kia, Hyundai MOBIS, ZF TRW, and/or STMicro did not conceal material information regarding the vehicle's defective ACU.

80.    Plaintiff Bobbi Jo Birk-LaBarge ("Plaintiff" for the purposes of this paragraph) is an individual residing in Merrill, Wisconsin. On or around October 24, 2014, Plaintiff purchased a new 2015 Kia Optima (for purposes of Plaintiff's allegations, the "Class Vehicle") from Luther Nissan Kia, an authorized Kia dealership located in Inver Grove Heights, Minnesota. At the time Plaintiff acquired the Class Vehicle, Plaintiff had a reasonable expectation that the Class Vehicle had working airbags and seatbelts, and Plaintiff had no way of knowing that the Class Vehicle contained a defective ACU that could cause the airbags and seatbelts to not function during a crash. Kia, Hyundai MOBIS, ZF TRW, and

STMicro concealed the existence of the defective ACU from consumers like Plaintiff, and this concealed information would have been material to Plaintiff's decision to acquire the Class Vehicle. Plaintiff has suffered a concrete injury as a result of Kia, Hyundai MOBIS, ZF TRW, and STMicro's misconduct, and did not receive the full benefit of the bargain in acquiring the Class Vehicle. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Kia, Hyundai MOBIS, ZF TRW, and/or STMicro did not conceal material information regarding the vehicle's defective ACU.

81.    Plaintiff Dan Sutterfield ("Plaintiff" for the purposes of this paragraph) is an individual residing in Newburg, Missouri. On or around September 27, 2013, Plaintiff purchased a used 2013 Kia Forte (for purposes of Plaintiff's allegations, the "Class Vehicle") from Kia of Rolla, an authorized Kia dealership located in Rolla, Missouri. At the time Plaintiff acquired the Class Vehicle, Plaintiff had a reasonable expectation that the Class Vehicle had working airbags and seatbelts, and Plaintiff had no way of knowing that the Class Vehicle contained a defective ACU that could cause the airbags and seatbelts to not function during a crash. Kia, Hyundai MOBIS, ZF TRW, and STMicro concealed the existence of the defective ACU from consumers like Plaintiff, and this concealed information would have been material to Plaintiff's decision to acquire the Class Vehicle. Plaintiff has suffered a concrete injury as a result of Kia,

Hyundai MOBIS, ZF TRW, and STMicro's misconduct, and did not receive the
full benefit of the bargain in acquiring the Class Vehicle. Plaintiff would not have
purchased the Class Vehicle, or would have paid less for it, if Kia, Hyundai
MOBIS, ZF TRW, and/or STMicro did not conceal material information regarding
the vehicle's defective ACU.

82. Plaintiff Gersen Damens ("Plaintiff" for the purposes of this
paragraph) is an individual residing in Moorestown, New Jersey. On or around
June 30, 2015, Plaintiff leased a new 2015 Kia Optima (for purposes of Plaintiff's
allegations, the "Class Vehicle") from Cherry Hill Kia, an authorized Kia
dealership located in Cherry Hill, New Jersey. Plaintiff purchased the Class
Vehicle at the end of the lease term on or around January 2, 2019. At the time
Plaintiff acquired the Class Vehicle, Plaintiff had a reasonable expectation that the
Class Vehicle had working airbags and seatbelts, and Plaintiff had no way of
knowing that the Class Vehicle contained a defective ACU that could cause the
airbags and seatbelts to not function during a crash. Kia, Hyundai MOBIS, ZF
TRW, and STMicro concealed the existence of the defective ACU from consumers
like Plaintiff, and this concealed information would have been material to
Plaintiff's decision to acquire the Class Vehicle. Plaintiff has suffered a concrete
injury as a result of Kia, Hyundai MOBIS, ZF TRW, and STMicro's misconduct,
and did not receive the full benefit of the bargain in acquiring the Class Vehicle.

Plaintiff would not have leased, and would not have ultimately purchased the Class Vehicle, or would have paid less for it, if Kia, Hyundai MOBIS, ZF TRW, and/or STMicro did not conceal material information regarding the vehicle's defective ACU.

83.    Plaintiff Larae Angel ("Plaintiff" for the purposes of this paragraph) is an individual residing in Smithfield, Pennsylvania. On or around May 4, 2013, Plaintiff purchased a new 2013 Hyundai Sonata Hybrid (for purposes of Plaintiff's allegations, the "Class Vehicle") from Auto Land Hyundai of Uniontown, an authorized Hyundai dealership located in Uniontown, Pennsylvania. At the time Plaintiff acquired the Class Vehicle, Plaintiff had a reasonable expectation that the Class Vehicle had working airbags and seatbelts, and Plaintiff had no way of knowing that the Class Vehicle contained a defective ACU that could cause the airbags and seatbelts to not function during a crash. Hyundai, Hyundai MOBIS, ZF TRW, and STMicro concealed the existence of the defective ACU from consumers like Plaintiff, and this concealed information would have been material to Plaintiff's decision to acquire the Class Vehicle. Plaintiff has suffered a concrete injury as a result of Hyundai, Hyundai MOBIS, ZF TRW, and STMicro's misconduct, and did not receive the full benefit of the bargain in acquiring the Class Vehicle. Plaintiff would not have purchased the Class Vehicle, or would

have paid less for it, if Hyundai, Hyundai MOBIS, ZF TRW, and/or STMicro did not conceal material information regarding the vehicle's defective ACU.

84.    Plaintiff Richard Kintzel ("Plaintiff" for the purposes of this paragraph) is an individual residing in Tremont, Pennsylvania. On or around December 30, 2015, Plaintiff purchased a new 2016 Kia Optima (for purposes of Plaintiff's allegations, the "Class Vehicle") from Savage Kia Inc., an authorized Kia dealership located in Reading, Pennsylvania. At the time Plaintiff acquired the Class Vehicle, Plaintiff had a reasonable expectation that the Class Vehicle had working airbags and seatbelts, and Plaintiff had no way of knowing that the Class Vehicle contained a defective ACU that could cause the airbags and seatbelts to not function during a crash. Kia, Hyundai MOBIS, ZF TRW, and STMicro concealed the existence of the defective ACU from consumers like Plaintiff, and this concealed information would have been material to Plaintiff's decision to acquire the Class Vehicle. Plaintiff has suffered a concrete injury as a result of Kia, Hyundai MOBIS, ZF TRW, and STMicro's misconduct, and did not receive the full benefit of the bargain in acquiring the Class Vehicle. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Kia, Hyundai MOBIS, ZF TRW, and/or STMicro did not conceal material information regarding the vehicle's defective ACU.

85.    Plaintiff Deloras McMurray ("Plaintiff" for the purposes of this paragraph) is an individual residing in Franklin, Tennessee. On or around August 28, 2014, Plaintiff purchased a new 2014 Hyundai Sonata (for purposes of Plaintiff's allegations, the "Class Vehicle") from Hyundai of Cool Springs, an authorized Hyundai dealership located in Franklin, Tennessee. At the time Plaintiff acquired the Class Vehicle, Plaintiff had a reasonable expectation that the Class Vehicle had working airbags and seatbelts, and Plaintiff had no way of knowing that the Class Vehicle contained a defective ACU that could cause the airbags and seatbelts to not function during a crash. Hyundai, Hyundai MOBIS, ZF TRW, and STMicro concealed the existence of the defective ACU from consumers like Plaintiff, and this concealed information would have been material to Plaintiff's decision to acquire the Class Vehicle. Plaintiff has suffered a concrete injury as a result of Hyundai, Hyundai MOBIS, ZF TRW, and STMicro's misconduct, and did not receive the full benefit of the bargain in acquiring the Class Vehicle. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Hyundai, Hyundai MOBIS, ZF TRW, and/or STMicro did not conceal material information regarding the vehicle's defective ACU.

86.    Plaintiff Burton Reckles ("Plaintiff" for the purposes of this paragraph) is an individual residing in Sugar Land, Texas. On or around August 16, 2012, Plaintiff purchased a new 2013 Hyundai Sonata (for purposes of

Plaintiff's allegations, the "Class Vehicle") from Texan Hyundai, an authorized Hyundai dealership located in Rosenberg, Texas. At the time Plaintiff acquired the Class Vehicle, Plaintiff had a reasonable expectation that the Class Vehicle had working airbags and seatbelts, and Plaintiff had no way of knowing that the Class Vehicle contained a defective ACU that could cause the airbags and seatbelts to not function during a crash. Hyundai, Hyundai MOBIS, ZF TRW, and STMicro concealed the existence of the defective ACU from consumers like Plaintiff, and this concealed information would have been material to Plaintiff's decision to acquire the Class Vehicle. Plaintiff has suffered a concrete injury as a result of Hyundai, Hyundai MOBIS, ZF TRW, and STMicro's misconduct, and did not receive the full benefit of the bargain in acquiring the Class Vehicle. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Hyundai, Hyundai MOBIS, ZF TRW, and/or STMicro did not conceal material information regarding the vehicle's defective ACU.

### ii.    FCA Plaintiffs

87.    Plaintiff James Kneup ("Plaintiff" for the purposes of this paragraph) is an individual residing in Tucson, Arizona. On or around May 30, 2013, Plaintiff purchased a new 2013 Jeep Wrangler (for purposes of Plaintiff's allegations, the "Class Vehicle") from Larry H. Miller Chrysler Jeep Tucson, an authorized FCA dealership located in Tucson, Arizona. At the time Plaintiff acquired the Class

Vehicle, Plaintiff had a reasonable expectation that the Class Vehicle had working airbags and seatbelts, and Plaintiff had no way of knowing that the Class Vehicle contained a defective ACU that could cause the airbags and seatbelts to not function during a crash. FCA, ZF TRW, and STMicro concealed the existence of the defective ACU from consumers like Plaintiff, and this concealed information would have been material to Plaintiff's decision to acquire the Class Vehicle. Plaintiff has suffered a concrete injury as a result of FCA, ZF TRW, and STMicro's misconduct, and did not receive the full benefit of the bargain in acquiring the Class Vehicle. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if FCA, ZF TRW, and/or STMicro did not conceal material information regarding the vehicle's defective ACU.

88. Plaintiff Remigiusz Rundzio ("Plaintiff" for the purposes of this paragraph) is an individual residing in Westminster, California. On or around July 22, 2012, Plaintiff purchased a new 2012 Jeep Wrangler (for purposes of Plaintiff's allegations, the "Class Vehicle") from Huntington Beach Chrysler Dodge Jeep Ram, an authorized FCA dealership located in Huntington Beach, California. At the time Plaintiff acquired the Class Vehicle, Plaintiff had a reasonable expectation that the Class Vehicle had working airbags and seatbelts, and Plaintiff had no way of knowing that the Class Vehicle contained a defective ACU that could cause the airbags and seatbelts to not function during a crash. FCA, ZF TRW, and STMicro

concealed the existence of the defective ACU from consumers like Plaintiff, and

this concealed information would have been material to Plaintiff's decision to

acquire the Class Vehicle. Plaintiff has suffered a concrete injury as a result of

FCA, ZF TRW, and STMicro's misconduct, and did not receive the full benefit of

the bargain in acquiring the Class Vehicle. Plaintiff would not have purchased the

Class Vehicle, or would have paid less for it, if FCA, ZF TRW, and/or STMicro

did not conceal material information regarding the vehicle's defective ACU.

89.    Plaintiff Steve Laveaux ("Plaintiff" for the purposes of this paragraph)

is an individual residing in Palmdale, California. In or around May 2017, Plaintiff

purchased a used 2014 Jeep Wrangler (for purposes of Plaintiff's allegations, the

"Class Vehicle") from Crown Dodge Chrysler Jeep Ram, an authorized FCA

dealership located in Ventura, California. At the time Plaintiff acquired the Class

Vehicle, Plaintiff had a reasonable expectation that the Class Vehicle had working

airbags and seatbelts, and Plaintiff had no way of knowing that the Class Vehicle

contained a defective ACU that could cause the airbags and seatbelts to not

function during a crash. FCA, ZF TRW, and STMicro concealed the existence of

the defective ACU from consumers like Plaintiff, and this concealed information

would have been material to Plaintiff's decision to acquire the Class Vehicle.

Plaintiff has suffered a concrete injury as a result of FCA, ZF TRW, and

STMicro's misconduct, and did not receive the full benefit of the bargain in

acquiring the Class Vehicle. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if FCA, ZF TRW, and/or STMicro did not conceal material information regarding the vehicle's defective ACU.

90.    Plaintiff Barry Adams ("Plaintiff" for the purposes of this paragraph) is an individual residing in Browning, Montana. In or around November 2012, Plaintiff purchased a new 2011 Ram 1500 (for purposes of Plaintiff's allegations, the "Class Vehicle") from Lithia Dodge, an authorized FCA dealership located in Great Falls, Montana. At the time Plaintiff acquired the Class Vehicle, Plaintiff had a reasonable expectation that the Class Vehicle had working airbags and seatbelts, and Plaintiff had no way of knowing that the Class Vehicle contained a defective ACU that could cause the airbags and seatbelts to not function during a crash. FCA, ZF TRW, and STMicro concealed the existence of the defective ACU from consumers like Plaintiff, and this concealed information would have been material to Plaintiff's decision to acquire the Class Vehicle. Plaintiff has suffered a concrete injury as a result of FCA, ZF TRW, and STMicro's misconduct, and did not receive the full benefit of the bargain in acquiring the Class Vehicle. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if FCA, ZF TRW, and/or STMicro did not conceal material information regarding the vehicle's defective ACU.

91.    Plaintiff Constanza Gonzalez ("Plaintiff" for the purposes of this paragraph) is an individual residing in Waxhaw, North Carolina. On or around February 2, 2019, Plaintiff purchased a used 2012 Jeep Wrangler (for purposes of Plaintiff's allegations, the "Class Vehicle") from Bob Mayberry Hyundai located in Monroe, North Carolina. At the time Plaintiff acquired the Class Vehicle, Plaintiff had a reasonable expectation that the Class Vehicle had working airbags and seatbelts, and Plaintiff had no way of knowing that the Class Vehicle contained a defective ACU that could cause the airbags and seatbelts to not function during a crash. FCA, ZF TRW, and STMicro concealed the existence of the defective ACU from consumers like Plaintiff, and this concealed information would have been material to Plaintiff's decision to acquire the Class Vehicle. Plaintiff has suffered a concrete injury as a result of FCA, ZF TRW, and STMicro's misconduct, and did not receive the full benefit of the bargain in acquiring the Class Vehicle. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if FCA, ZF TRW, and/or STMicro did not conceal material information regarding the vehicle's defective ACU.

92.    Plaintiff James Dean ("Plaintiff" for the purposes of this paragraph) is an individual residing in Oklahoma City, Oklahoma. On or around March 15, 2015, Plaintiff purchased a used 2015 Fiat 500 (for purposes of Plaintiff's allegations, the "Class Vehicle") from David Stanley Chrysler Dodge Jeep Ram, an

authorized FCA dealership located in Midwest City, Oklahoma. At the time Plaintiff acquired the Class Vehicle, Plaintiff had a reasonable expectation that the Class Vehicle had working airbags and seatbelts, and Plaintiff had no way of knowing that the Class Vehicle contained a defective ACU that could cause the airbags and seatbelts to not function during a crash. FCA, ZF TRW, and STMicro concealed the existence of the defective ACU from consumers like Plaintiff, and this concealed information would have been material to Plaintiff's decision to acquire the Class Vehicle. Plaintiff has suffered a concrete injury as a result of FCA, ZF TRW, and STMicro's misconduct, and did not receive the full benefit of the bargain in acquiring the Class Vehicle. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if FCA, ZF TRW, and/or STMicro did not conceal material information regarding the vehicle's defective ACU.

93.    Plaintiff John Robinson ("Plaintiff" for the purposes of this paragraph) is an individual residing in Walters, Oklahoma. On or around February 21, 2009, Plaintiff purchased a new 2009 Ram 1500 (for purposes of Plaintiff's allegations, the "Class Vehicle") from Patterson Chrysler Dodge Jeep Ram Tyler, an authorized FCA dealership located in Tyler, Texas. At the time Plaintiff acquired the Class Vehicle, Plaintiff had a reasonable expectation that the Class Vehicle had working airbags and seatbelts, and Plaintiff had no way of knowing that the Class Vehicle contained a defective ACU that could cause the airbags and

seatbelts to not function during a crash. FCA, ZF TRW, and STMicro concealed the existence of the defective ACU from consumers like Plaintiff, and this concealed information would have been material to Plaintiff's decision to acquire the Class Vehicle. Plaintiff has suffered a concrete injury as a result of FCA, ZF TRW, and STMicro's misconduct, and did not receive the full benefit of the bargain in acquiring the Class Vehicle. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if FCA, ZF TRW, and/or STMicro did not conceal material information regarding the vehicle's defective ACU.

### iii.    Toyota Plaintiffs

94.    Plaintiff Tatiana Gales ("Plaintiff" for the purposes of this paragraph) is an individual residing in Miami, Florida. On or around July 18, 2015, Plaintiff purchased a new 2015 Toyota Corolla (for purposes of Plaintiff's allegations, the "Class Vehicle") from South Dade Toyota, an authorized Toyota dealership located in Homestead, Florida. At the time Plaintiff acquired the Class Vehicle, Plaintiff had a reasonable expectation that the Class Vehicle had working airbags and seatbelts, and Plaintiff had no way of knowing that the Class Vehicle contained a defective ACU that could cause the airbags and seatbelts to not function during a crash. Toyota, ZF TRW, and STMicro concealed the existence of the defective ACU from consumers like Plaintiff, and this concealed information would have been material to Plaintiff's decision to acquire the Class Vehicle.

Plaintiff has suffered a concrete injury as a result of Toyota, ZF TRW, and STMicro's misconduct, and did not receive the full benefit of the bargain in acquiring the Class Vehicle. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Toyota, ZF TRW, and/or STMicro did not conceal material information regarding the vehicle's defective ACU.

95.    Plaintiff Dorothy Cooks ("Plaintiff" for the purposes of this paragraph) is an individual residing in Live Oak, Florida. On or around September 11, 2018, Plaintiff purchased a new 2018 Toyota Corolla (for purposes of Plaintiff's allegations, the "Class Vehicle") from Rountree Moore Toyota, an authorized Toyota dealership located in Lake City, Florida. At the time Plaintiff acquired the Class Vehicle, Plaintiff had a reasonable expectation that the Class Vehicle had working airbags and seatbelts, and Plaintiff had no way of knowing that the Class Vehicle contained a defective ACU that could cause the airbags and seatbelts to not function during a crash. Toyota, ZF TRW, and STMicro concealed the existence of the defective ACU from consumers like Plaintiff, and this concealed information would have been material to Plaintiff's decision to acquire the Class Vehicle. Plaintiff has suffered a concrete injury as a result of Toyota, ZF TRW, and STMicro's misconduct, and did not receive the full benefit of the bargain in acquiring the Class Vehicle. Plaintiff would not have purchased the

Class Vehicle, or would have paid less for it, if Toyota, ZF TRW, and/or STMicro did not conceal material information regarding the vehicle's defective ACU.

96.    Plaintiff Danny Hunt ("Plaintiff" for the purposes of this paragraph) is an individual residing in Mathis, Texas. On or around January 1, 2018, Plaintiff purchased a used 2014 Toyota Tacoma (for purposes of Plaintiff's allegations, the "Class Vehicle") from Mike Shaw Toyota, an authorized Toyota dealership located in Robstown, Texas. At the time Plaintiff acquired the Class Vehicle, Plaintiff had a reasonable expectation that the Class Vehicle had working airbags and seatbelts, and Plaintiff had no way of knowing that the Class Vehicle contained a defective ACU that could cause the airbags and seatbelts to not function during a crash. Toyota, ZF TRW, and STMicro concealed the existence of the defective ACU from consumers like Plaintiff, and this concealed information would have been material to Plaintiff's decision to acquire the Class Vehicle. Plaintiff has suffered a concrete injury as a result of Toyota, ZF TRW, and STMicro's misconduct, and did not receive the full benefit of the bargain in acquiring the Class Vehicle. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Toyota, ZF TRW, and/or STMicro did not conceal material information regarding the vehicle's defective ACU.

97.    Plaintiff Joy Davis ("Plaintiff" for the purposes of this paragraph) is an individual residing in Salem, Oregon. On or around May 15, 2014, Plaintiff

purchased a new 2014 Toyota Corolla (for purposes of Plaintiff's allegations, the "Class Vehicle") from Universal Toyota, an authorized Toyota dealership located in San Antonio, Texas. At the time Plaintiff acquired the Class Vehicle, Plaintiff had a reasonable expectation that the Class Vehicle had working airbags and seatbelts, and Plaintiff had no way of knowing that the Class Vehicle contained a defective ACU that could cause the airbags and seatbelts to not function during a crash. Toyota, ZF TRW, and STMicro concealed the existence of the defective ACU from consumers like Plaintiff, and this concealed information would have been material to Plaintiff's decision to acquire the Class Vehicle. Plaintiff has suffered a concrete injury as a result of Toyota, ZF TRW, and STMicro's misconduct, and did not receive the full benefit of the bargain in acquiring the Class Vehicle. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Toyota, ZF TRW, and/or STMicro did not conceal material information regarding the vehicle's defective ACU.

### iv.    Honda Plaintiffs

98.    Plaintiff Paul Huitzil ("Plaintiff" for the purposes of this paragraph) is an individual residing in Bridgeport, Connecticut. On or around October 19, 2015, Plaintiff purchased a used 2013 Honda Accord (for purposes of Plaintiff's allegations, the "Class Vehicle") from Honda of Westport, an authorized Honda dealership located in Westport, Connecticut. The Class Vehicle was totaled in an

accident where the airbags did not deploy on or around June 3, 2019. At the time Plaintiff acquired the Class Vehicle, Plaintiff had a reasonable expectation that the Class Vehicle had working airbags and seatbelts, and Plaintiff had no way of knowing that the Class Vehicle contained a defective ACU that could cause the airbags and seatbelts to not function during a crash. Honda, ZF TRW, and STMicro concealed the existence of the defective ACU from consumers like Plaintiff, and this concealed information would have been material to Plaintiff's decision to acquire the Class Vehicle. Plaintiff has suffered a concrete injury as a result of Honda, ZF TRW, and STMicro's misconduct, and did not receive the full benefit of the bargain in acquiring the Class Vehicle. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Honda, ZF TRW, and/or STMicro did not conceal material information regarding the vehicle's defective ACU.

     99.    Plaintiff Ravichandran Namakkal ("Plaintiff" for the purposes of this paragraph) is an individual residing in Ozone Park, New York. On or around May 31, 2014, Plaintiff purchased a new 2014 Honda Civic (for purposes of Plaintiff's allegations, the "Class Vehicle") from Hillside Honda, an authorized Honda dealership located in Queens, New York. At the time Plaintiff acquired the Class Vehicle, Plaintiff had a reasonable expectation that the Class Vehicle had working airbags and seatbelts, and Plaintiff had no way of knowing that the Class

Vehicle contained a defective ACU that could cause the airbags and seatbelts to
not function during a crash. Honda, ZF TRW, and STMicro concealed the
existence of the defective ACU from consumers like Plaintiff, and this concealed
information would have been material to Plaintiff's decision to acquire the Class
Vehicle. Plaintiff has suffered a concrete injury as a result of Honda, ZF TRW, and
STMicro's misconduct, and did not receive the full benefit of the bargain in
acquiring the Class Vehicle. Plaintiff would not have purchased the Class Vehicle,
or would have paid less for it, if Honda, ZF TRW, and/or STMicro did not conceal
material information regarding the vehicle's defective ACU.

     **v.**     **Mitsubishi Plaintiffs**

     100.   Plaintiff Donna Ronan ("Plaintiff" for the purposes of this paragraph)
is an individual residing in Palmdale, California. On or around May 26, 2018,
Plaintiff purchased a new 2017 Mitsubishi Lancer (for purposes of Plaintiff's
allegations, the "Class Vehicle") from Camacho Mitsubishi, an authorized
Mitsubishi dealership located in Palmdale, California. At the time Plaintiff
acquired the Class Vehicle, Plaintiff had a reasonable expectation that the Class
Vehicle had working airbags and seatbelts, and Plaintiff had no way of knowing
that the Class Vehicle contained a defective ACU that could cause the airbags and
seatbelts to not function during a crash. Mitsubishi, ZF TRW, and STMicro
concealed the existence of the defective ACU from consumers like Plaintiff, and

- 46 -

this concealed information would have been material to Plaintiff's decision to acquire the Class Vehicle. Plaintiff has suffered a concrete injury as a result of Mitsubishi, ZF TRW, and STMicro's misconduct, and did not receive the full benefit of the bargain in acquiring the Class Vehicle. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Mitsubishi, ZF TRW, and/or STMicro did not conceal material information regarding the vehicle's defective ACU.

101.   Plaintiff Tiffany Ecklor ("Plaintiff" for the purposes of this paragraph) is an individual residing in Hesperia, California. On or around July 5, 2013, Plaintiff leased a new 2013 Mitsubishi Outlander (for purposes of Plaintiff's allegations, the "Class Vehicle") from Victorville Mitsubishi, an authorized Mitsubishi dealership located in Victorville, California. Plaintiff purchased the Class Vehicle at the end of the lease term in or around February 7, 2018. At the time Plaintiff acquired the Class Vehicle, Plaintiff had a reasonable expectation that the Class Vehicle had working airbags and seatbelts, and Plaintiff had no way of knowing that the Class Vehicle contained a defective ACU that could cause the airbags and seatbelts to not function during a crash. Mitsubishi, ZF TRW, and STMicro concealed the existence of the defective ACU from consumers like Plaintiff, and this concealed information would have been material to Plaintiff's decision to acquire the Class Vehicle. Plaintiff has suffered a concrete injury as a

result of Mitsubishi, ZF TRW, and STMicro's misconduct, and did not receive the full benefit of the bargain in acquiring the Class Vehicle. Plaintiff would not have leased, and would not have ultimately purchased the Class Vehicle, or would have paid less for it, if Mitsubishi, ZF TRW, and/or STMicro did not conceal material information regarding the vehicle's defective ACU.

102.    Plaintiff Michael Nearing ("Plaintiff" for the purposes of this paragraph) is an individual residing in Aurora, Colorado. On or around September 23, 2013, Plaintiff purchased a new 2014 Mitsubishi Lancer (for purposes of Plaintiff's allegations, the "Class Vehicle") from Quality Mitsubishi, an authorized Mitsubishi dealership located in Littleton, Colorado. At the time Plaintiff acquired the Class Vehicle, Plaintiff had a reasonable expectation that the Class Vehicle had working airbags and seatbelts, and Plaintiff had no way of knowing that the Class Vehicle contained a defective ACU that could cause the airbags and seatbelts to not function during a crash. Mitsubishi, ZF TRW, and STMicro concealed the existence of the defective ACU from consumers like Plaintiff, and this concealed information would have been material to Plaintiff's decision to acquire the Class Vehicle. Plaintiff has suffered a concrete injury as a result of Mitsubishi, ZF TRW, and STMicro's misconduct, and did not receive the full benefit of the bargain in acquiring the Class Vehicle. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Mitsubishi, ZF

TRW, and/or STMicro did not conceal material information regarding the vehicle's defective ACU.

103.    Plaintiff John Sancomb ("Plaintiff" for the purposes of this paragraph) is an individual residing in West Bend, Wisconsin. On or around September 19, 2014, Plaintiff purchased a used 2013 Mitsubishi Lancer Sportback (for purposes of Plaintiff's allegations, the "Class Vehicle") from Heiser Chevrolet West Bend located in West Bend, Wisconsin. At the time Plaintiff acquired the Class Vehicle, Plaintiff had a reasonable expectation that the Class Vehicle had working airbags and seatbelts, and Plaintiff had no way of knowing that the Class Vehicle contained a defective ACU that could cause the airbags and seatbelts to not function during a crash. Mitsubishi, ZF TRW, and STMicro concealed the existence of the defective ACU from consumers like Plaintiff, and this concealed information would have been material to Plaintiff's decision to acquire the Class Vehicle. Plaintiff has suffered a concrete injury as a result of Mitsubishi, ZF TRW, and STMicro's misconduct, and did not receive the full benefit of the bargain in acquiring the Class Vehicle. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Mitsubishi, ZF TRW, and/or STMicro did not conceal material information regarding the vehicle's defective ACU.

### III.    JURISDICTION AND VENUE

**A.    Subject Matter Jurisdiction**

104.    This Court also has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs have claims under 18 U.S.C. § 1964 (RICO) and 15 U.S.C. § 2301 (Magnusson-Moss).

105.    This Court has subject matter jurisdiction over this case pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff Classes are citizens of states different from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

106.    This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

**B.    Personal Jurisdiction**

    **i.    Domestic Defendants**

107.    The domestic Defendants are Hyundai Motor America, Inc.; Mobis Parts America, LLC; Kia Motors America, Inc.; Toyota Motor North America, Inc.; Toyota Motor Sales, U.S.A., Inc.; Toyota Motor Engineering & Manufacturing North America, Inc.; American Honda Motor Co., Inc.; Honda R&D Americas, LLC; Honda of America Mfg., Inc.; Mitsubishi Motors North America, Inc.; ZF Active Safety and Electronics US LLC; ZF Passive Safety

Systems US Inc.; ZF Automotive US Inc.; ZF TRW Automotive Holdings Corp.; ZF North America, Inc.; FCA US LLC; and STMicroelectronics Inc.

108.   As explained below, this Court has personal jurisdiction over all of these Defendants for two basic reasons:

a.   The domestic Defendants are based in California or a transferor jurisdiction and therefore general jurisdiction exists; and/or

b.   California or a transferor jurisdiction has specific jurisdiction.

**a.   California Defendants**

109.   This Court has general jurisdiction over Hyundai Motor America, Inc.; Mobis Parts America, LLC; Kia Motors America, Inc.; Toyota Motor North America, Inc.; Toyota Motor Sales, U.S.A., Inc.; American Honda Motor Co., Inc.; Honda R&D Americas, LLC; and Mitsubishi Motors North America, Inc. because they are all California corporations.

**b.   Michigan Defendants**

110.   This Court has general jurisdiction over ZF Active Safety and Electronics US LLC; ZF Passive Safety Systems US Inc.; ZF Automotive US Inc.; ZF TRW Automotive Holdings Corp.; ZF North America, Inc.; and FCA US LLC because Michigan has general jurisdiction over each of Defendants (due to the location of their headquarters in Michigan) and because the Judicial Panel for

Multidistrict Litigation has transferred (and will continue to transfer in the future) all related cases from Michigan to this Court.

### c.    STMicroelectronics Inc.

111.    This Court has specific jurisdiction over STMicroelectronics Inc. because Michigan has specific jurisdiction over STMicroelectronics Inc. and because the Judicial Panel for Multidistrict Litigation has transferred related cases from Michigan to this Court. Michigan has specific jurisdiction over STMicroelectronics Inc. because, according to ZF Automotive US Inc., the Michigan office of STMicroelectronics Inc. was responsible for manufacturing the DS84 ASICs that are part of the defective ZF TRW ACUs. Because the DS84 ASIC—including its vulnerability to EOS—is a critical part of the defective ZF TRW ACU design, Plaintiffs' claims arise from STMicroelectronics Inc.'s Michigan activities.

112.    This Court also has specific jurisdiction over STMicroelectronics Inc. because consumers in California and the transferor jurisdictions bought vehicles equipped with ZF TRW ACUs containing STMicroelectronics Inc.'s DS84 ASIC. When it made the DS84 ASICs, STMicroelectronics Inc. intended for its DS84 ASICs to be installed in automobiles sold in California and the transferor districts.

113.    In any event, STMicroelectronics Inc. is based in Texas and a United States District Court has general jurisdiction over it. Although no member case was

filed in Texas, the Judicial Panel on Multidistrict Litigation transferred all the pending cases with consumer claims related to the defective ZF TRW ACUs to this Court. If a case were filed in Texas, it would almost certainly be transferred here and the Court would stand in the shoes of the transferor court.

### d.    Toyota Motor Engineering & Manufacturing North America, Inc.

114.    This Court has specific jurisdiction over Toyota Motor Engineering & Manufacturing North America, Inc. based on its operation of Toyota Motor Manufacturing de Baja California and TABC in Long Beach, California. Upon information and belief, Toyota vehicles with the defective ZF TRW ACUs were manufactured in these California facilities.

115.    This Court also has specific jurisdiction because consumers in California and the transferor jurisdictions bought Toyota vehicles equipped with ZF TRW ACUs that were made at other facilities operated by Toyota Motor Engineering & Manufacturing North America, Inc. Toyota Motor Engineering & Manufacturing North America, Inc. intended for automobiles made in its other facilities to be sold in California and the transferor districts.

116.    In any event, Toyota Motor Engineering & Manufacturing North America, Inc. is based in Kentucky and a United States District Court has general jurisdiction over it. Although no member case was filed in Kentucky, the Judicial Panel on Multidistrict Litigation transferred all the pending cases with consumer

claims related to the defective ZF TRW ACUs (including the cases against Toyota Motor Toyota Motor Engineering & Manufacturing North America, Inc.) to this Court. If a case were filed in Kentucky, it would almost certainly be transferred here and the Court would stand in the shoes of the transferor court.

### e. Honda of America Mfg., Inc.

117.   This Court has specific jurisdiction over Honda of America Mfg. Inc. because consumers in California and the transferor jurisdictions bought Honda vehicles equipped with ZF TRW ACUs that were made by Honda of America Mfg., Inc. The company intended for its automobiles to be sold in California and the transferor districts.

118.   In any event, Honda of America Mfg., Inc. is based in Ohio and a United States District Court has general jurisdiction over it. Although no member case was filed in Ohio, the Judicial Panel on Multidistrict Litigation transferred all the pending cases with consumer claims related to the defective ZF TRW ACUs (including the cases against Honda of America Mfg., Inc.) to this Court. If a case were filed in Ohio, it would almost certainly be transferred here and the Court would stand in the shoes of the transferor court.

### ii. Foreign Defendants

119.   The foreign Defendants are ZF Holdings B.V.; ZF Friedrichshafen AG; STMicroelectronics N.V.; STMicroelectronics International N.V.; Hyundai

Motor Co., Ltd.; Kia Motors Corporation; Hyundai MOBIS Co., Ltd.; Fiat Chrysler Automobiles N.V.; Toyota Motor Corporation; Honda Motor Co., Ltd.; Honda R&D Co., Ltd.; and Mitsubishi Motors Corporation.

120.   This Court has specific personal jurisdiction over Defendants, pursuant to the long-arm statutes of California (Cal. Code Civ. Proc § 410.10), Florida (Fla. Stat. §§ 48.193(1)), Alabama (Ala. R. Civ. P. 4.2), Michigan (Mich. Comp. Laws § 600.705), New York (N.Y. CPLR § 302), Washington (RCW § 4.28.185(1)(a) and any other applicable jurisdiction.

121.   In the alternative, should the Court find that any of the foreign Defendants did not have minimum contacts with any states sufficient for specific jurisdiction, the Court has personal jurisdiction under Rule 4(k) of the Federal Rules of Civil Procedure because Plaintiffs have pled a federal RICO claim and exercising jurisdiction is consistent with the United States Constitution, given the foreign Defendants' pervasive contacts with the United States and the fact that Plaintiffs' claims arise from transactions in the United States involving vehicles and vehicle parts designed and distributed by foreign Defendants.

122.   As explained below, the foreign Defendants targeted consumers in each of the fifty states with advertising for the Class Vehicles; purposely availed themselves of commerce in the fifty states; controlled the design, distribution, and sale of either vehicles with defective ZF TRW ACUs or the ACUs themselves; and

communicated with each other regarding the defective ZF TRW ACUs using mail and wire in the United States. These contacts with the United States, California, and the transferor districts establish personal jurisdiction.

### a.    ZF Holdings B.V. and ZF Friedrichshafen AG

123.    Although ZF Holdings B.V. and ZF Friedrichshafen AG are based in Europe, the Court has specific jurisdiction over them based on their pervasive contacts with the United States. ZF Holdings B.V.'s and ZF Friedrichshafen AG's contacts with the United States were intended to cause sales and leases of vehicles with ZF TRW component parts in the United States. Such sales and leases give rise to Plaintiffs' claims.

124.    On or around May 15, 2015, ZF Friedrichshafen AG and its subsidiaries acquired TRW Automotive Holdings Corp. and its subsidiaries. The purchase price was approximately $12 billion. TRW Automotive Holdings Corp. was (and remains) an American corporation, headquartered in Michigan. The merger was the largest acquisition in ZF Friedrichshafen AG's 100-year history. At the time, ZF Friedrichshafen AG reported that "TRW Automotive Holdings Corp. . . . is almost as big as ZF." Upon information and belief, ZF Friedrichshafen AG's primary reasons for acquiring TRW Automotive Holdings Corp. included its ties to the United States, its history and standing in the United States automotive industry, and the know-how of its United States personnel.

125.    Upon information and belief, since the merger, ZF Holdings B.V. and/or ZF Friedrichshafen AG have had the power to appoint board members to all of the American ZF TRW subsidiaries. They have exercised this power to appoint board members to these subsidiaries that they believe will manage the subsidiaries with the principal goal of benefiting the B.V. and AG entities.

126.    Following the May 15, 2015 acquisition, ZF Friedrichshafen AG exercised significant control over the day-to-day operations of ZF TRW in the United States.

127.    ZF Friedrichshafen AG's 2015 Annual Report describes its efforts to integrate TRW:

> To ensure the top quality of our products and services at economic costs, ZF is generating new synergies through the integration of ZF TRW: Knowledge sharing and the further development of common standards will improve the quality of our products even further. Materials procurement of the two companies is also being merged – with positive repercussions for the cost structure. . . .
>
> A common objective of the Supervisory Board and the Board of Management to ensure long-term success is the sustainable further development of the ZF Group based on the requirements for new technologies in an increasingly dynamic market. The pooling of the Group's e-mobility activities in the new E-Mobility Division, ZF's acquisition of Bosch Rexroth's industrial drives segment and, above all, the successful integration of ZF TRW play a major role here. The Supervisory Board will closely follow the further development of these activities. The know-how of ZF TRW, incorporated into the new Active & Passive Safety Technology Division,

opens up new opportunities for ZF to actively shape both the safety and automated driving megatrends. The process and structure of ZF TRW's integration as well as the adapted ZF management concept were regularly deliberated by the Board . . .

The members of the Board of Management are assigned directly to the six divisions as well as to the ZF Services Business Unit. The same applies to the responsibilities with regard to the Regions of North America, South America and Asia-Pacific. The Group structure with six divisions is aligned with the market and customers. . . .

The Active & Passive Safety Technology Division has been managing the business activities of the acquired company TRW Automotive Holdings Corp. since May 15, 2015. It includes the following business units: Braking Systems, Steering Systems, Commercial Steering Systems, Occupant Safety Systems, Electronics, Body Control Systems, Engineered Fasteners & Components and Parts & Service.

128.   A March 2018 letter from ZF Friedrichshafen AG CEO Wolf-Henning Scheider states: "An important operational highlight to mention is the integration of TRW into the ZF Group. The new ZF brand image unveiled for the first time at IAA 2017 makes the merging of the two companies also apparent to the public. ZF is now 'one company'." This statement exemplifies ZF Holdings B.V. and ZF Friedrichshafen AG's common pattern and practice of describing themselves, ZF TRW Automotive Holdings Corp., and the other U.S. TRW affiliates as a single, unified entity.

129.   A March 2018 letter from Franz-Josef Paefgen, Chairman of the ZF Friedrichshafen AG supervisory board states:

A key component of [the ZF 2025 Strategy], namely the integration of TRW Automotive Holding Corp, acquired in May 2015, was essentially complete by the end of the fiscal year [2017] with merged corporate functions, a unified identity and the remaining activities transferred into the line organization. Since the beginning of 2017, the service activities of ZF and TRW have been successfully brought together into one organization, 'ZF Aftermarket'.

This statement further exemplifies ZF Holdings B.V. and ZF Friedrichshafen AG's common pattern and practice of describing themselves, ZF TRW Automotive Holdings Corp., and the other U.S. TRW affiliates as a single, unified entity.

130.    ZF Friedrichshafen AG 2017 Annual Report states:

In order to ensure the company's long-term success, corporate social responsibility has to be assumed and business activities must be managed responsibly, sustainably and with integrity. With its effective Compliance Management System (CMS) that was further developed in 2017, ZF has taken this responsibility to heart. The ZF and ZF TRW compliance areas were merged on July 1, 2017. In the course of the integration, the legal and compliance organizations of the ZF Group were also merged. The Board Member for Human Resources and Governance is now responsible for them.

Based on this statement and upon information and belief, ZF Holdings B.V. and ZF Friedrichshafen AG develop the policies for and control the senior executives of the merged compliance, human resources, and governance functions of all the U.S.-based ZF TRW Defendants.

131.    ZF Friedrichshafen AG's companywide compliance guide dated July 2018 states:

- 59 -

> Product compliance is an important priority for ZF. ZF holds itself to the highest standards of legal and ethical conduct and is committed to making high quality products that are safe and comply with applicable laws, regulations, and standards. These principles are implemented through ZF's policies, processes and structures, and all ZF employees are held to these standards.

Upon information and belief, ZF Friedrichshafen AG distributed the compliance guide to all employees of ZF TRW, including employees of the American ZF TRW Defendants, and was responsible for enforcing (and failing to enforce) it.

132.   Based on these statements by ZF Friedrichshafen AG and upon information and belief, ZF Holdings B.V. and ZF Friedrichshafen AG were actively involved in monitoring whether ZF TRW's ACUs complied with safety standards in the United States and the legal risks arising from those ACUs.

133.   Upon information and belief, ZF Friedrichshafen AG controlled all ZF TRW company communications relating to the defective ZF TRW ACUs since the TRW acquisition in 2015. In connection with the partial recalls of the defective ACUs between 2016 and 2020 and NHTSA's investigation into the ACUs, ZF TRW prepared many slide deck presentations for NHTSA and the Vehicle Manufacturer Defendants. Defendants produced several such slide deck presentations to Plaintiffs. All such presentations since 2015 contain copyright marks identifying ZF Friedrichshafen AG as the owner of the materials. Presumably, it was the author as well. The presentations also contain language

stating: "This document is the property of ZF TRW and is disclosed in confidence. It may not be copied, disclosed to others, or used for manufacturing, without the prior consent of ZF TRW." Based on this language, ZF Friedrichschafen AG's consent was required to send the presentation to NHTSA and/or the Vehicle Manufacturer Defendants, and ZF Friedrichshafen AG provided consent. Accordingly, ZF Friedrichshafen AG had final approval over the statements contained in these presentations.

### b.   STMicroelectronics N.V. and STMicroelectronics International N.V.

134.   Although STMicroelectronics N.V. and STMicroelectronics International N.V. are based in Europe, the Court has specific jurisdiction over them based on their pervasive contacts with the United States. STMicroelectronics N.V. and STMicroelectronics International N.V.'s contacts with the United States are in furtherance of sales and leases of vehicles with STMicro component parts in the United States. Such sales and leases give rise to Plaintiffs' claims.

135.   Upon information and belief, STMicroelectronics N.V. and STMicroelectronics International N.V. have the power to appoint board members to all of the American STMicro subsidiaries. They have exercised this power to appoint board members to these subsidiaries that they believe will manage the subsidiaries with the principal goal of benefiting the two parent entities.

136.   STMicroelectronics N.V., either directly or through its wholly owned subsidiaries, designs, develops, manufactures, markets, and sells a broad range of products, including ASICs, throughout the world, including in the United States, this District, and Transferor Jurisdictions. STMicroelectronics N.V. reports that its three regional sales organizations, including the one covering the United States, report to a global head of sales & marketing at the parent company.

137.   Although STMicroelectronics N.V. is based in Europe, some of its securities are traded on the New York Stock Exchange.

138.   STMicroelectronics, Inc.—the company that ZF TRW identified as the manufacturer of the DS84 ASIC—renders services on behalf of STMicroelectronics N.V. that are sufficiently important that STMicroelectronics N.V. or STMicroelectronics International N.V. would need to perform those services themselves if its American subsidiary did not exist. STMicroelectronics N.V. controls the public name and brand of STMicroelectronics N.V., STMicroelectronics International N.V., and STMicroelectronics, Inc. In transactions and interactions with customers, including ZF TRW, STMicroelectronics N.V.'s unified brand and logo serve as its official seal and signature.

139.   During the relevant time period, STMicroelectronics N.V. continuously engaged in business in the United States by, among other things,

interacting with its wholly owned subsidiaries in the United States, including STMicroelectronics, Inc., STMicroelectronics Software Inc., Faroudja Laboratories Inc., and STMicroelectronics (North America) Holding, Inc. STMicroelectronics N.V. exerts a close degree of control over the actions of its United States subsidiaries, and exerts control over their daily affairs. Indeed, in its 2019 Annual Report, STMicroelectronics N.V. stated that it and STMicroelectronics International N.V. "provide certain administrative, human resources, legal, treasury, strategy, manufacturing, marketing and other overhead services to our consolidated subsidiaries pursuant to service agreements for which we recover the cost."

140.    STMicroelectronics N.V. established subsidiaries in the United States expressly to target the United States market, and the market is very important to STMicroelectronics N.V. For example, in 2019, STMicro's largest customer was Apple (itself headquartered in Cupertino, California), which accounted for 17.6% of its revenues.

141.    STMicro holds itself out as a single "company" that caters to United States companies and purposefully avails itself of the United States market for its products, including the DS84 ASIC—which is installed in millions of vehicles sold and leased in the United States.

142.    STMicro's website lists 12 offices in the United States through which it conducts sales and other business, including one in Santa Clara, California, and 14 other entities as designated sales representatives throughout the United States. Upon information and belief, all of these offices report to a global head of sales & marketing at STMicroelectronics N.V.

143.    STMicro represents that it also sells its products through distributors and retailers, and STMicro's website lists over 175 distributors in the United States, including in this District. STMicroelectronics N.V.'s 2019 Annual Report states that it had 761 employees in the United States in 2019.

144.    STMicroelectronics N.V. and STMicroelectronics International N.V. understood that the DS84 ASIC at issue in this litigation would be equipped in ZF TRW ACUs installed in millions of vehicles for sale and lease to consumers in the United States, including this District and the Transferor Jurisdictions. It also understood that the DS84 ASIC (when functioning properly) was essential to ensuring that vehicles had functioning airbags and seatbelts.

### c.    Hyundai Motor Co., Ltd., Kia Motors Corporation, and Hyundai MOBIS Co., Ltd.

145.    Although Hyundai Motor Co., Ltd., Kia Motors Corporation, and Hyundai MOBIS Co., Ltd. are based in South Korea, the Court has specific jurisdiction over them based on their pervasive contacts with the United States. These foreign Hyundai-Kia Defendants' contacts with the United States are all in

furtherance of sales and leases of Hyundai-Kia vehicles in the United States. These sales and leases give rise to Plaintiffs' claims.

146.  The Hyundai-Kia Defendants are an intertwined group of entities with overlapping roles and responsibilities. Hyundai Motor Co., Ltd. and Kia Motors Corporation are tightly affiliated, so much so that they often hold themselves out to be part of the same joint entity, the Hyundai-Kia Motor Company ("HKMC") and sometimes the "Hyundai Motor Group", which upon information and belief, are not formal legal entities. Each of these entities was involved with the issues related to the defective ACUs in Hyundai and Kia Class Vehicles.

147.  Hyundai Motor Co., Ltd. and Kia Motors Corporation share many key executives. For example, as of 2019, Eui-Sun Chung was the Executive Vice President of both companies.

148.  Hyundai Motor Co., Ltd. and Kia Motors Corporation established Hyundai Motor America, Inc. and Kia Motors America, Inc. in the United States to target consumers in the United States.

149.  In a recent complaint to enforce its trademark rights, Hyundai Motor Co., Ltd. represented that it "currently designs, manufactures, markets, distributes, and sells a wide range of automobile and related automobile parts to over 190 countries throughout the world, including the United States, under the trademark 'Hyundai.'" Upon information and belief, Kia Motors Corporation is similarly

involved in the design, manufacture, marketing, distribution, and sale of Kia vehicles in the United States.

150.   The services rendered by Hyundai Motor America, Inc., Kia Motors America, Inc., and Mobis Parts America, LLC for the foreign Hyundai-Kia Defendants are so important to the foreign Hyundai-Kia Defendants that they would perform those services themselves if Hyundai Motor America, Inc., Kia Motors America, Inc., and Mobis Parts America, LLC did not exist. Hyundai Motor Co., Ltd. controls the public name and brand of Hyundai Motor America, Inc., whereas Kia Motors Corporation controls the public name and brand of Kia Motors America, Inc. Hyundai MOBIS Co., Ltd. likewise controls the public name and brand of Mobis Parts America, LLC. In consumer transactions, like those with Plaintiffs, Hyundai Motor Co., Ltd.'s and Kia Motors Corporation's unified brands and logos serve as their and their subsidiaries' official seal and signature as to consumers.

151.   In each year of the last decade, Hyundai Motor Co., Ltd. sold at least 500,000 automobiles in the United States through Hyundai Motor America, Inc. Kia Motors Corporation has comparable sales volume in the United States. In 2019 alone, for example, it sold 615,000 vehicles in the United States through Kia Motors America, Inc.

152.   For decades, Hyundai Motor Co., Ltd. and Kia Motors Corporation have continuously engaged in business in the United States by, among other things, interacting with its wholly owned subsidiaries in the United States.

153.   Upon information and belief, Hyundai Motor Co., Ltd., Hyundai MOBIS Co., Ltd., and Kia Motors Corporation have the power to appoint board members to Hyundai Motor America, Inc., Mobis Parts America, LLC, and Kia Motors America, Inc., respectively. They have exercised this power to appoint board members to these subsidiaries that they believe will manage the subsidiaries with the principal goal of benefiting them.

154.   Hyundai Motor Co., Ltd., Hyundai MOBIS Co., Ltd., and Kia Motors Corporation purposely availed themselves of markets in the United States. For example, Hyundai Motor Co., Ltd. and Kia Motors Corporation each regularly submitted applications to the EPA to obtain certification necessary for the sale of their vehicles in the United States.

155.   Hyundai Motor Co., Ltd. reportedly maintains a "Global Command and Control Center" in Korea. The center monitors every operating line at all Hyundai plants in the world, in real time, 24 hours a day, 365 days a year. The production data is generated on the assembly lines and displayed on boards where team members can see it, and headquarters can see the same data at the same time.

Employees of Hyundai Motor America, Inc. report on quality issues to Hyundai Motor Co., Ltd.

156.    During the relevant period, Hyundai Motor Co., Ltd. registered and maintained registrations with the United States government for trademarks associated with its vehicles and parts, which it used to identify and distinguish its vehicles and parts in the United States, this District, and Transferor Jurisdictions. Kia Motors Corporation did the same for Kia vehicles sold in the United States.

157.    Senior Korean executives at Hyundai Motor Co., Ltd. visit Hyundai plants in the United States.

158.    Korean speaking "coordinators" reportedly work at Hyundai Motor America, Inc. and Kia Motors America, Inc. and report on their activities to Korean executives at Hyundai Motor Co., Ltd. and Kia Motors Corporation, respectively, every business day.

159.    Hyundai Motor Co., Ltd. and Hyundai Motor America, Inc. share common executives. For example, Jose Munoz is the current Global Chief Operating Officer of Hyundai Motor Co., Ltd. as well as the President and CEO of Hyundai Motor North America and the President and CEO of Hyundai Motor America, Inc.

160.    Kia Motors Corporation and Kia Motors America, Inc. also share common employees. For example, Suk Won (Scott) Hahn originally joined Kia

Motors Corporation in January 2006 before going on to become the Chief Financial Officer of Kia Motors American, Inc. in February 2015.

161.  Kia Motors Corporation, Hyundai Motor Co., Ltd., and Hyundai MOBIS Co., Ltd. played key roles in the Hyundai-Kia Defendants' analysis and decision-making relating to the defective ZF TRW ACUs in the United States. Multiple documents produced to NHTSA by the Hyundai-Kia Defendants are written in Korean. Upon information and belief, the use of Korean was necessary because employees of the Korean companies needed to review the information and approve the responses of the American subsidiaries.

162.  Between October 2015 and July of 2016, ZF TRW met with Hyundai Motor Co., Ltd., Kia Motors Corporation, Hyundai MOBIS Co., Ltd. in Korea at least four times for the purpose of discussing the problems with ZF TRW ACUs in Hyundai-Kia Class Vehicles and what to tell NHTSA.

163.  Between 2011 and 2017, Hyundai MOBIS Co., Ltd. referred multiple suspicious accidents involving failed airbags to ZF TRW for review and analysis, in part in relation to its, Hyundai Motor Co., Ltd.'s, and Kia Motors Corporation's decision-making about whether and when to disclose the defect with ZF TRW ACUs to consumers and NHTSA.

### d.    Fiat Chrysler Automobiles N.V.

164.    Although Fiat Chrysler Automobiles N.V. is based in Europe, the Court has specific jurisdiction over it based on its pervasive contacts with the United States. Its contacts with the United States are all in furtherance of sales and leases of its vehicles in the United States. These sales and leases give rise to Plaintiffs' claims.

165.    Fiat Chrysler Automobiles N.V. has described FCA US LLC as its "most significant" subsidiary, and one of two principal subsidiaries in the United States—the other being a holding company. Since its establishment in 2014 in connection with the merger of Chrysler and Fiat, Fiat Chrysler Automobiles N.V. continuously engaged in business in the United States by, among other things described below, interacting with FCA US LLC. Fiat Chrysler Automobiles N.V. exerts a close degree of control over the actions of FCA US LLC.

166.    FCA US LLC renders services on behalf of Fiat Chrysler Automobiles N.V., such as the lease and sale of vehicles in the United States, that are important enough to Fiat Chrysler Automobiles N.V. that Fiat Chrysler Automobiles N.V. would perform those services itself if FCA US LLC did not exist. There are approximately 2,500 authorized FCA US LLC dealerships in the United States. In 2019 alone, FCA US sold more than 2.2 million vehicles in the United States. In

2018 and 2019, Fiat Chrysler Automobiles N.V. reported that over 30% of its sales occurred in the United States, more than any other country.

167.   Fiat Chrysler Automobiles N.V. controls the public name and brand of FCA US LLC. In consumer transactions, like those with Plaintiffs, Fiat Chrysler Automobiles N.V.'s unified brand and trademarked logo serve as its and FCA US LLC's official seal and signature to consumers.

168.   Fiat Chrysler Automobiles N.V., together with FCA US LLC and its other subsidiaries, operates and holds itself out to the public as a single "Group" whose day to day operations is managed by a team called the Group Executive Council, which is comprised of employees from both Fiat Chrysler Automobiles N.V. and FCA US LLC.

169.   From at least 2016 through the present, FCA US LLC has registered and maintained registrations with the United States government for trademarks associated with its FCA US-branded vehicles and parts, which it uses to identify and distinguish its vehicles and parts in the United States, this District, and Transferor Jurisdictions. Fiat Chrysler Automobiles N.V. is recognized in the registrations as the owner of the FCA trademark.

170.   Fiat Chrysler Automobiles N.V. operates a website on behalf of the "Group," with a web address that references the "Group": www.fcagroup.com. Fiat Chrysler Automobiles N.V. advertises on its website that "Fiat Chrysler

Automobiles (FCA) designs, engineers, manufactures and sells vehicles and related parts, services and production systems worldwide. The Group operates over 100 manufacturing facilities and over 40 R&D centers; and it sells through dealers and distributors in more than 130 countries." The website also illustrates the unity of identity among the "Group" by referring to, among other things, "our people, throughout all FCA facilities worldwide," "our production processes," and "our teams." Additionally, the website contains a section entitled "Our Plants," which lists 18 plants in the United States.

171.    Fiat Chrysler Automobiles N.V.'s website actively promotes FCA brands, including Chrysler, Jeep, Dodge, and Fiat.

172.    Fiat Chrysler Automobiles N.V. claims to require that the officers and employees of its subsidiaries, including officers and employees of FCA US LLC, abide by its Code of Conduct. Fiat Chrysler Automobiles N.V. closely monitors its subsidiaries' compliance with the Code of Conduct and imposes discipline for violations thereof.

173.    Fiat Chrysler Automobiles N.V.'s 2019 Annual Report further confirms that Fiat Chrysler Automobiles N.V. and its subsidiaries, including FCA US LLC, operate and hold themselves out to the public as a unified "Group." Therein, Fiat Chrysler Automobiles N.V. reported that "[f]or our mass-market vehicle brands, we have centralized design, engineering, development and

manufacturing operations, which allow us to efficiently operate on a global scale." Fiat Chrysler Automobiles N.V.'s "mass-market vehicle brands" include Chrysler, Jeep, Dodge, and Fiat.

174.   Fiat Chrysler Automobiles N.V. stated in its 2019 Annual Report that it, together with its subsidiaries, operates 111 manufacturing facilities worldwide, 28 of which are in the United States, and employs approximately 191,752 people, 95,621 of which are in the United States—significantly more than in any other country or region.

175.   Fiat Chrysler Automobiles N.V. reported that it, together with its subsidiaries, sold approximately 2.2 million vehicles in the United States in 2019, and that approximately 68% of its revenue came from its North America business segment. Accordingly, the United States is the primary sales market for Fiat Chrysler Automobiles N.V. and FCA US LLC, and their sales to the United States and this District are voluntary, intentional, and regular.

176.   Fiat Chrysler Automobiles N.V.'s 2019 Annual Report notes that "in 2019, the Group announced plans to invest a total of $4.5 billion in five of its existing Michigan plants and to work with the State of Michigan and the City of Detroit on building a new assembly plant within the city limits." That investment is expected to "increase capacity to meet growing demand for Jeep and Ram brands."

177.    As Fiat Chrysler Automobiles N.V. acknowledged in its 2019 Annual Report, "[t]he Group and its subsidiaries, of which the most significant is FCA US LLC … together with its subsidiaries, are engaged in the design, engineering, manufacturing, distribution and sale of automobiles and light commercial vehicles, engines, transmission systems, metallurgical products and production systems." This includes centralized design, engineering, manufacturing, distribution, and sale of FCA Class Vehicles, including Plaintiffs' vehicles, in all 50 states and the District of Columbia.

178.    Fiat Chrysler Automobiles N.V. exercises ultimate control over FCA US LLC marketing and advertising through, among other things, Fiat Chrysler Automobiles N.V.'s Commercial Committee, which oversees matters related to sales and marketing.

### e.    Toyota Motor Corporation

179.    Although Toyota Motor Corporation is based in Japan, the Court has specific jurisdiction over it based on its pervasive contacts with the United States. Its contacts with the United States are all in furtherance of sales and leases of its vehicles in the United States. These sales and leases give rise to Plaintiffs' claims.

180.    On March 6, 2013, Toyota Motor Corporation announced changes to its organizational structure. Going forward, it would operate eight regional divisions, including one division for North America. The North American division

business unit heads and regional heads report to Toyota Motor Corporation's global headquarters in Japan.

181. Toyota Motor North America Inc.'s, Toyota Motor Engineering & Manufacturing North America, Inc.'s and Toyota Motor Sales, U.S.A., Inc.'s services on behalf of Toyota Motor Corporation are so important that Toyota Motor Corporation would perform those services itself if the subsidiaries did not exist. In consumer transactions, like those with Plaintiffs, Toyota Motor Corporation's unified brand and logo serve as its and Toyota Motor North America Inc.'s, Toyota Motor Engineering & Manufacturing North America, Inc.'s, and Toyota Motor Sales, U.S.A., Inc.'s official seal and signature to consumers.

182. Toyota Motor Corporation's 2019 Annual Report acknowledges:

> The North American region is one of Toyota's most significant markets. . . . In the North American region, of which the U.S. is the main market, Toyota has a wide product lineup (excluding large trucks and buses), and sold 2,745 thousand vehicles on a consolidated basis in fiscal 2019. This represents approximately 31% of Toyota's total unit sales on a consolidated basis. The U.S., in particular, is the largest market in the North American region, which accounts for 86% of the retail sales of Toyota in such region. Sales figures for fiscal 2019 were 97.8% of those in the prior fiscal year.

183. In 2020, Toyota Motor Corporation identified itself as one of the Toyota companies responsible for manufacturing Toyota Corollas with the defective ZF TRW ACU that were sold in the United States.

184.   For decades, Toyota Motor Corporation has continuously engaged in business in the United States by, among other things, interacting with its wholly owned subsidiaries in the United States.

185.   Upon information and belief, Toyota Motor Corporation has the power to appoint board members to Toyota Motor North America Inc., Toyota Motor Engineering & Manufacturing North America, Inc. and Toyota Motor Sales, U.S.A., Inc. Toyota Motor Corporation has exercised this power to appoint board members to these subsidiaries that Toyota Motor Corporation believes will manage the subsidiaries with the principal goal of benefiting Toyota Motor Corporation.

186.   Toyota Motor Corporation purposely avails itself of markets in the United States. For example, Toyota Motor Corporation regularly submitted applications to obtain certification from the EPA that was necessary for the sale of Toyota vehicles in the United States.

187.   Since 1992, Toyota Motor Corporation has maintained a set of "Guiding Principles" for all its subsidiaries. Toyota Motor Corporation has clarified these principles with additional guidelines. For example, according to Toyota Motor Corporation, a document called "Toyota Way 2001" "clarifies the values and business methods that all employees should embrace in order to carry out the Guiding Principles at Toyota throughout the company's global activities." To promote sharing of the Toyota Way, the Toyota Institute was established in

January 2002 as an internal human resources development organization. Since 2003, overseas affiliates in North America (U.S.), Europe (Belgium), Asia (Thailand and China), Africa (South Africa) and Oceania (Australia) have established their own human resources training organizations modeled after the Toyota Institute.

188.    Toyota Motor Corporation also authored and updates a Code of Conduct that employees of all Toyota subsidiaries are instructed to follow. Toyota Motor Corporation is responsible for ensuring (or failing to ensure) that the Code of Conduct is followed.

189.    Toyota Motor Corporation's Chief Risk Officer supervises the Chief Risk Officer for its North American division.

190.    Each fiscal year Toyota Motor Corporation conducts inspections of subsidiary management by each department.

191.    Toyota Motor Corporation's 2019 Corporate Governance Report further acknowledges its tight control over its subsidiaries:

> [Toyota Motor Corporation] will manage its subsidiaries in a comprehensive manner appropriate to their positioning by clarifying the roles of the division responsible for the subsidiaries' financing and management and the roles of the division responsible for the subsidiaries' business activities. Those divisions will confirm the appropriateness and legality of the operations of the subsidiaries by exchanging information with those subsidiaries, periodically and as needed.

192.    Toyota Motor Corporation and its American subsidiaries share many key executives. For example:

     a.    Zack Hicks has a global role leading information security management for Toyota Motor Corporation and serves as executive vice president and chief digital officer at Toyota Motor North America Inc.

     b.    Tetsuo Ogawa is operating officer at Toyota Motor Corporation as well as president and chief executive officer of Toyota Motor North America Inc.

     c.    Tadahisa Isono has been with Toyota Motor Corporation since 1986 in various positions and currently serves as a senior management member at Toyota Motor Corporation as well as executive vice president of production engineering at Toyota Motor North America Inc.

193.    Toyota Motor Corporation owns all rights, title, and interest in U.S. Trademark Registration No. 2,115,623 for TOYOTA, which is a word mark for goods including vehicle anti-theft systems comprising radio frequency transmitters, radio frequency receivers, status monitors, glass breakage sensor units, electronic control units, dashboard signal lights, vehicular horn activators, vehicular light activators, and dashboard control switches, in various combinations of

components, sold as a unit and individually as repair or replacement parts. From September 2, 1997 through the present, Toyota Motor Corporation has registered and maintained registrations with the U.S. government for trademarks associated with its vehicles and parts, which it uses to identify and distinguish its vehicles and parts in the United States, this District, and Transferor Jurisdictions.

194.    Toyota Motor Corporation owns all rights, title, and interest in U.S. Trademark Registration No. 3,376,132 for the TOYOTA word mark for goods and services associated with automobile dealerships having registered and maintained registration with the U.S. government from March 31, 2005 to the present based on corresponding United States registrations 1338339;1414492;1888870; and others.

195.    Toyota Motor Corporation played a key role in Toyota's analysis and decision-making relating to the defective ZF TRW ACUs in the United States. Multiple documents produced to NHTSA by the Toyota Defendants are written in Japanese. Upon information and belief, the use of Japanese was necessary because employees of Toyota Motor Corporation in Japan needed to review the information and approve the responses of Toyota's American subsidiaries.

196.    At least as early as 2018 and 2019, Toyota Motor Corporation received reports from its subsidiaries describing airbag failures in Toyota vehicles equipped with the defective ZF TRW ACUs. Toyota Motor Corporation received recovered parts from wrecked vehicles with airbag failures, including ACUs with

signs of ASIC damage. It communicated weekly with ZF TRW about the technical details of the problems with the ACUs.

197.   In January 2019, employees of Toyota Motor Corporation travelled to ZF TRW's offices in Farmington Hills to meet with ZF TRW employees face-to-face about the problems with ZF TRW's ACUs.

### f.   Honda Motor Co., Ltd. and Honda R&D Co., Ltd.

198.   Although Honda Motor Co., Ltd. and Honda R&D Co., Ltd. are based in Japan, the Court has specific jurisdiction over them based on their pervasive contacts with the United States. Honda Motor Co., Ltd.'s and Honda R&D Co., Ltd.'s contacts with the United States are all in furtherance of sales and leases of Honda vehicles in the United States. These sales and leases give rise to Plaintiffs' claims.

199.   Honda Motor Co., Ltd. established subsidiaries in the United States to target consumers in the United States.

200.   The services rendered by American Honda Motor Co., Inc.; Honda of America Mfg., Inc.; and Honda R&D Americas, LLC for the foreign Honda Defendants are so important to the foreign Honda Defendants that they would perform those services themselves if American Honda Motor Co., Inc.; Honda of America Mfg., Inc.; and Honda R&D Americas, LLC did not exist. Honda Motor Co., Ltd. controls the public name and brand of American Honda Motor Co., Inc.;

Honda of America Mfg., Inc.; and Honda R&D Americas, LLC In consumer transactions, like those with Plaintiffs, Honda Motor Co., Ltd.'s unified brand and logo serve as its and American Honda Motor Co., Inc.'s; Honda of America Mfg., Inc.'s; and Honda R&D Americas, LLC's official seal and signature as to consumers.

201.    Honda Motor Co., Ltd. derives more revenue from the United States than any other country. For fiscal year ending March 31, 2018 alone, Honda Motor Co., Ltd. reported $65 billion in sales in the United States, a little under half of its revenue.

202.    For decades, Honda Motor Co., Ltd. has continuously engaged in business in the United States by, among other things, interacting with its wholly owned subsidiaries in the United States.

203.    Upon information and belief, Honda Motor Co., Ltd. has the power to appoint board members to American Honda Motor Co., Inc.; Honda of America Mfg., Inc.; and Honda R&D Americas, LLC Honda Motor Co., Ltd. has exercised this power to appoint board members to these subsidiaries that Honda Motor Co., Ltd. believes will manage the subsidiaries with the principal goal of benefiting Honda Motor Co., Ltd.

204.    Honda Motor Co., Ltd. purposely avails itself of markets in the United States. For example, Honda Motor Co., Ltd. regularly submitted applications to

obtain certification from the EPA that was necessary for the sale of Honda vehicles in the United States.

205.   Honda Motor Co., Ltd. acknowledges that it develops human resource mandates for all its subsidiaries, including American Honda Motor Co., Inc.; Honda of America Mfg., Inc.; and Honda R&D Americas, LLC For example, Honda Motor Co., Ltd. admits in its 2017 Sustainability Report: "the Human Resources and Associate Relations Division at the corporate headquarters in Tokyo draws up global human resources strategies from the mid- to long-term perspective in coordination with operations in each region."

206.   In part because of the importance of United States markets to its business, Honda Motor Co., Ltd. decided in 2015 to change its official language for international communications to English by 2020. Under this policy, documents used in Honda Motor Co., Ltd. meetings that involve regional operation bases and any communication for information sharing across regions will also be in English. Honda Motor Co., Ltd. will require English proficiency for associates to be promoted to managerial positions in the future.

207.   To ensure its control and involvement over its American subsidiaries, Honda Motor Co., Ltd. established a "Leadership Resources" document in 2015 and distributed this document on its in-house intranet worldwide, including to American Honda Motor Co., Inc.; Honda of America Mfg., Inc.; and Honda R&D

Americas, LLC By distributing these resources, Honda Motor Co., Ltd. provides specific guidelines regarding decisionmaking and management judgment to the employees of American Honda Motor Co., Inc.; Honda of America Mfg., Inc.; and Honda R&D Americas, LLC.

208.   Since at least as early as 2003, Honda Motor Co., Ltd. has had a code of conduct called the "Honda Conduct Guidelines." Honda Motor Co., Ltd. distributes these guidelines to American Honda Motor Co., Inc.; Honda of America Mfg., Inc.; and Honda R&D Americas, LLC and claims to take steps to ensure that they comply with the guidelines. Once per year, each of Honda Motor Co., Ltd.'s American subsidiaries claims to check the status of activities to ensure awareness of the guidelines, and reports to Honda Motor Co., Ltd.'s Compliance Committee, Executive Council and the Board of Directors.

209.   Honda Motor Co., Ltd. or one of its Japanese subsidiaries tested the performance of the defective ZF TRW ACUs in Japanese and Australian vehicles in 2012 and 2014. ACUs demonstrated signs of EOS during the testing. Upon information and belief, Honda Motor Co., Ltd. was aware of the results of this testing.

210.   Upon information and belief, Honda Motor Co., Ltd. was responsible for the decision not to recall any Honda vehicles with the defective ZF TRW ACUs or warn consumers in the United States about the ACUs.

211.    Honda Motor Co., Ltd. and its American subsidiaries share common executives. For example:

a.      Shinji Aoyama is the president & CEO of American Honda Motor Co., Inc. Aoyama serves concurrently as the chief officer of Regional Operations (North America) for parent company Honda Motor Co., Ltd., as well as the President of Honda Patents & Technologies North America, LLC.

b.      Mitsugu Matsukawa is President of Honda of America Mfg., Inc. where he is responsible for manufacturing operations at Honda's four Ohio plants. Matsukawa is also on Honda Motor Co., Ltd.'s North American Regional Operating Board and serves as a managing officer of Honda Motor Co., Ltd.

c.      James A. Keller is the president of Honda R&D Americas, LLC He oversees all of the company's research & development operations in North America. Keller trained for at least two years at Honda R&D Co., Ltd. in Japan.

d.      Takashi Sekiguchi originally joined Honda Motor Co., Ltd. in 1982 and worked there for years before becoming the Executive Vice President and Director of American Honda Co., Inc. in April 2008.

     e.     Takanobu Ito, the CEO of Honda Motor Co., Ltd. from 2009 to 2015, was previously President and Director of Honda R&D Co., Ltd. and Executive Vice President of Honda R&D Americas, LLC.

212.   Owners' manuals for Honda vehicles with the defective ZF TRW ACUs state: "Honda Motor Co., Ltd. reserves the right . . . to discontinue or change specifications or design at any time." Based on these statements, and upon information and belief, Honda Motor Co., Ltd. has the ultimate responsibility for the design and specifications for all Honda vehicles with the defective ZF TRW ACUs.

213.   Honda Motor Co., Ltd. has brought litigation in United States courts to protect its trademarks from infringement and counterfeiting. The protection afforded their trademarks and patents under United States law enabled Honda Motor to sell Class Vehicles in the United States, this District, and Transferor Jurisdictions, including to Plaintiffs.

214.   In a recent complaint to enforce its trademark rights, Honda Motor Co., Ltd. represented that it "obtained registrations in the United States for designs for the HONDA and ACURA trademarks, used in connection with automobiles and automobile parts."

215.   From 1959 through the present, Honda Motor Co., Ltd. has registered and maintained registrations with the United States government for trademarks associated with its vehicles and parts, which it uses to identify and distinguish its vehicles and parts in the United States, this District, and Transferor Jurisdictions. Honda Motor Co., Ltd. is recognized in the registrations as the owner of the Honda trademarks.

### g.    Mitsubishi Motors Corporation

216.   Although Mitsubishi Motors Corporation is based in Japan, the Court has specific jurisdiction over it based on its pervasive contacts with the United States. Mitsubishi Motors Corporation's contacts with the United States are all in furtherance of sales and leases of Mitsubishi vehicles in the United States. These sales and leases give rise to Plaintiffs' claims.

217.   Until 2015, some Mitsubishi-branded vehicles were manufactured in Normal, Illinois. Currently, Mitsubishi Motors Corporation manufactures Mitsubishi-branded vehicles at its production facilities in Japan, Thailand, China, Indonesia, the Philippines, and Russia. It then exports these vehicles to the United States for sale.

218.   During the relevant time period, Mitsubishi Motors Corporation has continuously engaged in business in the United States by manufacturing Mitsubishi-branded vehicles and, together with Mitsubishi Motors North America,

Inc., marketing, selling, and distributing those vehicles in all 50 states and the District of Columbia. Additionally, during this period, Mitsubishi Motors Corporation worked with its other American subsidiary, Mitsubishi Motors R&D of America, Inc., to develop and test new vehicle technologies.

219.    Mitsubishi Motors North America, Inc. renders services on behalf of Mitsubishi Motors Corporation, such as the lease and sale of vehicles in the United States, that are important enough to Mitsubishi Motors Corporation that Mitsubishi Motors Corporation would perform those services itself if Mitsubishi Motors North America, Inc. did not exist.

220.    Mitsubishi Motors Corporation, together with its American subsidiaries Mitsubishi Motors North America, Inc. and Mitsubishi Motors R&D of America, Inc., operates and holds itself out to the public as a single entity known as "Mitsubishi Motors" that caters to American consumers and purposefully avails itself of the United States market for Mitsubishi-branded vehicles.

221.    Mitsubishi Motors Corporation and Mitsubishi Motors North America, Inc. share a common logo, which Mitsubishi Motors Corporation permits Mitsubishi Motors North America, Inc. to use along with the "Mitsubishi Motors" name under a contract agreement between the entities. Mitsubishi Motors Corporation and Mitsubishi Motors North America, Inc.'s common logo includes

Mitsubishi Motors Corporation's Global Tagline "Drive Your Ambition." Additionally, Mitsubishi Motors Corporation's General Manager for North America A Department is a Director of Mitsubishi Motors North America, Inc. Further, in March 2020, Mitsubishi Motors Corporation named Yoichi Yokozawa, who previously held senior-level positions throughout Mitsubishi Motors Corporation, as Mitsubishi Motors North America, Inc.'s President and Chief Executive Officer.

222.   Mitsubishi Motors Corporation's website promotes Mitsubishi Motors North America, Inc. as part of its "Global Network," and one of its "major affiliates." Mitsubishi Motors Corporation's website actively promotes its Mitsubishi-branded line of vehicles, which it represents are "produced by Mitsubishi Motors," and Mitsubishi Motors Corporation describes Mitsubishi Motors North America, Inc. as one of its distributors of Mitsubishi Motors Corporation's products.

223.   Mitsubishi Motors North America, Inc.'s website states that Mitsubishi Motors North America, Inc. is a part of the "Renault-Nissan-Mitsubishi Alliance," which is a strategic alliance between Mitsubishi Motors Corporation and automobile manufacturers Renault and Nissan. In the "History" section of its website, Mitsubishi Motors North America, Inc. presents its history and the history of Mitsubishi Motors Corporation together as a unified history that it calls

"Mitsubishi Company History." Additionally, Mitsubishi Motors North America, Inc.'s website includes Mitsubishi Motors Corporation press releases.

224.    Mitsubishi Motors Corporation designs, engineers, manufactures, markets and/or sells vehicles under the Mitsubishi brand with the knowledge and intent to market, sell, and lease them throughout the United States. Mitsubishi Motors Corporation, together with Mitsubishi Motors North America, Inc., sold 121,046 vehicles in the United States in 2019. Additionally, in 2019, Mitsubishi expanded its United States field operations network from two regions to four, adding 36 new dealer partners and offices in Florida and New York to reinforce sales support for dealers.

225.    Mitsubishi-branded vehicles, including Plaintiffs' vehicles and the Mitsubishi Class Vehicles, were the subject of nationwide advertising campaigns that were intended to reach and did reach this District and Transferor Jurisdictions. Mitsubishi advertised and promoted the alleged safety of Mitsubishi Class Vehicles. None of these advertisements or marketing materials disclosed that Plaintiffs' vehicles or Mitsubishi Class Vehicles were equipped with the defective ZF TRW ACUs.

226.    There are over 350 authorized Mitsubishi Motors North America, Inc. dealerships that sell and lease Mitsubishi vehicles in the United States, including in this District and Transferor Jurisdictions. Mitsubishi Motors North America, Inc.

dealerships facilitated the sale, lease, and service of Mitsubishi Class Vehicles throughout all 50 states and the District of Columbia.

## IV.   GENERAL FACTUAL ALLEGATIONS

**A.   The Class Vehicles are equipped with defective ZF TRW ACUs.**

227.   The Class Vehicles are vehicles equipped with ZF TRW ACUs that contain a DS84 ASIC. These vehicles suffer from a common, uniform defect ("the ACU defect") that makes them vulnerable to EOS, which in turn can prevent deployment of the airbags and seatbelts during a crash. EOS can also cause other failures of the ACU, including inadvertent airbag deployments and/or loss of recorded data about a crash and the ACU's responses thereto.

228.   Between September 2016 and July 2018, FCA, Hyundai, and Kia recalled millions of vehicles based on the common defect in ZF TRW ACUs with the DS84 ASIC.

229.   NHTSA also fears there is a common defect in all ZF TRW ACUs with the DS84 ASIC. In April 2019, it launched an investigation that covers more than 12 million vehicles. This investigation led Toyota to announce a recall of nearly 3 million vehicles with defective ZF TRW ACUs in 2020.[7]

230.   Based on the incomplete, pre-discovery information available at this time, Plaintiffs understand the Class Vehicles are as follows:

---

[7] The recall has not been completed yet.

a.    2011–2019 Hyundai Sonata;

b.    2011–2019 Hyundai Sonata Hybrid;

c.    2010–2013 Kia Forte;

d.    2010–2013 Kia Forte Koup;

e.    2011–2020 Kia Optima;

f.    2011–2016 Kia Optima Hybrid;

g.    2011–2012, 2014 Kia Sedona;

h.    2010–2014 Chrysler 200;

i.    2010 Chrysler Sebring;

j.    2010–2014 Dodge Avenger;

k.    2010–2017 Jeep Compass;

l.    2010–2013 Jeep Liberty;

m.    2010–2017 Jeep Patriot;

n.    2010–2018 Jeep Wrangler;

o.    2010–2012 Dodge Caliber;

p.    2009–2012 Dodge Ram 1500;

q.    2010–2012 Dodge Ram 2500/3500;

r.    2011–2012 Dodge Ram 3500/4500/5500 Cab-Chassis;

s.    2010–2012 Dodge Nitro;

t.    2012–2019 Fiat 500;

u.  2013–2015 Honda Accord;

v.  2012–2015 Honda Civic (including GX, SI and Hybrid models);

w.  2012–2016 Honda CR-V;

x.  2013–2014 Honda Fit EV;

y.  2012–2017 Honda Fit;

z.  2012–2014 Honda Ridgeline;

aa.  2014–2019 Acura RLX (and the Hybrid model);

bb.  2012–2014 Acura TL;

cc.  2015–2017 Acura TLX;

dd.  2012–2014 Acura TSX (and the TSX Sport Wagon model);

ee.  2011–2019 Toyota Corolla;

ff.  2011–2013 Toyota Corolla Matrix;

gg.  2012–2018 Toyota Avalon;

hh.  2013–2018 Toyota Avalon HV;

ii.  2012–2019 Toyota Tacoma;

jj.  2012–2017 Toyota Tundra;

kk.  2012–2017 Toyota Sequoia;

ll.  2013–2017 Mitsubishi Lancer;

mm.  2013–2015 Mitsubishi Lancer Evolution;

nn.    2013–2015 Mitsubishi Lancer Ralliart;

oo.    2013–2016 Mitsubishi Lancer Sportback; and

pp.    2013 Mitsubishi Outlander.

i.    **ACUs detect crashes and control airbags and seatbelts.**

231.    The system of safety features in motor vehicles is known as the Occupant Restraint System. Its purpose is to protect passengers during collisions.

232.    For decades, Occupant Restraint Systems have included systems that automatically tighten seatbelts during a crash to secure the occupants.

233.    Also for decades, Occupant Restraint Systems have included devices that rapidly inflate a padded cushion (the "airbag") from the steering wheel and other areas of the vehicle during a crash. Airbags protect occupants by buffering or preventing impact between occupants and hard surfaces within the vehicle.

234.    Seatbelt and airbag systems are "passive" Occupant Restraint Systems because they operate automatically without being triggered by the occupants.

235.    The ACU is a critical part of every passive Occupant Restraint System. The core function of the ACU is to interpret signals from crash sensors and  activate the safety restraints, including by deploying airbags and tightening seatbelts when it detects a crash. Because it controls the occupant restraints, like seatbelts, the ACU is sometimes referred to as an "Occupant Restraint Controller."

### ii.    A properly designed ACU can withstand transient electricity.

236.   Typically, the ACU is physically located in the vehicle's passenger compartment (i.e. where the passengers sit).

237.   Electrical wiring connects the ACU to crash sensors located on the front of the vehicle. The crash sensors detect activity in the front of the vehicle and send corresponding electrical signals to the ACU. The ACU receives and interprets these signals and activates the airbags and seatbelts when certain thresholds are met.

238.   As has been widely known in the auto industry for many years, when vehicles crash, the crash can cause large bursts of electrical energy to move through the wiring that connects the crash sensors to the ACU. These bursts are called "transients" or "transient electricity."

239.   Transient electricity is dangerous because it can damage important circuits, including those the ACU needs to trigger the airbags and seatbelts. Accordingly, a properly designed ACU has sufficient protections against the levels of transient electricity that could result from a car accident.

### iii.    ZF TRW began making the defective ACUs in or around 2008

240.   Historically, ZF TRW ACUs had included two separate ASICs to manage the dual functions that are critical to the safety of vehicle drivers and passengers: (1) to receive information from the crash sensors and (2) to trigger the

airbags and seatbelt pretensioners after a crash is detected. Freescale Semiconductor supplied the ASICs for ZF TRW's prior generation of ACUs.

241.   In or about February 2005, STMicro and ZF TRW kicked off a process to develop a new ASIC.

242.   For this new ASIC, ZF TRW wanted to combine these two functionalities in one, consolidated chip, thereby reducing the size. The ASIC is a special purpose chip (i.e., a set of miniaturized transistors) installed on the ACU circuit board (i.e., a sheet that houses and connects different related circuits). Upon information and belief, ZF TRW wanted to reduce the size of the ASICs to reduce the costs of mass manufacturing the components.

243.   STMicro custom-designed the DS84 ASIC for ZF TRW, and the companies worked closely together to create it. To develop the DS84 ASIC, STMicro looked to its pre-existing ASIC design and used it to develop an updated model to meet ZF TRW's specifications, combining the two functionalities (i.e. sending and receiving signals) into one ASIC. In the years post design, ZF TRW continued to work closely with STMicro to make decisions on whether and how to protect the DS84 ASIC from transient electricity.

244.   By August 2008, the parties had approved the new DS84 ASIC for production, and ZF TRW began producing the defective ACUs containing the DS84. The defective ZF TRW ACUs with the DS84 ASIC also used different

technology for managing signals from the front crash sensors than other prior ZF TRW ACUs.

### iv. The defective ZF TRW ACUs are susceptible to complete failure during a crash because they are vulnerable to EOS from transient electricity.

245. The defective ZF TRW ACUs do not adequately protect the DS84 ASIC against the risk of transient electricity travelling through the sensor wiring to the ACU during a collision.

246. Because the DS84 ASIC combines the previously separate functions of handling sensor signals and activating safety restraints, a collision that creates a surge of transient electricity through the sensor wire can cause the single ASIC to fail, which in turn can deactivate the car's entire passive safety system (rendering it unable to deploy the airbags and tighten seatbelts) at the very moment it's needed to save the driver and passengers.

247. Although the defective ZF TRW ACUs installed in the Class Vehicles vary slightly in terms of their circuit protection, they all suffer from the same basic vulnerability to transient electricity and EOS.

248. As a result of this defect, airbags and/or seatbelts in the Class Vehicles have failed to activate in multiple crashes. While the investigation remains open and ongoing, NHTSA and the Vehicle Manufacturer Defendants

have publicly linked at least eight fatalities to apparent failures of the ZF TRW ACUs.

249.    Other signs of ASIC EOS in ACUs, aside from airbag and seatbelt failures, can include visible burn marks on the ACU circuit board. For example, the below images of a defective ZF TRW ACU recovered from a wrecked Toyota Corolla in Northern California show visible burn marks on the circuit board. The Corolla's airbags failed to deploy during a crash in 2018. The crash killed the driver.



250.    Another sign of ASIC EOS in ACUs is the complete or partial loss of recorded crash data on the vehicle's Event Data Recorder. The Event Data Recorder is the automotive equivalent of a "black box" in airplanes and, when working properly, will keep a record of the ACU's commands to the safety system. Normally, this data enables investigators to determine if a crash was severe enough to trigger the airbags. When a crash is not severe enough to trigger the airbags, the

nondeployment of the airbags is "commanded" by the ACU's normal operations, and the crash data will show records of the ACU "commanding" nondeployment during the crash. Accordingly, a "commanded nondeployment" is automotive industry jargon for a crash where the airbags did not deploy because they were not supposed to deploy, and the ACU properly told them not to deploy.

251.    Because ASIC EOS can interrupt the ACU's generation of crash data, incomplete or missing crash data following an accident can indicate that the ACU suffered ASIC EOS. But since complete and accurate crash data is critical to post-hoc investigations of a vehicle's response to a crash, ASIC EOS makes it difficult or impossible for crash investigators to reliably determine whether airbags should not have deployed. Without reliable crash data, a conclusion of "commanded nondeployment" must rely upon subjective assessment of the severity of the crash based upon the wreckage and other evidence, such as witness statements.

252.    ACUs made by other manufacturers do not have the same vulnerabilities to transient electricity as the defective ZF TRW ACUs. For example, competing ACUs manufactured by Continental Automotive, Infineon and DENSO Corporation can withstand much stronger electrical surges than the defective ZF TRW ACUs.

253.    The predecessor ZF TRW ACUs that used two different ASICs to perform the jobs of the DS84 ASIC can also withstand much stronger electrical surges than the defective ZF TRW ACUs.

254.    Moreover, other contemporaneous ZF TRW ACUs that do not use the DS84 ASIC are also more resistant to electrical surges than the defective ZF TRW ACUs that do. These other, stronger ZF TRW ACUs use a different ASIC called the MS84. For crash sensor communication, the MS84 uses so-called "PSI-5" technology whereas the DS84 uses "DSI" technology. ZF TRW has suggested that this difference may explain the relative weakness of ACUS with the DS84 ASIC.

255.    While Defendants may try to obscure the fundamental defect by claiming that some Class Vehicles have additional protective components,[8] these arguments fail because airbag failures in multiple crashes have been linked to EOS in defective ZF TRW ACUs with a range of different protective components. Adding protective components as a band-aid to restrain the flow of electricity to the defective ZF TRW ACU does not appear to fix the defect. For example, the ZF TRW ACUs in Hyundai, Kia, Toyota, and FCA vehicles had different protective

---

[8] The most common protective component added to the defective ZF TRW ACUs has included so-called "Schottky" diodes on the crash sensor communication line. These diodes are not an absolute shield against transients and EOS. Instead, they may offer some protection against certain levels of transient electricity moving up the sensor lines. But when a transient's power level exceeds the diode's thresholds, the diode(s) can fail and EOS can still occur.

components (characterized by NHTSA as ranging from "low," "mid-level" to "high"), but these Vehicle Manufacturers each determined that the defective ZF TRW ACUs were dangerously vulnerable to EOS and decided to recall them.

256.   Although Defendants have downplayed the scope of the defect by blaming observed cases of ASIC EOS on these purported vehicle-specific variations in wiring around the ACU and crash sensors, the defective ZF TRW ACU is the root cause. It is simply not plausible that the many different vehicle that were recalled due to the ACU's vulnerability to ASIC EOS all coincidentally had similarly flawed wiring layouts, despite the lack of coordination among Defendants as to wiring layout and other elements of vehicle design. Defendants' implausible defense of "vehicle-specific" wiring layout assumes (without evidence) that the wiring layout in these dozens of different vehicles, each of which was recalled due to the confirmed ACU defect, did not vary meaningfully:

<ol type="a">
<li>2012–2018 Toyota Avalon;</li>
<li>2013–2018 Toyota Avalon Hybrid;</li>
<li>2011–2019 Toyota Corolla;</li>
<li>2011–2013 Toyota Matrix;</li>
<li>2010–2014 Chrysler 200;</li>
<li>2010 Chrysler Sebring;</li>
<li>2010–2014 Jeep Patriot;</li>
</ol>

h. 2010–2014 Jeep Compass;

i. 2010–2014 Jeep Compass;

j. 2010–2014 Dodge Avenger;

k. 2010–2012 Dodge Caliber;

l. 2011–2013 Hyundai Sonata;

m. 2011–2012 Hyundai Sonata Hybrid;

n. 2010–2013 Kia Forte;

o. 2010–2013 Kia Forte Koup; and

p. 2011–2013 Kia Optima.

The more plausible explanation for the common observed vulnerability to ASIC EOS across all these various vehicles is the one common feature they indisputably share: a ZF TRW ACU with a DS84 ASIC.

> **v.    ZF TRW and STMicro knew that ACUs with the DS84 ASIC were vulnerable to EOS since 2008.**

257.   At least as early as 2008, ZF TRW and STMicro knew that ACUs with the DS84 ASIC were vulnerable to EOS. They nonetheless intentionally concealed this information from consumers and NHTSA for years.

258.   In or around 2008, STMicro conducted thermal shutdown testing on the DS84 ASIC to verify its thermal shutdown and current limit performance (i.e. the point at which the ASIC will shut down following an increase in ambient temperature, and within a given normal voltage range). Through that test, STMicro

and ZF TRW observed damage to the ASIC as the result of negative transients. Following this testing, STMicro recognized additional protection to the ASIC was necessary and communicated with ZF TRW about the need for additional protection.

259. The vulnerability of ZF TRW ACUs with the DS84 ASIC became increasingly apparent following numerous crashes between 2011 and 2019 in which the Class Vehicles' airbags did not deploy. STMicro's technological expertise was necessary to analyze and draw conclusions about the DS84 component failure following these crash events. For example, a Toyota document produced to NHTSA characterizes STMicro as "indispensable" to the process to identify the manufacturing factors in relation to the EOS condition. This is because STMicro had the specialized capacity to test and isolate the source of the transient causing damages to the ASIC, among other things.

260. Upon information and belief and based on STMicro's expertise and capabilities, ZF TRW routinely requested STMicro's assistance to test the DS84 ASIC following suspicious crash events and to respond to technical questions from vehicle manufacturers regarding the same. For example, documents produced by ZF TRW describe STMicro's role in conducting "teardown analysis" and reports it provided to ZF TRW on DS84 ASICs. Further, notes from an October 2018 meeting between ZF TRW and Toyota regarding the ACU Defect state that DS84

"testing is difficult" and that ZF TRW would "confirm with ST" on specific questions.

261.    After a 2012 Kia Forte crashed and the airbags did not deploy, ZF TRW conducted an initial inspection of the vehicles' ACU, and then sent the DS84 ASIC to STMicro for further analysis. In a subsequent report dated January 14, 2016, STMicro's analysis revealed "burnt metal" and "confirmed the presence of electrical overstress," which again evidences STMicro's knowledge of the defect.

262.    Further, STMicro played an important role in the inspection for a Toyota Auris involved in a June 2016 accident in Turkey in which the airbags did not deploy. Again, STMicro's analysis "clearly found evidence of electrical overstress on the ASIC."

263.    STMicro also conducted a technical parts analysis following a July 13, 2017 crash involving a Toyota Auris in Portugal in which the airbags did not deploy and the driver was seriously injured. In an engineering report regarding that accident, ZF TRW noted that the "suspect components" needed to be sent to the supplier (i.e. STMicro) to conduct the analysis. STMicro found EOS damage in the ASIC, which ZF TRW described to "confirm" its own "hypothesis" about suspected EOS.

264.    From ZF TRW and STMicro's joint analyses of the DS84 ASIC, both ZF and STMicro knew about the DS84 ASIC's vulnerability to EOS dating back at

least to 2008. They each played an integral role in pre-market testing and post-crash analyses that indicated EOS in the DS84 ASIC in numerous Class Vehicles.

265.    However, despite this knowledge, STMicro and ZF TRW did not completely or timely inform consumers or regulators about the defect and the serious safety risks that it caused.

## B.    Defendants made misleading statements and omissions concerning the ACU defect for years.

266.    Defendants have repeatedly represented to consumers and to NHTSA that the Class Vehicles and the Occupant Restraint Systems that contain the defective ZF TRW ACUs can be relied upon to activate the airbags and seatbelts during a crash. These representations were false and misleading because of what they did not say. Defendants uniformly failed to disclose that the defective ZF TRW ACUs were particularly vulnerable to EOS and that transient electricity from a collision could—at the worst possible moment—prevent the airbags and seatbelts from activating. These omitted facts were contrary to Defendants' material representations about the Class Vehicles safety features. Thus, Defendants misled NHTSA and consumers about the safety of the Class Vehicles.

### i.    The Class Vehicles had labels and stickers stating that they were equipped with working airbags and seatbelts and that failed to disclose the ZF TRW ACU defect.

267.    To sell vehicles in the United States, the Vehicle Manufacturer Defendants must "certify to the distributor or dealer at delivery that the vehicle or

equipment complies with applicable motor vehicle safety standards prescribed" by

NHTSA under Chapter 301 of Title 49 of the U.S. Code. The Vehicle

Manufacturer Defendants "may not issue the certificate if, in exercising reasonable

care," they have "reason to know the certificate is false or misleading in a material

respect." 49 U.S.C. § 30115; *see also* 49 U.S.C. § 30112. Because "[c]ertification

of a vehicle must be shown by a label permanently fixed to the vehicle," all Class

Vehicles have a permanent label certifying compliance with the safety regulations

prescribed by NHTSA under Chapter 301. Since all of the Class Vehicles are

passenger vehicles, the permanent label must state: "This vehicle conforms to all

applicable Federal motor vehicle safety, bumper, and theft prevention standards in

effect on the date of manufacture shown above." 49 CFR § 567.4(g)(5). These

labels were false and misleading because they failed to warn consumers about the

risk of EOS during a crash, and instead indicated that the Occupant Restraint

System would function properly in a crash. *See* 49 C.F.R. § 571.208 (S4.1.5.4,

S4.1.5.5) (Federal motor vehicle safety standards requiring Occupant Restraint

Systems with airbags and seatbelts).

268.   Manufacturers of vehicles and component parts for vehicles have a

duty to disclose known safety defects to the public and to NHTSA.

a.   When a vehicle manufacturer learns of a safety defect, federal

law requires it to disclose the defect to NHTSA and to the

owners, purchasers, and dealers of the vehicle. 49 U.S.C.

§ 30118(c).

b.    When a safety defect relates to a component part, the

manufacturer of the component has a separate, independent

duty to submit public reports on the faulty equipment to

NHTSA. 49 C.F.R. § 573.6(a).

269.    The interiors of the Class Vehicles also contain prominent labels that alert the driver and passengers to the vehicle's airbag system. For example, steering wheels and passenger dashboards typically have labels identifying the airbag and safety restraint system (or "SRS"). They usually look like the below labels from the 2015 Mitsubishi Lancer:





270.   The Class Vehicles also contain a "readiness indicator" that was supposed to "monitor [the occupant protection system's] own readiness" and "be clearly visible from the driver's designated seating position." 49 C.F.R. § 571.208 (S4.5.2). Upon information and belief, this readiness indicator did not warn consumers about the risk of EOS during a crash, and instead indicated that the Occupant Restraint System would function properly in a crash.

271.   The Vehicle Manufacturer Defendants were also specifically required to include in their vehicles warning labels that alerted consumers of the need to perform airbag maintenance. For example, S4.5.1 of 49 C.F.R. § 571.208 states:

> Air bag maintenance or replacement information. If the
> vehicle manufacturer recommends periodic maintenance or
> replacement of an inflatable restraint system, as that term is
> defined in S4.1.5.1(b) of this standard, installed in a vehicle,
> that vehicle shall be labeled with the recommended schedule
> for maintenance or replacement. The schedule shall be
> specified by month and year, or in terms of vehicle mileage, or
> by intervals measured from the date appearing on the vehicle
> certification label provided pursuant to 49 CFR Part 567. The
> label shall be permanently affixed to the vehicle within the
> passenger compartment and lettered in English in block capital
> and numerals not less than three thirty-seconds of an inch
> high. This label may be combined with the label required by
> S4.5.1(b) of this standard to appear on the sun visor. If some
> regular maintenance or replacement of the inflatable restraint
> system(s) in a vehicle is recommended by the vehicle
> manufacturer, the owner's manual shall also set forth the
> recommended schedule for maintenance or replacement.

Plaintiffs are unaware of any label in any Class Vehicle that alerted consumers

about the defective ZF TRW ACUs or the need to perform maintenance on them to

protect them from EOS.

272.    The Vehicle Manufacturer Defendants also distributed the Class

Vehicles with so-called "Monroney" labels (also known as "window stickers") that

described the equipment and features of the vehicles. Dealers would then sell Class

Vehicles to consumers with these labels visible. Upon information and belief,

Monroney labels for many of the Class Vehicles are available at:

https://monroneylabels.com/. Exemplar labels for many of the Class Vehicles

retrieved from this website are attached hereto as Exhibit 1.

273.   As demonstrated by these examples, Monroney labels uniformly assured consumers that the Class Vehicles had working airbags and seatbelts. This information would have suggested to any reasonable consumer that the Occupant Restraint System did not suffer from a defect and would perform its intended function of activating the seatbelts and airbags during a collision. Had Defendants disclosed the defective nature of the ZF TRW ACUs on the Monroney labels of the Class Vehicles, Plaintiffs would have seen such a disclosure.

**ii.     The Vehicle Manufacturer Defendants marketed the safety features of the Class Vehicles but failed to mention the ACU defect.**

274.   The Vehicle Manufacturer Defendants touted the safety of the Class Vehicles in national advertising directed at consumers. This advertising uniformly omitted any warning about the risk of EOS during a crash. Instead, this advertising led consumers to believe that the Occupant Restraint System would function properly in a crash. Exhibits 6, 7, 10, 13, 16 and 19 to this Consolidated Complaint collect examples of misleading statements from advertising for the Class Vehicles concerning the seatbelts, airbags, ZF TRW ACUs, and overall vehicle safety.

275.   Based on information and belief, every single Class Vehicle advertisement omitted any mention that the vehicles' airbags and seatbelts could fail in a serious collision as a result of the defective ACUs.

### iii.    The Vehicle Manufacturer Defendants published owners' manuals that failed to mention the ACU defect.

276.    The Vehicle Manufacturer Defendants published owners' manuals for each of the Class Vehicles. These manuals were directed at consumers and included misleading statements regarding the seatbelts, airbags, and ZF TRW ACUs. These statements uniformly omitted any warning to consumers about the risk of EOS during a crash and instead indicated that the Occupant Restraint System would function properly in a crash. Exhibits 4, 5, 9, 12, 15, and 17 to this Consolidated Complaint collect examples of statements from the Vehicle Manufacturer Defendants' owners' manuals with materially misleading omissions concerning the effectiveness of their seatbelts, airbags, and ZF TRW ACUs.

### C.    Defendants knew about the ACU defect for years, yet failed to adequately warn or compensate consumers.

277.    As explained in more detail below, Defendants collectively learned that the defective ZF TRW ACUs are vulnerable to EOS years ago, yet failed to timely or adequately warn consumers, initiate recalls, remedy the defect, or compensate consumers.

### i.    Hyundai-Kia Class Vehicles

278.    Kia and Hyundai began selling vehicles equipped with defective ZF TRW ACUs that contain the DS84 ASIC, beginning with model year 2010 and 2011 vehicles, respectively. As explained above, because of the design of the

ACUs, a power surge on the crash sensors can lead to the complete failure of the ACU, airbags, and seatbelts during a crash. Hyundai-Kia, ZF TRW, and STMicro nonetheless conspired to conceal the true nature and scope of the defect from NHTSA and consumers.

### a.    The Definition of the Hyundai-Kia Class Vehicles

279.    The Hyundai-Kia Class Vehicles are all vehicles made by Hyundai or Kia that have a ZF TRW ACU that uses a DS84 ASIC.

280.    Based on the incomplete, pre-discovery information presently available, Plaintiffs understand the Hyundai vehicles equipped with defective ZF TRW ACUs include the 2011–2019 Sonatas and Sonata Hybrids. Plaintiffs refer to these vehicles as the "Hyundai Class Vehicles."

281.    Based on the incomplete, pre-discovery information presently available, Plaintiffs understand that Kia equipped the following vehicles with the defective ZF TRW ACU:

a.    2010–2013 Kia Forte;

b.    2010–2013 Kia Forte Koup;

c.    2011–2020 Kia Optima;

d.    2011–2016 Kia Optima Hybrid; and

e.    2011–2012, 2014 Kia Sedona.

282.   Plaintiffs refer to the Kia vehicles identified in the preceding paragraph as the Kia Class Vehicles.

283.   Plaintiffs refer to the Kia Class Vehicles and Hyundai Class Vehicles collectively as the "Hyundai-Kia Class Vehicles."

### b.    The ZF TRW ACUs in Hyundai-Kia Class Vehicles are defective.

284.   The ZF TRW ACUs in Hyundai-Kia Class Vehicles are defective because they are vulnerable to transients generated during crashes. The defect can cause the ACUs to fail precisely when they are most urgently needed: during a head-on collision. As a result, the ACU does not reliably serve its most basic purpose and poses a serious risk to the lives and physical well-being of drivers and passengers.

285.   The Hyundai-Kia Class Vehicles were either recalled by Hyundai and Kia based on an admitted defect with the ZF TRW ACU, or identified by NHTSA's investigation as vehicles containing potentially defective ZF TRW ACUs or are reasonably believed to contain the defective ZF TRW ACUs due to documents produced by Hyundai and Kia.

286.   Hyundai-Kia admits that the ACUs in many of the Hyundai-Kia Class Vehicles are defective.

a.     In announcing its first recall of Sonatas in February 2018, Hyundai described the defect as follows: "The subject vehicles

are equipped with an Airbag Control Unit ('ACU') which detects a crash signal and commands deployment of the airbags and seat belt pretensioner. In some airbag non-deployment allegations, electrical overstress ('EOS') was observed on an Application Specific Integrated Circuit ('ASIC') inside the ACU."

b.    When expanding its recall of Sonatas in April 2018, Hyundai further admitted: "As of the date of this filing, Hyundai believes that the ASIC used in the subject ACUs could be susceptible to EOS because it lacks adequate circuit protection. In at least one crash test, damage to the DS84 ASIC from EOS could have caused the loss of the AAS [(i.e., advanced airbag system)] and seat belt pretensioner deployment."

c.    When announcing its first recall in June 2018, Kia admitted: "The ASIC component within the subject ACUs may be susceptible to EOS due to inadequate circuit protection."

**c.    ZF TRW, STMicro, Hyundai, and Kia have known about the defect in ZF TRW ACUs for years.**

287.   Since at least June 2010, ZF TRW, STMicro, Hyundai, and Kia knew that the defective ACUs in Hyundai-Kia Class Vehicles were vulnerable to EOS. Although ZF TRW, STMicro, Hyundai, and Kia knew this vulnerability could lead

to airbag and seatbelt failures, they conspired to conceal the defect from consumers and safety regulators for years, including failing to disclose a pattern of EOS damage in crashes where airbags failed to deploy.

288.    In 2011, a Kia Forte crashed in China and its airbags failed to deploy. At the request of Hyundai MOBIS, ZF TRW analyzed the crash data and observed that there was damage to the ASIC that was "consistent with EOS." However, Hyundai and Kia nonetheless disregarded the incident as "a commanded nondeployment" rather than non-deployment due to EOS and stopped investigating. Upon information and belief, this conclusion was baseless and/or speculative because it is not possible to reliably conclude that a non-deployment was "commanded" by the ACU when the ACU is damaged from EOS. The conclusion of a commanded non-deployment fails to explain the observed evidence of EOS.

289.    In February 2012, Hyundai Motor America learned that a 2011 Hyundai Sonata crashed and the airbags failed to deploy. Hyundai Motor America inspected the vehicle four months later, in June 2012, and found no crash event recorded, which is a sign of ASIC EOS. Hyundai and ZF TRW communicated about the event. After ZF TRW inspected the vehicle's ACU at Hyundai's request, it concluded the ASIC showed evidence of EOS. Faced with this conclusion of EOS, and despite signs of EOS on the ACU and the loss of crash data, Hyundai

swept the issue under the rug and attributed the failure to "numerous aftermarket accessories" rather than another sign of ASIC EOS.

290.   In March of 2012, Hyundai MOBIS requested that ZF TRW perform a post-crash analysis related to failed airbag deployment—this time for a crash involving a Kia Forte in Egypt. Once again, ZF TRW found that the ASIC damage was consistent with EOS, and once again Hyundai and Kia together decided to label the incident a "commanded nondeployment" instead of non-deployment due to EOS. Upon information and belief, this conclusion was baseless and/or speculative because it is not possible to reliably conclude that a non-deployment was "commanded" by the ACU when the ACU is damaged from EOS. The conclusion of a commanded non-deployment fails to explain the evidence of EOS.

291.   On April 20, 2012, Kia Motors Corporation performed a 30-mph frontal impact test on a Kia Optima Hybrid for European market steering rearward displacement certification. Because the crash data was not recorded on the vehicle's Event Data Recorder, Kia Motors Corporation referred the matter to ZF TRW, which again found EOS damage on the ASIC.

292.   On May 17, 2012, ZF TRW communicated with Hyundai, Kia and Hyundai MOBIS about the ongoing investigation of field events with observed EOS, but did not share any information about the dangerous defect with NHTSA or consumers.

293.    Around July 23, 2012, after becoming aware of the crashes with EOS

damage to the ACUs in Hyundai and Kia vehicles described above, ZF TRW,

Hyundai, Hyundai MOBIS, and Kia began testing ACUs with additional protective

components on or around July 23, 2012. ZF TRW, Hyundai, and Kia still failed to

disclose any risks to consumers or NHTSA.

294.    In August 2012, following the tests described in the preceding

paragraph, Hyundai issued a change in the engineering plans for future productions

of the Sonata to "apply the Schottky diodes for ASIC damage problems." A

Schottky diode is a protective component that can be added to a circuit board. But

an electrical surge can still overwhelm a Schottky diode and cause EOS in the

ASIC.

295.    Likewise, Kia began including ZF TRW ACUs with the additional

Schottky diodes in the Sedona beginning August 15, 2012, and other Kia Class

Vehicles with defective ACUs beginning September 1, 2012.

296.    The addition of Schottky diodes to Hyundai-Kia Class Vehicles was

insufficient, but demonstrates Kia, Hyundai, and ZF TRW's knowledge that the

defective ACU was a serious failure that required action.[9] At that time and for

---

[9] As explained below, the use of two Schottky diodes does not appear to fix the
defect. Many FCA vehicles have one Schottky diode, but many of these vehicles
still had confirmed cases of ASIC EOS in the ACUs in crashes. Similarly, Toyota
Class Vehicles have two Schottky diodes, but the same pattern of ASIC EOS
emerged. Both FCA and Toyota have recalled many of these vehicles.

years after, ZF TRW, Hyundai, and Kia did not report the issue to NHTSA or consumers or take steps to recall vehicles.

297.    By July 2012, Kia Motors America, Inc. learned of a March 21, 2011 crash in Tallahassee, Florida where the airbags failed to deploy in a 2010 Kia Forte Koup and the driver suffered serious injuries. ZF TRW performed an analysis of the ACU and reported EOS damage to the ASIC. Pictures of the damage to the vehicle show severe damage that indicates the airbags should have deployed.





298.   In March 2014, Kia Motors America, Inc. received notice of a lawsuit alleging non-deployment of an airbag in a 2012 Kia Forte that was involved in a fatal accident on July 28, 2013 in Northern California. The crash destroyed the front end of the vehicle, as demonstrated by the below picture of the wreckage.



On or about July 2, 2014, NHTSA sent Kia Motors America, Inc. a letter requesting information about this crash. Kia did not begin to examine the vehicle until March 2015—at least a year after learning about the crash. Because Kia Motors America, Inc. could not download crash data from the ACU, it requested assistance from ZF TRW, who attempted to download the crash data on May 6, 2015, but also failed to extract it. Inability to extract crash data is a sign of ASIC EOS. Kia did not provide NHTSA with this information until more than five months later on October 16, 2015, and only after NHTSA had again requested it two days earlier.

299.    From June 2015 through January 2016, ZF TRW, Hyundai, and Kia investigated the airbag failures in the two Kia Forte crashes detailed above. Kia Motors America, Inc., Kia Motors Corporation, Hyundai MOBIS, and ZF TRW performed inspections and analyses. On December 9, 2015, ZF TRW prepared a report for the 2012 Forte involved in the fatal crash in Northern California, which it updated on January 15, 2016. The report concluded that an "[a]nalysis performed by ST Micro confirmed the presence of electrical overstress on the DS84." Despite STMicro's finding of EOS damage to the ASICs in both vehicles, Hyundai and Kia together again labeled one of the crashes "a commanded nondeployment" and considered the other "under investigation." Upon information and belief, this conclusion was baseless and/or speculative because it is not possible to reliably conclude that a nondeployment was "commanded" by the ACU when the ACU is damaged from EOS. The conclusion of commanded nondeployment fails to explain the evidence of EOS.

300.    During these same years, according to a document produced by ZF TRW to NHTSA in connection with NHTSA's investigation of the ACU Defect, Hyundai MOBIS and Hyundai returned seventeen Hyundai and Kia Class Vehicles to ZF TRW that showed signs of EOS damage to the DS84 ASIC supplied by STMicro. These warranty returns began as early as June 24, 2010, evidencing Hyundai, Kia, Hyundai MOBIS, STMicro, and ZF TRW's knowledge of EOS

issues in the DS84 ASIC at this early juncture. Further, these warranty returns proceeded up through August 2015, demonstrating knowledge of the potential for EOS damage to the DS84 ASIC in ACUs across multiple vehicle model years. Relevant excerpts of this document are included in the chart below:[10]

| Component | Analysis Category | Supplier Name | Receipt Date | Short Description Verbatim | Reason for Return | Customer | Vehicle |
|---|---|---|---|---|---|---|---|
| DS84 | EOS | ST Micro | 25-Aug-15 | SR2016102609, RMA (FR-16-03982), partially shorted to VFIREvoltage | Airbag warning lamp on | Hyundai | Sonata |
| DS84 | EOS | ST Micro | 24-Jun-10 | U501 is short to GND, pin44 is only 87ohm | Airbag warning lamp on | MOBIS | Unknown |
| DS84 | EOS | ST Micro | 11-Feb-11 | Car crash, airbag isn't deployment [Crash records indicate commanded non deployment] | Airbag warning lamp on | MOBIS | Forte |
| DS84 | EOS | ST Micro | 16-Jan-12 | AR49655, RMA34289, a fire supply open squib2 powered | Airbag warning lamp on | MOBIS | Sonata |
| DS84 | EOS | ST Micro | 3-May-12 | pin7&44 of US01 short-circuit to GND | Airbag warning lamp on | MOBIS | Forte |
| DS84 | EOS | ST Micro | 5-May-12 | pin7 of U501 short-circuit to GND. | Airbag warning lamp on | MOBIS | Forte |
| DS84 | EOS | ST Micro | 25-Jul-12 | Pin7 output signal abnormal | Airbag warning lamp on | MOBIS | Sonata |
| DS84 | EOS | ST Micro | 8-Dec-11 | Mobis 43369km return (bad U501) | Airbag warning lamp on | MOBIS | Sonata |
| DS84 | EOS | ST Micro | 22-Oct-11 | warranty return from Mobis 8938km | Airbag warning lamp on | MOBIS | Sonata |

---

[10] This excerpt excludes some columns to make the table readable.

| Component | Analysis Category | Supplier Name | Receipt Date | Short Description Verbatim | Reason for Return | Customer | Vehicle |
|---|---|---|---|---|---|---|---|
| DS84 | EOS | ST Micro | 13-Oct-11 | warranty return from Mobis 5068km | Airbag warning lamp on | MOBIS | Sonata |
| DS84 | EOS | ST Micro | 3-Oct-13 | AR55575, RMA36366, B556E1700, pins 6 & 7 out of circuit & around 5.5 ohms B556E1700 | Airbag warning lamp on | MOBIS | Sonata |
| DS84 | EOS | ST Micro | 20-Apr-13 | Burnt ( ic) | Airbag warning lamp on | MOBIS | Sonata |
| DS84 | EOS | ST Micro | 20-Jan-13 | SR2014111008, RMA, Short between pins 19 and 20 B706E2337 | Airbag warning lamp on | MOBIS | Optima |
| DS84 | EOS | ST Micro | 21-Nov-14 | two current fault:PAB 1st Stg Batt. | Airbag warning lamp on | MOBIS | Sonata |
| DS84 | EOS | ST Micro | 30-Nov-14 | This is Warranty return U501 and U601 were burnt | Airbag warning lamp on | MOBIS | Sonata |
| DS84 | EOS | ST Micro | 11-Dec-14 | link to ECU-30-E181 | Airbag warning lamp on | MOBIS | Sonata |
| DS84 | EOS | ST Micro | 14-Feb-15 | link to 2308-ECU-30-F024 | Airbag warning lamp on | MOBIS | Sonata |

301.    In May 2015, Hyundai Motor America, Inc. was notified of a crash where a 2011 Hyundai Sonata's airbags failed to deploy. Hyundai Motor America inspected the vehicle five months later, in October 2015, and requested assistance from ZF TRW. Subsequent analysis by ZF TRW indicated internal damage potentially caused by EOS.

302.    On October 20, 2015, Kia Motors America, Inc., Kia Motors Corporation, Hyundai Motor America, Inc., Hyundai Motor Co., Ltd., Hyundai

MOBIS, and ZF TRW met in Korea to discuss the issue of the defective ACUs and EOS.

303.   On February 5, 2016, ZF TRW made a presentation to NHTSA regarding the defective ACUs. The presentation admits: "EOS has been observed in specific circumstances . . . . Two customers (Chrysler and HKMC [Hyundai-Kia]) with field incidents in the U.S." According to the presentation, ZF TRW received information about field incidents in the U.S. from Hyundai in "late 2015" and included details about six different instances in which EOS was suspected or confirmed on DS84 ASICs in Hyundai-Kia vehicles. The presentation also provided details about the cause of the EOS, which ZF TRW confirmed through vehicle testing and investigation. Although ZF TRW was responsible for producing the defective ACUs, the presentation suggested its Vehicle Manufacturer "[c]ustomers are in the best position to evaluate their vehicles and determine whether any modifications are appropriate." Upon information and belief, ZF TRW shared that presentation with the Hyundai-Kia Defendants in or around February 2016.

304.   On February 25, 2016, after meeting with NHTSA, ZF TRW met with Kia, Hyundai, and Hyundai MOBIS in Korea to discuss its meeting with NHTSA and the continued investigation of airbag failures caused by EOS.

305.    In April 2016, ZF TRW analyzed an ACU from a 2011 Hyundai Sonata following a crash event in which the airbags did not deploy. ZF TRW reported that it found damage "consistent with EOS." Instead of investigating the matter further, Hyundai and Kia labeled the airbag failure a "commanded nondeployment" and considered the matter closed. Upon information and belief, this conclusion was baseless and/or speculative because it is not possible to reliably conclude that a nondeployment was "commanded" by the ACU when the ACU is damaged from EOS. The conclusion of commanded nondeployment fails to explain the evidence of EOS.

306.    In May and July of 2016, ZF TRW, Kia, Hyundai, and Hyundai MOBIS met in Korea, with the July meeting coming after ZF TRW met with NHTSA on July 19, 2016. Kia Motors Corporation provided information to ZF TRW to report to NHTSA in advance of ZF TRW's meeting with NHTSA.

307.    In August 2016, Kia Motors America, Inc. requested that ZF TRW download and review ACU data from another Kia Forte that was involved in a crash where the airbags failed to deploy.

308.    Between July and November 2016, Hyundai Motor America, Inc. received reports of two more accidents involving failed airbags in 2011 Hyundai Sonatas. Hyundai Motor America, Inc. again worked with ZF TRW to investigate, and ZF TRW again observed damage consistent with EOS on the ASIC from one

of the vehicles. Again, despite a conclusion of observed EOS from ZF TRW, Hyundai, through Hyundai Motor Co., Ltd., concluded that "it was possible that [airbag] deployment was not warranted" in those accidents. This conclusion was speculative and unreliable, and failed to explain why the ACU showed signs of EOS (a remarkable coincidence given that the airbags failed to deploy).

309.    In March 2017, Hyundai MOBIS requested an analysis from ZF TRW for another crash involving a Kia Forte in China where the airbags failed to deploy.

310.    By May 2017, Kia Motors America, Inc. learned of a fatal crash that occurred on March 18, 2017 in Canada involving a 2013 Kia Forte Koup in which the airbags failed to deploy. Pictures of the wreckage again confirm extensive damage.



Transport Canada (a government agency) requested support from Kia Canada, Inc. with downloading crash data from the ACU, and Kia Canada notified Kia Motors America, Inc., who in turn notified ZF TRW.

313.   In August 2017, ZF TRW analyzed an ACU from a Hyundai Sonata that crashed with no airbag deployment. ZF TRW reported damage consistent with EOS, and again, Hyundai and Kia together continued to try and avoid the consequences from reporting the defective ACU and communicated to ZF TRW their usual message that the incident was a "commanded nondeployment." Upon information and belief, this conclusion was baseless and/or speculative because it is not possible to reliably conclude that a nondeployment was "commanded" by the ACU when the ACU is damaged from EOS. The conclusion of commanded nondeployment fails to explain the evidence of EOS.

314.   Also in August 2017, ZF TRW, Kia, and Hyundai MOBIS analyzed the data from the Kia Forte Koup crash in Canada. ZF TRW observed damage to the ASIC that was consistent with EOS; however, Kia Motors America, Inc. reported to NHTSA that ZF TRW engineers advised it that the damage to the ASIC occurred when Transport Canada attempted to download data from the ACU. Although there was no crash data on the Event Data Record, and the vehicle had been destroyed by Transport Canada so that examination of the vehicle was only available via photographs, Kia Motors Corporation concluded that there was insufficient frontal crash energy to generate an airbag deployment signal. For at least the sixth time, Hyundai and Kia communicated their usual message that the ACU "commanded nondeployment[.]" Upon information and belief, this

conclusion was baseless and/or speculative because it is not possible to reliably conclude that a nondeployment was "commanded" by the ACU when the ACU is damaged from EOS.

315.    In addition to the series of damning field incidents and internal testing and investigations with ZF TRW's assistance evidencing the ACU defect over the course of many years, the Hyundai-Kia Defendants were *also* on notice of the defective ACUs and their attendant safety risks from consumer complaints about vehicle accidents involving the Hyundai and Kia Class Vehicles which the airbag systems did not work to protect the vehicle occupants. These complaints are publicly available (including to the Hyundai-Kia Defendants) online through NHTSA. Indeed, Hyundai reported to NHTSA that *at least* as early as May 2015, following notice of EOS issues causing airbag nondeployments in its vehicles, Hyundai Motor America specifically monitored for public reports of crash events with issues relating to airbag nondeployments.

316.    And there were many such reports for Hyundai to see. Between 2014 and the present, dozens of consumers reported to NHTSA that airbags and/or seatbelts had failed in Hyundai Class Vehicles, including for Hyundai Class Vehicles that have still not been subject to recall, even though they contain a defective ZF TRW ACU. For example:

a.  A publicly available complaint with NHTSA dated January 28, 2014 reported a January 3, 2014 accident involving a 2013 Hyundai Sonata in Westminster, California. The complaint states: "I START THE VEHICLE TO TURN RIGHT THEN GOT HIT ON THE DRIVER SIDE UP TO THE FRONT END. THE OTHER VEHICLE RAN THE RED LIGHT AND HIS SPEED WAS ABOUT 45-50 MPH. MY CAR GOT HIT HARD AT THE FRONT AND TURNED 180 DEGREE, NONE OF THE AIRBAGS WAS DEPLOYED. AS A SAFETY CONCERN, I WOULD LIKE TO FILE A COMPLAINT AS I AM GONNA HAVE A BABY SOON THIS YEAR 2014. WHAT IF THAT ANOTHER ACCIDENT OCCUR AND THE BABY OR MY SPOUSE [WERE] IN THE CAR WITH ME? *TR."

b.  A publicly available complaint with NHTSA dated August 4, 2014 reported a September 6, 2011 accident involving a 2012 Hyundai Sonata in Bossier City, Louisiana. The complaint states: "TL* THE CONTACT OWNS A 2012 HYUNDAI SONATA. THE CONTACT STATED THAT WHILE DRIVING 45 MPH, THE BRAKING SYSTEM FAILED TO

ENGAGE. THE CONTACT APPLIED THE EMERGENCY

BRAKE AND THE VEHICLE SKIDDED. AS A RESULT,

THE CONTACT CRASHED INTO A MEDIAN. THE

DRIVER SIDE AIR BAG FAILED TO DEPLOY. THE

CONTACT SUSTAINED BRAIN AND BACK INJURIES

AND THE REAR PASSENGER SUSTAINED INJURIES TO

THE HANDS AND SHOULDER, WHO BOTH REQUIRED

MEDICAL ATTENTION. A POLICE REPORT WAS FILED.

THE VEHICLE WAS DESTROYED. THE

MANUFACTURER WAS MADE AWARE OF THE

FAILURE. THE APPROXIMATE FAILURE MILEAGE

WAS 50,000."

c.     A publicly available complaint with NHTSA dated December

20, 2019 reported an October 10, 2019 accident involving a

2019 Hyundai Sonata in Casco, Wisconsin. The complaint

states: "TL* THE CONTACT OWNED A 2019 HYUNDAI

SONATA. WHILE THE CONTACT WAS PULLING INTO

AN INTERSECTION, A SECOND VEHICLE CRASHED

INTO THE FRONT DRIVER SIDE OF HIS VEHICLE. THE

FRONT END OF THE VEHICLE WAS SEVERELY

DAMAGED; HOWEVER, THE AIR BAGS DID NOT DEPLOY. THE DRIVER SUSTAINED BROKEN RIBS, AND INJURIES TO THE LEG, HEAD, AND ARM. MEDICAL ATTENTION WAS RECEIVED AND POLICE REPORT NUMBER: [XXX] WAS FILED. THE VEHICLE WAS DESTROYED AND TOWED FROM THE SCENE. BROADWAY AUTOMOTIVE (1010 S. MILITARY AVE, GREEN BAY, WI) AND THE MANUFACTURER WERE NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS 3,500. *DT."

d.   More than 30 examples of such complaints are attached hereto as Exhibit 2.

317.   For Kia, too, dozens of consumers reported to NHTSA that airbags and/or seatbelts had failed in Kia Class Vehicles between 2012 and the present, including for Kia Class Vehicles that have still not been subject to a recall:

a.   A publicly available complaint with NHTSA dated September 16, 2013 reported a September 10, 2013 accident involving a 2011 Forte in Sharpsburg, Georgia. The complaint states: "TL* THE CONTACT OWNS A 2011 KIA FORTE. THE CONTACT STATED THAT WHILE SITTING AT A

COMPLETE STOP, ANOTHER VEHICLE TRAVELING 60

MPH CRASHED INTO THE REAR OF THE CONTACTS

VEHICLE. THE IMPACT CAUSED THE CONTACTS

VEHICLE TO BE PUSHED FORWARD AT

APPROXIMATELY TWO HUNDRED FEET AND INTO

THE REAR OF ANOTHER VEHICLE. THE DRIVERS SIDE

HEAD REST AND METAL BAR BECAME SEPARATED

UPON IMPACT. THE CONTACT SUFFERED FROM

WHIPLASH, NECK STRAINS, AND LACERATIONS TO

THE LOWER BACK AND RIGHT LEG. A POLICE

REPORT WAS FILED. IN ADDITION, THE DRIVER AND

PASSENGERS SIDE AIR BAGS FAILED TO DEPLOY. THE

VEHICLE WAS DESTROYED. THE MANUFACTURER

WAS MADE AWARE OF THE FAILURE. THE FAILURE

AND CURRENT MILEAGE WAS 35,000."

b.   A publicly available complaint with NHTSA dated February 6,

2015 reported a February 3, 2015 accident involving a 2010

Forte in Saint John, Indiana. The complaint states: "2010 KIA

FORTE REAR ENDED A 2012 TOYOTA VENZA WHILE

TRAVELING AT APPROXIMATELY 40 MPH ON WET

ASPHALT PAVEMENT. UPON COLLISION, THE AIR

BAG FAILED TO DEPLOY AND SEAL BELT RESTRAINT

FAILED TO HOLD BACK DRIVER OF THE KIA. DRIVERS

FOREHEAD HIT AND BENT STEERING WHEEL AND

CAUSED MAJOR FRONT END DAMAGE TO THE KIA

AND CONSIDERABLY LESS DAMAGE TO THE TOYOTA

VENZA. KIA WAS NOT DRIVABLE, SO IT WAS TAKEN

TO A SALVAGE YARD OF A FLAT BED TRUCK. DRIVER

OF KIA WAS TAKEN TO HOSPITAL FOR X-RAYS AND

EVALUATION. DRIVER OF KIA SUFFER NECK\BACK

PAIN, BRUISED FOREHEAD AND HEAD ACHE AND

WAS PRESCRIBED PAIN PILLS & ANTI

INFLAMMATORY MEDICATION. MY GREATEST

CONCERN IS THAT I OWN TWO KIA'S, ONE FOR EACH

OF MY COLLAGE AGE KIDS AND FEAR THAT THE

SAME OUTCOME MAY OCCUR AGAIN WITH DIRE

CONSEQUENCES. FAILURE OF THE AIR BAG

DEPLOYMENT AND SEAT BELT RESTRAINT MUST BE

ADDRESSED AND CORRECTED BY KIA BEFORE MORE

INJURIES OCCUR. . UPDATED 02/19/15 *BF UPDATED 3/30/2016 *JS UPDATED 9/20/2017*CN."

c.   A publicly available complaint with NHTSA dated May 29, 2019 reported a March 24, 2019 accident involving a 2015 Optima in Naperville, Illinois. The complaint states: "I WAS TRAVELING EAST ON A 4 LANE ROAD AT 45 MPH. AS I WAS PASSING THRU A GREEN LIGHT, A WESTBOUND VEHICLE MADE AN ILLEGAL LEFT TURN IN FRONT OF ME, CAUSING ME TO 'T-BONE' HIS VEHICLE. ALL OF HIS AIRBAGS DEPLOYED.....NONE OF MINE DID. THE CAR WAS REPAIRED, SURPRISINGLY; YET I DO NOT FEEL SAFE DRIVING IT. I SUSTAINED CERVICAL AND LUMBAR SPINE INJURIES, AS WELL AS A SEVERE WHIPLASH AND CONCUSSION. I AM UNABLE TO WORK, DUE TO SURGERY THAT WAS NECESSARY. I JUST NEED TO KNOW IF THIS CAR IS SAFE?? I WAS ALSO IN A SIDE COLLISION THAT WAS NOT MY FAULT; TWO YEARS AGO, WHERE SOMEONE HIT ME, AND NO AIRBAGS DEPLOYED. AT THAT PARTICULAR ACCIDENT, I WAS STATIONARY; AT A STOP LIGHT."

d.    Approximately 24 examples of such complaints are attached hereto as Exhibit 3.

318.    Finally, in 2018—at least *eight years* after learning about the defective ACUs in or around 2010—the Hyundai-Kia Defendants began to issue partial recalls for some of the Hyundai and Kia Class Vehicles.

319.    On February 27, 2018, Hyundai Motor America submitted a Part 573 Safety Recall Report to NHTSA announcing its intention to recall a small subset of the Hyundai Class Vehicles. This initial recall included just 154,753 vehicles— limited to only model year 2011 Sonatas. At that time, Hyundai Motor America and Hyundai Motor Co. Ltd reported they were "investigating" the issue with the "ACU supplier," which would include ZF TRW and Hyundai MOBIS.

320.    On March 1, 2018, Kia Motors America, Inc. informed NHTSA that the observed Hyundai Sonata EOS incidents were "very different" than incidents with Kia Fortes and that it believed that it had resolved the issue with Kia vehicles. Despite this representation, Kia Motors America, Inc. proposed conducting a design analysis in April 2018 to determine whether 2010–2013 Kia Forte and Forte Koup vehicles are susceptible to ASIC EOS.

321.    On March 8, 2018, ZF TRW reported to NHTSA that it was aware of *twelve* separate incidents of crashes involving Hyundai and Kia Class Vehicles where the airbags failed to deploy and EOS was suspected or confirmed. ZF TRW

further reported that Hyundai and Kia communicated to ZF TRW that seven out of the twelve airbag nondeployments were the result of "commanded non deployment," while the other five incidents were "under investigation."

322.   On March 14, 2018, Kia met with NHTSA regarding its investigation of the ASIC EOS problem in Kia Forte vehicles. Despite the repeated findings of EOS by ZF TRW, Kia misleadingly reported that "no cause has been found."

323.   Days later, on March 16, 2018, NHTSA opened a formal investigation called a "Preliminary Investigation" concerning ZF TRW ACUs with DS84 ASICs installed in Hyundai and Kia vehicles.

324.   On April 18, 2018, Hyundai Motor America submitted an amended Part 573 Safety Recall Report to NHTSA to expand the earlier recall to cover 580,058 vehicles based on this same defect (the "Recalled Hyundai Class Vehicles"). The amended 573 Report noted that the observed "defect appears substantially similar to the defect in Recall No. 16V-668 [the Fiat Chrysler Recall] where EOS appeared to be a root cause of [airbag] non-deployment in significant frontal crashes." Hyundai did not explain why these 400,000 additional vehicles were not included in its February 2018 recall based on the same ACU Defect.

325.   Despite Hyundai's recall related to the ZF TRW ACUs, Kia failed to take action for its own vehicles with that same ACU until three months later, when

NHTSA requested a recall after it found additional evidence of EOS in a Kia vehicle during a joint inspection.

326.   Specifically, on May 15-16, 2018, Kia Motors America, Inc. and NHTSA conducted a joint inspection of "exemplar" 2011 Kia Forte Koup and 2012 Kia Forte vehicles that NHTSA had located in salvage yards and requested Kia Motors America, Inc.'s assistance to download data from the ACU. Kia Motors America, Inc. was unable to communicate with the 2012 Forte module, and both ACUs were sent to ZF TRW for further analysis. On May 24, 2018, after another joint inspection between ZF TRW, Kia, Hyundai MOBIS, and NHTSA at ZF TRW, an analysis confirmed that the 2012 Forte had experienced damage consistent with EOS. Based on that analysis, NHTSA requested that Kia conduct a recall of the 2010–2013 model year Kia Forte. Only at the regulators' request did Kia finally recall some of its vehicles.

327.   On May 28, 2018, Kia Motors Corporation agreed to recall 2010–2013 model year Kia Forte and Forte Koup vehicles, and based on its engineering analysis of other Kia models equipped with the same ACU as those vehicles, determined that a recall of 2011–2013 Optima, 2011–2012 Optima Hybrid and 2011–2012 Sedona (the "Recalled Kia Class Vehicles") was also required. In its Part 573 Safety Recall Report announcing its intention to recall 507,587 vehicles, Kia explained that the recall was the result of its conclusion that "[t]he ASIC

component within the subject ACUs may be susceptible to EOS due to inadequate circuit protection," which the Hyundai-Kia defendants had already known about for years.

328.    Although Kia Motors Corporation agreed to the above recall of over 500,000 vehicles, it falsely reported to NHTSA that it was doing so despite the fact that it "has received no warranty claims, field or service reports which identify an airbag ACU being subject to EOS during a frontal crash event, and thus there is no count of injuries or fatalities to include with that information." However, as alleged above, ZF TRW had received EOS-related warranty returns on at least four Kia vehicles by January 2013, as well as one additional vehicle with a defective ZF TRW ACU supplied by Kia's auto parts supplier, Hyundai MOBIS. Additionally, ZF TRW found evidence of EOS in several other crashes, including the 2011 Kia Forte crash in China, 2012 Kia Forte crash in Egypt, 2012 Kia Optima Hybrid crash test that Kia Motors Corporation conducted, 2012 Kia Forte fatal crash in Northern California, 2013 Kia Fore Koup fatal crash in Canada, and 2010 Kia Forte crash in Tallahassee, Florida.

329.    On July 16, 2019, NHTSA sent a letter to Kia Motors America, Inc. stating that it had opened an Engineering Analysis related to the EOS issue and requesting information about the defective ACUs. In response, on August 30, 2019, Kia Motors America, Inc. again falsely reported to NHTSA that it had

received no consumer complaints, field reports, lawsuits, arbitration claims, property damage claims, reports for ACUs returned from the field or from test vehicles, or reports involving crashes, injuries, or fatalities related to defective ACUs or EOS. Kia Motors America, Inc. repeated this false claim in an updated letter dated September 20, 2019.

> **d. Hyundai, Kia, and ZF TRW made misleading statements and omitted material facts about the airbags, seatbelts and ACUs in Hyundai-Kia Class Vehicles.**

330.   Hyundai and Kia made multiple false and/or misleading statements concerning the Hyundai and Kia Class Vehicles using interstate mail and/or wire.

331.   To sell the Hyundai-Kia Class Vehicles through dealerships, Hyundai or Kia (for their respective vehicles) had to certify compliance with applicable safety standards described in Section IV.B.i above, including by affixing written certifications to its vehicles and sending them to dealers. These certifications were transmitted via interstate shipping channels with the vehicles.

332.   Hyundai and Kia also distributed via mail and wire numerous manuals for the Hyundai and Kia Class Vehicles. These manuals contain affirmative statements concerning occupant restraint controllers, airbags, and seatbelts. Charts summarizing these statements are attached hereto as Exhibits 4 and 5. Manuals for the Hyundai and Kia Class Vehicles are available on Hyundai's and Kia's

websites. They are also typically included in the vehicles when they are sold at dealerships.

333.   Hyundai and Kia also distributed misleading advertising concerning the Hyundai-Kia Class Vehicles via mail and wire. Their advertising contains affirmative statements about airbags and seatbelts and omits important facts about the dangers posed by the defective ACUs. *See* Exhibits 6 and 7 (collecting exemplars). Illustrative examples of these types of advertising campaigns and content are included below.

334.   On July 2, 2017, Hyundai's website on vehicle safety assured that "[w]hen it comes to safety, you can't be better enough. You can't overstate the importance of keeping the people you love safe, which is why we can't overstate the importance of always striving to make our safety features more advanced and innovative," and featured an image of deployed driver and passenger airbags.



335.   When Kia announced its 2011 Forte in an October 11, 2010 press release, it led with its "impressive list of safety features" noting that "Forte offers an exceptional level of standard safety equipment, with features such as front active headrests, dual advanced front airbags, front seat-mounted and side curtain airbags, full-length side curtain airbags."

336.   A brochure for the 2012 Hyundai Sonata noted that "When it comes to being a top safety pick, Sonata has earned its stripes and stars . . . Contributing to these ratings (and your peace of mind) are things like reinforced unibody construction, 4-wheel ABS brakes, airbags galore and an array of modern safety technologies fitted as standard equipment." As it continued, "an intelligent airbag system deploys and inflates front airbags in relation to driver/passenger height, weight and impact speed."

337.    The brochure for the 2013 Sonata similar assured: "Safety. At Hyundai, it's more than a list of features. It's a mindset. You don't become one of the first midsize cars to receive a 5-Star overall safety rating under the federal government's new, more stringent 2012 guidelines by accident. Or get named a Top Safety Pick two years in a row by the Insurance Institute for Highway Safety because you offer more airbags than the other guy. Safety is a mindset that starts with the car's core engineering." It also boasts that its "[s]ix airbags stand poised to protect."

338.    In the brochure for the 2012 Forte, Kia promised a "comprehensive list of advanced safety systems" that were "standard in every Forte" including an "advanced system" that "monitors the severity of an impact, the presence of a front passenger and seat-belt use, and then controls airbag inflation accordingly."

339.    As to the 2012 Kia Sedona, Kia assured consumers it was the "ideal minivan for families on the go – A smarter way to take on the world. The 2012 Sedona is the perfect minivan to help your family enjoy life from dawn to dusk and beyond" due to its "[s]ophisticated active and passive safety systems [to] help provide protection and peace of mind," including "Six airbags placed throughout the cabin are designed to help protect occupants in certain collisions. They include dual front advanced, dual front seat-mounted side, and full-length side-curtain airbags. The advanced front airbag system monitors the severity of a frontal

impact, the presence of a front passenger and seat-belt use, and then controls airbag inflation accordingly."

340.   A July 17, 2014 Press Release for the 2015 Sonata touted that "The all-new 2015 Sonata is rated as one of the safest cars on the road today." It also included a statement from Mike O'Brien, vice president, Corporate and Product Planning at Hyundai Motor America that "Occupant safety is at the forefront of Hyundai design and engineering," and that "Sonata's TOP SAFETY PICK+ recognition reinforces our dedication to occupant safety, and integrating our accident prevention technologies makes the 2015 Sonata one of the safest midsize sedans on the market today."

341.   In a brochure for the 2015 Optima, Kia assured that its "[s]afety systems help add peace of mind in certain situations. That's why all Optima models are equipped with advanced safety systems engineered to help you maintain control, even in challenging road conditions and in some emergency situations. They function automatically, leaving you free to focus on the road." These safety systems included airbag and seat-belt sensors in an "advanced system [that] monitors the severity of certain impacts, the presence of a front passenger and seat-belt use, and then controls airbag inflation accordingly."

342.   Likewise, a 2016 Sonata brochure also stated that "[e]ven if safety's not foremost in your mind, you can rest assured it's foremost in ours" given that

"Sonata's safety features not only include seven airbags, but technologies that help drivers avoid accidents in the first place."

343.   Upon information and belief, Hyundai and Kia's advertising uniformly omitted any description of a defect in the Hyundai-Kia Class Vehicles' ACUs that made them vulnerable to failure during a crash.

344.   Tellingly, during these same years where the Hyundai-Kia Defendants learned about the defective ACUs and numerous field incidents in Hyundai and Kia Class Vehicles yet did not issue a recall, Hyundai was being investigated by NHTSA for improperly delaying a recall of its Genesis model to fix a brake defect. In 2014, Hyundai agreed to settle the matter, and NHTSA stated that Hyundai "must change the way they deal with safety-related defects." In 2016, a whistleblower from one of the Hyundai-Kia Defendants also reported concerns to NHTSA about the scope and timeliness of three recalls carried out in the U.S.

>           **e.      Hyundai-Kia's belated and partial recall did not prevent or remedy the economic harm to consumers.**

345.   The limited recalls to date for some of the Hyundai and Kia Class Vehicles did not provide an adequate remedy to the hundreds of thousands of consumers who paid for those vehicles.

>           a.      First, Hyundai and Kia's respective limited recalls occurred multiple *years* after they first knew about the ACU defect, during which they avoided incurring the costs associated with

recalls and installing replacement parts for almost a decade. Throughout this time, consumers continued to buy, lease, and drive vehicles that the Hyundai-Kia Defendants knew to be unsafe every day.

b.    Second, when Hyundai first announced a recall for *some* of the Class Vehicles in February 2018, it also admitted that it did not have a solution to fix the defective ACU, despite having knowledge of the defect for almost a decade. Hyundai first mailed notice of an available repair to owners eight months after announcing the recall, in mid-October 2018, while Kia first mailed notice of an available repair to owners two months after announcing its recall, on or about July 28, 2018.

c.    Third, the recall repair eventually offered by Hyundai and Kia did not provide an adequate remedy to the problem. The "fix" involved installing an extension wire harness kit for additional circuit protection. However, by simply installing a separate wire harness kit outside of the ACU—and even then, only "if necessary" in Kia Sedonas—the Hyundai-Kia Defendants' recalls did not remedy the defective ACUs themselves.

d.    Fourth, as of the most recent reports from January 2020, the Hyundai-Kia Defendants' recalls have remedied just over half of the recall population since they were announced over two years ago. According to Hyundai's most recent recall report, Hyundai had repaired 338,604 of the 580,058 vehicles with defective ACUs as of January 31, 2020. According to Kia's most recent recall report, Kia had repaired 201,060 of the 507,587 vehicles with defective ACUs as of January 13, 2020. During this time period, and in the years that have followed, consumers reported airbag and seatbelt failures in the Recalled Hyundai and Kia Class Vehicles.[11]

e.    Fifth, Hyundai and Kia have not offered any monetary compensation to purchasers or lessees of the Recalled Hyundai and Kia Class Vehicles.

346.    Hyundai has not recalled 2013–2019 Sonatas and Sonata Hybrids also equipped with defective ACUs containing DS84 ASICs (the "Unrecalled Hyundai Class Vehicles"). Kia has likewise not recalled Forte, Forte Koup, Optima, or

---

[11] *See* Hyundai reports, Ex. 2 (ODI Nos. 11160781, 11140564, 11156730, 11232616, 11208091, 11208630, 11291530, 11301138, 11111515, 11109647, 11153247, 11182813, 11307272); Kia reports, Ex. 3 (ODI Nos. 10781050, 11018775, 11105328, 11129933, 11130355, 11142259, 11131971, 11174482, 11150286).

Optima Hybrid models produced after August 31, 2012, or Sedona vehicles

produced after August 14, 2012—all of which were equipped with defective ACUs

containing DS84 ASICs (the "Unrecalled Kia Class Vehicles"). Upon information

and belief, ZF TRW and the Hyundai-Kia Defendants conspired to exclude the

Unrecalled Hyundai and Kia Class Vehicles from their recalls and misled NHTSA

and consumers to believe that those vehicles were safe by describing additional

protective components added to the ACUs in the Unrecalled Hyundai and Kia

Class Vehicles.

347.   The additional protective components added to some Hyundai and Kia

Class Vehicles did not fix the defect, but does demonstrate Hyundai-Kia, ZF TRW,

and STMicro's knowledge that the original ACU was vulnerable to EOS, as well

as their complicity in failing to warn customers that any change to the Hyundai-Kia

Class Vehicles was needed.

348.   The added components in the Unrecalled Hyundai and Kia Class

Vehicles did not remedy the defective ACUs for at least three reasons.

a.    First, the cost of these additional protections was a primary

motivation in the Hyundai-Kia Defendants' decision-making

process. An internal November 2011 presentation reflected

Hyundai's plan and technical requirements to source ACUs for

the model year 2013 Sonatas. One of the key considerations

identified was a direction to "constantly consider" "mass/cost reduction" and to "provide plans for additional [cost] reduction" in any proposal.

b.    Second, other Class Vehicles with similar additional protective components have been recalled based on the same vulnerability to ASIC EOS in the ACU. For example, Toyota Class Vehicles have similar protective components to the Unrecalled Hyundai and Kia Class Vehicles. Despite these components, NHTSA has "identified two substantial frontal crash events (one fatal) involving Toyota products where EOS is suspected as the likely cause of the non-deployments" and noted that the "crashes involved a MY 2018 and a MY 2019 Corolla equipped with the subject ACU that incorporated higher levels of ASIC protection." In 2020, Toyota recalled the Corollas despite these additional protective components. Accordingly, the Unrecalled Hyundai and Kia Class Vehicles are also still vulnerable to EOS.

c.    Third, Hyundai returned numerous Unrecalled Hyundai Class Vehicles to ZF TRW expressly due to EOS-related warranty issues, including throughout 2014 and 2015.

d.      Fourth, consumers continue to make public complaints to NHTSA about suspicious airbag failures in Unrecalled Hyundai and Kia Class Vehicles. *See* Exhibit 2 (Hyundai complaints, ODI Nos. 10966365, 11218278, 11113831, 11185315, 11207275, 11235075, 11290285, and 11309986); Exhibit 3 (Kia complaints, ODI Nos. 11019598, 11183175, 11184995, 11210649, 11271129, 11287036).

e.      Fifth, the ZF TRW ACUs that supposedly have additional protective components purportedly justifying exclusion from a recall are currently under investigation by NHTSA, along with all other defective ZF TRW ACUs.

## ii.      FCA Class Vehicles

349.   In or around 2008 and 2009, FCA began selling vehicles equipped with defective ZF TRW ACUs that contain the same DS84 ASIC. As explained above, because of the design of the ACUs, EOS from a power surge on the crash sensors can lead to the complete failure of the ACU, airbags, and seatbelts during a crash. FCA, ZF TRW, and STMicro nonetheless conspired to conceal the defect from NHTSA and consumers.

### a.    The Definition of the FCA Class Vehicles

350.    The FCA Class Vehicles are all vehicles made by FCA that have a ZF TRW ACU that uses a DS84 ASIC.

351.    Based on the incomplete, pre-discovery information presently available, Plaintiffs understand the FCA vehicles were equipped with defective ZF TRW ACUs:

   a.    2010–2014 Chrysler 200;

   b.    2010 Chrysler Sebring;

   c.    2010–2014 Dodge Avenger;

   d.    2010–2017 Jeep Compass;

   e.    2010–2013 Jeep Liberty;

   f.    2010–2017 Jeep Patriot;

   g.    2010–2018 Jeep Wrangler;

   h.    2010–2012 Dodge Caliber;

   i.    2009–2012 Dodge Ram 1500;

   j.    2010–2012 Dodge Ram 2500/3500;

   k.    2011–2012 Dodge Ram 3500/4500/5500 Cab-Chassis;

   l.    2010–2012 Dodge Nitro; and

   m.    2012–2019 Fiat 500.

352.   Plaintiffs refer to the vehicles identified in the preceding paragraph as the FCA Class Vehicles.

### b.    The ZF TRW ACUs in FCA Class Vehicles are defective.

353.   The ZF TRW ACUs in FCA Class Vehicles are defective because they are vulnerable to transients generated during crashes. The defect can cause the ACUs to fail precisely when they are most urgently needed: during a head-on collision. As a result, the ACU does not reliably serve its most basic purpose and poses a serious risk to the lives and physical well-being of drivers and passengers.

354.   The FCA Class Vehicles were either recalled by FCA based on an admitted defect with the ZF TRW ACU or identified by NHTSA as vehicles containing potentially defective ZF TRW ACUs.

355.   FCA has publicly admitted that, as of September 2016, it was aware of at least three fatalities and five injuries in car accidents where the airbags in FCA Class Vehicles failed to deploy. Discovery will reveal the full extent of FCA's knowledge of other fatalities and injuries in collisions where airbags failed in FCA Class Vehicles.

356.   FCA has also publicly admitted that, as of September 2016, it was aware of 10 separate crashes where the airbags in FCA Class Vehicles failed to deploy and where EOS in a defective ZF TRW ACU was either confirmed or suspected as the cause.

357. On September 13, 2016, nearly 18 months after FCA supposedly had first learned of the ACU defect, FCA submitted a Part 573 Safety Recall Report to NHTSA announcing its intention to recall 1,425,627 vehicles based on an admitted defect with the ZF ACUs. Although the recalled vehicles were all equipped with defective ZF TRW ACUs, FCA did not recall all of the FCA Class Vehicles equipped with the defective ZF TRW ACUs. It still has not recalled all of the FCA Class Vehicles today.

358. FCA's September 13, 2016 Part 573 Safety Recall Report states:

> 2010–2014 MY Chrysler 200, Chrysler Sebring and Dodge Avenger ('JS'), 2010–2014 MY Jeep Compass and Jeep Patriot ('MK') and 2010–2012 MY Dodge Caliber ('PM') vehicles may experience loss of air bag and seat belt pretensioner deployment capability in certain crash events due to a shorting condition resulting in a negative voltage transient that travels to the Occupant Restraint Controller ('ORC')[12] via the front impact sensor wires damaging an Application Specific Integrated Circuit ('ASIC') in the ORC. The root cause of the failure was determined to be a combination of the relative susceptibility of the subject ORC ASIC to negative transients and the front acceleration sensor signal cross-car wire routing in certain crash events. . . . The potential loss of air bag and seat belt pretensioner deployment capability in such crash events may increase the risk of injury in a crash.

359. Between 2010 and the present, dozens of consumers reported to NHTSA that their airbags and seatbelts had failed in FCA Class Vehicles.

---

[12] As explained above, "ORC" is another term for ACU.

Approximately 100 examples of such complaints are attached hereto as Exhibit 8.

Illustrative examples of these complaints are quoted below.

a.    A September 29, 2010 complaint concerning a September 7, 2010 crash involving a 2010 Dodge Ram states: "TL* THE CONTACT OWNS A 2010 DODGE RAM 1500. THE CONTACT WAS RUN OFF THE ROAD WHILE DRIVING 65 MPH INTO A DITCH. THE FRONTAL AIR BAGS DID NOT DEPLOY AND THE SEAT BELT DID NOT LOCK. THE CONTACT HIT AND BROKE THE STEERING WHEEL AND STEERING COLUMN BECAUSE OF THE SEAT BELT FAILURE; HE WAS INJURED. THE VEHICLE WAS TOWED TO A REPAIR SHOP. THE MECHANIC (AND POLICE OFFICER ON THE SCENE) STATED THAT THE AIR BAGS SHOULD HAVE DEPLOYED. THE CURRENT AND FAILURE MILEAGES WERE APPROXIMATELY 3,600."

b.    A July 18, 2016 complaint concerning a July 13, 2016 crash involving a 2009 Dodge Ram states: "AIR BAG FAILURE-- ON WEDNESDAY JULY 13 2016 THE VEHICLE (2009 DODGE RAM 1500) WAS INVOLVED IN A FRONT END

COLLISION WHILE TRAVELING ON A CITY OWNED ROAD. THE DRIVER WHO WAS THE ONLY PERSON IN THE VEHICLE LOST CONTROL OF THE VEHICLE WHEN TAKING A SHARP RIGHT TURN ON A DIRT ROAD IN THE DARK. AS A RESULT THE VEHICLE CRASHED INTO A DITCH, COMPLETELY SMASHING IN THE FRONT END AND DAMAGED MOST OF THE REST OF THE TRUCK AS WELL. UPON IMPACT THE DRIVER'S AIR BAG DID NOT DEPLOY. THE DRIVER SUSTAINED INJURIES TO HIS ENTIRE UPPER BODY AS WELL AS SUFFERING FROM A CONCUSSION UPON IMPACT BECAUSE OF THE AIR BAG MALFUNCTION. HE REQUIRED EMERGENCY MEDICAL ATTENTION AND WAS TRANSPORTED TO THE HOSPITAL BY AMBULANCE. WE HAVE MORE PICTURES INCLUDING PICTURES OF THE FRONT END OF THE TRUCK HOWEVER THE FILE IS TO BIG TO UPLOAD ON THIS REPORT."

c.    A September 19, 2017 complaint concerning an October 2, 2015 crash involving a 2012 Jeep Wrangler states: "I WAS

INVOLVED IN A SINGLE VEHICLE ACCIDENT ON

10/2/2015 INVOLVING 2012 JEEP WRANGLER, MY

VEHICLE JERKED TO THE RIGHT SUDDENLY CAUSING

ME TO LOSE CONTROL. THE JEEP WAS JERKED OFF

THE ROAD INTO A DITCH ON THE RIGHT, HIT THE

FRONT END OF THE DITCH AND WAS LAUNCHED

AIRBORNE, THEN CRASHED ON THE CEMENT WALL

OF A SECOND DITCH, BOUNCING TWICE BEFORE

LANDING IN THE DITCH AND HITTING THE FRONT

END OF THAT DITCH. I REPEATEDLY SLAMMED ON

MY BRAKES BUT THEY DID NOT ENGAGE. MY

AIRBAGS DID NOT DEPLOY. MY SEAT BELT

TENSIONER DID NOT ENGAGE, CAUSING ME TO BE

THROWN FORWARD AND BACKWARDS REPEATEDLY.

I SUFFERED A CLOSED HEAD INJURY AND

HERNIATIONS TO MULTIPLE DISCS IN MY NECK AS

WELL AS TRAUMA TO THE FACET JOINTS IN MY

NECK, RESULTING IN SEVERE FORAMINAL STENOSIS

AT MULTIPLE LEVELS THAT REQUIRES

NEUROSURGICAL INTERVENTION. I SLAMMED MY

HEAD ON THE STEERING WHEEL 4 TIMES, MY CHEST ONCE. THIS ACCIDENT FOREVER CHANGED MY LIFE. I HAVE REPEATEDLY CALLED FCA TO FILE A FORMAL COMPLAINT, AM ALWAYS TOLD SOMEONE WILL CALL ME BACK. IT'S BEEN ALMOST TWO YEARS AND NO ONE HAS CALLED ME BACK. I WAS GIVEN A CASE NUMBER AND TOLD SOMEONE WOULD COME LOOK AT MY VEHICLE TO INSPECT IT, NEVER HAPPENED. AS I FACE URGENT SURGERY TO MY SPINE WITH PAIN TO MY NECK RADIATING DOWN MY RIGHT ARM, ALL I CAN THINK ABOUT IS CHRYSLER. THEY RECALLED 2016-2017 JEEP WRANGLERS FOR FAULTY WIRING OF THE OCCUPANT RESTRAINT CONTROL MODULE, AS WELL AS JEEP PATRIOTS AND COMPASSES MADE THE SAME YEAR AS MY VEHICLE ALONG WITH MILLIONS OF OTHER CHRYSLER VEHICLES. FCA REFUSES TO RETURN MY PHONE CALLS, HOW MANY MORE PEOPLE ARE THEY IGNORING? THEY NEED SEE WHAT HAPPENS WHEN THEY DON'T RECALL ALL VEHICLES

BUILT WITH THE SAME COMPONENTS, KNOWING

THERE ARE MORE VEHICLES NOT INCLUDED IN THE

RECALL THAT POSE A SAFETY RISK."

d.    A February 28, 2019 complaint concerning a collision

involving a 2016 Jeep Wrangler states: "DURING A

ROLLOVER CRASH WHICH INITIATED AT 40 MILES

PER HOUR, THE FRONTAL AIRBAGS FAILED TO

DEPLOY. THE VECHICLE ROLLED AND AN ADEQUATE

AMOUNT OF FORCE TO DEPLOY THE AIR BAGS

SHOULD HAVE BEEN TRIGGERED. AS A RESULT THE

OOCCUPANTS EXPERIENCE EXTENSIVE INJURIES

CONSISTENT WITH SUDDEN DECELERATION."

c.    **ZF TRW, STMicro and FCA have known about the defect in ZF TRW ACUs for years.**

360.    For many years, ZF TRW, FCA, and STMicro have known that the

defective ZF TRW ACUs in FCA Class Vehicles are vulnerable to EOS.

361.    According to a document produced by ZF TRW to NHTSA in

connection with NHTSA's investigation of vehicles equipped with defective ZF

TRW ACUs containing the DS84 ASIC, FCA returned over twenty vehicles to ZF

TRW that showed signs of EOS in the DS84 ASIC between September 25, 2009

and September 6, 2016. Excerpts of this document with relevant dates are collected

below, and indicate ACU failures due to EOS.

| Component | Analysis Category | Supplier Name | Receipt Date | Short Description Verbatim | Reason for Return | Customer | Vehicle |
|-----------|-------------------|---------------|--------------|----------------------------|-------------------|----------|---------|
| DS84 | EOS | ST Micro | 25-Sep-09 | AR45062, RMA31574, SQUIB FAULTS, PART BURNED | Airbag warning lamp on | Chrysler | 200/ Sebring/ Avenger |
| DS84 | EOS | ST Micro | 19-Nov-09 | AR46093, RMA 32032, VSAT SHORT TO GROUND | Airbag warning lamp on | Chrysler | 200/ Sebring/ Avenger |
| DS84 | EOS | ST Micro | 7-Oct-08 | AR47049, RMA32522, VDD SHORTED TO GROUND | Airbag warning lamp on | Chrysler | 200/ Sebring/ Avenger |
| DS84 | EOS | ST Micro | 1-May-10 | AR47619, RMA32729, VDD SHORTED TO GND, PIN 7 | Airbag warning lamp on | Chrysler | 200/ Sebring/ Avenger |
| DS84 | EOS | ST Micro | 9-Jun-11 | AR49585, RMA34205, pulling down VUPP_Out(VRES) voltage | Airbag warning lamp on | Chrysler | Caliber |
| DS84 | EOS | ST Micro | 4-Jan-10 | AR49609, RMA34284, return Squib to ST Micro analysis | Airbag warning lamp on | Chrysler | Wrangler |
| DS84 | EOS | ST Micro | 4-Apr-12 | AR50384, RMA34495, internally shorted pins 61 to 62 | Airbag warning lamp on | Chrysler | 200/ Sebring/ Avenger |
| DS84 | EOS | ST Micro | 15-Jan-12 | AR51945, RMA34838, Squib short to ground for squib 0 | Airbag warning lamp on | Chrysler | Wrangler |
| DS84 | EOS | ST Micro | 14-Sep-11 | AR51952, RMA34848, Drivers seat belt is not working | Airbag warning lamp on | Chrysler | Wrangler |
| DS84 | EOS | ST Micro | 13-May-11 | AR52298, RMA34986, US01 has an internal VDD-GNDshort | Airbag warning lamp on | Chrysler | Caliber |

| Component | Analysis Category | Supplier Name | Receipt Date | Short Description Verbatim | Reason for Return | Customer | Vehicle |
|---|---|---|---|---|---|---|---|
| DS84 | EOS | ST Micro | 29-Nov-11 | EOS Customer Caused VOIDING QCCAR AR53218, RMA35467 | Airbag warning lamp on | Chrysler | Ram |
| DS84 | EOS | ST Micro | 11-Oct-11 | EOS Customer Caused VOIDING QCCAR AR53245, RMA35578 | Airbag warning lamp on | Chrysler | Caliber |
| DS84 | EOS | ST Micro | 28-Aug-11 | AR53251, RMA35671, No communication | Airbag warning lamp on | Chrysler | Ram |
| DS84 | EOS | ST Micro | 26-Mar-11 | RMA 35626 Part was EOS VOIDING | Airbag warning lamp on | Chrysler | Fiat 500 |
| DS84 | EOS | ST Micro | 18-Mar-12 | AR53893, RMA35948, hot to the touch unit powered up B220E700 | Airbag warning lamp on | Chrysler | 200/ Sebring/ Avenger |
| DS84 | EOS | ST Micro | 25-Sep-12 | AR54077 RMA36007, pulling down Sys_Reset line onpin5 B323E972 | Airbag warning lamp on | Chrysler | Fiat 500 |
| DS84 | EOS | ST Micro | 11-Sep-12 | AR54343, RMA36059, SQ5 appear shorted to battery voltage | Airbag warning lamp on | Chrysler | Fiat 500 |
| DS84 | EOS | ST Micro | 9-Aug-13 | AR55344, RMA36223, Internal short between pins 29 & 30 B462E1418 | Airbag warning lamp on | Chrysler | 200/ Sebring/ Avenger |
| DS84 | EOS | ST Micro | 3-Jun-13 | AR55568, RMA36358, 3 volts & should be around 22 volts B546E1664 | Airbag warning lamp on | Chrysler | Compass / Patriot |
| DS84 | EOS | ST Micro | 2-Sep-13 | SR2014072201, RMA, causing abnormal squib output signals B623E1930 | Airbag warning lamp on | Chrysler | Compass / Patriot |
| DS84 | EOS | ST Micro | 11-Dec-15 | SR2016020310, RMA (B1009E3749), U501 has an internal short | Airbag warning lamp on | Chrysler | Wrangler |

| Component | Analysis Category | Supplier Name | Receipt Date | Short Description Verbatim | Reason for Return | Customer | Vehicle |
|-----------|-------------------|---------------|--------------|---------------------------|-------------------|----------|---------|
| DS84 | EOS | ST Micro | 29-Jan-16 | SR2016100401, RMA (FR-16-03608), measure 17vdc instead of 23vdc. | Airbag warning lamp on | Chrysler | Wrangler |
| DS84 | EOS | ST Micro | 6-Sep-16 | SR2017110503, RMA (FR-17-05688), short from pin 34 to Gnd on pin 6 | Airbag warning lamp on | Chrysler | Wrangler |

362.   On or around May 30, 2013, FCA received a document from ZF TRW addressing a potential warranty concern regarding the defective ZF TRW ACUs. The document described a risk that the wire connecting the crash sensor to the ACU could cause EOS, and recommended that further circuit protection be added to the defective ZF TRW ACUs in light of this risk.

363.   In October 2014, a consumer sued FCA in Cameron County, Texas, for claims arising from the defect in ZF TRW airbag systems installed in a 2011 Jeep Compass.

364.   At least as early as 2014, FCA and ZF TRW began making changes to the ZF TRW ACUs used on new Jeep Patriots, Compasses, and Wranglers based on concerns regarding EOS. Upon information and belief, STMicro was involved in the testing and analysis that led this decision. Based on STMicro's analysis and input, ZF TRW altered the ACUs for these FCA Class Vehicles for the 2015 model year by adding some additional protective components to the communication lines between the crash sensors and the DS84 ASIC but otherwise leaving the design

flaws of the ZF TRW ACUs unfixed. This inadequate stopgap measure did not fix the defect but does demonstrate FCA, ZF TRW, and STMicro's knowledge that the original ACU was vulnerable to EOS, as well as their complicity in failing to warn customers that any change to FCA Class Vehicles was needed.

365.   Although FCA made these minor changes to certain Jeep vehicles, FCA continued to equip other new vehicles with defective ZF TRW ACUs that had the same lower levels of circuit protection, including for the 2015 and 2016 Fiat 500.

366.   FCA claims that its compliance department first launched an investigation concerning crashes involving failed airbags and FCA Class Vehicles in April 2015.

367.   On April 6, 2015, FCA engineers informed FCA's compliance department that signs of EOS had been observed in the ACU of a 2012 Dodge Avenger that was involved in a frontal collision with no airbag deployment.

368.   That same day, FCA engineers also informed FCA's compliance department that signs of EOS had been observed in the ACU of a 2012 Jeep Patriot that was involved in a frontal collision with no airbag deployment.

369.   On April 8, 2015, FCA engineers informed FCA's compliance department that signs of EOS had been observed in the ACU of another 2012 Jeep Patriot after a crash test.

370.    No later than April 15, 2015, FCA's compliance department was aware of six other frontal collisions in the field where no frontal airbags deployed. These incidents involved a 2012 Jeep Patriot, two 2012 Chrysler 200s, a 2011 Dodge Avenger, a 2014 Jeep Compass and a 2012 Jeep Compass. All of these vehicles were equipped with the same defective ZF TRW ACUs. In the second half of 2015, ZF TRW and FCA concluded that EOS occurred in three of these crashes, "suspected" EOS in two others, and labeled the cause of one nondeployment "unknown."

371.    In June 2015, ZF TRW and FCA communicated regarding the vulnerability of the DS84 ASIC to EOS. ZF TRW acknowledged to FCA that "ASIC EOS failure could be caused by an electrical transient generated during the crash under conditions of a front sensor signal wire and high current power feed simultaneously shorted to vehicle chassis and subsequent the power feed short opens." During this time, ZF TRW also demonstrated in testing that a transient of -1.2 Volts to -2.0 Volts with duration of less than 100 microseconds could create an ASIC EOS failure in its defective ZF TRW ACUs. Other ACUs can withstand far greater voltage.

372.    On July 29, 2015, FCA simulated the conditions of a simultaneous shorted sensor signal wire and shorted high current power feed to vehicle chassis on a Jeep Patriot. The simulation determined that even when the shorted power

feed condition was removed, transients of 1 to 2 Volts were generated and could cause an ASIC EOS failure.

373.   On September 15, 2015, ZF TRW sent a lab report to FCA confirming that the ZF TRW ACU resets when a negative transient creates an ASIC EOS event. In other words, the ACU could fail to trigger the airbags and seatbelts when a transient creates and EOS event.

374.   A February 5, 2016 ZF TRW slide deck presentation provided to NHTSA admits: "EOS has been observed in specific circumstances, including those when there is no or partial crash record, inadvertent deployment or nondeployment. . . . Two customers (Chrysler and [Hyundai-Kia]) with field incidents in the U.S." According to the slide deck presentation, EOS had occurred in scenarios involving "vehicle ground shift combined with other failures, including intermittent power supply to the ACU and a shorted satellite to ground." "Satellite" in this context refers to the communication lines between the crash sensor and the ACUs. Importantly, "ZF TRW and a customer ha[d] replicated this failure mode using bench testing. . . ." Another observed scenario involving EOS was a "[c]ombined failure of a shorted satellite to ground and an intermittent short of a power line to chassis resulting in an out of specification negative transient on the vehicle satellite line." Again, "ZF TRW and customers ha[d] replicated this failure mode using bench testing . . . ."

### d.    FCA and ZF TRW made misleading statements and omitted material facts about the airbags, seatbelts, and ACUs in FCA Class Vehicles.

375.   During the Class Period, FCA made multiple false and/or misleading statements concerning the FCA Class Vehicles using interstate mail and/or wire.

376.   To sell the FCA Class Vehicles through dealerships, FCA had to certify compliance with applicable safety standards described in Section IV.B.i above. Accordingly, FCA affixed written certifications to the FCA Class Vehicles and delivered them to dealers. These written certifications were transmitted through interstate shipment channels with the vehicles.

377.   FCA also distributed numerous manuals via mail and wire for the FCA Class Vehicles. These manuals contain affirmative statements about ACUs, airbags, and seatbelts and omit important facts about the dangers posed by the defective ACUs. None of the manuals mentions any risk of ASIC EOS. A chart summarizing these statements and omissions is attached hereto at Exhibit 9. Manuals for the FCA Class Vehicles are available on FCA's website. They are also typically included in the vehicles when they are sold at dealerships.

378.   FCA also distributed misleading advertising concerning the FCA Class Vehicles via mail and wire. FCA's advertising contains affirmative statements about airbags and seatbelts and omits important facts about the dangers posed by the defective ACUs. *See* Exhibit 10 (collecting exemplars).

379.   For example, FCA's brochure for the 2015 Jeep Compass states:

**STANDARD SUPPLEMENTAL FRONT-SEAT MOUNTED SIDE AIR BAGS[a]**

Each side air bag[a] has its own sensor to autonomously trigger the air bag[a] on the side where the impact occurs.

**ADVANCED MULTISTAGE FRONT AND SIDE-CURTAIN AIR BAGS[a]**

These air bags[a] provide nearly instantaneous occupant protection by matching air bag[a] output to crash severity.

The brochure also includes this image of the airbags deploying to suggest that they will work during a crash.



380.   FCA's brochure for the 2016 Jeep Compass similarly states:

Peace of mind will take you far – Supplemental front-seat-mounted side air bags: Each side has its own sensor to

autonomously trigger the air bags on the side where the impact occurs. Standard on all models.

Advanced multistage front and side-curtain air bags: Provide nearly instantaneous occupant protection by matching air bag output to crash severity. Standard on all models.

Advanced multistage driver and front passenger air bags.

381.   FCA's brochure for the 2012 Jeep Patriot similarly states:

Advanced multi stage front and side curtain air bags. These air bags provide nearly instantaneous occupant protection by matching air bag output to crash severity. Standard. Standard advanced multistage front and side-curtain air bags and available supplemental side air bags help protect your most important cargo. These systems all work together to help keep you moving safely forward in all types of weather.

382.   Upon information and belief, FCA's advertising uniformly omitted any description of a defect in the FCA Class Vehicles' ACUs that made them vulnerable to failure during a crash.

> **e.    FCA's belated and partial recall did not prevent or remedy the economic harm to consumers.**

383.   FCA's partial recall did not recall many vehicles with defective ZF TRW ACUs. The Unrecalled FCA Class Vehicles include:

a.    2015–2017 Jeep Compass;

b.    2010–2013 Jeep Liberty;

c.    2015–2017 Jeep Patriot;

d.    2010–2018 Jeep Wrangler;

e.    2009–2012 Dodge Ram 1500;

     f.     2010–2012 Dodge Ram 2500/3500;

     g.     2011–2012 Dodge Ram 3500/4500/5500 Cab-Chassis; and

     h.     2012–2019 Fiat 500.

384.   The Unrecalled FCA Class Vehicles are also equipped with defective ZF TRW ACUs that are vulnerable to ASIC EOS because they share the same flawed DS84 ASIC. This allegation is further supported by NHTSA's investigation into these unrecalled vehicles (which has prompted at least two further recalls and it still ongoing) and the multiple consumer complaints reporting suspicious airbag and seatbelt failures involving these vehicles.[13]

385.   FCA and ZF TRW conspired to exclude the Unrecalled FCA Class Vehicles from the recall by concealing the true scope of vehicles equipped with defective ZF TRW ACUs and misleadingly assuring NHTSA and consumers that unrecalled FCA Class Vehicles were safe. For example:

     a.     In or around September 2016, ZF TRW's Vice President Marc

           Bolitho wrote to NHTSA: "Although a similar TRW

---

[13] *See* Ex. 8 (ODI nos. 10358293, 10431129, 10404435, 10406392, 10435172, 10473292, 10485943, 10614617, 10671988, 10885546, 10917675, 10544054, 10575416, 10896487, 10981445, 11024190, 10556705, 10560907, 10653811, 10907251, 10909641, 11048288, 11176266, 10508974, 10511307, 10633640, 10712093, 10716219, 11166733, 11221179, 11240474, 10712196, 10712623, 10897438, 10920550, 10920550, 10928584, 10928871, 10939731, 10957707, 10979167, 10991421, 10993249, 10994152, 11045006, 11110422, 11120992, 11132330, 11155925, 11161506, 11162152, 11164740, 11170716, 11171619, 11182545, 11183268, 11203683, 11209549, 11230028, 11292488, 11300488).

component is installed in vehicles other than those identified in the [September 13, 2016 FCA Defect Information Report], the conditions described in FCA's [Defect Information Report] are limited to the specific FCA vehicles identified in that report." This statement to NHTSA was false and/or materially misleading because ZF TRW knew of other similar failures involving defective ACUs, including prior failures in Hyundai and Kia vehicles. Moreover, the decision of three separate manufacturing groups—Hyundai-Kia, FCA, and Toyota—to recall a variety of different vehicles (likely with different methods of sensor wiring) undermines ZF TRW's efforts to blame observed incidents of ASIC EOS on vehicle-specific sensor wiring. The more compelling explanation for these related failures across manufacturers is the failure of the ZF TRW ACUs with a common DS84 ASIC.

b.   When announcing its partial recall, FCA admitted many of its other vehicles were equipped "with the same ORC/ASIC," but misleadingly claimed these vehicles were not defective and did not need to be recalled. FCA's purported justification for leaving these dangerous vehicles on the road was that the

- 169 -

ACU's "front sensor wiring [was] routed independently along the left and right side of the vehicles front sensor wiring." According to FCA, the vehicles allegedly using this slightly different configuration of the DS84 ASIC included the 2009–2012 Dodge Ram 1500, 2010–2012 Dodge Ram 2500/3500, 2011–2012 Dodge Ram 3500/4500/5500 Cab-Chassis, 2010–2014 Jeep Wrangler, 2010–2012 Dodge Nitro, 2010–2013 Jeep Liberty, and 2012–2016 Fiat 500. But this slight difference in sensor wiring does not prevent the transients from occurring or adequately protect the ASIC. Multiple consumers have reported that airbags and seatbelts in these unrecalled vehicles have failed in the field.[14]

c.    In more recent presentations to NHTSA in 2019, ZF TRW has asserted that circuit protection components in the form of two diodes and a resistor have been added to ACUs in 2015–2017 Jeep Compasses, 2015–2017 Jeep Patriots, and 2015–2018 Jeep Wranglers. These additions are insufficient, since the ACUs

---

[14] *See* Ex. 8 (ODI Nos. 10358293, 10404435, 10406392, 10431129, 10435172, 10473292, 10485943, 10508974, 10511307, 10544054, 10556705, 10560907, 10575416, 10614617, 10633640, 10653811, 10671988, 10712093, 10716219, 10885546, 10896487, 10907251, 10909641, 10917675, 10981445, 11024190, 11166733, 11221179, 11240474).

have the same underlying design flaws. Toyota's 2020 recall confirms that merely adding protective components does not address the defect. Like the newer versions of the Jeep Compass, Patriot and Wrangler, the recalled Toyota vehicles had ACUs equipped with so-called "Schottky" diodes on the crash sensor communication lines as part of an attempt to add protection against transience without altering the other problematic aspects of the defective ZF TRW ACUs. Because the addition of two diodes failed in the recalled Toyota vehicles, newer Jeep vehicles have similar vulnerabilities.[15] Again, NHTSA's investigation into these newer Jeep vehicles and the numerous consumer complaints regarding failed airbags in these same vehicles further indicates an uncured defect with the ZF TRW ACUs.[16]

386.    ZF TRW and FCA also failed to provide an adequate remedy to consumers who paid for vehicles covered by FCA's partial recall.

---

[15] Moreover, ZF TRW's recent proposed fixes for the defective Toyota Corolla ACUs included adding even stronger circuit protection than those installed on the defective ZF TRW ACUs on these Jeep vehicles.

[16] *See* Ex. 8 (ODI Nos. 10897438, 10920550, 10928584, 10928871, 10939731, 10957707, 10979167, 10991421, 10993249, 10994152, 11045006, 11120992, 11132330, 11155925, 11161506, 11162152, 11164740, 11170716, 11171619, 11182545, 11183268, 11203683, 11209549, 11230028, 11292488, 11300488).

a.  First, when FCA announced the recall in September 2016, it also admitted "FCA US has not defined a recall remedy at this time." Due to a lack of parts, FCA would not even begin to recall and repair vehicles pursuant to this recall for approximately 11 months. During this time period, consumers continued to report airbag and seatbelt failures in several of the vehicles subject to the recall. Examples of these reports are listed below. *See* Exhibit 8 (ODI nos. 10920626, 10926236, 11006561, 11006731, 11022674, 10917305, 10926700, 11019118, 10915978, 10993562, 11192853).

b.  Second, for years after FCA began conducting its partial recall in August 2017, consumers continued to report airbags and seatbelts failures in vehicles subject to the recall. Exhibit 8 (ODI nos. 11164588, 11183650, 11203283, 11204387, 11219085, 11301047). This suggests a possible ongoing problem with these vehicles.

c.  Third, FCA's September 13, 2016 recall has not remedied most of the recall population. According to FCA's most recent recall report, FCA had only repaired 550,005 of the 1,435,625 vehicles with defective ZF TRW ACUs as of January 16, 2019.

    d.    Fourth, FCA's partial recall offered no monetary compensation to consumers.

**iii.    Toyota Class Vehicles**

387.    In or around 2009, Toyota began selling vehicles equipped with defective ZF TRW ACUs that contain the same DS84 ASIC as other Class Vehicles. As explained above, because of the design of the ACUs with the DS84 ASIC, EOS from a transient power surge on the crash sensors can lead to the complete failure of the ACU, airbags, and seatbelts during a crash. Toyota, ZF TRW, and STMicro nonetheless conspired to conceal the true nature and scope of the defect from NHTSA and consumers.

**a.    The Definition of the Toyota Class Vehicles**

388.    The Toyota Class Vehicles are all vehicles made by Toyota that have a ZF TRW ACU that uses a DS84 ASIC.

389.    Based on incomplete, pre-discovery information available at this time, Plaintiffs understand that the Toyota U.S. vehicle models equipped with the defective ZF TRW ACUs include:

    a.    2011–2019 Toyota Corolla;

    b.    2011–2013 Toyota Corolla Matrix;

    c.    2012–2018 Toyota Avalon;

    d.    2013–2018 Toyota Avalon HV;

e.    2012–2019 Toyota Tacoma;

f.    2012–2017 Toyota Tundra; and

g.    2012–2017 Toyota Sequoia.

390.    Plaintiffs refer to the vehicles identified in the preceding paragraph as the Toyota Class Vehicles.

### b.    The ZF TRW ACUs in Toyota Class Vehicles are defective.

391.    The ZF TRW ACUs in Toyota Class Vehicles are defective because they are vulnerable to transients generated during car accidents. The defect can cause the ACUs to fail precisely when they are most urgently needed: during a head-on collision. As a result, the ACU does not reliably serve its most basic purpose and poses a serious risk to the lives and physical well-being of drivers and passengers.

392.    The vast majority of the Toyota Class Vehicles are covered by NHTSA's investigation into potentially defective ZF TRW ACUs.

393.    NHTSA has linked at least two fatalities to crashes in Toyota Class Vehicles where the airbags failed to deploy.

394.    In January 2020, Toyota admitted that ZF TRW ACUs with the DS84 ASIC are defective and described the defect as follows:

> The ECU [(a term used by Toyota for ACU)] contains a model DS84 application-specific integrated circuit (ASIC) which controls the communication of the crash sensor signals, firing commands (i.e., when to deploy airbag(s) and/or [seatbelt]

pretensioners), and fault information (e.g., diagnostic trouble codes).

This ASIC does not have sufficient protection against negative electrical transients that can be generated in certain severe crashes, such as an underride frontal crash where there is a large engine compartment intrusion before significant deterioration. In these cases, the crash sensor and other powered wiring can be damaged and shorted so as to create a negative electrical transient of sufficient strength and duration to damage the ASIC before the deployment signal is received in the [Safety Restraint System] ECU. This can lead to incomplete or nondeployment of the airbags and/or pretensioners.

395.    Since at least as early as 2012, dozens of consumers have reported to NHTSA that airbags and seatbelts in Toyota Class Vehicles failed to activate during serious accidents. Over 70 examples of such complaints are attached hereto as Exhibit 11. Three illustrative examples of these complaints are quoted below.

a.    A March 2, 2013 complaint reported a February 20, 2013 accident involving a 2012 Toyota Corolla in Herndon, Virginia. The complaint states: "I BELIEVE THERE IS A SERIOUS SAFETY ISSUE RELATED TO THE PLACEMENT OF THE AIR BAG SENSOR. MY WIFE AND A CO-WORKERS WIFE WERE INVOLVED IN AN ACCIDENT THAT SEVERELY DEFORMED THE FRONT OF A 2012 TOYOTA COROLLA WITHOUT TRIGGERING THE AIRBAG SENSOR. UPON INSPECTION, IT APPEARS THAT THE

PORTION OF THE CAR THAT THE AIRBAG SENSOR IS

ATTACHED TO, MOVED OVER A FOOT AND A HALF

WITHOUT TRIGGERING THE AIR BAG SENSOR. AS A

FORMER ASE MASTER TECHNICIAN AND TECHNICAL

EXPERT FOR THE BETTER BUSINESS BUREAU, THIS

MAY BE A SERIOUS DESIGN FLAW THAT COULD

ENDANGER THE HEALTH AND SAFETY OF OTHER

2012 COROLLA OWNERS. I FILE A COMPLAINT WITH

TOYOTA USA AND I AM WAITING FOR THEIR

RESPONSE. *TR."

b.    A May 8, 2014 complaint reported an April 2, 2014 accident

involving a 2011 Toyota Corolla in Graham, Texas. The

complaint states: "I REAR ENDED A TRUCK FULL

BUMPER TO FULL BUMPER COLLISION GOING ABOUT

25-30MPH. MY ENTIRE FRONT END WAS CRUSHED,

RADIATOR AND TRANSMISSION BUSTED, AND FRONT

BUMPER PULLED OFF, AND INSIDE CAR UNDER

STEERING WHEEL HAD BEEN SLIGHTLY PUSHED OUT

TOWARDS DRIVER SEAT. MY CAR WAS TOTALED. I

BUSTED THE WINDSHIELD WITH MY HEAD WHEN I

HIT IT GIVING ME A CONCUSSION AND HAD
CONTUSIONS TO MY CHEST FROM HITTING STEERING
WHEEL, AND CONTUSION AND SPRAIN TO MY RIGHT
HAND. NO ONE INCLUDING POLICE, FIREMEN,
AMBULANCE, AND WRECKING YARD COULD
BELIEVE MY AIR BAGS DID NOT DEPLOY. MY
HUSBAND AND I CONTACTED TOYOTA ABOUT THIS
AND THEY ASSURED ME IT SHOULD NOT HAVE
DEPLOYED AND SENT ME AN EMAIL LINK TO READ
DESCRIBING WHEN AIR BAGS SHOULD DEPLOY.
WHEN I CALLED BACK AFTER READING THE EMAIL
AND TOLD THE MAN WHAT THE EMAIL SAID AND
THAT MY AIR BAG SHOULD HAVE DEPLOYED HE
CALLED ME A LIAR, AND SAID THAT WAS NOT WHAT
THE EMAIL SAID. MY HUSBAND THEN CALLED AND
REQUESTED INFORMATION FROM EDR BE
DOWNLOADED AND READ. TOYOTA NEVER
RETURNED OUR PHONE CALL AND NEVER
RETRIEVED INFORMATION FROM EDR, AND NOW
INSURANCE HAS TAKEN POSSESSION OF THE

VEHICLE AND IT IS GONE. A MONTH LATER WE STILL HAVE NEVER RECEIVED A RETURN PHONE CALL OR EXPLANATION FROM TOYOTA. *TR." The reference to an "EDR" refers to the Event Data Recorder, the automotive equivalent of a "black box" on an airplane.

c.    An August 21, 2014 complaint with NHTSA reported an August 7, 2014 accident involving a 2013 Toyota Avalon Hybrid in Indiana, Pennsylvania. The complaint states: "TL* THE CONTACT OWNED A 2013 TOYOTA AVALON HYBRID. THE CONTACT'S VEHICLE WAS STRUCK BY A DRUNK DRIVER, WHICH CAUSED THE CONTACT TO CRASH THE VEHICLE INTO AN EMBANKMENT. THE VEHICLE ROLLED OVER SEVERAL TIMES. THE AIR BAGS FAILED TO DEPLOY. THE CONTACT AND FRONT PASSENGER WERE INJURED AND RECEIVED MEDICAL ATTENTION. THE DRIVER FROM THE OTHER VEHICLE ALSO SUSTAINED INJURIES. A POLICE REPORT WAS FILED AND THE VEHICLE WAS DESTROYED. THE MANUFACTURER WAS NOTIFIED. THE FAILURE

OCCURRED WHILE DRIVING 40 MPH. THE

APPROXIMATE FAILURE MILEAGE WAS 9,500."

396.   Toyota's January 17, 2020 recall covers 2,891,976 vehicles equipped with the defective ZF TRW ACUs, but Toyota failed to recall millions of other Toyota Class Vehicles with the same ACUs.

> ### c.   ZF TRW, STMicro, and Toyota have known about the defect in ZF TRW ACUs for years.

397.   For many years, ZF TRW, Toyota, and STMicro have known that the defective ZF TRW ACUs in Toyota Class Vehicles are vulnerable to EOS.

398.   Upon information and belief, Toyota monitors NHTSA complaints regarding Toyota vehicles, since the database is publicly available and can be easily queried by vehicle make and model. Toyota's production of NHTSA complaints in response to Plaintiffs' discovery requests in this litigation supports the inference of its regular monitoring. For example, one NHTSA complaint produced by Toyota reported the airbags failed to deploy in a 2012 Corolla during a March 2, 2013 accident.

399.   In or around 2015, ZF TRW, STMicro, and Toyota began implementing design changes to defective ZF TRW ACUs installed in Toyota vehicles for sale in Europe, but decided not to make any changes to the same defective ACUs installed in Toyota Class Vehicles in the United States. For the Toyota Class Vehicles, the changes made the ZF TRW ACUs in European Toyotas

approximately four times more resilient than the defective ZF TRW ACUs sold in the United States. ZF TRW and STMicro made these changes because they knew that defective ZF TRW ACUs in Hyundai-Kia and Toyota Class Vehicles had failed due to EOS. Nonetheless, ZF TRW, STMicro, and Toyota continued to sell Toyota Class Vehicles with the lower level of protection in the United States.

400.   According to a document produced by ZF TRW to NHTSA in connection with NHTSA's investigation of vehicles equipped with the DS84 ASIC, Toyota returned multiple vehicles to ZF TRW that showed signs of EOS in the DS84 ASIC between December 16, 2013 and October 25, 2016. Relevant excerpts of this document are reproduced below.

| Component | Analysis Category | Supplier Name | Receipt Date | Short Description Verbatim | Reason for Return | Customer | Vehicle |
|---|---|---|---|---|---|---|---|
| DS84 | EOS | ST Micro | 20-May-10 | Component Damaged | Airbag warning lamp on | Toyota | Corolla |
| DS84 | EOS | ST Micro | 4-Jun-12 | AR54218, RMA36039, shorted internally between pins 6&7 B317E941 | Airbag warning lamp on | Toyota | Unknown |
| DS84 | EOS | ST Micro | 16-Dec-13 | AR55622, RMA36414, shorted out of circuit B593E1800 | Airbag warning lamp on | Toyota | Corolla |
| DS84 | EOS | ST Micro | 12-Dec-13 | SR2015120208, RMA (B984E3583), Pin 36 measures 95ohms to ground | Airbag warning lamp on | Toyota | Avalon |
| DS84 | EOS | ST Micro | 20-Sep-14 | SR2016060601, RMA (FR-16-01359), shorted between pins 6 & 7 outcircuit | Airbag warning lamp on | Toyota | Avalon |

| Component | Analysis Category | Supplier Name | Receipt Date | Short Description Verbatim | Reason for Return | Customer | Vehicle |
|---|---|---|---|---|---|---|---|
| DS84 | EOS | ST Micro | 5-Aug-16 | SET-334 U600 pin7 is short to pin6 | Airbag warning lamp on | Toyota | Corolla |
| DS84 | EOS | ST Micro | 25-Oct-16 | Defective squib ASIC | Airbag warning lamp on | Toyota | Augo |
| DS84 | EOS | ST Micro | 1-Feb-16 | SFT-116 waveform of U600 pin51 abnormal | Airbag warning lamp on | Toyota | Corolla |

401.    In early 2016, ZF TRW representatives met with Toyota representatives to review a presentation ZF TRW made to NHTSA on February 5, 2016 about the defective ACUs that it supplied to its customers. The presentation alerted Toyota that two other manufacturers had notice of field incidents involving confirmed and suspected EOS. The presentation also confirmed that ZF TRW had replicated two failure modes involving ACU EOS, and concluded: "These multipoint failure modes can cause EOS to the ASIC that may impact ACU function during a crash event." The presentation stated that one risk of EOS included "no airbag deployment" during a crash. ZF TRW, STMicro, and Toyota did not take any corrective actions with respect to Toyota Class Vehicles in response to this meeting or these warnings.

402.    On June 29, 2016, a Toyota Auris equipped with a ZF TRW ACU crashed in Turkey and the airbag failed to deploy. Toyota inspected the vehicle on July 25, 2016. The ACU data included diagnostic trouble codes were detected in

the ACU and airbag warning lamp was on. The investigator concluded "the probable cause is the IC [(integrated circuit)] failure inside the ECU." Despite this clear conclusion by Toyota's own investigator, Toyota and ZF TRW delayed admitting that the ACU failed due to EOS for approximately two and a half years.

403.   On July 9, 2016, a 2014 Corolla was involved in a head-on crash in which the airbags did not deploy. Toyota investigated the wreckage at the vehicle owner's request, and despite being unable to read the ACU's crash data, Toyota wrote off the incident and informed the owner that the airbag did not deploy because the accident did not meet the criteria for front airbag deployment. But the loss of a crash record, which can be a symptom of ASIC EOS, renders this conclusion inherently unreliable. Moreover, the below photographs of the wreckage show the type of severe front-end damage which would typically merit deployment of the airbags.



404.   On December 19, 2017, Toyota became aware of a head-on collision in Morocco involving a 2015 Auris where the airbags did not deploy. According to Toyota's records:

> [The driver] was severely injured on her way to work while driving under the speed limit when another car from the opposite direction diverged to her line and caused a head-on collision. [The driver] instantly lost consciousness due to the force of the impact as none of her car's airbags deployed, then was transported to the hospital via ambulance. . . . Immediately after [the driver's] arrival at the hospital, doctors told her family that her situation is highly critical and urgent brain surgery essential to save her life. Not only had she suffered serious brain, lung, and liver injuries, but she also had been admitted in severe Coma for several weeks.

Over four months later, on April 27, 2018, Toyota Du Maroc S.A.R.L. performed an investigation, prepared a report on this issue, and shipped the recovered parts to Toyota Motor Corporation. ZF TRW analyzed the ACU in November 2018 and notified Toyota that EOS damage was visible on the ASIC. No crash data was retrievable.

405.   Beginning in early March 2018, ZF TRW and Toyota Motor Corporation began holding weekly telephonic meetings and exchanging written correspondence regarding the defective ACUs, EOS, and related issues.

406.   On April 24, 2018, at Toyota Motor Corporation's request, ZF TRW provided guidance on how to identify signs of EOS in the defective ZF TRW ACUs. Upon information and belief, Toyota Motor Corporation had previously

relied primarily or exclusively upon ZF TRW and STMicro to perform the investigation.

407.   In May 2018, NHTSA contacted Toyota about a potential case of ASIC EOS in a 2012 Corolla that crashed.

408.   On May 30, 2018, the California Highway Patrol asked Toyota how to read and download the crash data from a 2018 Corolla ACU that had a severe front-end crash on May 21, 2018. No airbags had deployed and the driver died from the crash. ZF TRW later reviewed the ACU and confirmed to Toyota that the damage was consistent with EOS. Photographs of the crashed Toyota Class Vehicle are below. The severity of the damage strongly indicates the airbags should have deployed.

 

*Figure 1.* Front of the Toyota.    *Figure 2.* Front and right side of the Toyota.

.

409.   California Highway Patrol investigators authored a report regarding the Toyota Corolla from the crash described in the preceding paragraph that states:

The ACM [(i.e., "Airbag Control Module," another term for

ACU)] in the Toyota did not command deployment of any supplemental restraints, nor did it record a non-deployment event as a result of this collision. Per 49 CFR 563, the ACM installed in the Toyota was required, at a minimum; to record a non-deployment 'event' as long as the 'trigger threshold' (longitudinal change velocity of 5 miles per hour within 150 millisecond interval) was met. Given the damage sustained to the front of the Toyota, and the fact it impacted a vehicle nearly twice as heavy, it would be expected that at the very least, a non-deployment event would have been recorded by the ACM installed in the Toyota. . . . Due to this apparent failure of the ACM installed in the Toyota to comply with federal regulations, on September 11, [2018], NHTSA Investigator Perry took custody of the surrogate ACM and the ACM removed from the Toyota for testing and analysis.

Toyota received a copy of this report.

410.    On July 2, 2018, ZF TRW produced an engineering report describing an analysis of the ACU from the Toyota Auris that crashed on July 13, 2017 in Portugal, as requested by Toyota. The report's conclusion states: "Analysis findings are consistent with a damaged DS84 ASIC. Analysis performed by ST Micro found electrical overstress to the DS84 consistent with beyond specification transient." Thereafter, ZF TRW provided a document to Toyota dated September 12, 2018 entitled "Electrical Overstress Hypothesis," which provided evidence of how EOS occurred in that crash. The document states: "Likely initiation point is an out of specification negative transient introduced due to an external Short of DSI Channel." The DSI channel is the communication line connecting the crash sensors

to the ACU. In other words, the likely cause of the ACU failure was transient current flowing from the crash sensors to the ACU.

411.   On October 4, 2018, ZF TRW confirmed to Toyota Motor Corporation that even the more durable versions of the ACU used in some European Toyotas, the company was still not sure whether even these more durable ACUs had enough protection to survive a negative surge in Toyota vehicles. This, of course, confirms ZF TRW's even greater uncertainty as to the weaker version of the ACU in Toyota Class Vehicles in the United States.

412.   In October 2018, Toyota acknowledged in an internal report the possibility that EOS caused the airbags to fail in an August 2018 accident involving a 2018 Corolla, as well as in accidents in Portugal, Spain, Morocco, and other countries involving Toyota vehicles equipped with defective ACUs. The below pictures of the August 2018 accident illustrate the severity of the crash and that the airbags clearly should have deployed.



414.    In November 2018, representatives of Toyota Motor Corporation and ZF TRW discussed a redesign of the ACU that would add stronger protective components to the links between the frontal crash sensors to the ACU, as well as the length of time it would take for design and evaluation. ZF TRW estimated that "design verification" alone for the proposed solutions would take "~50wks" (i.e., nearly a year).

415.    Additionally, in October or November 2018, ZF TRW provided Toyota with the results of its testing of suspected DS84 ASIC failure mechanisms. ZF TRW concluded that the likely root cause of the failures was "beyond specification external voltage applied on Satellite drivers" (i.e., the entry point for crash sensor signals) which led to EOS. This was the same issue that ZF TRW and Toyota expressly discussed during a meeting in or around February 2016.

416.    In late January through early February 2019, Toyota Motor Corporation, Toyota Motor North America and Toyota Motor Europe representatives met with ZF-TRW in Michigan to review the EOS issue. In a document created by Toyota in connection with that meeting, Toyota acknowledged that there was a possibility that the same EOS issue reported by other manufacturers had occurred in Toyota vehicle accidents in the U.S., Portugal, Spain, and Morocco. Toyota also acknowledged that it discussed potential fixes for

the EOS issue. Among the options for a remedy to the defect, Toyota considered the possibility of abandoning ZF TRW ACUs with the DS84 ASIC entirely.

417.   In February 2019, Toyota representatives met with NHTSA to discuss various issues, including two crashes where the airbags failed to deploy: the April 12, 2018 fatal collision involving the 2015 Toyota Auris in Spain, and a December 1, 2018 rear-end collision involving a 2015 Corolla. Toyota reported to NHTSA that it was still investigating the Auris collision because there were no recorded events in the Event Data Recorder, which is a common occurrence in cases of EOS, and that it had concluded that non-deployment was warranted in the Corolla collision.

418.   On March 11, 2019, NHTSA notified ZF TRW and Toyota that NHTSA had been monitoring salvage yards looking for other vehicles that may suffer from the ACU defect. NHTSA's search had identified a 2019 Corolla in Chicago, Illinois and a 2013 Corolla in Atlanta, Georgia with potential EOS damage. NHTSA requested that ZF TRW schedule a time to test the vehicles the vehicles to ZF TRW's facility.

419.   On or about March 14, 2019, Toyota representatives met with NHTSA. Despite Toyota's findings of EOS in multiple crashes involving its vehicles, Toyota reported that its testing and investigation were ongoing with

assistance from ZF TRW, and that it did not yet have enough information to make an assessment.

420.    On or around March 27, 2019, Toyota requested that ZF TRW provide redesign options for the ACU in the Toyota Class Vehicles. On or about August 7, 2019, ZF-TRW provided Toyota with three different options. One of the options offered by ZF TRW was to add even stronger protective components that would increase the circuit protection beyond the level of circuit protection in any Toyota or other manufacturer Class Vehicles.

421.    On April 1, 2019, a customer reported to Toyota that the airbags had failed to deploy in a 2013 Toyota Avalon during a crash in Pennsylvania. A photograph of the wreckage is below.



Toyota inspected the vehicle on April 11, 2019 and, by its own account, "identified two locations on the DS84 [ASIC] with evidence of possible damage." Toyota admits it "sent the ECU [(i.e., ACU)] to Japan for further investigation." Like

many of the ACUs with signs of EOS damage, the crash data was missing.

423.   On or about May 28, 2019, Toyota met with NHTSA again. Toyota reported that it still did not have enough information to make an assessment of the data it had collected in either its strength testing or stress testing. Toyota reported that the ASIC resistance value was abnormal and consistent with EOS in at least one of the vehicles that it had tested from salvage yards in conjunction with NHTSA, while it was unable to retrieve crash data for the relevant crash in the other.

424.   On May 29-31, 2019, representatives of ZF TRW, Toyota Motor Corporation, and NHTSA attended in-vehicle transient testing and crash testing events in Arizona. Both types of testing resulted in ACU failures.

425.   In mid-December 2019, Toyota conducted two crash tests in which the airbags did not deploy. Toyota confirmed damage to the DS84 ASIC in one of those vehicles.

### d.    Toyota and ZF TRW made misleading statements and omitted material facts about the airbags, seatbelts, and ACUs in Toyota Class Vehicles.

426.   Toyota made multiple false and/or misleading statements concerning the Toyota Class Vehicles using interstate mail and/or wire.

427.   To sell the Toyota Class Vehicles through dealerships, Toyota had to certify compliance with applicable safety standards described in Section IV.B.i

above. Toyota affixed written certifications to each of the Toyota Class Vehicles and delivered them to its dealers with the vehicles. These written certifications were transmitted through interstate shipment channels with the vehicles.

428.   Toyota also distributed numerous manuals for the Toyota Class Vehicles via mail and wire. These manuals contain affirmative statements concerning ACUs, airbags, and seatbelts and omit important facts about the dangers posed by the defective ACUs. None of the manuals mentions any risk of ASIC EOS. A chart summarizing these relevant portions of Toyota's manuals is attached hereto at Exhibit 12. Manuals for the Toyota Class Vehicles are available on Toyota's website. They are also typically included in the vehicles when they are sold at dealerships.

429.   Toyota also distributed misleading advertising concerning the Toyota Class Vehicles via mail and wire. Toyota's advertising contains affirmative statements about airbags and seatbelts and omits important facts about the dangers posed by the defective ACUs. *See* Exhibit 13 (collecting exemplars). Upon information and belief, Toyota's advertising uniformly omitted any description of a defect in the Toyota Class Vehicles' ACUs that made them vulnerable to failure during a crash.

430.   In 2015, Toyota represented on its website that "[f]or us, the journey towards a safe road never ends. This belief, along with our collaborative research

efforts, drives us to create advancements and innovations in safety that have helped (and continue to help) prevent crashes and protect people."

431.    A brochure from the 2012 Toyota Avalon made clear, "Safety is not a luxury" specifically noting the vehicles' "Seven Airbags… Avalon's advanced Supplemental Restraint System (SRS) is a marvel of safety technology. Employing sophisticated sensors, the system includes seven airbags: driver and front passenger airbags, front and rear side curtain airbags, front seat-mounted side airbags for the driver and front passenger, and a driver knee airbag."

432.    In a brochure for the 2013 Sequoia, Toyota set out: "You planned your trip. We planned your return. With Sequoia, one thing you'll never leave behind is peace of mind. Sequoia's equipped with an array of active safety features to help you avoid trouble, and passive safety features to help protect you if trouble proves unavoidable" with features including a "Comprehensive airbag system that senses impact severity, adjusting airbag deployment accordingly."

433.    An October 15, 2015 Press Release for the 2016 Toyota Avalon promised "safety in all directions" as "the Avalon comes equipped with 10 standard airbags."

434.    Similarly, a brochure for the 2017 Toyota Corolla affirmed that "Safety should never be just an option" and "[e]very journey should be a safe one" further noting that "[a]t Toyota, your safety is what drives us. That's why we've

given Corolla an impressive list of active and passive safety features as standard equipment. From systems designed to help you avoid accidents to those that can help protect you should a collision occur, Corolla takes your safety seriously," and listed the "8 Airbags include[ing] Dual-Stage Driver and Front Passenger Airbags" as part of those features.

435.   Upon information and belief, Toyota's advertising uniformly omitted any warning that Toyota Class Vehicles were equipped with ACUs that were vulnerable to EOS or that airbags and seatbelts in the Toyota Class Vehicles could fail during a crash due to EOS.

### e.   Toyota's belated and partial recall did not prevent or remedy the economic harm to consumers.

436.   Toyota did not include any of the over two million Tacoma, Sequoia, or Tundra vehicles equipped with the same defective ZF TRW ACU as other vehicles included in its recall (the "Unrecalled Toyota Class Vehicles").

437.   Upon information and belief, Toyota and ZF TRW conspired to exclude the Unrecalled Toyota Class Vehicles from the recall by misleadingly assuring NHTSA and consumers that Unrecalled Toyota Class Vehicles were safe. Specifically, in its Part 573 Safety Recall Report, Toyota stated that "due to different body construction and other factors, Toyota believes at this time that an occurrence of a sufficient negative transient at a timing [sic] that can affect airbag deployment in a crash is unlikely." Toyota's determination that a significant

negative transient is "unlikely" is inherently speculative and unreliable for at least three reasons.

> a.    First, in the very same 573 Report, Toyota admits that, even though it "believes" negative transients to be rare, "Toyota is unable to estimate the likelihood for this to occur in the real world." The Unrecalled Toyota Vehicles, of course, are also driven in "the real world" and Toyota offers no credible explanation for why NHTSA and consumers can rely on its assurances regarding the risks of transients as to Unrecalled Class Vehicles when it admits it cannot estimate the likelihood of severe transients or ASIC EOS in the Recalled Vehicles.

> b.    Second, as explained above, negative transients and EOS have damaged ZF TRW ACUs in over a dozen different vehicles made by multiple different Vehicle Manufacturers. Toyota's suggestion that variables such as differences regarding "body construction and other factors" fails to explain why these different vehicles are all suffering from the same problem. The only plausible explanation is the defective ZF TRW ACU shared by all the vehicles, not the layout of the wiring, which, upon information and belief, differs.

c.    Third, NHTSA's investigation into the Unrecalled Toyota Class Vehicles and numerous consumer complaints regarding failed airbags in these same vehicles further indicates an uncured defect in the Unrecalled Toyota Class Vehicles with the ZF TRW ACUs. *See* Exhibit 11 (ODI Nos. 10483711, 10521864, 10572518, 10724322, 10908928, 10945149, 11115644, 11203097).

438.    On information and belief, the remedy offered by Toyota under its partial recall does not repair the defective nature of the ZF TRW ACUs. Instead, the partial recall merely adds a noise filter "between the airbag control module and its wire harness."

439.    Toyota has not offered any monetary compensation to any consumers for the Toyota Class Vehicles.

iv.    **Honda Class Vehicles**

440.    In or around 2011, Honda began selling vehicles equipped with defective ZF TRW ACUs that contain the same DS84 ASIC as the other Class Vehicles. As explained above, because of the design of the ACUs, EOS from a power surge on the crash sensors can lead to the complete failure of the ACU, airbags, and seatbelts during a crash. Honda, ZF TRW, and STMicro nonetheless conspired to conceal the defect from NHTSA and consumers.

### a. The Definition of the Honda Class Vehicles

441. The Honda Class Vehicles are all vehicles made by Honda that have a ZF TRW ACU that uses a DS84 ASIC.

442. Honda began selling vehicles equipped with defective ZF TRW ACUs starting with certain 2012 model years.

443. Based on incomplete, pre-discovery information available at this time, Plaintiffs understand that the Honda U.S. vehicle models equipped with the defective ZF-TRWACUs include:

      a.     2013–2015 Honda Accords;

      b.     2012–2015 Honda Civics (including GXs, SIs and Hybrids);

      c.     2012–2016 Honda CR-Vs;

      d.     2013–2014 Honda Fit EVs;

      e.     2012–2017 Honda Fits;

      f.     2012–2014 Honda Ridgelines;

      g.     2014–2019 Acura RLXs (and Hybrids);

      h.     2012–2014 Acura TLs;

      i.     2015–2017 Acura TLXs; and

      j.     2012–2014 Acura TSXs (and TSX Sport Wagons).

444. Plaintiffs refer to the vehicles identified in the preceding paragraph as the Honda Class Vehicles.

**b.**     **The ZF TRW ACUs in Honda Class Vehicles are defective.**

445.   The ZF TRW ACUs in Honda Class Vehicles are defective because
they are vulnerable to transients generated during accidents. The defect can cause
the ACUs to fail precisely when they are most urgently needed: during a head-on
collision. As a result, the ACU does not reliably serve its most basic purpose and
poses a serious risk to the lives and physical well-being of drivers and passengers.

446.   The Honda Class Vehicle list is the same list of Honda vehicles
covered by NHTSA's investigation into potentially defective ZF TRW ACUs.

447.   NHTSA appears to have identified these Honda Class Vehicles
because they all have ZF TRW ACUs equipped with the DS84 ASIC—the
equipment that Hyundai-Kia and FCA identified as defective when announcing
recalls based on defective ACUs. After NHTSA announced its investigation,
Toyota announced admitted the ZF TRW ACU with DS84 ASICs in some Toyota
vehicles were also defective.

448.   Between 2012 and the present, dozens of consumers reported to
NHTSA that airbags and/or seatbelts had failed in Honda Class Vehicles.
Approximately 40 examples of such complaints are attached hereto as Exhibit 14.
Three examples of these complaints are quoted below.

a.     A November 28, 2014 complaint reported an October 21, 2014
accident involving a 2013 Honda Civic. The complaint states:

"TL* THE CONTACT OWNS A 2013 HONDA CIVIC. THE

CONTACT STATED THAT WHILE MAKING A LEFT

TURN, ANOTHER VEHICLE DROVE THROUGH A RED

LIGHT AND CRASHED INTO THE FRONT OF THE

CONTACTS VEHICLE. THE AIR BAG WARNING LIGHT

ILLUMINATED AND THE AIR BAGS FAILED TO

DEPLOY. A POLICE REPORT WAS FILED. THE

CONTACT SUSTAINED INJURIES TO THE CHEST, THE

BACK, ABDOMEN AND SHOULDER PAINS THAT

REQUIRED MEDICAL ATTENTION. THE VEHICLE WAS

NOT DIAGNOSED OR REPAIRED. THE

MANUFACTURER WAS NOTIFIED OF THE FAILURE.

THE APPROXIMATE FAILURE MILEAGE WAS 10,000."

b.    A May 20, 2015 complaint reported an April 23, 2014 accident

involving a 2013 Honda Accord. The complaint states: "MY

VEHICLE STRUCK ANOTHER VEHICLE IN FRONT OF

ME FROM BEHIND. AIRBAG LIGHTS CAME ON YET

DID NOT DEPLOY. IMPACT CAUSED DAMAGE TO MY

CHEST BY THE SEATBELT. IT CAUSED A TISSUE

EXPANDER IMPLANTED IN MY RIGHT BREAST TO BE

DAMAGED AND RIPPED OUT THE PLACES STITCHED
TO ME. THE TE WAS THERE AS PART OF A BREAST
CANCER RECONSTRUCTION PROCESS. SURGERY WAS
REQUIRED TO REMOVE AND REPLACE THE TE. THE
FRONT END OF THE VEHICLE WAS DAMAGED,
SENSORS NEEDED REPLACEMENT, AND SEATBELT
STRUCTURE ALSO NEEDED REPLACEMENT."

c.    A September 5, 2016 complaint reported an August 30, 2016
accident involving a 2015 Honda Civic. The complaint states:
"THE VEHICLE (V-2) WAS INVOLVED IN A COLLISION
AT THE 1-5 NB CYPRESS OFF RAMP IN REDDING
CALIFORNIA IN EVENING PEAK HOUR TRAFFIC (AT
1810). V-2 WAS STRUCK BY V-1, WHICH IN TURN
PUSHED V-2 INTO V-3. BOTH V-1 AND V-2 WERE
STATIONARY AT THE TIME OF COLLISION. V-1, A
ISUZA TROOPER SUSTAINED MINOR FRONT END
DAMAGE. V-2 RECEIVED MINOR FRONT END
DAMAGE, AND MAJOR REAR END DAMAGE. V-3, A
KIA SOUL RECEIVED MINOR REAR END DAMAGE.
THE ISSUE IS THAT THE V-2 AIRBAG DID NOT DEPLOY

OR THE SEATBELT RESTRAIN THE DRIVER IN THE
VEHICLE. THE DRIVER STRUCK THE STEERING
WHEEL RECEIVING A MAJOR BRAIN CONCUSSION
AND BROKEN NOSE UPON BEING PUSHED BY V-1
INTO V-3. SEVERAL ON THE SCENE QUESTIONED THE
LACK OF AIRBAG DEPLOYMENT OR THE SEAT-BELT
NOT PROVIDING THE RESTRAINT NECESSARY TO
PREVENT THE INJURY. MY CONCERN IS THIS IS A
FAILURE OF THE SAFETY SYSTEMS NECESSARY TO
RESTRAIN THE DRIVER. REPORTING PARTY IS THE
FATHER OF THE DRIVER OF V-2, A TEEN DRIVER."

      c.    **ZF TRW, STMicro, and Honda have known about the defect in ZF TRW ACUs for years.**

449.  Since at least as early as 2012, ZF TRW and Honda knew that the defective ACUs in Honda Class Vehicles were vulnerable to EOS. Although ZF TRW and Honda knew this vulnerability could lead to airbag and seatbelt failures, they conspired to conceal this risk from consumers and safety regulators for years.

450.  On December 3, 2012, EOS occurred in a DS84 ASIC installed in an Australian Honda Accord during a crash test for certification. Honda and ZF TRW investigated this incident when an igniting device for the driver's side and

passenger side front airbags failed during a crash test. Upon information and belief, STMicro participated in the analysis of this incident. According to documents Honda produced to NHTSA in 2019, the ASIC had "abnormal heat during the unit analysis after testing" and an "[o]vercurrent energizing condition." Honda concluded "there was an internal failure within the [ASIC] before the 2nd [airbag] ignition, resulting in the function outage." ZF TRW suggested a scenario involving certain out-of-specification conditions (meaning circumstances not anticipated in the product design) could have generated a "[l]arge current [that] ran through ASIC, causing a failure." Honda reported that "[t]he internal unit failure was reproduced when" three out-of-specification conditions occurred.

451.   On January 13, 2014, EOS occurred in a DS84 ASIC installed in a Japanese 2014 Honda City during a crash test. The ASIC failed to record data after the airbags deployed during the test. ZF TRW supplier STMicro again investigated the incident and observed signs of circuit board burnout. Honda reported concluding "overcurrent led to destruction" and "burnout due to overcurrent." Honda also reported concluding that "[a] negative surge is larger than the capacity of the Schottky diode or Zener diode travelled from the [front crash sensor] harness and cause[d] the failure." (As described above, these diodes are protective components on the crash sensor wires). Honda reported concluding that countermeasures to guard against this risk could include "[a]dd[ing] a large

capacity Schottky diode" to "[i]mprove the surge absorption performance" and "[a]dding fuse resistance" to "[p]revent the surge intrusion with the amount of the surge above the designated level."

452.   After the incident described in the preceding paragraph, Honda claims it added further protective components to the ZF TRW ACUs in some of its vehicles. Based on the incomplete, pre-discovery information available at this time, these changes may apply to some 2015 Honda Accords, 2015–2017 Honda CR-Vs, and 2016–2017 Honda Fits with ZF TRW ACUs. Although these purported changes are insufficient to fix the defect, the timing of these additions demonstrates that Honda and ZF TRW were aware of the risk of EOS with the prior design and began making some limited changes. But at the same time, Honda and ZF TRW continued to use the defective ACUs for other Honda vehicles and failed to warn consumers about the risks posed by Honda vehicles equipped with less robust ZF TRW ACUs.

453.   Between 2012 and the present, Honda received over 300 consumer complaints involving the Honda Class Vehicles, nondeployment of airbags, and serious injury. Honda produced a chart to NHTSA tracking these complaints in the second half of 2019. Relevant portions of this chart are reproduced below.

| | Model | Model Year | A Owner/Fleet Reports | G Lawsuits |
|---|---|---|---|---|
| **Acura** | RLX | 2014 | 1 | |
| | | 2015 | | |
| | | 2016 | | |
| | | 2017 | | |
| | | 2018 | | |
| | | 2019 | | |
| | RLX Hybrid | 2014 | | |
| | | 2015 | | |
| | | 2016 | | |
| | | 2017 | | |
| | | 2018 | | |
| | | 2019 | | |
| | TL | 2012 | 3 | 2 |
| | | 2013 | 2 | |
| | | 2014 | 1 | |
| | TLX | 2015 | 4 | |
| | | 2016 | 1 | |
| | | 2017 | | |
| | TSX | 2012 | 5 | 1 |
| | | 2013 | 1 | |
| | | 2014 | | |
| | TSX Sport Wagon | 2012 | | |
| | | 2013 | | |
| | | 2014 | | |
| **Honda** | Accord (2 Dr) | 2013 | 2 | |
| | | 2014 | 2 | |
| | | 2015 | 4 | |
| | Civic (4 Dr) | 2012 | 37 | 4 |
| | | 2013 | 42 | |
| | | 2014 | 32 | |
| | | 2015 | 39 | |

|  | Civic GX (4 Dr) | 2012 | 1 |  |
|---|---|---|---|---|
|  |  | 2013 |  |  |
|  |  | 2014 |  |  |
|  |  | 2015 |  |  |
|  | Civic Hybrid (4 Dr) | 2013 |  |  |
|  |  | 2014 |  | 1 |
|  |  | 2015 |  |  |
|  | Civic Si (4 Door) | 2012 |  |  |
|  |  | 2013 |  |  |
|  |  | 2014 |  |  |
|  |  | 2015 |  |  |
|  | CR-V | 2012 | 8 |  |
|  |  | 2013 | 14 |  |
|  |  | 2014 | 21 |  |
|  |  | 2015 | 28 |  |
|  |  | 2016 | 15 |  |
|  | Fit | 2012 | 6 |  |
|  |  | 2013 | 4 |  |
|  |  | 2014 |  |  |
|  |  | 2015 | 13 |  |
|  |  | 2016 | 3 |  |
|  |  | 2017 |  |  |
|  | Fit EV | 2013 |  |  |
|  |  | 2014 |  |  |
|  | Ridgeline | 2012 | 2 |  |
|  |  | 2013 | 1 |  |
|  |  | 2014 | 1 |  |

454.   On February 10 and 13, 2017, the brother of the driver of a 2013 Accord TSX reported to Honda that his sister had died when the TSX's airbags failed to deploy. The Accord had crashed into a barrier and his sister broke her back and suffered a hyperextension of the artery in her neck. She died in the hospital shortly after the crash. The brother reported that the vehicle had travelled

around 50 miles per hour. Honda's record of the investigation history does not indicate that Honda retrieved the crash data or the ACUs from this accident to determine whether EOS had prevented the airbags from deploying.

455.   On or around December 19, 2018, Honda received a complaint that the driver of a 2016 Honda CR-V fell asleep while driving on a highway, veered off the road, hit a guard rail, and crashed into a tree. The airbags failed to deploy. The driver flew from the vehicle and died. Honda's record of the investigation history does not indicate that Honda retrieved the crash data or the ACUs from this accident to confirm whether EOS had prevented the airbags from deploying.

456.   According to a document produced by ZF TRW to NHTSA in connection with NHTSA's investigation of vehicles equipped with the DS84 ASIC, Honda returned 17 vehicles to ZF TRW that showed signs of EOS in the DS84 ASIC between July 29, 2012 and January 4, 2015. The relevant portions of the document have been reproduced below.

| Component | Analysis Category | Supplier Name | Receipt Date | Short Description Verbatim | Reason for Return | Customer | Vehicle |
|---|---|---|---|---|---|---|---|
| DS84 | EOS | ST Micro | 29-Jul-12 | EOS, Voiding | Airbag warning lamp on | Honda | CRV |
| DS84 | EOS | ST Micro | 30-May-12 | AR54020, RMA35988, abnormal comm.pins42&43 B264E840 | Airbag warning lamp on | Honda | Civic |
| DS84 | EOS | ST Micro | 17-Nov-12 | WARRANTY return from HONDA 4823KM | Airbag warning lamp on | Honda | Fit |

| Component | Analysis Category | Supplier Name | Receipt Date | Short Description Verbatim | Reason for Return | Customer | Vehicle |
|---|---|---|---|---|---|---|---|
| DS84 | EOS | ST Micro | 5-Oct-12 | AR55451, RMA36275, High Side FET fault pin s18 & 19at-40C B489E1511 | Airbag warning lamp on | Honda | Civic |
| DS84 | EOS | ST Micro | 10-Aug-13 | SR2014061122, RMA, Short to Battery faults quib 5 B602E1846 | Airbag warning lamp on | Honda | Civic |
| DS84 | EOS | ST Micro | 19-Jun-14 | SR2014102301, RMA (B695E2253), short to battery fault Squib3, pin51 | Airbag warning lamp on | Honda | Civic |
| DS84 | EOS | ST Micro | 2-Jan-15 | link to ecu-11-f010 | Airbag warning lamp on | Honda | Fit |
| DS84 | EOS | ST Micro | 14-Nov-13 | SR2015042902, RMA (B826E2881), short to battery fault on squib | Airbag warning lamp on | Honda | CRV |
| DS84 | EOS | ST Micro | 7-Jan-15 | SR2015060311, RMA (B842E2966), low resistance between VDD pins 7&6 | Airbag warning lamp on | Honda | CRV |
| DS84 | EOS | ST Micro | 24-Oct-14 | SR2015092359, RMA (B926E3327), Asic faults for all DSI lines | Airbag warning lamp on | Honda | FIT |
| DS84 | EOS | ST Micro | 7-Sep-14 | SR2015092807, RMA (B930E3351), appears to have overheated | Airbag warning lamp on | Honda | Civic |
| DS84 | EOS | ST Micro | 14-Jan-15 | SR2015100110, RMA (B930E3347), U700 has a short to battery | Airbag warning lamp on | Honda | CRV |
| DS84 | EOS | ST Micro | 19-Oct-14 | SR2015122301, RMA (B995E3634), No signals present at U700 | Airbag warning lamp on | Honda | Acura TL |
| DS84 | EOS | ST Micro | 23-Apr-15 | SR2016011404, RMA (B999E3655), losing communication on its DSI_3 | Airbag warning lamp on | Honda | CRV |

| Component | Analysis Category | Supplier Name | Receipt Date | Short Description Verbatim | Reason for Return | Customer | Vehicle |
|---|---|---|---|---|---|---|---|
| DS84 | EOS | ST Micro | 24-Nov-15 | SR2016020806, RMA (B1007E3708), pulling down the VUPP_Out voltage | Airbag warning lamp on | Honda | Civic |
| DS84 | EOS | ST Micro | 12-Sep-14 | SR2016030205, RMA (FR-16-00155), short to battery fault | Airbag warning lamp on | Honda | Acura TL |
| DS84 | EOS | ST Micro | 3-Dec-14 | SR2016041001, RMA (FR-16-00628), Fire Supply Open faults | Airbag warning lamp on | Honda | Civic |
| DS84 | EOS | ST Micro | 25-Mar-16 | link305-The waveform is different | Airbag warning lamp on | Honda | Fit |
| DS84 | EOS | ST Micro | 1-Oct-16 | SR2016101209, RMA (FR-16-03652), battery fault pins 54 and 55 | Airbag warning lamp on | Honda | CRV |
| DS84 | EOS | ST Micro | 17-Mar-15 | SR2016121101, RMA (FR-16-05070), internally shorted SQ HI 6 pin 6 & 7 | Airbag warning lamp on | Honda | Civic |
| DS84 | EOS | ST Micro | 4-Jan-15 | SR2017012612, RMA (FR-17-00108), EOS - VOIDING | Airbag warning lamp on | Honda | CRV |
| DS84 | EOS | ST Micro | 6-Jan-16 | All the failed suibs configured at the ASIC0 U700 | Airbag warning lamp on | Honda | K-Car |
| DS84 | EOS | ST Micro | 8-Jun-15 | found U700 pin2 and pin14 abnormal | Airbag warning lamp on | Honda | Unknown |
| DS84 | EOS | ST Micro | 2-May-17 | SFT-136 waveform of pin48(AOUT) abnormal | Airbag warning lamp on | Honda | K-Car |

457.   Upon information and belief, in or around January or February 2016,

ZF TRW informed Honda that some ZF TRW ACUs had experienced EOS in

vehicles made by other manufacturers and that ZF TRW had communicated with NHTSA regarding these developments.[17]

458.   Upon information and belief, in March and September 2018, ZF TRW communicated with Honda about its ongoing investigation of EOS in ACUs with the DS84 ASIC and its contacts with NHTSA.

459.   Upon information and belief, Honda monitored the public record developments about FCA's and Hyundai-Kia's recalls, particularly in light of ZF TRW's communications about developments with NHTSA.

460.   On April 19, 2019, NHTSA upgraded its preliminary investigation concerning ZF TRW ACUs to a type of investigation called an "Engineering Analysis." In connection with this decision, NHTSA expanded the scope of the investigation to include the Honda Class Vehicles.

461.   Also on April 19, 2019, NHTSA filed a public document describing the investigation. The document noted that the recalled Hyundai and Kia Class Vehicles included "the lowest levels of ASIC protection" and the recalled FCA vehicles used "a mid-level form of ASIC protection." The document also noted: "ODI has identified two substantial frontal crash events (one fatal) involving

---

[17] This allegation is based on ZF TRW's acknowledgment in a 573 Report filed in 2018 that it "communicate[d] with customers regarding EOS and contact with NHTSA" in January 2016. It is also based on ZF TRW's discussions with Toyota around the same time.

Toyota products where EOS is suspected as the likely cause of the non-deployments. The crashes involved a MY 2018 and a MY 2019 Corolla equipped with the subject ACU that incorporated higher levels of ASIC protection. Additionally, both ACUs were found to be non-communicative (meaning the ACU could not be read with an Event Data Recorder) after the crash, a condition found in other cases where EOS occurred with other [vehicle manufacturers]." Upon information and belief, Honda, ZF TRW and Honda all read this document.

462.   On January 17, 2020, Toyota submitted a Part 573 Safety Recall Report to NHTSA announcing its intention to recall 2,891,976 vehicles based on an admitted defect with ZF-TRW's ACUs containing DS84 ASICs. The recalled Toyota vehicles were equipped with versions of the ACU with same level of circuit protection as most Honda Class Vehicles. Upon information and belief, Honda, ZF TRW and Honda all read this document and knew that the ZF TRW ACUs in Honda Class Vehicles had effectively the same levels of circuit protection as the ZF TRW ACUs that prompted Toyota's recall.

> **d.    Honda and ZF TRW made misleading statements and omitted material facts about the airbags, seatbelts, and ACUs in Honda Class Vehicles.**

463.   During the Class Period, Honda made multiple false and/or misleading statements concerning the Honda Class Vehicles using interstate mail and/or wire.

464.    To sell the Honda Class Vehicles through dealerships, Honda had to certify compliance with applicable safety standards described in Section IV.B.i above, including by affixing written certifications to its vehicles and sending them to dealers. These written certifications were shipped across states with the vehicles.

465.    Honda also distributed via mail and wire numerous manuals for the Honda Class Vehicles. These manuals contain affirmative statements and important omissions about ACUs, airbags, and seatbelts. A chart summarizing these statements and omissions is attached hereto at Exhibit 15. Manuals for the Honda Class Vehicles are available on Honda's website. They are also typically included in the vehicles when they are sold at dealerships.

466.    Honda also distributed misleading advertising concerning the Honda Class Vehicles via mail and wire. Honda's advertising contains misleading statements and important omissions about airbags and seatbelts. *See* Exhibit 16 (collecting exemplars).

467.    A brochure for the 2014 Honda Fit similarly states:

SOLID ON SAFETY.

Safety for everyone is our commitment to providing one of the highest levels of standard safety features to help ensure occupant safety and protection. And through real-world research, Honda is also focusing on developing unequalled measures of protection to enhance the safety of occupants in other vehicles and even pedestrians – an innovative idea that is quickly becoming a reality.

It also states:



SIX STANDARD AIRBAGS

Six airbags line the vehicle's cabin, including side curtain airbags and front side airbags with passenger-side Occupant Position Detection System (OPDS) that is designed not to deploy if the system detects a smaller-sized or out-of-position occupant.

The brochure includes the below image of the airbags deploying to suggest that they will in fact deploy in a crash.



Honda's standard practice is to use this similar comforting images and language when describing the safety features of its vehicles in vehicle brochures and advertising.

468.    In a brochure for the 2014 Accord, Honda pledged that "Your Safety Is Our Responsibility. At Honda, Your Safety Has Always Been Our Highest Priority" and assured that "[t]he Accord comes with six standard airbags, surrounding you with safety features."

469.    A brochure for the 2014 Honda CR-V boasted that "Airbags Abound" as "The CR-V is equipped with dual -stage, multiple -threshold front airbags, side -

curtain airbags with rollover sensor, and front side airbags with passenger-side Occupant Position Detection System (OPDS). And they all come standard." In that same brochure, it continued, "[w]herever you're headed in your CR-V, nothing's more important than arriving there safely. That's why safety features come standard, no exceptions. And we're proud to say the CR-V achieved a 5-Star Overall Vehicle Score from the National Highway Traffic Safety Administration (NHTSA). So when you're out there chasing down everything you always wanted to do, know you've got Honda's unwavering commitment to safety around you."

470.    In a brochure for the 2015 Accord, Honda similarly expressed that it was "Always thinking about safety –Because, of all the things you need the Accord to do, nothing's more important than getting you where you need to go safely."

471.    In a March 4, 2015 press release regarding the 2015 Acura TLX, Michael Accavitti, senior vice president and general manager, Acura Division assured that "The TLX exemplifies how advanced safety performance is an inherent part of how Acura delivers luxury" and continued, "[s]afety is a core value of the brand and all Acura models are expected to earn top safety scores. When you think of safety performance and luxury, you'll think Acura." In that same release, Honda noted that vehicles' "advanced airbags systems" which "provide a high level of occupant protection in a wide spectrum of collision scenarios."

472.   An October 15, 2015 press release regarding the 2016 Acura TLX described a new national advertising campaign focusing on vehicle safety and "the brand's philosophy of putting people first." Jon Ikeda, vice president and general manager, Acura division, noted that "[a]t Acura, safety has been a part of our engineering culture and DNA since the inception of the brand nearly 30 years ago."

473.   In a vehicle brochure for the 2018 Acura RLX, Honda touted the vehicle's safety as follows: "Never compromise safety. We always put safety first, so when it comes to helping to protect our passengers, we ask ourselves one simple question: 'Is it safe enough for our own families to ride in?' It's our greatest goal to one day drive in a zero-collision society, and the RLX was designed and engineered with that goal in mind. For us, safety is personal." In the same brochure, Honda noted the "Advanced Front Airbags" system. Honda repeated these same statements in the brochure for the 2019 Acura RLX.

474.   Upon information and belief, Honda's advertising uniformly omitted any description of a defect in the Honda Class Vehicles' ACUs that made them vulnerable to failure during a crash.

475.   Honda has also misleadingly denied the existence of a defect in its vehicles. For example, Honda submitted a letter to NHTSA on September 20, 2019 rejecting the implication that "the alleged defect has occurred in a Honda vehicle"

- 214 -

and stating: "Honda is not presently aware of known incidents where the alleged defect, specifically of the ACU to maintain full operation, has manifested in any of Honda's subject vehicles." This statement was misleading and flat-out wrong because Honda's own testing identified two instances where foreign Honda vehicles with similar designs and the same ACUs as U.S. Honda vehicles had shown signs of electrical overstress and ceased "full operation."

> **e.    Honda has taken no steps to remedy the defective ZF TRW ACUs or compensate Plaintiffs or the class members.**

476.    Honda has not initiated any recalls or offered monetary compensation to consumers for the defective ZF TRW ACUs in Honda Class Vehicles.

477.    Insofar as Honda made any improvements at all after its own testing identified vulnerabilities to EOS, its fixes—adding stronger protective diodes and a fuse resistor to try to limit transient EOS from the crash sensors—are insufficient for at least three reasons.

> a.    First, these changes appear to only apply to some 2015 Honda Accords, 2015-2017 Honda CR-Vs, and 2016-2017 Honda Fits. The rest of the Honda Class Vehicles contain defective ZF TRW ACUs with, at best, the same level of circuit protection as the Recalled Toyota Class Vehicles and therefore present similar dangers.

b.   Second, even the higher levels of circuit protection do not address the underlying vulnerabilities or bring the ZF TRW ACU's in line with peer ACUs of competitors. Toyota's testing on the same higher level of protective diodes, for example, indicates that ZF TRW ACUs are still far less resistant to electrical surges than ACUs with ASICs manufactured by NXP or Infineon.

c.   Third, NHTSA's investigation into 2015 Honda Accords, 2015–2017 Honda CR-Vs, and 2016–2017 Honda Fits and numerous consumer complaints regarding failed airbags in these same vehicles further indicates an uncured defect in the Unrecalled Honda Class Vehicles with the ZF TRW ACUs. *See* Exhibit 14 (10606730, 10904988, 10904991, 11006304, 11006609, 11209214, 11230881, 11232553, 11297555).

d.   Fourth, Honda has received over 70 complaints that airbags failed to deploy in these model vehicles during accidents with serious injuries.

## v.   Mitsubishi Class Vehicles

478.   In or around 2012, Mitsubishi began selling vehicles equipped with defective ZF TRW ACUs that contain the same DS84 ASIC as the other Class

Vehicles. As explained above, because of the design of the ACUs, EOS from a power surge on the crash sensors can lead to the complete failure of the ACU, airbags, and seatbelts during a crash. Mitsubishi, ZF TRW, and STMicro nonetheless conspired to conceal the true nature and scope of the defect from NHTSA and consumers.

### a.    The Definition of the Mitsubishi Class Vehicles

479.    The Mitsubishi Class Vehicles are all vehicles made by Mitsubishi that have a ZF TRW ACU that uses a DS84 ASIC.

480.    Based on the incomplete, pre-discovery information presently available, Plaintiffs understand that the list of Mitsubishi vehicles equipped with defective ZF TRW ACUs includes:

a.    2013–2017 Lancer;

b.    2013–2015 Lancer Evolution;

c.    2013–2015 Lancer Ralliart;

d.    2013–2016 Lancer Sportback; and

e.    2013 Outlander.

481.    Plaintiffs refer to the vehicles identified in the preceding paragraph as the Mitsubishi Class Vehicles.

### b.   The ZF TRW ACUs in Mitsubishi Class Vehicles are defective.

482.   The ZF TRW ACUs in Mitsubishi Class Vehicles are defective because they are vulnerable to transients generated during crashes. The defect can cause the ACUs to fail precisely when they are most urgently needed: during a head-on collision. As a result, the ACU does not reliably serve its most basic purpose and poses a serious risk to the lives and physical well-being of drivers and passengers.

483.   Since at least 2014, dozens of consumers have reported to Mitsubishi or NHTSA that the airbags in their Mitsubishi Class Vehicle failed to deploy after a crash. Examples of such complaints are attached hereto as Exhibit 18. For example:

a.   On December 30, 2014, a consumer contacted Mitsubishi's Customer Relations hotline to inquire why the airbags in her 2013 Outlander did not deploy after she rear-ended the car in front of her at 40 miles per hour.

b.   On January 27, 2015, a consumer contacted Mitsubishi's Customer Relations hotline to report a severe accident where the airbags in his 2014 Lancer Evolution did not deploy and he was ejected from the vehicle. Mitsubishi's internal notes indicate that the consumer suffered extensive injuries, including

"BROKEN COLLAR BONE[,] HEAD LACERATION WITH

STAPLES[,] BOTH WRIST AND PELVIS."

c.     On May 16, 2016, a consumer contacted Mitsubishi's Customer

Relations hotline to report that his son was in a four-car

freeway collision where the airbags in his 2013 Lancer

Sportback did not deploy and the seatbelt restraints failed to

lock. The vehicle sustained a frontal impact and was traveling

at approximately 50-60 miles per hour at the time of collision.

d.     A publicly available complaint with NHTSA dated October 21,

2016 reported a September 13, 2016 accident involving a 2015

Mitsubishi Lancer in Centralia, Washington. The complaint

states: "I WAS TRAVELING ALONG 20 MILES BELOW

THE SPEED LIMIT HAD A DEER JUMPED OUT IN

FRONT OF ME I SWEAR TO MISS IT MY FRONT

PASSENGER SIDE TIRE WENT OFF THE ASPHALT AND

INTO SOFT DIRT AND MY CAR HIGH CENTERED ON

THE RAISED LIP OF THE ROAD AND SLID DOWN THE

HILLSIDE LANDING INTO TREES BOTH GOING

FORWARD AND TOWARDS THE RIGHT SIDE OF THE

CAR STOPPING BECAUSE OF TREES IT DESTROYED

THE FRONT END THE ENTIRE UNDERCARRIAGE THE

ENTIRE PASSENGER SIDE OF THE CAR POPPED OPEN

THE SUNROOF TRIED PUSHING THE ROOF OFF THE

BACK DRIVER SIDE OF THE CAR AND NO AIRBAGS

WENT OFF NO SAFETY FEATURES OTHER THAN THE

SEAT BELT WORK."

e.    A publicly available complaint with NHTSA dated June 8,

2017 reported a May 13, 2017 accident involving a 2015

Mitsubishi Lancer in Kent, Washington. The complaint states:

"SON WAS DRIVING VEHICLE REAR ENDED A

VEHICLE, AT 35 MPH, ROLLED MITSUBISHI 8 TO 9

TIMES, SLED ON ROOF ABOUT 50 FEET BEFORE

COMING TO A STOP UP SIDE DOWN. AIRBAGS NEVER

DEPLOYED. NOT EVEN WHEN THE TOW TRUCK

FLIPPED CAR RIGHT SIDE UP."

f.    A publicly available complaint with NHTSA dated November

14, 2017 reported a November 12, 2017 accident involving a

2015 Mitsubishi Lancer in Boyers, Pennsylvania. The

complaint states: "DRIVING ON INTERSTATE AT 1130 AT

NIGHT NO RAIN OR ANYTHING. I HIT A DEER AT 72

MPH LOTS OF DAMAGE TO THE FRONT AND DRIVERSIDE. MY SEST BELT WAS LOCKED BUT NOT ONE OF MY AIR BAGS COME OUT...”

g.    A publicly available complaint with NHTSA dated January 16, 2020 reported a January 11, 2020 accident involving a 2016 Mitsubishi Lancer in Lake Havasu City, Arizona. The complaint states: “ACCIDENT THAT RESULTED IN THE CAR BEING DECLARED TOTAL LOSS. THE CAR WAS HIT IN THE UPPER FRONT AND SIDE AREA OF DRIVERS SIDE. DURING THE ACCIDENT THE AIR BAGS DID NOT DEPLOY. RESULTED IN INJURIES, OF COURSE. THE CAR WAS MAKING LEFT HANDED TURN FROM RESIDENTIAL AREA ONTO A BUSY MAIN STREET. AND THE OTHER VEHICLE WAS NOT PAYING ATTENTION AND HIT THE CAR WHILE IT WAS TRYING TO TURN. THE CAR WAS GOING APPROXIMATELY 15-20 MPH. THE OTHER VEHICLE WAS GOING 40-45 MPH. WHAT WOULD CAUSE THE AIR BAGS TO MALFUNCTION?? BECAUSE I WOULD LOVE TO KNOW WHY INJURIES HAD TO EVEN OCCUR SINCE THEY

ONLY HAPPENED DUE TO THE MALFUNCTION OF THE

AIR BAGS."

    **c.**    **ZF TRW, STMicro and Mitsubishi have known about the defect in ZF TRW ACUs for years.**

484.   Mitsubishi, STMicro, and ZF TRW were aware of the risk of EOS in the ZF TRW ACUs since at least 2012. Although Mitsubishi, STMicro, and ZF TRW knew this vulnerability could lead to airbag and seatbelt failures, they conspired to conceal this risk from consumers and safety regulators for years.

485.   Mitsubishi documents produced to NHTSA indicate that on or around April 26, 2012, Mitsubishi's engineers conducted testing "[t]o confirm ACU manufactured by ZF TRW protection level for transient." On information and belief, Mitsubishi conducted this testing based on a known concern with the ACUs.

486.   Even with repeated consumer reports of airbag nondeployment dating back to at least 2014, including reports directly to Mitsubishi's own Customer Relations department, Mitsubishi did not conduct any further testing of the ZF TRW ACU after 2012. In contrast, Mitsubishi continued to test ACUs for other Mitsubishi vehicles manufactured by Bosch—another component manufacturer— in 2013 and 2019.

487.   Upon information and belief, in or around January or February 2016, ZF TRW contacted Mitsubishi to disclose that it had confirmed that some ZF TRW

ACUs had experienced EOS in vehicles made by other manufacturers and that ZF TRW had communicated with NHTSA regarding these developments.[18]

488.    Upon information and belief, in March and September 2018, ZF TRW communicated with Mitsubishi about its ongoing investigation of EOS in ACUs with the DS84 ASIC and its contacts with NHTSA.

489.    Upon information and belief, Mitsubishi monitored the public record developments about FCA's and Hyundai-Kia's recalls, particularly in light of ZF TRW's communications about developments with NHTSA.

490.    On April 19, 2019, NHTSA upgraded its preliminary investigation concerning ZF TRW ACUs to a type of investigation called an "Engineering Analysis." In connection with this decision, NHTSA expanded the scope of the investigation to include the Mitsubishi Class Vehicles.

491.    Also on April 19, 2019, NHTSA filed a public document describing the investigation. The document noted that the recalled Hyundai and Kia Class Vehicles included "the lowest levels of ASIC protection" and the recalled FCA vehicles used "a mid-level form of ASIC protection." The document also noted: "ODI has identified two substantial frontal crash events (one fatal) involving

---

[18] This allegation is based on ZF TRW's acknowledgment in a 573 Report filed in 2018 that it "communicate[d] with customers regarding EOS and contact with NHTSA" in January 2016. It is also based on ZF TRW's discussions with Toyota around the same time.

Toyota products where EOS is suspected as the likely cause of the non-deployments. The crashes involved a MY 2018 and a MY 2019 Corolla equipped with the subject ACU that incorporated higher levels of ASIC protection. Additionally, both ACUs were found to be non-communicative (meaning the ACU could not be read with an Event Data Recorder) after the crash, a condition found in other cases where EOS occurred with other [vehicle manufacturers]." Upon information and belief, Mitsubishi, ZF TRW and STMicro all read this document, and understood that Mitsubishi Class Vehicles were equipped with, at best, a mid-level form of ASIC protection described by NHTSA.

### d. Mitsubishi and ZF TRW made misleading statements and omitted material facts about the airbags, seatbelts, and ACUs in Mitsubishi Class Vehicles.

492. During the Class Period, Mitsubishi made multiple false and/or misleading statements concerning the Mitsubishi Class Vehicles using interstate mail and/or wire.

493. To sell the Mitsubishi Class Vehicles through dealerships, Mitsubishi had to certify compliance with applicable safety standards described in Section IV.B.i above, including by affixing written certifications to its vehicles and sending them to dealers. These certifications were shipped across states.

494. Mitsubishi also distributed numerous manuals for the Mitsubishi Class Vehicles via mail and wire. These manuals contain affirmative statements and omit

material facts about ACUs, airbags, and seatbelts. A chart summarizing these statements and omissions is attached hereto at Exhibit 17. Manuals for the Mitsubishi Class Vehicles are available on Mitsubishi's website. They are also typically included in the vehicles when they are sold at dealerships.

495.   Mitsubishi also distributed misleading advertising concerning the Mitsubishi Class Vehicles via mail and wire. Mitsubishi's advertising contains misleading statements and important omissions about airbags and seatbelts. *See* Exhibit 19 (collecting exemplars).

496.   Mitsubishi's brochure for the 2013 Outlander touted that "Safety Comes Standard – When it comes to your safety, the 2013 Outlander is on constant alert with active technologies to pre-empt whatever the road might throw in your way. It is also fitted with front passenger Supplementary Restraint System (SRS) and six standard airbags including front, side and curtain protection."

497.   A brochure for the 2014 Mitsubishi Lancer assured that "[a]t Mitsubishi, we consider performance and safety to be two sides of the same coin; that's why our comprehensive safety systems underpin our next-generation engineering. Safety is a priority beneath every surface of the 2014 Lancer" and named its "Robust safety features such as a standard 7 airbag Supplemental Restraint System (SRS) and Lancer's Reinforced Impact Safety Evolution (RISE)

structure are just a couple of reasons why the Lancer . . . has earned an IIHS 'Top

Safety Pick' for five consecutive years (2009-2013)."

498.   A Mitsubishi webpage for the 2014 Lancer Sportback, available on

June 25, 2014, touted the "Power of Seven" with a "7 Airbag Safety System"

described as follows: "This innovative system features six standard airbags, along

with a seventh under the driver's side dash that helps stabilize the driver's lower

body and knees during certain types of frontal collisions. This is one Lancer

Sportback feature you'll probably never use, but it's nice to know it's there."

499.   Mitsubishi's advertising proved to be effective. During the Class

Period, Mitsubishi produced approximately 100,000 Mitsubishi Class Vehicles for

sale or lease in the United States.

500.   Upon information and belief, Mitsubishi's advertising uniformly

omitted any description of a defect in the Mitsubishi Class Vehicles' ACUs that

made them vulnerable to failure during a crash.

> **e.    Mitsubishi has taken no steps to remedy the defective ZF
> TRW ACUs or compensate Plaintiffs or the class members.**

501.   As of the date of the filing of this Consolidated Complaint, Mitsubishi

has not recalled any of the Mitsubishi Class Vehicles.

502.   Purported differences in circuit protection cannot explain Mitsubishi's

decision, because the Mitsubishi Class Vehicle are equipped with the same

inadequate "mid-level" form of protection that failed in the Recalled FCA Class Vehicles.

**D.    Defendants' material omissions and misrepresentations about the defective ZF TRW ACUs injured Plaintiffs and class members.**

503.   Had Defendants disclosed the existence of the defect in the Class Vehicles, Plaintiffs and other class members would not have purchased or leased the Class Vehicles, or they would have paid less for them.

504.   Had Defendants disclosed the existence of the defect to NHTSA before the Vehicle Manufacturer Defendants sold the Class Vehicles, the Vehicle Manufacturer Defendants could not have avoided or delayed recalling the Class Vehicles.

505.   Had Defendants disclosed the existence of the defect in the Class Vehicles' ZF TRW ACUs, the market price of the Class Vehicles would have been lower. Accordingly, Plaintiffs and class members paid a premium reflecting the market's assumption that the Class Vehicles did not have defective ACUs.

506.   Plaintiffs have been deprived of the benefit of their bargain and did not receive the products they paid for and reasonably expected: vehicles with fully functional ACUs, airbags, and seatbelts.

## V. <u>TOLLING OF THE STATUTE OF LIMITATIONS</u>

507.   As explained above in Section IV.B.i, Defendants all had a duty to disclose the ZF TRW ACU defect to consumers and NHTSA. Contrary to this duty, Defendants concealed the defect from consumers and NHTSA by:

   a.   Advertising the safety of the Class Vehicles and/or ACUs;

   b.   Dismissing observed incidents where the ACU suffered EOS and airbags failed to deploy in Class Vehicles as "commanded nondeployments" (i.e., intentional nondeployment of airbags in high-speed wrecks where the ACU coincidentally happened to show suspicious signs of EOS); and

   c.   Downplaying the true scope of the ZF TRW ACU defect by asserting that vehicle-specific design issues (such as differences about the location of wiring in the vehicles) were to blame, even after Defendants observed EOS in ZF TRW ACUs across a variety of different Class Vehicles with different wiring configurations manufactured by four different Vehicle Manufacture Defendants.

508.   As explained above in Section IV.C, Defendants have known or had reason to know of the defect with ZF TRW ACUs installed in the Class Vehicles since at least 2008 and further incidents from practically every year since then have

provided additional notice of the defect to Defendants. Nonetheless, Defendants failed to fully warn consumers, initiate timely and complete recalls, or fully inform NHTSA of the problem.

509.    Due to the highly technical nature of the defect with the ZF TRW ACUs installed in the Class Vehicles, Plaintiffs and class members were unable to independently discover the defect using reasonable diligence. Prior to the retention of counsel and without third-party experts, Plaintiffs and class members lack the necessary expertise to analyze the ZF TRW ACUS for signs of EOS or to even identify the Class Vehicles with ZF TRW ACUs.

510.    Accordingly:

    a.    Defendants' fraudulent concealment tolls the statute of limitations.

    b.    Defendants are estopped from relying on the statute of limitations.

    c.    The statute of limitations is tolled by the discovery rule.

## VI.    CLASS ACTION ALLEGATIONS

511.    The proposed Classes' and Subclasses' claims all derive directly from a single course of conduct by Defendants. Within each Claim for Relief asserted by the respective proposed Classes, the same legal standards govern. Additionally, many—and for some, all—states share the same legal standards and elements of

proof, facilitating the certification of multistate or nationwide classes for some or all claims. Accordingly, Plaintiffs bring this lawsuit as a class action on their own behalf, and on behalf of all other persons similarly situated, as members of the proposed Classes pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and/or (b)(3), and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

## A.    The Class and Subclasses

512.   All Plaintiffs bring this action, and seek to certify and maintain it as a class action, under Federal Rules of Civil Procedure 23(a), (b)(2), and/or (b)(3), and/or c(4), on behalf of themselves, and a Class defined as follows: All persons in the United States who purchased or leased a Class Vehicle.[19] This Class is referred to as the "Nationwide Class."

513.   Plaintiffs also plead state subclasses within the Nationwide Class, each defined based on purchases or leases of the Class Vehicles within each state.

514.   The Hyundai-Kia Plaintiffs also bring this action, and seek to certify and maintain it as a class action, under Federal Rules of Civil Procedure 23(a),

---

[19] Excluded from the Nationwide Class are Defendants; their employees, officers, directors, legal representatives, heirs, and successors; wholly or partly owned subsidiaries or affiliates of Defendants. Also excluded from the Class and all Subclasses are Class Counsel and their employees; and the judicial officers, their immediate family members, and associated court staff assigned to this case.

*Footnote continued on next page*

(b)(2), and/or (b)(3), and/or c(4), on behalf of themselves, and a nationwide consumer Subclass defined as follows: All persons in the United States who purchased or leased a Hyundai-Kia Class Vehicle.[20] This Subclass is referred to as the Nationwide Hyundai-Kia Class. Similar subclasses exist on a statewide basis for all persons in the United States who purchased or leased a Hyundai-Kia Class Vehicle in each state. Plaintiffs seek to represent those subclasses for the states of their purchases and/or leases.

515.   FCA Plaintiffs bring this action, and seek to certify and maintain it as a class action, under Federal Rules of Civil Procedure 23(a), (b)(2), and/or (b)(3), and/or c(4), on behalf of themselves, and a nationwide consumer Subclass defined as follows: All persons in the United States who purchased or leased a FCA Class Vehicle.[21] This Subclass is referred to as the Nationwide FCA Class. Similar subclasses exist on a statewide basis for all persons in the United States who purchased or leased a FCA Class Vehicle in each state. Plaintiffs seek to represent those subclasses for the states of their purchases and/or leases.

---

[20] Excluded from the Nationwide Hyundai-Kia Subclass are the ZF TRW, STMicro, and Hyundai-Kia Defendants; their employees, officers, directors, legal representatives, heirs, and successors; and wholly or partly owned subsidiaries or affiliates of these Defendants.

[21] Excluded from the Nationwide FCA Subclass are ZF TRW, STMicro, and FCA Defendants; their employees, officers, directors, legal representatives, heirs, and successors; and wholly or partly owned subsidiaries or affiliates of these Defendants.

*Footnote continued on next page*

516.    Toyota Plaintiffs bring this action, and seek to certify and maintain it as a class action, under Federal Rules of Civil Procedure 23(a), (b)(2), and/or (b)(3), and/or c(4), on behalf of themselves, and a nationwide consumer Subclass defined as follows: All persons in the United States who purchased or leased a Toyota Class Vehicle.[22] This Subclass is referred to as the Nationwide Toyota Class. Similar subclasses exist on a statewide basis for all persons in the United States who purchased or leased a Toyota Class Vehicle in each state. Plaintiffs seek to represent those subclasses for the states of their purchases and/or leases.

517.    Honda Plaintiffs bring this action, and seek to certify and maintain it as a class action, under Federal Rules of Civil Procedure 23(a), (b)(2), and/or (b)(3), and/or c(4), on behalf of themselves, and a nationwide consumer Subclass defined as follows: All persons in the United States who purchased or leased a Honda Class Vehicle.[23] This Subclass is referred to as the Nationwide Honda Class. Similar subclasses exist on a statewide basis for all persons in the United

---

[22] Excluded from the Nationwide Toyota Subclass are the ZF TRW, STMicro, and Toyota Defendants; their employees, officers, directors, legal representatives, heirs, and successors; and wholly or partly owned subsidiaries or affiliates of these Defendants.

[23] Excluded from the Nationwide Honda Subclass are the ZF TRW, ST Micro, and Honda Defendants; their employees, officers, directors, legal representatives, heirs, and successors; and wholly or partly owned subsidiaries or affiliates of these Defendants.

States who purchased or leased a Honda Class Vehicle in each state. Plaintiffs seek to represent those subclasses for the states of their purchases and/or leases.

518.    Mitsubishi Plaintiffs bring this action, and seek to certify and maintain it as a class action, under Federal Rules of Civil Procedure 23(a), (b)(2), and/or (b)(3), and/or c(4), on behalf of themselves, and a nationwide consumer Subclass defined as follows: All persons in the United States who purchased or leased a Mitsubishi Class Vehicle.[24] This Subclass is referred to as the Nationwide Mitsubishi Class. Similar subclasses exist on a statewide basis for all persons in the United States who purchased or leased a Mitsubishi Class Vehicle in each state. Plaintiffs seek to represent those subclasses for the states of their purchases and/or leases.

**B.    Numerosity**

519.    This action satisfies the requirements of Federal Rule of Civil Procedure 23(a)(1). There are millions of Class Vehicles and class members nationwide. Individual joinder of all class and subclass members is impracticable.

520.    The Class and Subclasses are ascertainable because their members can be readily identified using information tying the defective ZF TRW ACUs to

---

[24] Excluded from the Nationwide Mitsubishi Subclass are the ZF TRW, ST Micro, and Mitsubishi Defendants; their employees, officers, directors, legal representatives, heirs, and successors; and wholly or partly owned subsidiaries or affiliates of these Defendants.

particular vehicle identification numbers, vehicle registration records, sales records, production records, and other information kept by the Vehicle Manufacturer Defendants or third parties in the usual course of business and within their control. Plaintiffs anticipate providing appropriate notice to the Class and Subclasses in compliance with Federal Rules of Civil Procedure 23(c)(1)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Rule 23(d).

## C.   Predominance of Common Issues

521.   This action satisfies the requirements of Federal Rules of Civil Procedure 23(a)(2) and (b)(3), because questions of law and fact that have common answer and predominate over questions affecting only individual Class and Subclass members. These include, without limitation, the following:

    a.    Whether the Class Vehicles were equipped with defective ACUs that were vulnerable to EOS;

    b.    Whether and when Defendants knew, or should have known, that the ZF TRW ACUs installed in Class Vehicles were defective;

    c.    Whether Defendants had a duty to disclose the defective nature of the ACUs in the Class Vehicles to Plaintiffs and class members;

d.    Whether the defective nature of the Class Vehicles was contrary to material representations made by Defendants;

e.    Whether Defendants omitted and failed to disclose material facts about the Class Vehicles;

f.    Whether Vehicle Manufacturer Defendants' certifications concerning vehicle safety were misleading in light of the risk that EOS can cause ZF TRW ACUs not to trigger airbags and seatbelts during a collision;

g.    Whether Vehicle Manufacturer Defendants' descriptions of safety features controlled by the defective ZF TRW ACUs in advertising, on Monroney stickers, and in owner's manuals were misleading in light of the risk that EOS can cause ZF TRW ACUs not to trigger airbags and seatbelts during a collision;

h.    Whether Defendants' statements, concealments, and omissions regarding the Class Vehicles, were material, in that a reasonable consumer could consider them important in purchasing, selling, maintaining, or operating such vehicles;

i.    Whether Defendants engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices, in trade or commerce, by

failing to disclose that the Class Vehicles were designed, manufactured, and sold with defective airbag components;

j.    Whether Defendants' conduct, as alleged herein, was likely to mislead a reasonable consumer;

k.    Whether Defendants' concealment of the true defective nature of the Class Vehicles induced Plaintiffs and class members to act to their detriment by purchasing the Class Vehicles;

l.    Whether Defendants' concealment of the true defective nature of the Class Vehicles caused the market price of the Class Vehicles to incorporate a premium reflecting the assumption by consumers that the Class Vehicles were equipped with fully functional Occupant Restraint Systems and, if so, the market value of that premium;

m.    Whether the Class Vehicles have suffered a diminution of value as a result of those Vehicles' incorporation of the defective ACUs at issue;

n.    Whether Defendants' conduct tolls any or all applicable limitations periods by acts of fraudulent concealment, application of the discovery rule, or equitable estoppel;

o.    Whether Defendants violated State consumer protection

statutes, and if so, what remedies are available under those

statutes;

p.    Whether the Class Vehicles were unfit for the ordinary

purposes for which they were used, in violation of the implied

warranty of merchantability;

q.    Whether Defendants' unlawful, unfair, and/or deceptive

practices harmed Plaintiffs and the Classes;

r.    Whether Defendants have been unjustly enriched by their

conduct;

s.    Whether Defendants conspired with others to violate RICO;

and

t.    Whether Defendants associated with any enterprise engaged in,

or the activities of which affect, interstate or foreign commerce,

to conduct or participate, directly or indirectly, in the conduct of

such enterprise's affairs through a pattern of racketeering

activity.

## D.    Typicality

522.   This action satisfies the requirements of Federal Rule of Civil

Procedure 23(a)(3), because Plaintiffs' claims are typical of the claims of the class

members, and arise from the same course of conduct by Defendants. The relief Plaintiffs seek is typical of the relief sought for the absent class members.

## E.    Adequacy of Representation

523.    Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective products.

524.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes, and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Classes.

## F.    Superiority

525.    This action satisfies the requirements of Federal Rule of Civil Procedure 23(b)(2), because Defendants have acted and refused to act on grounds generally applicable to each Class, thereby making appropriate final relief with respect to each Class as a whole.

526.    This action satisfies the requirements of Federal Rule of Civil Procedure 23(b)(3), because a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

527.    Because the damages suffered by each individual class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual class members to redress the wrongs

done to each of them individually, such that most or all class members would have no rational economic interest in individually controlling the prosecution of specific actions; and the burden imposed on the judicial system by individual litigation—by even a small fraction of the Class—would be enormous, making class adjudication the superior alternative under Federal Rule of Civil Procedure 23(b)(3)(A).

528.   The conduct of this action as a class action instead of as millions of individual lawsuits presents far fewer management difficulties; far better conserves judicial resources, and the parties' resources; and far more effectively protects the rights of each class member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the court, and the public of class treatment in this court, making class adjudication superior to other alternatives, under Federal Rule of Civil Procedure 23(b)(3)(D).

529.   Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Federal Rule of Civil Procedure 23 provides the Court with the authority and flexibility to maximize the efficiencies and benefits of the class mechanism, and reduce management challenges. The Court may, on motion of Plaintiffs, or on

its own determination, certify nationwide, statewide and/or multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law, for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into subclasses.

530.   The Classes expressly disclaim any recovery in this action for physical injury resulting from the defective ZF TRW ACUs without waiving or dismissing such claims. Plaintiffs are informed and believe that injuries suffered in crashes as a result of defective ZF TRW ACUs implicate the Class Vehicles; constitute evidence supporting various claims, including potential diminution of value; and are continuing to occur because of Defendants' delays and inaction regarding the commencement and completion of recalls. The increased risk of injury from the ASIC Defect serves as an independent justification for the relief sought by Plaintiffs and the Class and Subclasses.

## VII.   CLAIMS FOR RELIEF

**A.   Nationwide Claims**

**i.   Nationwide Count 1: Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)-(d), on Behalf of the Nationwide Class Against the ZF TRW and STMicro Defendants**

531.   Plaintiffs bring this claim on behalf of the Nationwide Class against ZF TRW and STMicro.

532.   ZF TRW and STMicro are "persons" under 18 U.S.C. § 1961(3) because each was capable of holding "a legal or beneficial interest in property."

533.   ZF TRW and STMicro violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of an "association-in-fact enterprise" through a pattern of racketeering activity. This enterprise is referred to as the ACU Enterprise.

534.   The purpose of the ACU Enterprise was to mislead consumers and NHTSA concerning the existence, nature, and scope of the defect with ZF TRW ACUs installed in the Class Vehicles. By concealing and minimizing the defect, ZF TRW and STMicro maximized their revenue by selling as many defective ZF TRW ACUs (the only ACUs on the market that contained STMicro's DS84 ASIC) to Vehicle Manufacturer Defendants as possible and avoiding or limiting the substantial costs and reputational harms associated with breaching warranties to the Vehicle Manufacturer Defendants and having to assist with recalling the Class Vehicles. In so doing, ZF TRW and STMicro obtained money directly or indirectly from sale of the defective ZF TRW ACUs to the Vehicle Manufacturer Defendants (and the Class Vehicles to Plaintiffs and Class Members).

535.   As the owners and users of the Class Vehicles, Plaintiffs and the Nationwide Class are the parties most affected by the dangerous and defective ZF TRW ACUs. ZF TRW and STMicro knew that Plaintiffs and the Nationwide Class would be the parties who overpaid for the Class Vehicles as the result of their

concealing the ACU Defect, and who suffered the attendant harms and safety risks of driving vehicles without properly functioning ACUs.

536. At all relevant times, ZF TRW and STMicro agreed to conduct and participate, directly and indirectly, in the affairs of the ACU Enterprise through a pattern of racketeering activity. For the conspiracy to succeed, ZF TRW and STMicro had to commit to secrecy about the existence and scope of the defect with the ZF TRW ACUs contained in Class Vehicles. When forced to acknowledge serious problems with the ACUs (including in fatal crashes with airbag failures), ZF TRW and/or STMicro also agreed to obscure and minimize the defect by misleadingly blaming other parts, such as wiring in the front-end of the vehicle. In reality, they knew the defective ZF TRW ACUs were uniquely vulnerable to EOS.

537. ZF TRW and STMicro each existed separately from one another at all relevant times. They each had distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

538. ZF TRW and STMicro also each existed separately from the ACU Enterprise.

      a.    STMicro made many other products aside from the DS84 ASICs used in the defective ZF TRW ACUs.

    b.    ZF TRW similarly made many other automotive parts aside from the defective ZF TRW ACUs.

539.   ZF TRW participated in the conduct of the ACU Enterprise by:

    a.    Collaborating with STMicro to design the defective ACUs in Class Vehicles;

    b.    Manufacturing, and supplying the defective ACUs;

    c.    Communicating with STMicro regarding specific field incidents where ACUs in Class Vehicles had failed due to EOS;

    d.    Concealing that the Class Vehicles were equipped with defective ZF TRW ACUs that were vulnerable to EOS;

    e.    Falsely writing to NHTSA in 2016 that the defective ZF TRW ACUs in unrecalled Class Vehicles were not defective;

    f.    Continuing to manufacture defective ACUs for unrecalled Class Vehicles; and

    g.    Collecting revenue flowing from the sale of defective ZF TRW ACUs.

540.   STMicro participated in the ACU Enterprise by:

    a.    Designing and manufacturing the DS84 ASIC included in the Defective ACUs;

      b.     Testing the ACUs in the Class Vehicles and consulting with ZF TRW concerning observed evidence of EOS in Class Vehicles;

      c.     Concealing that the Class Vehicles were equipped with defective ZF TRW ACUs that were vulnerable to EOS;

      d.     Concealing information about the existence, nature, and scope of the defect from NHTSA and the public; and

      e.     Collecting revenue flowing from the sale of the DS84 ASIC.

541. Without ZF TRW and STMicro's willing participation in the conduct above, the ACU Enterprise's scheme and common course of conduct would have been unsuccessful.

542. To carry out, or attempt to carry out the scheme to defraud, ZF TRW and STMicro—each of whom is a person associated-in-fact with the Enterprise—did knowingly conduct or participate, directly or indirectly, in the affairs of the ACU Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and which employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

543. The ACU Enterprise used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme to conceal the ACU defect.

544.   In devising and executing the illegal scheme, ZF TRW and STMicro devised and knowingly carried out a material scheme and/or artifice to defraud or obtain money from the Plaintiffs and the Nationwide Class by means of materially false or fraudulent pretenses, representations, or omissions of material facts.

545.   Examples of the ACU Enterprise's multiple predicate acts of mail and wire fraud are summarized in the below subparagraphs.[25]

a.   While using mail and wire to defraud and obtain revenue under false pretenses, ZF TRW and STMicro failed to timely, accurately, and completely disclose the vulnerability of the defective ACUs to ASIC EOS to NHTSA and consumers when ZF TRW and STMicro had a duty to disclose this information.[26]

b.   Upon information and belief, since around 2008 and throughout the course of its sale of defective ACUs with the DS84 ASIC,

---

[25] Many of the precise dates and examples of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden by Defendants, and cannot be alleged without access to Defendants' books and records. However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred.

[26] As explained above, suppliers of component parts have a duty to report defects in their equipment to NHTSA. *See* 49 C.F.R. §573.6(a). The 573 defect reports are typically published on NHTSA's public docket. ZF TRW and STMicro also had a duty to disclose in light of their knowledge that the Vehicle Manufacturer Defendants presented the Class Vehicles to consumers as vehicles with working airbags and seatbelts in advertising, certification labels, and owner's manuals, in contrast to their exclusive knowledge of the ACU Defect, which was not available to consumers.

ZF TRW used mail and wire to successfully execute the ACU

Enterprise's fraudulent scheme, including sending invoices to

the Vehicle Manufacturers, corresponding with STMicro, and

shipping the defective ACUs.

c.      Upon information and belief, since around 2008 and throughout

the course of its sale of DS84 ASIC, STMicro used mail and

wire to successfully execute ACU Enterprise's fraudulent

scheme, including sending invoices to the Vehicle

Manufacturers, corresponding with STMicro, and shipping the

defective ACUs.

d.      ZF TRW also mailed NHTSA a false and misleading slide deck

presentation on or around February 5, 2016. The presentation

sought to downplay the scope of the vehicles affected by the

defective ZF TRW ACUs by stating: "Presence and impact of

EOS on ACUs is vehicle dependent" and "Customer airbag

deployment strategy can result in a commanded non-

deployment." ZF TRW intended for these statements to

persuade NHTSA that ZF TRW ACUs in most of the Class

Vehicles were not defective and that the ZF TRW ACUs that

had suffered EOS in the field may not have caused the airbags

not to deploy. Upon information and belief, ZF TRW contemporaneously sent a version of this presentation with similarly misleading statements to Mitsubishi, Honda, and Toyota.

e.    ZF TRW also mailed NHTSA a letter in or around September 2016 in connection with FCA's partial recall stating: "Although a similar TRW component is installed in vehicles other than those identified in the [Defect Information Report], the conditions in FCA's [Defect Information Report] are limited to the specific FCA vehicles identified in that report." This statement was false and misleading because the defect with ZF TRW ACUs extended to other Class Vehicles and the rest of the Class Vehicles.[27] At the time, ZF TRW knew that ACU failures in multiple Hyundai and Kia had been linked to ASIC EOS and that two Honda vehicles had shown signs of ASIC EOS in testing.

f.    On or around March 12, 2018, ZF TRW sent a letter to NHTSA attorney Otto Matheke. The letter contains a slide deck

_____

[27] ZF TRW produced an undated version of this letter, but it is appears likely that the letter was sent to NHTSA shortly after FCA's 2016 recall.

presentation in which ZF TRW makes the following misleading statements: "ZF has not identified any defect related to motor vehicle safety in the ACU or any of its components. . . . ZF has not found evidence to link non deployments to EOS. . . . Customer airbag deployment strategy can result in a commanded non-deployment in certain crash types on specific platforms. . . . EOS with non deployment is vehicle dependent and platform dependent within a customer. . . . All ZF ACUs have appropriate levels of protection against specified and foreseeable transients." Each of these statements was false and misleading, and omitted material information, because (i) ZF TRW and STMicro had previously concluded that ASIC EOS had likely caused airbag nondeployment in multiple crashes, (ii) it is not possible to reliably conclude that a nondeployment was "commanded" when the crash data is missing (as it was in many crashes), (iii) ZF TRW and STMicro had recommended design changes due to testing that demonstrated vulnerability to EOS, and (iv) ASIC EOS has occurred across a wide variety of vehicles with ZF TRW ACUs (i.e., "platforms") and is therefore not "platform-specific."

546.   ZF TRW and STMicro knew and intended that government regulators would rely on their material omissions made about the Class Vehicles to approve them for importation, marketing, and sale to consumers in the United States. ZF TRW and STMicro understood that disclosing the defect would require a recall of all the Class Vehicles to be conducted and design change to be implemented, and negatively impact the profits of the ACU Enterprise.

547.   ZF TRW and STMicro knew and intended that consumers would purchase the Class Vehicles and incur costs as a result. Plaintiffs' reliance on this ongoing concealment is demonstrated by the fact that they paid money for defective Class Vehicles that never should have been introduced into the U.S. stream of commerce, and that they overpaid for vehicles with defective safety systems.

548.   As described herein, ZF TRW and STMicro engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining money from Plaintiffs and Class members. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

549.   The predicate acts had the common purpose of generating significant revenue and profits for ZF TRW and STMicro from the sale and lease of the Class

Vehicles, while minimizing or avoiding costs of necessary repairs, at the expense of Plaintiffs and Class members.

550. ZF TRW and STMicro knew for years that the defective ZF TRW ACUs in the Class Vehicles were vulnerable to EOS, but continued to manufacture, sell/lease, and accept payment from Plaintiffs for them anyway, as demonstrated by:

      a.    ZF TRW and STMicro's thermal testing in 2008 that demonstrated EOS damage and vulnerability in the DS84 ASIC;

      b.    ZF TRW records demonstrating that dozens of ACUs with signs of EOS in DS84 ASICs were returned in Class Vehicles to ZF TRW based on signs of EOS in the ACU between 2009 and 2016;

      c.    Multiple tests and analyses of field incidents and crash tests where ZF TRW (on information and belief, working with ST Micro) concluded that EOS occurred in Hyundai and Kia Class Vehicles. For example, ZF TRW reported observations consistent with EOS to Hyundai and Kia following: a Kia Forte crash in China in 2011; a MY 2010 Kia Forte Koup crash in Tallahassee, Florida in March 2011; a MY 2011 Hyundai

Sonata crash in or about February 2012; a Kia Forte crash in Egypt in or about March 2012; a Kia Optima Hybrid crash test in April 2012; a fatal MY 2012 Kia Forte crash in Northern California in July 2013; a MY 2011 Hyundai Sonata crash in or about May 2015; a MY 2011Hyundai Sonata crash in or about April 2016; two MY 2011 Hyundai Sonata crashes between July and November 2016; a fatal MY 2013 Kia Forte Koup crash in Canada in March 2017; and a Hyundai Sonata crash in or about August 2017;

d.    The decision in or about July and August 2012 by ZF TRW, STMicro, Hyundai, and Kia to test and add protective components to some, but not all, of the Hyundai and Kia Class Vehicles with ZF TRW ACUs containing the DS84 ASIC;

e.    ZF TRW's May 30, 2013 communication to FCA regarding a potential warranty issue relating to EOS in ZF TRW ACUs;

f.    The decision in 2014 by ZF TRW, STMicro, and FCA to add protective components to some, but not all, the FCA Class Vehicles with ZF TRW ACUs containing the DS84 ASIC; and

g. Multiple tests and analyses of field incidents and crash tests in 2015 and 2016 where FCA, ZF TRW, and STMicro concluded that EOS was occurring in FCA Class Vehicles.

551. Plaintiffs and Nationwide Class members are "person[s] injured in his or her business or property" by reason of ZF TRW and STMicro's violation of RICO within the meaning of U.S.C. § 1964(c). Because of ZF TRW and STMicro's pattern of racketeering activity, Plaintiffs and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

a. The purchase or lease of defective Class Vehicles;

b. Overpayment at the time of purchase or lease for Class Vehicles with an undisclosed safety defect; and

c. Other, ongoing out-of-pocket and loss-of-use expenses.

552. Plaintiffs and Class members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**ii. Nationwide Count 2: Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)-(d), on Behalf of the Hyundai-Kia Subclass Against the ZF TRW, STMicro, and Hyundai-Kia Defendants**

553. Hyundai-Kia Plaintiffs bring this claim on behalf of the Nationwide Hyundai-Kia Class against ZF TRW, STMicro, and the Hyundai-Kia Defendants.

554.   ZF TRW, STMicro, Hyundai, and Kia are all "persons" under 18 U.S.C. § 1961(3) because each was capable of holding "a legal or beneficial interest in property."

555.   ZF TRW, STMicro, Hyundai, and Kia violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of an "association-in-fact enterprise" through a pattern of racketeering activity. This enterprise is referred to as the Hyundai-Kia Enterprise.

556.   The purpose of the Hyundai-Kia Enterprise was to mislead consumers and NHTSA concerning the existence and scope of the defect with ZF TRW ACUs installed in the Hyundai and Kia Class Vehicles. By concealing and minimizing the defect, ZF TRW, STMicro, Hyundai, and Kia maximized their revenue by selling as many Hyundai and Kia vehicles with defective ZF TRW ACUs as possible and avoiding or limiting the substantial costs associated with recalling the Hyundai and Kia Class Vehicles and remedying the defective ZF TRW ACUs. In so doing, ZF TRW, STMicro, Hyundai and/or Kia, obtained money directly or indirectly from sales or leases to Plaintiffs and the Nationwide Hyundai-Kia Class by means of materially false or fraudulent misrepresentations and omissions of material facts.

557.   At all relevant times, ZF TRW, STMicro, Hyundai, and Kia agreed to conduct and participate, directly and indirectly, in the affairs of the Hyundai-Kia Enterprise through a pattern of racketeering activity. For the conspiracy to succeed,

Hyundai, Kia, ZF TRW, and STMicro had to commit to secrecy about the existence and scope of the defect with the ZF TRW ACUs contained in Hyundai and Kia Class Vehicles.

558. ZF TRW, STMicro, Hyundai, and Kia each existed separately from each other at all relevant times. They each had distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

559. ZF TRW, STMicro, Hyundai, and Kia also each existed separately from the Hyundai-Kia Enterprise.

       a.    Hyundai and Kia manufactured and sold many vehicles that did not contain defective ZF TRW ACUs.

       b.    The STMicro Defendants also made many other products aside from the DS84 ASICs used in the defective ZF TRW ACUs.

       c.    The ZF TRW Defendants similarly made many other automotive parts aside from the defective ZF TRW ACUs.

560. Hyundai and Kia participated in the Hyundai-Kia Enterprise by:

       a.    Ordering and purchasing the defective ZF TRW ACUs and providing ZF TRW with payment for the same;

b.　Through Hyundai MOBIS, manufacturing the ACU for some of the Hyundai and Kia Class Vehicles using ZF TRW designs and ST Micro's DS84 ASIC;

c.　Installing the defective ZF TRW ACUs in Hyundai and Kia Class Vehicles;

d.　Affixing misleading certification labels assuring compliance with safety requirements to the Hyundai and Kia Class Vehicles and shipping the Hyundai and Kia Class Vehicles to dealerships throughout the United States;

e.　Participating in the creation of Monroney labels that stated the Hyundai and Kia Class Vehicles were equipped with Occupant Restraint Systems but did not disclose the related defect in the ACU;

f.　Participating in the creation of misleading advertising for the Hyundai and Kia Class Vehicles that stressed the safety of Hyundai and Kia Class Vehicles and omitted material facts;

g.　Concealing incidents of observed EOS in certain Hyundai and Kia Class Vehicles involved in suspicious accidents;[28]

---

[28] This included through Hyundai and Kia's repeated conclusions of "commanded" non-deployment instead of a non-deployment of the ACU due to EOS, where EOS

*Footnote continued on next page*

h.      Concealing that the Recalled Hyundai and Kia Class Vehicles were equipped with defective ZF TRW ACUs that were vulnerable to EOS due to insufficient levels of circuit protection until initiating the partial recalls in February, April, and June 2018;

i.      Concealing and continuing to conceal that the extension wire harness kits installed in the recalled Hyundai and Kia Class Vehicles are defective in that they do not remedy the defective ACU and DS84 ASIC;

j.      Concealing and continuing to conceal that the unrecalled Hyundai and Kia Class Vehicles contain defective ZF TRW ACUs that provide insufficient circuit protection, rendering the ACUS in the vehicles susceptible to EOS;

k.      Misleading consumers and NHTSA regarding the adequacy of the February, April, and June 2018 recalls by submitting Part

_____

had been observed following an accident. For example, on March 8, 2018, ZF TRW reported to NHTSA that at that time it was aware of *twelve* separate crashes involving Hyundai and Kia Class Vehicles where the airbags failed to deploy and EOS was suspected or confirmed. ZF TRW further reported that Hyundai and Kia communicated to ZF TRW that seven out of the twelve airbag non-deployments were the result of "commanded non deployment," while the other five incidents were "under investigation." In each of these instances, the Hyundai-Kia Defendants concealed observed EOS in favor of their own, unsupported conclusions to contrary.

573 Reports that ignored or downplayed the risks of the defective ZF TRW ACUs installed in unrecalled Hyundai and Kia Class Vehicles;

l. Persisting in installing defective ZF TRW ACUs in new Hyundai and Kia Class Vehicles even after announcing a partial recall of some of the Hyundai and Kia Class Vehicles based on observed field incidents where the ACUs failed due to EOS; and

m. Collecting revenue from the sale and lease of the Hyundai and Kia Class Vehicles.

561. ZF TRW participated in the conduct of the Hyundai-Kia Enterprise by:

a. Collaborating with Hyundai and Kia to develop specifications for the defective ACUs in Hyundai and Kia Class Vehicles;

b. Designing, manufacturing, and supplying the defective ACUs;

c. Providing the design for Hyundai MOBIS to manufacture ACUs consistent with ZF TRW designs for some of the Hyundai and Kia Class Vehicles;

d.    Communicating with Hyundai and Kia regarding specific field incidents where ACUs in Hyundai and Kia Class Vehicles had failed due to EOS;

e.    Concealing that the Hyundai and Kia Class Vehicles were equipped with defective ZF TRW ACUs that were vulnerable to EOS due to inadequate circuit protection;

f.    Continuing to manufacture defective ACUs for unrecalled Hyundai and Kia Class Vehicles; and

g.    Collecting revenue flowing from the sale of defective ZF TRW ACUs.

562.  STMicro participated in the Hyundai-Kia Enterprise by:

a.    Designing and manufacturing the DS84 ASIC included in the Defective ACUs;

b.    Testing for and consulting with ZF TRW concerning observed evidence of EOS in Hyundai and Kia Class Vehicles;

c.    Concealing that the Hyundai and Kia Class Vehicles were equipped with defective ZF TRW ACUs that were vulnerable to EOS due to inadequate circuit protection;

d.    Concealing information about the existence and prevalence of the defect from NHTSA and the public; and

e.    Collecting revenue flowing from the sale of the DS84 ASIC.

563.   Without Hyundai, Kia, ZF TRW and STMicro's willing participation in the conduct above, the Hyundai-Kia Enterprise's scheme and common course of conduct would have been unsuccessful.

564.   To carry out, or attempt to carry out the scheme to defraud, Hyundai, Kia, ZF TRW, and STMicro—each of whom is a person associated-in-fact with the Hyundai-Kia Enterprise—did knowingly conduct or participate, directly or indirectly, in the affairs of the Hyundai-Kia Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and which employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

565.   The Hyundai-Kia Enterprise used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments and material omissions regarding the Hyundai and Kia Class Vehicles.

566.   In devising and executing the illegal scheme, Hyundai, Kia, ZF TRW, and STMicro devised and knowingly carried out a material scheme and/or artifice to defraud or obtain money from the Hyundai-Kia Plaintiffs and the Nationwide Hyundai-Kia Class by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts.

567.    Examples of the Hyundai-Kia Enterprise's multiple predicate acts of mail and wire fraud are summarized in the below subparagraphs.[29]

    a.    Hyundai and Kia violated the mail fraud act by affixing false and/or misleading safety certifications relating to Occupant Restraint Systems in each Hyundai and Kia Class Vehicle and shipping them to dealers through interstate carriers. Hyundai and Kia also violated the mail and/or wire fraud acts by using mail and/or wire in connection with the creation of Monroney stickers and owners' manuals for Hyundai and Kia Class Vehicles that contained false and/or misleading statements and assurances regarding the vehicles' Occupant Restraint System. Examples of such statements are collected in Exhibit 1 and in Exhibits 4-5. Because Hyundai and Kia took no steps to warn consumers of a defect in some Hyundai and Kia Class Vehicles until February, April, and June 2018 at the very earliest, and limited their warnings to recalled Hyundai and Kia Class

---

[29] Many of the precise dates and examples of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden by Defendants, and cannot be alleged without access to Defendants' books and records. However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. These include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

Vehicles, the Hyundai and Kia Class Vehicles were sold to Hyundai-Kia Plaintiffs and the Hyundai-Kia Nationwide Class under false and/or misleading pretenses insofar as the certification label, Monroney stickers, and owner's manuals suggested that the Hyundai and Kia Class Vehicles had working Occupant Restraint Systems with no known defects. ZF TRW and STMicro were aware of Hyundai and Kia's standard practice of selling Hyundai and Kia Class Vehicles under these false or misleading pretenses, but conspired with Hyundai and Kia to conceal the existence and scope of the defect in the ZF TRW ACUs installed in Hyundai and Kia Class Vehicles.

b.    Hyundai and Kia also violated the mail and wire acts by falsely advertising the safety of Hyundai and Kia Class Vehicles through broadcast media, through social media, on its website, and in printed materials. Examples of such advertising are collected in Exhibits 6 and 7. Hyundai and Kia's advertising uniformly omitted any description of the defect that made ZF TRW ACUs vulnerable to EOS or the risk that the Occupant Restraint System could fail in Hyundai and Kia Class Vehicles at the worst possible time. ZF TRW and STMicro were aware

of Hyundai and Kia's advertising, and conspired with Hyundai and Kia to conceal the existence and scope of the defect in the ZF TRW's ACUs installed in Hyundai and Kia Class Vehicles.

c.   Hyundai and Kia violated the mail and wire fraud acts by using interstate mail and wire to submit paper and electronic versions of Part 573 Safety Recall Reports false stating that the unrecalled Hyundai and Kia Class Vehicles were not defective. On April 18, 2018, Hyundai Motor America stated in a Part 573 Safety Recall Report that the ACU Defect was corrected in unrecalled Hyundai Class Vehicles because those vehicles included "redesigned ACUs." Similarly, Kia Motors America, Inc. stated in a June 1, 2018 Part 573 Safety Recall Report that the ACUs in the unrecalled Kia Class Vehicles "have adequate circuit protection." These statements were misleading because the unrecalled Hyundai and Kia Class Vehicles have the same defect (insufficient levels of circuit protection and the use of a DS84 ASIC vulnerable to overstress) as the recalled Hyundai and Kia Class Vehicles.

d.   Kia also violated the mail and wire fraud acts by using interstate mail and/or wire to communicate to NHTSA on or

about March 1, 2018 that the observed instances of EOS in the

Hyundai Sonata were "very different" than what Kia saw in Kia

Forte vehicles, despite its knowledge of multiple instances of

EOS in the same ZF ACUs in the Kia Class Vehicles.

e.      ZF TRW also violated the mail fraud act and/or wire fraud act

by sending NHTSA a false and misleading slide deck

presentation on or around February 5, 2016. The presentation

sought to downplay the scope of the vehicles affected by the

defective ZF TRW ACUs by stating: "Presence and impact of

EOS on ACUs is vehicle dependent" and "Customer airbag

deployment strategy can result in a commanded non-

deployment." ZF TRW intended for these statements to

persuade NHTSA that ZF TRW ACUs in most of the Class

Vehicles were not defective and that the ZF TRW ACUs that

had suffered EOS in the field may not have caused the airbags

not to deploy.

f.      ZF TRW also violated the mail fraud act by sending NHTSA a

letter in September 2016 in connection with FCA's partial

recall stating: "Although a similar TRW component is installed

in vehicles other than those identified in the [Defect

Information Report], the conditions in FCA's [Defect Information Report] are limited to the specific FCA vehicles identified in that report." This statement was false and misleading because the defect with ZF TRW ACUs extended to other FCA Class Vehicles and the rest of the Class Vehicles, including the Hyundai and Kia Class Vehicles.

g.    On or around March 12, 2018, ZF TRW sent a letter to NHTSA attorney Otto Matheke. The letter contains a slide deck presentation in which ZF TRW makes the following misleading statements: "ZF has not identified any defect related to motor vehicle safety in the ACU or any of its components. . . . ZF has not found evidence to link non deployments to EOS. . . . Customer airbag deployment strategy can result in a commanded non-deployment in certain crash types on specific platforms. . . . EOS with non deployment is vehicle dependent and platform dependent within a customer. . . . All ZF ACUs have appropriate levels of protection against specified and foreseeable transients." Each of these statements was false and misleading, and omitted material information, because (i) ZF TRW and STMicro had previously concluded that ASIC EOS

had likely caused airbag nondeployment in multiple crashes, (ii)

it is not possible to reliably conclude that a nondeployment was

"commanded" when the crash data is missing (as it was in

many crashes), (iii) ZF TRW and STMicro had recommended

design changes due to testing that demonstrated vulnerability to

EOS, and (iv) ASIC EOS has occurred across a wide variety of

vehicles with ZF TRW ACUs (i.e., "platforms") and is

therefore not "platform-specific."

568.   ZF TRW, STMicro, Hyundai, and Kia knew and intended that

government regulators would rely on their material omissions made about the

Hyundai and Kia Class Vehicles to approve them for importation, marketing,

and/or sale in the United States. ZF TRW, STMicro, Hyundai, and Kia understood

that disclosing the defect would require a recall of all the Hyundai and Kia Class

Vehicles to be conducted and design change to be implemented, and negatively

impact the profits of the Hyundai-Kia Enterprise.

569.   ZF TRW, STMicro, Hyundai, and Kia knew and intended that

consumers would purchase the Hyundai and Kia Class Vehicles and incur costs as

a result. Plaintiffs' reliance on this ongoing concealment is demonstrated by the

fact that they paid money for defective Hyundai and Kia Class Vehicles that never

should have been introduced into the U.S. stream of commerce, and that they overpaid for vehicles with defective safety systems.

570.    As described herein, ZF TRW, STMicro, Hyundai, and Kia engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining money from Hyundai-Kia Plaintiffs and Hyundai and Kia Class members. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

571.    The predicate acts had the common purpose of generating significant revenue and profits for ZF TRW, STMicro, Hyundai, and Kia from the sale and lease of the Hyundai and Kia Class Vehicles, while minimizing or avoiding costs of necessary repairs, at the expense of Hyundai-Kia Plaintiffs and Hyundai and Kia Class members.

572.    Hyundai, Kia, ZF TRW, and STMicro knew for years that the defective ZF TRW ACUs in the Hyundai and Kia Class Vehicles were vulnerable to EOS, but continued to manufacture, sell/lease, and accept payment from Plaintiffs for them anyway, as demonstrated by:

      a.    Hyundai and Kia's decision to return at least seventeen Hyundai and Kia Class Vehicles to ZF TRW based on signs of

EOS in the ACU between June 24, 2010 through August 25, 2015;

b.    Multiple tests and analyses of field incidents and crash tests where ZF TRW (on information and belief, working with ST Micro) concluded that EOS occurred in Hyundai and Kia Class Vehicles. For example, ZF TRW reported observations consistent with EOS to Hyundai and Kia following: a Kia Forte crash in China in 2011; a MY 2010 Kia Forte Koup crash in Tallahassee, Florida in March 2011; a MY 2011 Hyundai Sonata crash in or about February 2012; a Kia Forte crash in Egypt in or about March 2012; a Kia Optima Hybrid crash test in April 2012; a fatal MY 2012 Kia Forte crash in Northern California in July 2013; a MY 2011 Hyundai Sonata crash in or about May 2015; a MY 2011Hyundai Sonata crash in or about April 2016; two MY 2011 Hyundai Sonata crashes between July and November 2016; a fatal MY 2013 Kia Forte Koup crash in Canada in March 2017; and a Hyundai Sonata crash in or about August 2017;

    c.     ZF TRW's May 17, 2012 communication with Hyundai and Kia, regarding the ongoing investigation of field events with EOS;

    d.     The decision in or about July and August 2012 by ZF TRW, STMicro, Hyundai, and Kia to test and add circuit protection to some, but not all, of the Hyundai and Kia Class Vehicles with ZF TRW ACUs containing the DS84 ASIC; and

    e.     Dozens of publicly available complaints to NHTSA from consumers reporting that airbags and/or seatbelts had failed in Hyundai and Kia Class Vehicles, along with Hyundai's acknowledgement that it began monitoring for such reports at least as early as May 2015.

573.    Hyundai-Kia Plaintiffs and Nationwide Hyundai-Kia Class members are "person[s] injured in his or her business or property" by reason of ZF TRW, STMicro, Hyundai, and Kia Defendants' violation of RICO within the meaning of U.S.C. § 1964(c). Because of ZF TRW, STMicro, Hyundai, and Kia's pattern of racketeering activity, Plaintiffs and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

    a.     Purchase or lease of defective Hyundai and Kia Class Vehicles;

b.     Overpayment at the time of purchase or lease for Hyundai and

Kia Class Vehicles with an undisclosed safety defect; and

c.     Other, ongoing out-of-pocket and loss-of-use expenses.

574.   Hyundai-Kia Plaintiffs and Class members are entitled to bring this

action for three times their actual damages, as well as injunctive/equitable relief,

costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

### iii.   Nationwide Count 3: Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)-(d), on Behalf of the FCA Subclass Against the ZF TRW, STMicro, and FCA Defendants

575.   FCA Plaintiffs bring this claim on behalf of the Nationwide FCA

Class against ZF TRW, STMicro, and FCA.

576.   ZF TRW, STMicro, and FCA are all "persons" under 18 U.S.C.

§ 1961(3) because each was capable of holding "a legal or beneficial interest in

property."

577.   ZF TRW, STMicro, and FCA violated 18 U.S.C. § 1962(c) by

participating in or conducting the affairs of an "association-in-fact enterprise"

through a pattern of racketeering activity. This enterprise is referred to as the FCA

Enterprise.

578.   The purpose of the FCA Enterprise was to mislead consumers and

NHTSA concerning the existence and scope of the defect with ZF TRW ACUs

installed in the FCA Class Vehicles. By concealing and minimizing the defect, ZF

TRW, STMicro, and FCA maximized their revenue by selling as many FCA vehicles with defective ZF TRW ACUs as possible and avoiding or limiting the substantial costs associated with recalling the FCA Class Vehicles and paying the costs of remedying the defective ZF TRW ACUs. In so doing, ZF TRW, STMicro, and/or FCA obtained money directly or indirectly from sales or leases to Plaintiffs and the Nationwide FCA Class by means of materially false or fraudulent misrepresentations and omissions of material facts.

579.   At all relevant times, ZF TRW, STMicro, and FCA agreed to conduct and participate, directly and indirectly, in the affairs of the FCA Enterprise through a pattern of racketeering activity. For the conspiracy to succeed, FCA, ZF TRW, and STMicro had to commit to secrecy about the existence and scope of the defect with the ZF TRW ACUs contained in FCA Class Vehicles.

580.   ZF TRW, STMicro, and FCA each existed separately from each other at all relevant times. They each had distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

581.   ZF TRW, STMicro, and FCA also each existed separately from the FCA Enterprise.

  a. The FCA Defendants manufactured and sold many vehicles that did not contain defective ZF TRW ACUs.

b.   The STMicro Defendants also made many other products aside from the DS84 ASICs used in the defective ZF TRW ACUs.

c.   The ZF TRW Defendants similarly made many other automotive parts aside from the defective ZF TRW ACUs.

582.   FCA participated in the FCA Enterprise by:

a.   Ordering and purchasing the defective ZF TRW ACUs and providing ZF TRW with payment for the same;

b.   Installing the defective ZF TRW ACUs in FCA Class Vehicles;

c.   Affixing misleading certification labels assuring compliance with safety requirements to the FCA Class Vehicles and shipping the FCA Class Vehicles to dealerships throughout the United States;

d.   Participating in the creation of Monroney labels that stated the FCA Class Vehicles were equipped with Occupant Restraint Systems but did not disclose the related defect in the ACU;

e.   Participating in the creation of misleading advertising for the FCA Class Vehicles that stressed the safety of FCA Class Vehicles and omitted material facts;

f.   Concealing that it had found evidence of EOS in certain FCA Class Vehicles until disclosing to NHTSA nine instances of

confirmed or suspected EOS in certain models of recalled FCA

Class Vehicles when it initiated a partial recall for some of the

FCA Class Vehicles in September 2016;

g.  Concealing that the recalled FCA Class Vehicles were equipped

with defective ZF TRW ACUs that were vulnerable to EOS due

to insufficient levels of circuit protection until initiating the

partial recall in September 2016;

h.  Concealing and continuing to conceal that the replacement ZF

TRW ACUs installed in the recalled FCA Class Vehicles are

defective in that they still provide insufficient levels of circuit

protection, rendering the ACUs in the vehicles susceptible to

ASIC EOS;

i.  Concealing and continuing to conceal that the unrecalled FCA

Class Vehicles contain defective ZF TRW ACUs that provide

insufficient circuit protection, rendering the ACUS in the

vehicles susceptible to EOS;

j.  Misleading consumers and NHTSA regarding the adequacy of

the September 2016 recall by submitting a Part 573 Report that

ignored or downplayed the risks of the defective ZF TRW

ACUs installed in unrecalled FCA Class Vehicles;

    k.    Persisting in installing defective ZF TRW ACUs in new FCA Class Vehicles even after announcing a partial recall of some of the FCA Class Vehicles based on observed field incidents where the ACUs failed due to EOS; and

    l.    Collecting revenue from the sale and lease of the FCA Class Vehicles.

583.    ZF TRW participated in the conduct of the FCA Enterprise by:

    a.    Collaborating with FCA to develop specifications for the defective ACUs in FCA Class Vehicles;

    b.    Designing, manufacturing, and supplying the defective ACUs,

    c.    Communicating with FCA regarding specific field incidents where ACUs in FCA Class Vehicles had failed due to EOS;

    d.    Concealing that the FCA Class Vehicles were equipped with defective ZF TRW ACUs that were vulnerable to EOS due to inadequate circuit protection;

    e.    Falsely writing to NHTSA in 2016 that the defective ZF TRW ACUs in unrecalled FCA Class Vehicles were not defective;

    f.    Continuing to manufacture defective ACUs for unrecalled FCA Class Vehicles; and

g.    Collecting revenue flowing from the sale of defective ZF TRW ACUs.

584.   STMicro participated in the FCA Enterprise by:

a.    Designing and manufacturing the DS84 ASIC included in the Defective ACUs;

b.    Consulting with ZF TRW concerning observed evidence of EOS in FCA Class Vehicles;

c.    Concealing that the FCA Class Vehicles were equipped with defective ZF TRW ACUs that were vulnerable to EOS due to inadequate circuit protection;

d.    Concealing information about the existence and prevalence of the defect from NHTSA and the public; and

e.    Collecting revenue flowing from the sale of the DS84 ASIC.

585.   Without FCA, ZF TRW and STMicro's willing participation in the conduct above, the FCA Enterprise's scheme and common course of conduct would have been unsuccessful.

586.   To carry out, or attempt to carry out the scheme to defraud, FCA, ZF TRW, and STMicro—each of whom is a person associated-in-fact with the FCA Enterprise—did knowingly conduct or participate, directly or indirectly, in the affairs of the FCA Enterprise through a pattern of racketeering activity within the

meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and which employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

587.  The FCA Enterprise used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments and material omissions regarding the FCA Class Vehicles.

588.  In devising and executing the illegal scheme, FCA, ZF TRW, and STMicro devised and knowingly carried out a material scheme and/or artifice to defraud or obtain money from the FCA Plaintiffs and the FCA Nationwide Class by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts.

589.  Examples of the FCA Enterprise's multiple predicate acts of mail and wire fraud are summarized in the below subparagraphs.[30]

   a.    FCA violated the mail fraud act by affixing false and/or

          misleading safety certifications relating to Occupant Restraint

---

[30] Many of the precise dates and examples of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden by Defendants, and cannot be alleged without access to Defendants' books and records. However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. These include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

Systems in each FCA Class Vehicle and shipping them to dealers through interstate carriers. FCA also violated the mail and/or wire fraud acts by using mail and/or wire in connection with the creation of Monroney stickers and owners' manuals for FCA Class Vehicles that contained false and/or misleading statements and assurances regarding the vehicles' Occupant Restraint System. Examples of such statements are collected in Exhibit 1 and in Exhibit 9. Because FCA took no steps to warn consumers of a defect until September 2016 at the very earliest, and limited its warning in September 2016 to recalled FCA Class Vehicles, the FCA Class Vehicles were sold to FCA Plaintiffs and the FCA Nationwide Class under false and/or misleading pretenses insofar as the certification label, Monroney stickers, and owner's manuals suggested that the FCA Class Vehicles had working Occupant Restraint Systems with no known defects. ZF TRW and STMicro were aware of FCA's standard practice of selling FCA Class Vehicles under these false or misleading pretenses, but conspired with FCA to conceal the existence and scope of the defect in the ZF TRW ACUs installed in FCA Class Vehicles.

b.    FCA also violated the mail and wire acts by falsely advertising the safety of FCA Class Vehicles through broadcast media, through social media, on its website, and in printed materials. Examples of such advertising are collected in Exhibit 10. FCA's advertising uniformly omitted any description of the defect that made ZF TRW ACUs vulnerable to EOS or the risk that the Occupant Restraint System could fail in FCA Class Vehicles at the worst possible time. ZF TRW and STMicro were aware of FCA's advertising, and conspired with FCA to conceal the existence and scope of the defect in the ZF TRW's ACUs installed in FCA Class Vehicles.

c.    FCA violated the mail and wire fraud acts by using interstate mail and wire to submit paper and electronic versions of a September 13, 2016 Part 573 Safety Recall Report falsely stating that unrecalled FCA Class Vehicles equipped "with the same ORC/ASIC" were not defective because the ASIC's "front sensor wiring [was] routed independently along the left and right side of the vehicles front sensor wiring." This statement was misleading because the unrecalled FCA Class Vehicles have the same defect (insufficient levels of circuit

protection and the use of a DS84 ASIC vulnerable to

overstress) as the recalled FCA Class Vehicles.

d.    ZF TRW also violated the mail fraud act and/or wire fraud act

by sending NHTSA a false and misleading slide deck

presentation on or around February 5, 2016. The presentation

sought to downplay the scope of the vehicles affected by the

defective ZF TRW ACUs by stating: "Presence and impact of

EOS on ACUs is vehicle dependent" and "Customer airbag

deployment strategy can result in a commanded non-

deployment." ZF TRW intended for these statements to

persuade NHTSA that ZF TRW ACUs in most of the Class

Vehicles were not defective and that the ZF TRW ACUs that

had suffered EOS in the field may not have caused the airbags

not to deploy.

e.    ZF TRW also violated the mail fraud act by sending NHTSA a

letter in 2016 in connection with FCA's partial recall stating:

"Although a similar TRW component is installed in vehicles

other than those identified in the [Defect Information Report],

the conditions in FCA's [Defect Information Report] are

limited to the specific FCA vehicles identified in that report."

This statement was false and misleading because the defect with ZF TRW ACUs extended to other FCA Class Vehicles and the rest of the Class Vehicles.[31]

f.    On or around March 12, 2018, ZF TRW sent a letter to NHTSA attorney Otto Matheke. The letter contains a slide deck presentation in which ZF TRW makes the following misleading statements: "ZF has not identified any defect related to motor vehicle safety in the ACU or any of its components. . . . ZF has not found evidence to link non deployments to EOS. . . . Customer airbag deployment strategy can result in a commanded non-deployment in certain crash types on specific platforms. . . . EOS with non deployment is vehicle dependent and platform dependent within a customer. . . . All ZF ACUs have appropriate levels of protection against specified and foreseeable transients." Each of these statements was false and misleading, and omitted material information, because (i) ZF TRW and STMicro had previously concluded that ASIC EOS had likely caused airbag nondeployment in multiple crashes, (ii)

---

[31] ZF TRW produced an undated version of this letter, but it is appears likely that the letter was sent to NHTSA shortly after FCA's 2016 recall.

it is not possible to reliably conclude that a nondeployment was "commanded" when the crash data is missing (as it was in many crashes), (iii) ZF TRW and STMicro had recommended design changes due to testing that demonstrated vulnerability to EOS, and (iv) ASIC EOS has occurred across a wide variety of vehicles with ZF TRW ACUs (i.e., "platforms") and is therefore not "platform-specific."

590.   ZF TRW, STMicro, and FCA knew and intended that government regulators would rely on their material omissions made about the FCA Class Vehicles to approve them for importation, marketing, and/or sale in the United States. ZF TRW, STMicro, and FCA understood that disclosing the defect would require a recall of all the FCA Class Vehicles to be conducted and design change to be implemented, and negatively impact the profits of the FCA Enterprise.

591.   ZF TRW, STMicro, and FCA knew and intended that consumers would purchase the FCA Class Vehicles and incur costs as a result. Plaintiffs' reliance on this ongoing concealment is demonstrated by the fact that they paid money for defective FCA Class Vehicles that never should have been introduced into the U.S. stream of commerce, and that they overpaid for vehicles with defective safety systems.

592.   As described herein, ZF TRW, STMicro, and FCA engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining money from FCA Plaintiffs and FCA Class members. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

593.   The predicate acts had the common purpose of generating significant revenue and profits for ZF TRW, STMicro, and FCA from the sale and lease of the FCA Class Vehicles, while minimizing or avoiding costs of necessary repairs, at the expense of FCA Plaintiffs and FCA Class members.

594.   FCA, ZF TRW, and STMicro knew for years that the defective ZF TRW ACUs in the FCA Class Vehicles were vulnerable to EOS, but continued to manufacture, sell/lease, and accept payment from Plaintiffs for them anyway, as demonstrated by:

a.    FCA's decision to return more than 20 FCA Class Vehicles to ZF TRW based on signs of EOS in the ACU between September 25, 2009 and September 6, 2016;

b.    ZF TRW's May 30, 2013 communication to FCA regarding a potential warranty issue relating to EOS in ZF TRW ACUs,

c. The decision in 2014 by ZF TRW, STMicro, and FCA to add circuit protection to some, but not all, the FCA Class Vehicles with ZF TRW ACUs containing the DS84 ASIC; and

d. The multiple tests and analyses of field incidents and crash tests in 2015 and 2016 where FCA, ZF TRW, and STMicro concluded that EOS was occurring in FCA Class Vehicles.

595. FCA Plaintiffs and Nationwide FCA Class members are "person[s] injured in his or her business or property" by reason of ZF TRW, STMicro, and FCA Defendants' violation of RICO within the meaning of U.S.C. § 1964(c). Because of ZF TRW, STMicro, and FCA's pattern of racketeering activity, Plaintiffs and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

a. Purchase or lease of defective FCA Class Vehicles;

b. Overpayment at the time of purchase or lease for FCA Class Vehicles with an undisclosed safety defect; and

c. Other, ongoing out-of-pocket and loss-of-use expenses.

596. FCA Plaintiffs and Class members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

### iv.  Nationwide Count 4: Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)-(d), on Behalf of the Toyota Subclass Against the ZF TRW, STMicro, and Toyota Defendants

597.   Toyota Plaintiffs bring this claim on behalf of the Nationwide Toyota Class against ZF TRW, STMicro, and Toyota.

598.   ZF TRW, STMicro, and Toyota are all "persons" under 18 U.S.C. § 1961(3) because each was capable of holding "a legal or beneficial interest in property."

599.   ZF TRW, STMicro, and Toyota violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of an "association-in-fact enterprise" through a pattern of racketeering activity. This enterprise is referred to as the Toyota Enterprise.

600.   The purpose of the Toyota enterprise was to mislead consumers and NHTSA concerning the existence and scope of the defect with ZF TRW ACUs installed in the Toyota Class Vehicles. By concealing and minimizing the defect, ZF TRW, STMicro, and Toyota maximized their revenue by selling as many Toyota Class Vehicles with defective ZF TRW ACUs as possible and avoiding or limiting the substantial costs associated with recalling the Toyota Class Vehicles and adding necessary circuit protection to the defective ZF TRW ACUs. In so doing, ZF TRW, STMicro, and Toyota obtained money from Toyota Plaintiffs and

the Nationwide Toyota Class by means of materially false or fraudulent
misrepresentations and omissions of material facts.

601.   At all relevant times, ZF TRW, STMicro, and Toyota agreed to
conduct and participate, directly and indirectly, in the conduct of the affairs of the
Toyota Enterprise through a pattern of racketeering activity. For the conspiracy to
succeed, Toyota, ZF TRW, and STMicro had to commit to secrecy about the
existence and scope of the defect with the ZF TRW ACUs contained in Toyota
Class Vehicles.

602.   ZF TRW, STMicro, and Toyota each existed separately from each
other at all relevant times. They each had distinct legal statuses, different offices
and roles, bank accounts, officers, directors, employees, individual personhood,
reporting requirements, and financial statements.

603.   ZF TRW, STMicro, and Toyota also each existed separately from the
Toyota Enterprise.

> a.   The Toyota Defendants manufactured and sold many vehicles
> that did not contain defective ZF TRW ACUs.

> b.   The STMicro Defendants also made many other products aside
> from the DS84 ASICs used in the defective ZF TRW ACUs.

> c.   The ZF TRW Defendants similarly made many other
> automotive parts aside from the defective ZF TRW ACUs.

604.  Toyota participated in the Toyota Enterprise by:

a.  Ordering and purchasing the defective ZF TRW ACUs and providing ZF TRW with payment for the same;

b.  Installing the defective ZF TRW ACUs in Toyota Class Vehicles;

c.  Affixing certification labels assuring compliance with safety requirements to the Toyota Class Vehicles and shipping the Toyota Class Vehicles to dealerships throughout the United States;

d.  Participating in the creation of Monroney labels that stated the Toyota Class Vehicles were equipped with Occupant Restraint Systems but did not disclose the related defect in the ACU;

e.  Participating in the creation of misleading advertising for the Toyota Class Vehicles that stressed the safety of Toyota Class Vehicles;

f.  Concealing that Occupant Restraint Systems in Toyota Class Vehicles had failed in the field due to EOS in defective ZF TRW ACUs until announcing a partial recall for some of the Toyota Class Vehicles in January 2020;

g.      Misleading consumers and NHTSA regarding the adequacy of the January 2020 recall by submitting a Part 573 Report that downplayed the risks of the defective ZF TRW ACUs installed in the Unrecalled Toyota Class Vehicles;

h.      Persisting in installing defective ZF TRW ACUs in new Toyota Class Vehicles after field incidents where the ACUs failed due to EOS were observed;

i.       Persisting in installing defective ACUs in U.S. Toyota Class Vehicles, even after ZF TRW, STMicro and Toyota decided to make the ACUs in European versions of the same vehicles more resistant to EOS; and

j.       Collecting revenues from the sale and lease of the Toyota Class Vehicles.

605.    ZF TRW participated in the conduct of the Toyota Enterprise by:

a.      Collaborating with Toyota to develop specifications for the defective ACUs in Toyota Class Vehicles;

b.      Designing and manufacturing the defective ACUs;

c.      Communicating with Toyota regarding specific field incidents where ACUs in Toyota Class Vehicles had failed due to EOS;

d.      Concealing that Occupant Restraint Systems in Toyota Class Vehicles had failed in the field due to EOS in defective ZF TRW ACUs until Toyota announced a partial recall for some of the Toyota Class Vehicles in January 2020;

e.      Continuing to manufacture defective ACUs for the Unrecalled Toyota Class Vehicles; and

f.      Collecting revenues flowing from the sale and lease of the Toyota Class Vehicles.

606.  STMicro participated in the Toyota Enterprise by:

a.      Designing and manufacturing the DS84 ASIC, including the Defective ACUs;

b.      Consulting with ZF TRW concerning observed evidence of EOS in at least one Toyota Class Vehicle;

c.      Concealing that Occupant Restraint Systems in Toyota Class Vehicles had failed in the field due to EOS in defective ZF TRW ACUs until Toyota announced a partial recall for some of the Toyota Class Vehicles in January 2020;

d.      Concealing information about the existence and prevalence of the defect from NHTSA and the public; and

  e. Collecting revenues flowing from the sale and lease of the

    Toyota Class Vehicles.

607. Without Toyota, ZF TRW and STMicro's willing participation in the conduct above, the Toyota Enterprise's scheme and common course of conduct would have been unsuccessful.

608. Toyota, ZF TRW, and STMicro directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Toyota Plaintiffs cannot fully know at present, because such information lies in the Defendants' and others' hands. Similarly, because the Defendants often refer to themselves as a group (i.e., "ZF TRW" rather than by the parent and various subsidiaries), Toyota Plaintiffs cannot know the full extent of each individual corporate entity's involvement in the wrongdoing prior to having access to discovery.

609. To carry out, or attempt to carry out the scheme to defraud, Toyota, ZF TRW, and STMicro—each of whom is a person associated-in-fact with the Toyota Enterprise—did knowingly conduct or participate, directly or indirectly, in the conduct of the affairs of the Toyota Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and which employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

610.    The Toyota Enterprise used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments and material omissions regarding the Toyota Class Vehicles.

611.    In devising and executing the illegal scheme, Toyota, ZF TRW, and STMicro devised and knowingly carried out a material scheme and/or artifice to defraud or obtain money from the Toyota Plaintiffs and the Toyota Nationwide Class by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts.

612.    Examples of the Toyota Enterprise's multiple predicate acts of mail and wire fraud are summarized in the below subparagraphs.[32]

    a.    Toyota violated the mail fraud act by affixing false and/or misleading safety certifications relating to Occupant Restraint Systems in each Toyota Class Vehicle and shipping them to dealers through interstate carriers. Toyota also violated the mail and/or wire fraud acts by using mail and/or wire in connection

---

[32] Many of the precise dates and examples of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books and records. However, Toyota Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. These include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

with the creation of Monroney stickers and owners' manuals for

Toyota Class Vehicles that contained false and/or misleading

statements and assurances regarding the vehicles' Occupant

Restraint System. Examples of such statements are collected in

Exhibit 1 and in Exhibit 12. Because Toyota took no steps to

warn consumers of a defect until January 2020 at the very

earliest, and limited its warning in January 2020 to recalled

Toyota Class Vehicles, the Toyota Class Vehicles were sold to

Toyota Plaintiffs and the Toyota Nationwide Clause under false

and/or misleading pretenses insofar as the certification label,

Monroney stickers, and owner's manuals suggested that the

Toyota Class Vehicles had working Occupant Restraint

Systems with no known defects. ZF TRW and STMicro were

aware of Toyota's standard practice of selling FCA Class

Vehicles under these false or misleading pretenses, but

conspired with Toyota to conceal the existence and scope of the

defect in the ZF TRW ACUs installed in Toyota Class

Vehicles.

b.     Toyota also violated the mail and wire acts by advertising the

safety of Toyota Class Vehicles on its website and in printed

materials. Examples of such advertising are collected in Exhibit 13. Toyota's advertising uniformly omitted any description of the defect that made ZF TRW ACUs vulnerable to EOS or the risk that the Occupant Restraint System would fail in Toyota Class Vehicles. ZF TRW and STMicro were aware of Toyota's advertising, but conspired with Toyota to conceal the existence and scope of the defect in the ZF TRW's ACUs installed in Toyota Class Vehicles.

c.    Concealing that Occupant Restraint Systems in Toyota Class Vehicles had failed in the field due to EOS in defective ZF TRW ACUs.

d.    ZF TRW also violated the mail fraud act and/or wire fraud act by sending NHTSA a misleading slide deck presentation on or around February 5, 2016. The presentation sought to downplay the scope of the vehicles affected by the defective ZF TRW ACUs by stating: "Presence and impact of EOS on ACUs is vehicle dependent" and "Customer airbag deployment strategy can result in a commanded non-deployment." ZF TRW intended for these statements to persuade NHTSA that ZF TRW ACUs in most of the Class Vehicles were not defective and that

the ZF TRW ACUs that had suffered EOS in the field may not

have caused the airbags not to deploy.

e.    ZF TRW also violated the mail fraud act by sending NHTSA a

letter in 2016 in connection with FCA's partial recall stating:

"Although a similar TRW component is installed in vehicles

other than those identified in the [Defect Information Report],

the conditions in FCA's [Defect Information Report] are

limited to the specific FCA vehicles identified in that report."

This statement was misleading because the defect with ZF

TRW ACUs extended to the Toyota Class Vehicles and the rest

of the Class Vehicles.

f.    On or around March 12, 2018, ZF TRW sent a letter to NHTSA

attorney Otto Matheke. The letter contains a slide deck

presentation in which ZF TRW makes the following misleading

statements: "ZF has not identified any defect related to motor

vehicle safety in the ACU or any of its components. . . . ZF has

not found evidence to link non deployments to EOS. . . .

Customer airbag deployment strategy can result in a

commanded non-deployment in certain crash types on specific

platforms. . . . EOS with non deployment is vehicle dependent

and platform dependent within a customer. . . . All ZF ACUs have appropriate levels of protection against specified and foreseeable transients." Each of these statements was false and misleading, and omitted material information, because (i) ZF TRW and STMicro had previously concluded that ASIC EOS had likely caused airbag nondeployment in multiple crashes, (ii) it is not possible to reliably conclude that a nondeployment was "commanded" when the crash data is missing (as it was in many crashes), (iii) ZF TRW and STMicro had recommended design changes due to testing that demonstrated vulnerability to EOS, and (iv) ASIC EOS has occurred across a wide variety of vehicles with ZF TRW ACUs (i.e., "platforms") and is therefore not "platform-specific."

g.      Toyota further violated the mail and wire fraud act by sending NHTSA a written response to NHTSA's investigation requests in or around August 29, 2019 in response to the EA19-001 it opened in April 2019 stating that it had not confirmed there was a direct relationship between EOS damage to the ASIC "from negative voltage transients during [a] real-world crash event and an airbag non-deployment." This statement was misleading

because Toyota had already confirmed that such direct

relationship existed through the investigation and analysis of

field incidents and crash tests involving Toyota Class Vehicles.

    h.    Toyota again violated the mail and wire fraud act by using

interstate mail and wire to submit paper and electronic versions

of a January 17, 2020 Part 573 Safety Recall Report stating that

"an occurrence of a sufficient negative transient at a timing [sic]

that can affect airbag deployment in a crash is unlikely" with

regard to the Unrecalled Toyota Class Vehicles "due to

different body construction and other factors." This statement

was misleading because the Unrecalled Toyota Class Vehicles

have the same defect (insufficient levels of circuit protection

and the use of a DS84 ASIC vulnerable to overstress) as the

recalled Toyota Class Vehicles.

613.   ZF TRW, STMicro, and Toyota knew and intended that government

regulators would rely on their material omissions made about the Toyota Class

Vehicles to approve them for importation, marketing, and/or sale in the United

States. ZF TRW, STMicro, and Toyota understood that disclosing the defect would

require a recall of all the Toyota Class Vehicles to be conducted and design change

to be implemented, and negatively impact the profits for the Toyota Enterprise.

614.   ZF TRW, STMicro, and Toyota knew and intended that consumers
would purchase the Toyota Class Vehicles and incur costs as a result. Plaintiffs'
reliance on this ongoing concealment is demonstrated by the fact that they paid
money for defective Toyota Class Vehicles that never should have been introduced
into the U.S. stream of commerce.

615.   As described herein, ZF TRW, STMicro, and Toyota engaged in a
pattern of related and continuous predicate acts for years. The predicate acts
constituted a variety of unlawful activities, each conducted with the common
purpose of obtaining significant monies and revenues from Toyota Plaintiffs and
Nationwide Toyota Class members. The predicate acts also had the same or similar
results, participants, victims, and methods of commission. The predicate acts were
related and not isolated events.

616.   The predicate acts had the purpose of generating significant revenue
and profits for ZF TRW, STMicro, and Toyota from the sale and lease of the
Toyota Class Vehicles, while minimizing or avoiding costs of necessary repairs, at
the expense of Toyota Plaintiffs and Nationwide Toyota Class members.

617.   Toyota, ZF TRW, and STMicro knew for years that the defective ZF
TRW ACUs in the Toyota Class Vehicles were vulnerable to EOS, but continued
to manufacture, sell/lease, and accept payment from Toyota Plaintiffs for them
anyway, as demonstrated by:

    a.      Toyota's decision to return six Toyota Class Vehicles to ZF TRW based on EOS in the ACU between December 16, 2013 and October 25, 2016;

    b.      The decision in 2015 by ZF TRW, STMicro, and Toyota to upgrade protective components in the ZF TRW ACUs used in European Toyota vehicles; and

    c.      The multiple tests and analyses of field incidents and crash tests conducted throughout 2016-2019 where Toyota, ZF TRW, and STMicro concluded that EOS was occurring in Toyota Class Vehicles.

618.   Toyota Plaintiffs and Nationwide Toyota Class members are "person[s] injured in his or her business or property" by reason of ZF TRW, STMicro, and Toyota Defendants' violation of RICO within the meaning of U.S.C. § 1964(c). Because of ZF TRW, STMicro, and Toyota's pattern of racketeering activity, Toyota Plaintiffs and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

    a.      Purchase or lease of defective Toyota Class Vehicles;

    b.      Overpayment at the time of purchase or lease for Toyota Class Vehicles with an undisclosed defect; and

    c.      Other, ongoing out-of-pocket and loss-of-use expenses.

619.    Toyota Plaintiffs and Class members are entitled to bring this action

for three times their actual damages, as well as injunctive/equitable relief, costs,

and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**v.    Nationwide Count 5: Violation of the Racketeer Influenced and
Corrupt Organizations Act, 18 U.S.C. § 1962(c)-(d), on Behalf of
the Honda Class Against the ZF TRW, STMicro, and Honda
Defendants**

620.    Honda Plaintiffs bring this claim on behalf of the Nationwide Honda

Class against ZF TRW, STMicro, and Honda.

621.    ZF TRW, STMicro, and FCA are all "persons" under 18 U.S.C.

§ 1961(3) because each was capable of holding "a legal or beneficial interest in

property."

622.    ZF TRW, STMicro, and Honda violated 18 U.S.C. § 1962(c) by

participating in or conducting the affairs of an "association-in-fact enterprise"

through a pattern of racketeering activity. This enterprise is referred to as the

Honda Enterprise.

623.    The purpose of the Honda enterprise was to mislead consumers and

NHTSA concerning the existence and scope of the defect with ZF TRW ACUs

installed in the Honda Class Vehicles. By concealing and minimizing the defect,

ZF TRW, STMicro, and Honda maximized their revenue by selling as many

Honda vehicles with defective ZF TRW ACUs as possible and avoiding or limiting

the substantial costs associated with recalling the Honda Class Vehicles and adding

necessary circuit protection to the defective ZF TRW ACUs. In so doing, ZF TRW, STMicro, and Honda obtained money from Honda Plaintiffs and the Nationwide Honda Class by means of materially false or fraudulent misrepresentations and omissions of material facts.

624.   At all relevant times, ZF TRW, STMicro, and Honda agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the Honda Enterprise through a pattern of racketeering activity. For the conspiracy to succeed, Honda, ZF TRW, and STMicro had to commit to secrecy about the existence and scope of the defect with the ZF TRW ACUs contained in Honda Class Vehicles.

625.   ZF TRW, STMicro, and Honda each existed separately from each other at all relevant times. They each had distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

626.   ZF TRW, STMicro, and Honda also each existed separately from the Honda Enterprise.

a.    The Honda Defendants manufactured and sold many vehicles that did not contain defective ZF TRW ACUs.

b.    The STMicro Defendants also made many other products aside from the DS84 ASICs used in the defective ZF TRW ACUs.

     c.     The ZF TRW Defendants similarly made many other automotive parts aside from the defective ZF TRW ACUs.

627.   Honda participated in the FCA Enterprise by:

     a.     Ordering and purchasing the defective ZF TRW ACUs and providing ZF TRW with payment for the same;

     b.     Installing the defective ZF TRW ACUs in Honda Class Vehicles;

     c.     Affixing certification labels assuring compliance with safety requirements to the Honda Class Vehicles and shipping the Honda Class Vehicles to dealerships throughout the United States;

     d.     Participating in the creation of Monroney labels that stated the Honda Class Vehicles were equipped with Occupant Restraint Systems but did not disclose the related defect in the ACU;

     e.     Participating in the creation of misleading advertising for the Honda Class Vehicles that stressed the safety of Honda Class Vehicles;

     f.     Concealing that Occupant Restraint Systems in Honda Class Vehicles had failed in the field due to EOS in defective ZF TRW ACUs;

g.    Persisting in installing defective ZF TRW ACUs in new Honda Class Vehicles even after it began equipping other Honda vehicles with DS84 ASICs with stronger circuit protection; and

h.    Collecting revenues from the sale and lease of the Honda Class Vehicles.

628.   ZF TRW participated in the conduct of the Honda Enterprise by:

a.    Collaborating with Honda to develop specifications for the defective ACUs in Honda Class Vehicles;

b.    Designing and manufacturing the defective ACUs,

c.    Communicating with Honda regarding specific field incidents where ACUs in Honda Class Vehicles had failed due to EOS;

d.    Concealing that Occupant Restraint Systems in Honda Class Vehicles had failed in the field due to EOS in defective ZF TRW ACUs;

e.    Continuing to manufacture defective ACUs for Honda Class Vehicles; and

f.    Collecting revenues flowing from the sale and lease of the Honda Class Vehicles.

629.   STMicro participated in the Honda Enterprise by:

a.    Designing and manufacturing the DS84 ASIC including the Defective ACUs;

b.    Consulting with ZF TRW concerning observed evidence of EOS in Honda Class Vehicles;

c.    Concealing that Occupant Restraint Systems in Honda Class Vehicles had failed in the field due to EOS in defective ZF TRW ACUs;

d.    Concealing information about the existence and prevalence of the defect from NHTSA and the public; and

e.    Collecting revenues flowing from the sale and lease of the Honda Class Vehicles.

630.    Without Honda, ZF TRW and STMicro's willing participation in the conduct above, the Honda Enterprise's scheme and common course of conduct would have been unsuccessful.

631.    Honda, ZF TRW, and STMicro directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Honda Plaintiffs cannot fully know at present, because such information lies in the Defendants' and others' hands. Similarly, because the Defendants often refer to themselves as a group (i.e., "ZF TRW" rather than by the parent and various subsidiaries), Honda Plaintiffs cannot know the full extent of

each individual corporate entity's involvement in the wrongdoing prior to having access to discovery.

632.   To carry out, or attempt to carry out the scheme to defraud, Honda, ZF TRW, and STMicro—each of whom is a person associated-in-fact with the Honda Enterprise—did knowingly conduct or participate, directly or indirectly, in the conduct of the affairs of the Honda Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and which employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

633.   The Honda Enterprise used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments and material omissions regarding the Honda Class Vehicles.

634.   In devising and executing the illegal scheme, Honda, ZF TRW, and STMicro devised and knowingly carried out a material scheme and/or artifice to defraud or obtain money from the Honda Plaintiffs and the Honda Nationwide Class by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts.

635.   Examples of the Honda Enterprise's multiple predicate acts of mail and wire fraud are summarized in the below subparagraphs.[33]

    a.    Honda violated the mail fraud act by affixing false and/or misleading safety certifications relating to Occupant Restraint Systems in each Honda Class Vehicle and shipping them to dealers through interstate carriers. Honda also violated the mail and/or wire fraud acts by using mail and/or wire in connection with the creation of Monroney stickers and owners' manuals for Honda Class Vehicles that contained false and/or misleading statements and assurances regarding the vehicles' Occupant Restraint System. Examples of such statements are collected in Exhibit 1 and in Exhibit 15. Because Honda has taken no steps to warn consumers of a defect, the Honda Class Vehicles were sold to Honda Plaintiffs and the Honda Nationwide Clause under false and/or misleading pretenses insofar as the certification label, Monroney stickers, and owner's manuals

---

[33] Many of the precise dates and examples of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books and records. However, Honda Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. These include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

suggested that the Honda Class Vehicles had working Occupant Restraint Systems with no known defects. ZF TRW and STMicro were aware of Honda's standard practice of selling Honda Class Vehicles under these false or misleading pretenses, but conspired with Honda to conceal the existence and scope of the defect in the ZF TRW ACUs installed in Honda Class Vehicles.

b.    Honda also violated the mail and wire acts by advertising the safety of Honda Class Vehicles on its website and in printed materials. Examples of such advertising are collected in Exhibit 16. Honda's advertising uniformly omitted any description of the defect that made ZF TRW ACUs vulnerable to EOS or the risk that the Occupant Restraint System would fail in Honda Class Vehicles. ZF TRW and STMicro were aware of Honda's advertising, but conspired with Honda to conceal the existence and scope of the defect in the ZF TRW's ACUs installed in Honda Class Vehicles.

c.    ZF TRW also violated the mail fraud act and/or wire fraud act by sending NHTSA a misleading slide deck presentation on or around February 5, 2016. The presentation sought to downplay

the scope of the vehicles affected by the defective ZF TRW

ACUs by stating: "Presence and impact of EOS on ACUs is

vehicle dependent" and "Customer airbag deployment strategy

can result in a commanded non-deployment." ZF TRW

intended for these statements to persuade NHTSA that ZF TRW

ACUs in most of the Class Vehicles were not defective and that

the ZF TRW ACUs that had suffered EOS in the field may not

have caused the airbags not to deploy.

d.     ZF TRW also violated the mail fraud act by sending NHTSA a

letter in 2016 in connection with FCA's partial recall stating:

"Although a similar TRW component is installed in vehicles

other than those identified in the [Defect Information Report],

the conditions in FCA's [Defect Information Report] are

limited to the specific FCA vehicles identified in that report."

This statement was misleading because the defect with ZF

TRW ACUs extended to the Honda Class Vehicles and the rest

of the Class Vehicles.

e.     On or around March 12, 2018, ZF TRW sent a letter to NHTSA

attorney Otto Matheke. The letter contains a slide deck

presentation in which ZF TRW makes the following misleading

statements: "ZF has not identified any defect related to motor vehicle safety in the ACU or any of its components. . . . ZF has not found evidence to link non deployments to EOS. . . . Customer airbag deployment strategy can result in a commanded non-deployment in certain crash types on specific platforms. . . . EOS with non deployment is vehicle dependent and platform dependent within a customer. . . . All ZF ACUs have appropriate levels of protection against specified and foreseeable transients." Each of these statements was false and misleading, and omitted material information, because (i) ZF TRW and STMicro had previously concluded that ASIC EOS had likely caused airbag nondeployment in multiple crashes, (ii) it is not possible to reliably conclude that a nondeployment was "commanded" when the crash data is missing (as it was in many crashes), (iii) ZF TRW and STMicro had recommended design changes due to testing that demonstrated vulnerability to EOS, and (iv) ASIC EOS has occurred across a wide variety of vehicles with ZF TRW ACUs (i.e., "platforms") and is therefore not "platform-specific."

636.   ZF TRW, STMicro, and Honda knew and intended that government regulators would rely on their material omissions made about the Honda Class Vehicles to approve them for importation, marketing, and/or sale in the United States. ZF TRW, STMicro, and Honda understood that disclosing the defect would require a recall of all the Honda Class Vehicles to be conducted and design change to be implemented, and negatively impact the profits for the Honda Enterprise.

637.   ZF TRW, STMicro, and Honda knew and intended that consumers would purchase the Honda Class Vehicles and incur costs as a result. Plaintiffs' reliance on this ongoing concealment is demonstrated by the fact that they paid money for defective Honda Class Vehicles that never should have been introduced into the U.S. stream of commerce.

638.   As described herein, ZF TRW, STMicro, and Honda engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from Honda Plaintiffs and Nationwide Honda Class members. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

639.   The predicate acts had the purpose of generating significant revenue and profits for ZF TRW, STMicro, and Honda from the sale and lease of the

Honda Class Vehicles, while minimizing or avoiding costs of necessary repairs, at the expense of Honda Plaintiffs and Nationwide Honda Class members.

640.    Honda, ZF TRW, and STMicro knew for years that the defective ZF TRW ACUs in the Honda Class Vehicles were vulnerable to EOS, but continued to manufacture, sell/lease, and accept payment from Honda Plaintiffs for them anyway, as demonstrated by:

  a. Honda's decision to return 17 Honda Class Vehicles to ZF TRW based on EOS in the ACU between July 29, 2012 and January 4, 2015;

  b. The decision in 2014 by ZF TRW, STMicro, and Honda to add circuit protection to some, but not all, the Honda Class Vehicles with ZF TRW ACUs containing the DS84 ASIC, and

  c. The tests and analyses of crash tests conducted in 2012 and 2014 where Honda, ZF TRW, and STMicro concluded that EOS was occurring in Honda Class Vehicles.

641.    Honda Plaintiffs and Nationwide Honda Class members are "person[s] injured in his or her business or property" by reason of ZF TRW, STMicro, and Honda Defendants' violation of RICO within the meaning of U.S.C. § 1964(c). Because of ZF TRW, STMicro, and Honda's pattern of racketeering

activity, Honda Plaintiffs and Nationwide Honda Class members have been injured in their business and/or property in multiple ways, including but not limited to:

<blockquote>

a.    Purchase or lease of defective Honda Class Vehicles;

b.    Overpayment at the time of purchase or lease for Honda Class Vehicles with an undisclosed defect; and

c.    Other, ongoing out-of-pocket and loss-of-use expenses.

</blockquote>

642.   Honda Plaintiffs and Nationwide Honda Class members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**vi.    Nationwide Count 6: Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)-(d), on Behalf of the Class Against the ZF TRW, STMicro Defendants, and Mitsubishi Defendants**

643.   The Mitsubishi Plaintiffs bring this claim on behalf of the Nationwide Mitsubishi Class against ZF TRW, STMicro, and Mitsubishi.

644.   ZF TRW, STMicro, and Mitsubishi are all "persons" under 18 U.S.C. § 1961(3) because each was capable of holding "a legal or beneficial interest in property."

645.   ZF TRW, STMicro, and Mitsubishi violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of an "association-in-fact enterprise"

through a pattern of racketeering activity. This enterprise is referred to as the Mitsubishi Enterprise.

646.    The purpose of the Mitsubishi Enterprise was to mislead consumers and NHTSA concerning the existence and scope of the defect with ZF TRW ACUs installed in the Mitsubishi Class Vehicles. By concealing and minimizing the defect, ZF TRW, STMicro, and Mitsubishi maximized their revenue by selling as many Mitsubishi vehicles with defective ZF TRW ACUs as possible and avoiding or limiting the substantial costs associated with recalling the Mitsubishi Class Vehicles and adding necessary circuit protection to the defective ZF TRW ACUs. In so doing, ZF TRW, STMicro, and/or Mitsubishi obtained money directly or indirectly from sales or leases to Plaintiffs and the Nationwide Mitsubishi Class by means of materially false or fraudulent misrepresentations and omissions of material facts.

647.    At all relevant times, ZF TRW, STMicro, and Mitsubishi agreed to conduct and participate, directly and indirectly, in the affairs of the Mitsubishi Enterprise through a pattern of racketeering activity. For the conspiracy to succeed, Mitsubishi, ZF TRW, and STMicro had to commit to secrecy about the existence and scope of the defect with the ZF TRW ACUs contained in Mitsubishi Class Vehicles.

648.   ZF TRW, STMicro, and Mitsubishi each existed separately from each other at all relevant times. They each had distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

649.   ZF TRW, STMicro, and Mitsubishi also each existed separately from the Mitsubishi Enterprise.

a.    Mitsubishi manufactured and sold many vehicles that did not contain defective ZF TRW ACUs.

b.    The STMicro Defendants also made many other products aside from the DS84 ASICs used in the defective ZF TRW ACUs.

c.    The ZF TRW Defendants similarly made many other automotive parts aside from the defective ZF TRW ACUs.

650.   Mitsubishi participated in the Mitsubishi Enterprise by:

a.    Ordering and purchasing the defective ZF TRW ACUs and providing ZF TRW with payment for the same;

b.    Installing the defective ZF TRW ACUs in Mitsubishi Class Vehicles;

c.    Affixing misleading certification labels assuring compliance with safety requirements to the Mitsubishi Class Vehicles and

shipping the Mitsubishi Class Vehicles to dealerships throughout the United States;

d.      Participating in the creation of Monroney labels that stated the Mitsubishi Class Vehicles were equipped with Occupant Restraint Systems but did not disclose the related defect in the ACU;

e.      Participating in the creation of misleading advertising for the Mitsubishi Class Vehicles that stressed the safety of Mitsubishi Class Vehicles and omitted material facts;

f.      Concealing and continuing to conceal that the Mitsubishi Class Vehicles contain defective ZF TRW ACUs that provide insufficient circuit protection, rendering the ACUS in the vehicles susceptible to EOS;

g.      Persisting in installing defective ZF TRW ACUs in new Mitsubishi Class Vehicles even after repeated consumer reports of airbag non-deployment dating back to at least 2014, including reports directly to Mitsubishi's own Customer Relations department; and

h.      Collecting revenue from the sale and lease of the Mitsubishi Class Vehicles.

651. ZF TRW participated in the conduct of the Mitsubishi Enterprise by:

    a.    Collaborating with Mitsubishi to develop specifications for the defective ACUs in Mitsubishi Class Vehicles;

    b.    Designing, manufacturing, and supplying the defective ACUs,

    c.    Concealing that the Mitsubishi Class Vehicles were equipped with defective ZF TRW ACUs that were vulnerable to EOS due to inadequate circuit protection;

    d.    Communicating with Mitsubishi regarding EOS in ZF TRW ACUs and its communications with NHTSA regarding the same;

    e.    Continuing to manufacture defective ACUs for the Mitsubishi Class Vehicles; and

    f.    Collecting revenue flowing from the sale of defective ZF TRW ACUs.

652. STMicro participated in the Mitsubishi Enterprise by:

    a.    Designing and manufacturing the DS84 ASIC included in the Defective ACUs;

    b.    Concealing that the Mitsubishi Class Vehicles were equipped with defective ZF TRW ACUs that were vulnerable to EOS due to inadequate circuit protection;

c.    Concealing information about the existence and prevalence of the defect from NHTSA and the public; and

d.    Collecting revenue flowing from the sale of the DS84 ASIC.

653.    Without Mitsubishi, ZF TRW and STMicro's willing participation in the conduct above, the Mitsubishi Enterprise's scheme and common course of conduct would have been unsuccessful.

654.    To carry out, or attempt to carry out the scheme to defraud, Mitsubishi, ZF TRW, and STMicro—each of whom is a person associated-in-fact with the Mitsubishi Enterprise—did knowingly conduct or participate, directly or indirectly, in the affairs of the Mitsubishi Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and which employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

655.    The Mitsubishi Enterprise used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments and material omissions regarding the Mitsubishi Class Vehicles.

656.    In devising and executing the illegal scheme, Mitsubishi, ZF TRW, and STMicro devised and knowingly carried out a material scheme and/or artifice to defraud or obtain money from the Mitsubishi Plaintiffs and the Mitsubishi

Nationwide Class by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts.

657.   Examples of the Mitsubishi Enterprise's multiple predicate acts of mail and wire fraud are summarized in the below subparagraphs.[34]

a.   Mitsubishi violated the mail fraud act by affixing false and/or misleading safety certifications relating to Occupant Restraint Systems in each Mitsubishi Class Vehicle and shipping them to dealers through interstate carriers. Mitsubishi also violated the mail and/or wire fraud acts by using mail and/or wire in connection with the creation of Monroney stickers and owners' manuals for Mitsubishi Class Vehicles that contained false and/or misleading statements and assurances regarding the vehicles' Occupant Restraint System. Examples of such statements are collected in Exhibit 1 and in Exhibit 17. Because Mitsubishi has taken no steps to warn consumers of a defect, the Mitsubishi Class Vehicles were sold to Mitsubishi Plaintiffs

---

[34] Many of the precise dates and examples of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden by Defendants, and cannot be alleged without access to Defendants' books and records. However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. These include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

and the Mitsubishi Nationwide Class under false and/or misleading pretenses insofar as the certification label, Monroney stickers, and owner's manuals suggested that the Mitsubishi Class Vehicles had working Occupant Restraint Systems with no known defects. ZF TRW and STMicro were aware of Mitsubishi's standard practice of selling Mitsubishi Class Vehicles under these false or misleading pretenses, but conspired with Mitsubishi to conceal the existence and scope of the defect in the ZF TRW ACUs installed in Mitsubishi Class Vehicles.

b.     Mitsubishi also violated the mail and wire acts by falsely advertising the safety of Mitsubishi Class Vehicles through broadcast media, through social media, on its website, and in printed materials. Examples of such advertising are collected in Exhibit 19. Mitsubishi's advertising uniformly omitted any description of the defect that made ZF TRW ACUs vulnerable to EOS or the risk that the Occupant Restraint System could fail in Mitsubishi Class Vehicles at the worst possible time. ZF TRW and STMicro were aware of Mitsubishi's advertising, and conspired with Mitsubishi to conceal the existence and scope of

the defect in the ZF TRW's ACUs installed in Mitsubishi Class Vehicles.

c.    ZF TRW also violated the mail fraud act and/or wire fraud act by sending NHTSA a false and misleading slide deck presentation on or around February 5, 2016. The presentation sought to downplay the scope of the vehicles affected by the defective ZF TRW ACUs by stating: "Presence and impact of EOS on ACUs is vehicle dependent" and "Customer airbag deployment strategy can result in a commanded non-deployment." ZF TRW intended for these statements to persuade NHTSA that ZF TRW ACUs in most of the Class Vehicles were not defective and that the ZF TRW ACUs that had suffered EOS in the field may not have caused the airbags not to deploy.

d.    ZF TRW also violated the mail fraud act by sending NHTSA a letter in 2016 in connection with FCA's partial recall stating: "Although a similar TRW component is installed in vehicles other than those identified in the [Defect Information Report], the conditions in FCA's [Defect Information Report] are limited to the specific FCA vehicles identified in that report."

This statement was misleading because the defect with ZF TRW ACUs extended to the Honda Class Vehicles and the rest of the Class Vehicles.

e.  On or around March 12, 2018, ZF TRW sent a letter to NHTSA attorney Otto Matheke. The letter contains a slide deck presentation in which ZF TRW makes the following misleading statements: "ZF has not identified any defect related to motor vehicle safety in the ACU or any of its components. . . . ZF has not found evidence to link non deployments to EOS. . . . Customer airbag deployment strategy can result in a commanded non-deployment in certain crash types on specific platforms. . . . EOS with non deployment is vehicle dependent and platform dependent within a customer. . . . All ZF ACUs have appropriate levels of protection against specified and foreseeable transients." Each of these statements was false and misleading, and omitted material information, because (i) ZF TRW and STMicro had previously concluded that ASIC EOS had likely caused airbag nondeployment in multiple crashes, (ii) it is not possible to reliably conclude that a nondeployment was "commanded" when the crash data is missing (as it was in

many crashes), (iii) ZF TRW and STMicro had recommended

design changes due to testing that demonstrated vulnerability to

EOS, and (iv) ASIC EOS has occurred across a wide variety of

vehicles with ZF TRW ACUs (i.e., "platforms") and is

therefore not "platform-specific."

658.   ZF TRW, STMicro, and Mitsubishi knew and intended that

government regulators would rely on their material omissions made about the

Mitsubishi Class Vehicles to approve them for importation, marketing, and/or sale

in the United States. ZF TRW, STMicro, and Mitsubishi understood that disclosing

the defect would require a recall of all the Mitsubishi Class Vehicles to be

conducted and design change to be implemented, and negatively impact the profits

of the Mitsubishi Enterprise.

659.   ZF TRW, STMicro, and Mitsubishi knew and intended that

consumers would purchase the Mitsubishi Class Vehicles and incur costs as a

result. Plaintiffs' reliance on this ongoing concealment is demonstrated by the fact

that they paid money for defective Mitsubishi Class Vehicles that never should

have been introduced into the U.S. stream of commerce, and that they overpaid for

vehicles with defective safety systems.

660.   As described herein, ZF TRW, STMicro, and Mitsubishi engaged in a

pattern of related and continuous predicate acts for years. The predicate acts

constituted a variety of unlawful activities, each conducted with the common purpose of obtaining money from Mitsubishi Plaintiffs and Mitsubishi Class members. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

661.   The predicate acts had the common purpose of generating significant revenue and profits for ZF TRW, STMicro, and Mitsubishi from the sale and lease of the Mitsubishi Class Vehicles, while minimizing or avoiding costs of necessary repairs, at the expense of Mitsubishi Plaintiffs and Mitsubishi Class members.

662.   Mitsubishi, ZF TRW, and STMicro knew for years that the defective ZF TRW ACUs in the Mitsubishi Class Vehicles were vulnerable to EOS, but continued to manufacture, sell/lease, and accept payment from Plaintiffs for them anyway, as demonstrated by:

   a.   Mitsubishi tested the ZF TRW ACU for transient protection as early as April 2012, illustrating awareness of the defect;

   b.   Mitsubishi's receipt of numerous consumer reports about accidents in which airbags in their Mitsubishi Class Vehicles failed to deploy after a crash, consistent with the ACU Defect, starting as early as 2014;

c.    ZF TRW's January or February 2016 communication to Mitsubishi regarding EOS in ZF TRW ACUs and ZF TRW's communications with NHTSA regarding the same;

d.    Mitsubishi and ZF TRW's access to and awareness of the public record relating to recalls for ZF TRW ACUs in FCA and Hyundai-Kia vehicles starting in 2016 and 2018, respectively; and

e.    ZF TRW's knowledge that the Mitsubishi Class Vehicles include the same level of circuit protection as some of the FCA Class Vehicles recalled in 2016, given its role as the manufacturer for the ACUs in both FCA and Mitsubishi Class Vehicles, and Mitsubishi's knowledge of the same where that information was filed in a public document by NHTSA on April 19, 2019.

663.   Mitsubishi Plaintiffs and Nationwide Mitsubishi Class members are "person[s] injured in his or her business or property" by reason of ZF TRW, STMicro, and Mitsubishi Defendants' violation of RICO within the meaning of U.S.C. § 1964(c). Because of ZF TRW, STMicro, and Mitsubishi's pattern of racketeering activity, Plaintiffs and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

a.  Purchase or lease of defective Mitsubishi Class Vehicles;

b.  Overpayment at the time of purchase or lease for Mitsubishi Class Vehicles with an undisclosed safety defect; and

c.  Other, ongoing out-of-pocket and loss-of-use expenses.

664.  Mitsubishi Plaintiffs and Class members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

### vii.  Nationwide Count 7: Common Law Fraud on Behalf of the Nationwide Class against the Vehicle Manufacturer Defendants

665.  Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

### a.  Affirmative Misrepresentations

666.  Plaintiffs assert this affirmative misrepresentation theory of fraud on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Subclasses, against the Vehicle Manufacturer Defendants.

667.  As detailed above and in Exhibits 1, 4-7, 9-10, 12-13, 15-16, 17, and 19, the Vehicle Manufacturer Defendants made false or misleading statements to Plaintiffs and Class members regarding the safety of the Class Vehicles and the effectiveness of their Occupant Restraint Systems, including seatbelts and airbags. The Vehicle Manufacturer Defendants made these statements through, inter alia, statutory labels on the Class Vehicles, Monroney labels that described the

equipment and features of the Class Vehicles, and the owners' manuals, warranty booklets, product brochures, advertisements, and other promotional materials for the Class Vehicles.

668.   The Vehicle Manufacturer Defendants' representations were false and misleading because the Class Vehicles came equipped with defective ACUs that are vulnerable to EOS, which in turn can prevent deployment of the airbags and seatbelt pretensioners during a crash.

669.   The Vehicle Manufacturer Defendants knew the representations were false and intended that Plaintiffs and Class members to rely on them.

670.   These misrepresentations were material to Plaintiffs' and Class members' decision to acquire the Class Vehicles.

671.   Each Plaintiff decided to acquire a Class Vehicle based in part on the Vehicle Manufacturer Defendants' representations regarding the safety of the Class Vehicles and the effectiveness of their Occupant Restraint Systems, and/or the Vehicle Manufacturer Defendants presenting themselves as reputable manufacturers that value safety.

### b.    Fraudulent Concealment: Vehicle Safety Representations

672.   Plaintiffs assert this fraudulent concealment theory on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Subclasses, against the Vehicle Manufacturer Defendants.

673. The Vehicle Manufacturer Defendants made pervasive and consistent representations regarding the safety of the Class Vehicles and the effectiveness of their Occupant Restraint Systems, including airbags and seatbelts. As detailed above and in Exhibits 1, 4-7, 9-10, 12-13, 15-16, 17, and 19, the Vehicle Manufacturer Defendants made these representations through the statutory certifications to dealers and distributors, readiness indicators, Monroney labels, owners' manuals, warranty booklets, product brochures, advertisements, and other promotional materials for the Class Vehicles. These statements represented that the Class Vehicles were safe and that the Occupant Restraint Systems in the Class Vehicles, including the seatbelts and airbags, would function properly in a crash.

674. The Vehicle Manufacturer Defendants concealed and suppressed material facts regarding the Class Vehicles, including the fact that the vehicles contained defective ACUs that are vulnerable to EOS, which in turn can prevent deployment of the airbags and seatbelt pretensioners during a crash. These concealed, suppressed facts were material because a reasonable consumer would have expected that their vehicle had working airbags and seatbelt pretensioners, and would rely on those facts in deciding whether to purchase, lease, or retain a new or used motor vehicle. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

675.   Plaintiffs and Class Members did not know that their Class Vehicles contained defective ACUs vulnerable to EOS, and could not have discovered these concealed facts through reasonably diligent investigation.

676.   The Vehicle Manufacturer Defendants had a duty to disclose the ACU Defect because their omission related to a safety hazard and because Defendants:

   a.   had exclusive and/or far superior knowledge and access to the material, suppressed facts regarding the ACU Defect;

   b.   affirmatively and intentionally concealed the material facts from Plaintiffs and Class Members; and

   c.   knew that the ACU Defect was a material fact that would affect Plaintiffs' and Class members decisions to buy or lease a Class Vehicle.

677.   Each Plaintiff decided to buy or lease a Class Vehicle based in part on the Vehicle Manufacturer Defendants' representations as to the safety of the Class Vehicles and the effectiveness of their Occupant Restraint Systems.

   c.   **Fraudulent Concealment: Installing and Concealing the Defective ACUs**

678.   Plaintiffs assert this fraudulent concealment theory on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Subclasses, against all Defendants.

679.    Each Defendant committed fraud by manufacturing and/or installing defective ACUs, or component parts thereof, in the Class Vehicles while concealing from regulators and consumers that the ACUs were vulnerable to EOS and could malfunction during a crash.

680.    Although the Class Vehicles were marketed as safe cars, Defendants intentionally concealed, suppressed, and failed to disclose the fact that the Class Vehicles came equipped with defective ACUs that may cause the vehicles' airbags and seatbelt pretensioners to fail during a crash.

681.    Moreover, each Defendant knew or should have known the true facts about this defect due to their involvement in the design, testing, manufacture, installation, and/or sale of the defective ACUs in the Class Vehicles. And yet, at no time did any of the Defendants reveal the truth to Plaintiffs or the Class members. To the contrary, each Defendant concealed the truth, intending for Plaintiffs and Class members to rely on partial representations and omitted facts when acquiring a Class Vehicle—which they did.

682.    Defendants concealed and suppressed material facts regarding the Class Vehicles, including the fact that the vehicles contained defective ACUs that are vulnerable to EOS, which in turn can prevent deployment of the airbags and seatbelt pretensioners during a crash. These concealed, suppressed facts were material because a reasonable consumer would have expected that their vehicle had

working airbags and seatbelt pretensioners, and would rely on those facts in deciding whether to purchase, lease, or retain a new or used motor vehicle. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

683.   Plaintiffs and Class Members did not know that their Class Vehicles contained defective ACUs vulnerable to EOS, and could not have discovered these concealed facts through reasonably diligent investigation.

684.   Defendants had a duty to disclose the ACU Defect because they:

    a.    had exclusive and/or far superior knowledge and access to the material, suppressed facts regarding the ACU Defect;

    b.    affirmatively and intentionally concealed the ACU Defect from Plaintiffs and Class members; and

    c.    knew that the ACU Defect was a material fact that would affect Plaintiffs' and Class members decisions to buy or lease a Class Vehicle.

*    *    *

685.   But for Defendants' fraud, Plaintiffs and Class members would not have purchased the Class Vehicles, or would have paid less for them. Plaintiffs and Class members have suffered damages as a result of Defendants' fraud because they have been deprived of the benefit of their bargain in acquiring vehicles with

full functional ACUs, airbags, and seatbelts. Accordingly, Defendants are liable to Plaintiffs and Class members for damages in an amount to be proven at trial.

686.    Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of the rights of Plaintiffs and the Class; and to enrich themselves. Their misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

### viii.    Nationwide Count 8: Unjust Enrichment on Behalf of the Nationwide Class against the Vehicle Manufacturer Defendants

687.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

688.    Plaintiffs assert this Unjust Enrichment count on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Subclasses, against the Vehicle Manufacturer Defendants.

689.    By reason of their conduct, the Vehicle Manufacturer Defendants caused damages to Plaintiffs and Class members.

690.    Plaintiffs and Class members conferred a benefit on the Vehicle Manufacturer Defendants by overpaying for Class Vehicles at prices that were artificially inflated by the Vehicle Manufacturer Defendants' misrepresentations regarding the Class Vehicles' safety, and concealment of the ACU Defect.

691.   As a result of the Vehicle Manufacturer Defendants' fraud and deception, Plaintiffs and Class members were not aware of the true facts concerning the Class Vehicles and did not benefit from the Vehicle Manufacturer Defendants' misconduct.

692.   The Vehicle Manufacturer Defendants knowingly benefitted from their unjust conduct. They sold and leased Class Vehicles equipped with defective ACUs for more than what the vehicles were worth, at the expense of Plaintiffs and Class members.

693.   The Vehicle Manufacturer Defendants readily accepted and retained these benefits from Plaintiffs and Class members.

694.   It is inequitable and unconscionable for the Vehicle Manufacturer Defendants to retain these benefits because they misrepresented that the Class Vehicles were safe, and intentionally concealed, suppressed, and failed to disclose the ACU Defect from consumers. Plaintiffs and Class members would not have purchased or leased the Class Vehicles, or would have paid less for them, had the Vehicle Manufacturer Defendants not concealed the ACU Defect.

695.   Plaintiffs and Class members do not have an adequate remedy at law.

696.   Equity cannot in good conscience permit the Vehicle Manufacturer Defendants to retain the benefits that they derived from Plaintiffs and Class members through unjust and unlawful acts, and therefore restitution or

disgorgement of the amount of the Vehicle Manufacturer Defendants' unjust enrichment is necessary.

## B.    State-Specific Claims

### i.    Arizona

#### a.    Arizona Count 1: Breach of Express Warranty (Ariz. Rev. Stat. Ann. §§ 47-2313 and 47-2A210) Against the FCA Defendants

697.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

698.    Plaintiff James Kneup (hereinafter, "Arizona Plaintiff") brings this count individually and on behalf of members of the Arizona State Class who purchased or leased FCA Class Vehicles, against the FCA Defendants.

699.    The FCA Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Ariz. Rev. Stat. Ann. §§ 47-2104(A) and 47-2A103(C)(11), and "sellers" of motor vehicles under § 47-2103(A)(4).

700.    With respect to leases, the FCA Defendants are and were at all relevant times "lessors" of motor vehicles under Ariz. Rev. Stat. Ann. § 47-2a103(A)(16).

701.   All Arizona State Class members who purchased FCA Class Vehicles in Arizona are "buyers" within the meaning of Ariz. Rev. Stat. Ann. § 47-2103(A)(1).

702.    All Arizona State Class members who leased FCA Class Vehicles in Arizona are "lessees" within the meaning of Ariz. Rev. Stat. Ann. § 47-2A103(A)(14).

703.   The FCA Class Vehicles are and were at all relevant times "goods" within the meaning of Ariz. Rev. Stat. Ann. §§ 47-2105(A) and 47-2A103(A)(8).

704.   In connection with the purchase or lease of FCA Class Vehicles, the FCA Defendants provided the Arizona Plaintiff and Arizona State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

705.   The FCA Defendants' warranties formed the basis of the bargain that was reached when the Arizona Plaintiff and Arizona State Class members unknowingly purchased or leased FCA Class Vehicles that came equipped with a defective ACU.

706.   However, the FCA Defendants knew or should have known that the warranties were false and/or misleading. Specifically, the FCA Defendants were aware of the ACU defect in the FCA Class Vehicles, which made the vehicles

inherently defective and dangerous at the time that they were sold and leased to the Arizona Plaintiff and Arizona State Class members.

707.    The Arizona Plaintiff and Arizona State Class members reasonably relied on the FCA Defendants' express warranties when purchasing or leasing their FCA Class Vehicles.

708.    The FCA Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the ACU defect or replace the defective ACUs in the FCA Class Vehicles. The FCA Defendants also breached their express warranties by providing a product containing defects that were never disclosed to the Arizona Plaintiff and Arizona State Class members.

709.    The Arizona Plaintiff and Arizona State Class members have provided the FCA Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of the numerous NHTSA complaints filed against them, and the individual notice letters sent by Arizona State Class members within a reasonable amount of time after the ACU defect became public. Additionally, a notice letter was sent on behalf of the Arizona Plaintiff and Arizona State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

710.   Alternatively, any opportunity to cure the breach is unnecessary and futile.

711.   As a direct and proximate result of the FCA Defendants' breach of their express warranties, the Arizona Plaintiff and Arizona State Class members have been damaged in an amount to be proven at trial.

**b.     Arizona Count 2: Breach of Implied Warranty of Merchantability (Ariz. Rev. Stat. Ann. §§ 47-2314 and 47-2a212) Against the FCA Defendants**

712.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

713.   The Arizona Plaintiff brings this count individually and on behalf of members of the Arizona State Class who purchased or leased FCA Class Vehicles, against the FCA Defendants.

714.   A warranty that the FCA Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Ariz. Rev. Stat. Ann. §§ 47-2314 and 47-2A212.

715.   The FCA Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used.

Specifically, the FCA Class Vehicles suffer from the ACU defect, which may cause the airbags and seatbelt pretensioners to fail to deploy during an accident, rendering the FCA Class Vehicles inherently defective and dangerous.

716.   The FCA Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Ariz. Rev. Stat. Ann. §§ 47-2104(A) and 47-2A103(C)(11), and "sellers" of motor vehicles under § 47-2103(A)(4).

717.   With respect to leases, the FCA Defendants are and were at all relevant times "lessors" of motor vehicles under Ariz. Rev. Stat. Ann. § 47-2a103(A)(16).

718.   All Arizona State Class members who purchased FCA Class Vehicles in Arizona are "buyers" within the meaning of Ariz. Rev. Stat. Ann. § 47-2103(A)(1).

719.    All Arizona State Class members who leased FCA Class Vehicles in Arizona are "lessees" within the meaning of Ariz. Rev. Stat. Ann. § 47-2a103(A)(14).

720.   The FCA Class Vehicles are and were at all relevant times "goods" within the meaning of Ariz. Rev. Stat. Ann. §§ 47-2105(A) and 47-2A103(A)(8).

721.   The Arizona Plaintiff and Arizona State Class members have provided the FCA Defendants with reasonable notice and opportunity to cure the breaches of their implied warranties by way of the numerous NHTSA complaints filed against

them, and individual notice letters sent by Arizona State Class members within a reasonable amount of time after the ACU defect became public. Additionally, a notice letter was sent on behalf of the Arizona Plaintiff and Arizona State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

722.   Alternatively, any opportunity to cure the breach is unnecessary and futile.

723.   As a direct and proximate result of the FCA Defendants' breach of the implied warranty of merchantability, the Arizona Plaintiff and Arizona State Class members have been damaged in an amount to be proven at trial.

    **c.**    **Arizona Count 3: Violation of the Arizona Consumer Fraud Act (Ariz. Rev. Stat. Ann. § 44-1521, *et seq.*) Against the FCA Defendants**

724.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

725.   The Arizona Plaintiff brings this count individually and on behalf of members of the Arizona State Class who purchased or leased FCA Class Vehicles, against the FCA Defendants.

726.   The FCA Defendants, the Arizona Plaintiff, and Arizona State Class members are "persons" within the meaning of Ariz. Rev. Stat. Ann. § 44-1521(6).

727.   The FCA Class Vehicles and ACUs installed in them are "merchandise" within the meaning of Ariz. Rev. Stat. Ann § 44-1521(5).

728.   The Arizona Consumer Fraud Act ("Arizona CFA") prohibits unlawful business practices. Ariz. Rev. Stat. Ann § 44-1522(A).

729.   In the course of their business, the FCA Defendants, through their agents, employees, and/or subsidiaries, violated the Arizona CFA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the FCA Class Vehicles and/or the defective ACUs, as detailed above.

730.   Specifically, by misrepresenting the FCA Class Vehicles and/or the defective ACUs installed in them as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the FCA Class Vehicles and/or the ACU defect, the FCA Defendants engaged in deceptive acts or practices, as outlined in Ariz. Rev. Stat. § 44-1522(A), including using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the advertisement and sale or lease of the FCA Class Vehicles.

731.   The FCA Defendants' unfair or deceptive acts or practices, including

misrepresentations, concealments, omissions, and suppressions of material facts,

had a tendency or capacity to mislead and create a false impression in consumers,

and were likely to and did in fact deceive reasonable consumers, including the

Arizona Plaintiff and Arizona State Class members, about the true safety and

reliability of FCA Class Vehicles and/or the defective ACUs installed in them, the

quality of the FCA Class Vehicles, and the true value of the FCA Class Vehicles.

732.   The FCA Defendants' scheme and concealment of the ACU defect

and true characteristics of the Occupant Restraint Systems in the FCA Class

Vehicles were material to the Arizona Plaintiff and Arizona State Class members,

as the FCA Defendants intended. Had they known the truth, the Arizona Plaintiff

and Arizona State Class members would not have purchased or leased the FCA

Class Vehicles, or would have paid significantly less for them.

733.   The Arizona Plaintiff and Arizona State Class members had no way of

discerning that the FCA Defendants' representations were false and misleading, or

otherwise learning the facts that the FCA Defendants had concealed or failed to

disclose. The Arizona Plaintiff and Arizona State Class members did not, and

could not, unravel the FCA Defendants' deception on their own.

734.   The FCA Defendants had an ongoing duty to the Arizona Plaintiff and

Arizona State Class members to refrain from unfair or deceptive practices under

the Arizona CFA in the course of their business. Specifically, the FCA Defendants owed the Arizona Plaintiff and Arizona State Class members a duty to disclose all the material facts concerning the ACU defect in the FCA Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the ACU defect from Plaintiff and the Arizona State Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

735.   The Arizona Plaintiff and Arizona State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the FCA Defendants' concealment, misrepresentations, and/or failure to disclose material information.

736.   The FCA Defendants' violations present a continuing risk to the Arizona Plaintiff and Arizona State Class members, as well as to the general public. The FCA Defendants' unlawful acts and practices complained of herein affect the public interest.

737.   The Arizona Plaintiff and Arizona State Class members seek an order enjoining the FCA Defendants' unfair and/or deceptive acts or practices and awarding damages and any other just and proper relief available under the Arizona CFA.

    **d.**    **Arizona Count 4: Violation of the Arizona Consumer Fraud Act (Ariz. Rev. Stat. Ann. § 44-1521, *et seq.*) Against the ZF TRW and STMicro Defendants**

738.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

739.    The Arizona Plaintiff brings this count individually and on behalf of members of the Arizona State Class against the ZF TRW and STMicro Defendants.

740.    The ZF TRW Defendants, the STMicro Defendants, the Arizona Plaintiff, and Arizona State Class members are "persons" within the meaning of Ariz. Rev. Stat. Ann. § 44-1521(6).

741.    The Class Vehicles and ACUs installed in them are "merchandise" within the meaning of Ariz. Rev. Stat. Ann § 44-1521(5).

742.    The Arizona Consumer Fraud Act ("Arizona CFA") prohibits unlawful business practices. Ariz. Rev. Stat. Ann § 44-1522(A).

743.    In the course of their business the ZF TRW and STMicro Defendants, through their agents, employees, and/or subsidiaries, violated the Arizona CFA by knowingly and intentionally omitting, concealing, and failing to disclose material facts regarding the existence, nature, and scope of the defect with ZF TRW ACUs installed in the Class Vehicles, as detailed above.

744.   Specifically, by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles due to the ACU defect, the ZF TRW and STMicro Defendants engaged in unlawful business practices prohibited by Ariz. Rev. Stat. § 44-1522(A), including using or employing deception or fraud, and/or the concealment, suppression and/or omission of a material fact with intent that others rely upon such concealment, suppression, or omission.

745.   The ZF TRW and STMicro Defendants' unfair or deceptive acts or practices, including concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Arizona Plaintiff and Arizona State Class members, about the true safety and reliability of Class Vehicles and/or the defective ACUs installed in them.

746.   The ZF TRW and STMicro Defendants' scheme and concealment of the ACU defect and true characteristics of the defective ACUs in the Class Vehicles were material to the Arizona Plaintiff and Arizona State Class members, as the ZF TRW and STMicro Defendants intended. Had they known the truth, the Arizona Plaintiff and Arizona State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

747.   The Arizona Plaintiff and Arizona State Class members had no way learning the facts that the ZF TRW and STMicro Defendants had concealed or

failed to disclose. The Arizona Plaintiff and Arizona State Class members did not, and could not, unravel the ZF TRW and STMicro Defendants' deception on their own.

748.   The ZF TRW and STMicro Defendants had an ongoing duty to the Arizona Plaintiff and Arizona State Class members to refrain from unfair or deceptive practices under the Arizona CFA in the course of their business. Specifically, the ZF TRW and STMicro Defendants owed the Arizona Plaintiff and Arizona State Class members a duty to disclose all the material facts concerning the ACU defect in the Class Vehicles because they possessed exclusive knowledge and they intentionally concealed the ACU defect from the Arizona Plaintiff and Arizona State Class members.

749.   The Arizona Plaintiff and Arizona State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the ZF TRW and STMicro Defendants' concealment and/or failure to disclose material information.

750.   The ZF TRW and STMicro Defendants' violations present a continuing risk to the Arizona Plaintiff and Arizona State Class members, as well as to the general public. The ZF TRW and STMicro Defendants' unlawful acts and practices complained of herein affect the public interest.

751.    The Arizona Plaintiff and Arizona State Class members seek an order enjoining the ZF TRW and STMicro Defendants' unfair and/or deceptive acts or practices and awarding damages and any other just and proper relief available under the Arizona CFA.

### ii.    California

#### a.    California Count 1: Breach of Express Warranty (Cal. Com. Code §§ 2313 and 10210) Against the FCA, Kia, and Mitsubishi Defendants

752.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

753.    Plaintiffs Remigiusz Rundzio and Steve Laveaux bring this count individually and on behalf of members of the California State Class who purchased or leased FCA Class Vehicles, against the FCA Defendants.

754.    Plaintiff Lore VanHouten brings this count individually and on behalf of members of the California State Class who purchased or leased Kia Class Vehicles, against the Kia Defendants.

755.    Plaintiffs Donna Ronan and Tiffany Ecklor bring this count individually and on behalf of members of the California State Class who purchased or leased Mitsubishi Class Vehicles, against the Mitsubishi Defendants.

756.   Hereinafter, Plaintiffs Rundzio, Laveaux, VanHouten, Ronan, and Ecklor shall be referred to as the "California Plaintiffs."

757.   The FCA, Kia, and Mitsubishi Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of motor vehicles under § 2103(1)(d).

758.   With respect to leases, the FCA, Kia, and Mitsubishi Defendants are and were at all relevant times "lessors" of motor vehicles under Cal. Com. Code § 10103(a)(16).

759.   All California State Class members who purchased FCA, Kia, and Mitsubishi Class Vehicles in California are "buyers" within the meaning of Cal. Com. Code § 2103(1)(a).

760.   All California State Class members who leased FCA, Kia, and Mitsubishi Class Vehicles in the California are "lessees" within the meaning of Cal. Com. Code § 10103(a)(14).

761.   The FCA, Kia, and Mitsubishi Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

762.   In connection with the purchase or lease of FCA, Kia, and Mitsubishi Class Vehicles, the FCA, Kia, and Mitsubishi Defendants provided the California Plaintiffs and California State Class members with written express warranties

covering the repair or replacement of components that are defective in materials or workmanship.

763.    The FCA, Kia, and Mitsubishi Defendants' warranties formed the basis of the bargain that was reached when the California Plaintiffs and California State Class members unknowingly purchased or leased FCA, Kia, and Mitsubishi Class Vehicles that came equipped with a defective ACU.

764.    However, the FCA, Kia, and Mitsubishi Defendants knew or should have known that the warranties were false and/or misleading. Specifically, the FCA, Kia, and Mitsubishi Defendants were aware of the ACU defect in the FCA, Kia, and Mitsubishi Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to the California Plaintiffs and California State Class members.

765.    The California Plaintiffs and California State Class members reasonably relied on the FCA, Kia, and Mitsubishi Defendants' express warranties when purchasing or leasing their FCA, Kia, and Mitsubishi Class Vehicles.

766.    The FCA, Kia, and Mitsubishi Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the ACU defect or replace the defective ACUs in the FCA, Kia, and Mitsubishi Class Vehicles. The FCA, Kia, and Mitsubishi Defendants also breached their express warranties by providing a product containing defects that

were never disclosed to the California Plaintiffs and California State Class
members.

767.    The California Plaintiffs and California State Class members have
provided the FCA, Kia, and Mitsubishi Defendants with reasonable notice and
opportunity to cure the breaches of their express warranties by way of the NHTSA
investigations, the numerous complaints filed against them, and the individual
notice letters sent by California State Class members within a reasonable amount
of time after the ACU defect became public. Additionally, on May 23, 2019,
California State Class members sent a notice letter to FCA US LLC, Honda
Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North
America, Inc., Toyota Defendants, and ZF TRW Defendants. Moreover, a second
notice letter was sent on behalf of the California Plaintiffs and California State
Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia
Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai
MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

768.    Alternatively, any opportunity to cure the breach is unnecessary and
futile.

769.    As a direct and proximate result of the FCA, Kia, and Mitsubishi
Defendants' breach of their express warranties, the California Plaintiffs and

California State Class members have been damaged in an amount to be proven at trial.

> **b.    California Count 2: Violations of Song-Beverly Consumer Warranty Act For Breach of Express Warranties (Cal. Civ. Code §§ 1791.2 and 1793.1) Against the FCA, Kia, and Mitsubishi Defendants**

770.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

771.    Plaintiffs Remigiusz Rundzio and Steve Laveaux bring this count individually and on behalf of members of the California State Class who purchased or leased FCA Class Vehicles, against the FCA Defendants.

772.    Plaintiff Lore VanHouten brings this count individually and on behalf of members of the California State Class who purchased or leased Kia Class Vehicles, against the Kia Defendants.

773.    Plaintiffs Donna Ronan and Tiffany Ecklor bring this count individually and on behalf of members of the California State Class who purchased or leased Mitsubishi Class Vehicles, against the Mitsubishi Defendants.

774.    The FCA, Kia, and Mitsubishi Defendants are "manufacturer[s]" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

775.    The FCA, Kia, and Mitsubishi Defendants are and were at all relevant times "sellers" of motor vehicles under Cal. Civ. Code § 1791(l).

776.    With respect to leases, the FCA, Kia, and Mitsubishi Defendants are and were at all relevant times "lessors" of motor vehicles under Cal. Civ. Code § 1791(i).

777.    All California State Class members who purchased FCA, Kia, and Mitsubishi Class Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

778.    All California State Class members who leased FCA, Kia, and Mitsubishi Class Vehicles in California are "lessees" within the meaning of Cal. Civ. Code § 1791(h).

779.    The FCA, Kia, and Mitsubishi Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

780.    In connection with the purchase or lease of FCA, Kia, and Mitsubishi Class Vehicles, the FCA, Kia, and Mitsubishi Defendants provided the California Plaintiffs and California State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

781.    The FCA, Kia, and Mitsubishi Defendants' warranties formed the basis of the bargain that was reached when the California Plaintiffs and California

State Class members unknowingly purchased or leased their Class Vehicles equipped with a defective ACU.

782.    However, the FCA, Kia, and Mitsubishi Defendants knew or should have known that their warranties were false and misleading. Specifically, the FCA, Kia, and Mitsubishi Defendants were aware of the ACU defect in the FCA, Kia, and Mitsubishi Class Vehicles which made the vehicles inherently defective and dangerous at the time that they were sold and leased to the California Plaintiffs and California State Class members.

783.    The California Plaintiffs and California State Class members reasonably relied on the FCA, Kia, and Mitsubishi Defendants' express warranties when purchasing or leasing the California FCA, Kia, and Mitsubishi Class Vehicles.

784.    The FCA, Kia, and Mitsubishi Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the ACU defect or replace the defective ACUs in the FCA, Kia, and Mitsubishi Class Vehicles. The FCA, Kia, and Mitsubishi Defendants also breached their express warranties by providing a product containing defects that were never disclosed to the California Plaintiffs and California State Class members.

785.    The California Plaintiffs and California State Class members have provided the FCA, Kia, and Mitsubishi Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of the NHTSA investigations, the numerous complaints filed against them, and the individual notice letters sent by California State Class members within a reasonable amount of time after the ACU defect became public. Additionally, on May 23, 2019, California State Class members sent a notice letter to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, and ZF TRW Defendants. Moreover, a second notice letter was sent on behalf of the California Plaintiffs and California State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

786.    Alternatively, any opportunity to cure the breach is unnecessary and futile.

787.    As a direct and proximate result of the FCA, Kia, and Mitsubishi Defendants' breach of express warranties, the California Plaintiffs and California State Class members have suffered significant damages, and seek damages in an amount to be determined at trial.

788.   Pursuant to Cal. Civ. Code §§ 1793.2 and 1794, the California Plaintiffs and California State Class members seek an order enjoining the FCA, Kia, and Mitsubishi Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and any other just and proper relief available under the Song-Beverly Consumer Warranty Act.

### c.    California Count 3: Breach of Implied Warranty of Merchantability (Cal. Com. Code §§ 2314 and 10212) Against the FCA, Kia, and Mitsubishi Defendants

789.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

790.   Plaintiffs Remigiusz Rundzio and Steve Laveaux bring this count individually and on behalf of members of the California State Class who purchased or leased FCA Class Vehicles, against the FCA Defendants.

791.   Plaintiff Lore VanHouten brings this count individually and on behalf of members of the California State Class who purchased or leased Kia Class Vehicles, against the Kia Defendants.

792.   Plaintiffs Donna Ronan and Tiffany Ecklor bring this count individually and on behalf of members of the California State Class who purchased or leased Mitsubishi Class Vehicles, against the Mitsubishi Defendants.

793.   A warranty that the FCA, Kia, and Mitsubishi Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Cal. Com. Code §§ 2314 and 10212.

794.   The FCA, Kia, and Mitsubishi Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the FCA, Kia, and Mitsubishi Class Vehicles suffer from the ACU defect, which may cause the airbags and seatbelt pretensioners to fail to deploy during an accident, rendering the FCA, Kia, and Mitsubishi Class Vehicles inherently defective and dangerous.

795.   The FCA, Kia, and Mitsubishi Defendants are and were at all relevant times "merchants" with respect to motor vehicles, Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of motor vehicles under § 2103(1)(d).

796.   With respect to leases, the FCA, Kia, and Mitsubishi Defendants are and were at all relevant times "lessors" of motor vehicles under Cal. Com. Code § 10103(a)(16).

797.   All California State Class members who purchased FCA, Kia, and Mitsubishi Class Vehicles in California are "buyers" within the meaning of Cal. Com. Code § 2103(1)(a).

798.   All California State Class members who leased FCA, Kia, and Mitsubishi Class Vehicles in California are "lessees" within the meaning of Cal. Com. Code § 10103(a)(14).

799.   The FCA, Kia, and Mitsubishi Class Vehicles were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

800.   The California Plaintiffs and California State Class members have provided the FCA, Kia, and Mitsubishi Defendants with reasonable notice and opportunity to cure the breaches of their implied warranties by way of the NHTSA investigations, the numerous complaints filed against them, and the individual notice letters sent by California State Class members within a reasonable amount of time after the ACU defect became public. Additionally, on May 23, 2019, California State Class members sent a notice letter to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, and ZF TRW Defendants. Moreover, a second notice letter was sent on behalf of the California Plaintiffs and California State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

801.   Alternatively, any opportunity to cure the breach is unnecessary and futile.

802.   As a direct and proximate result of the FCA, Kia, and Mitsubishi Defendants' breach of the implied warranty of merchantability, the California Plaintiffs and California State Class members have been damaged in an amount to be proven at trial.

> **d.   California Count 4: Violations of Song-Beverly Consumer Warranty Act For Breach of Implied Warranty of Merchantability (Cal. Civ. Code §§ 1791.1 and 1792) Against the FCA, Kia, and Mitsubishi Defendants**

803.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

804.   Plaintiffs Remigiusz Rundzio and Steve Laveaux bring this count individually and on behalf of members of the California State Class who purchased or leased FCA Class Vehicles, against the FCA Defendants.

805.   Plaintiff Lore VanHouten brings this count individually and on behalf of members of the California State Class who purchased or leased Kia Class Vehicles, against the Kia Defendants.

806.   Plaintiffs Donna Ronan and Tiffany Ecklor bring this count individually and on behalf of members of the California State Class who purchased or leased Mitsubishi Class Vehicles, against the Mitsubishi Defendants.

807.   The FCA, Kia, and Mitsubishi Defendants are "manufacturer[s]" of the FCA, Kia, and Mitsubishi Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

808.   The FCA, Kia, and Mitsubishi Defendants are and were at all relevant times "sellers" of motor vehicles under Cal. Civ. Code § 1791(l).

809.   With respect to leases, the FCA, Kia, and Mitsubishi Defendants are and were at all relevant times "lessors" of motor vehicles under Cal. Civ. Code § 1791(i).

810.   All California State Class members who purchased FCA, Kia, and Mitsubishi Class Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

811.   All California State Class members who leased FCA, Kia, and Mitsubishi Class Vehicles in California are "lessees" within the meaning of Cal. Civ. Code § 1791(h).

812.   The FCA, Kia, and Mitsubishi Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

813.   The FCA, Kia, and Mitsubishi Defendants impliedly warranted to the California Plaintiffs and California State Class members that their Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) and 1792,

however, the FCA, Kia, and Mitsubishi Class Vehicles do not have the quality that a buyer would reasonably expect.

814.   Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

      a.    Pass without objection in the trade under the contract description.

      b.    Are fit for the ordinary purposes for which such goods are used.

      c.    Are adequately contained, packaged, and labeled.

      d.    Conform to the promises or affirmations of fact made on the container or label.

815.   The FCA, Kia, and Mitsubishi Class Vehicles would not pass without objection in the automotive trade due to the ACU defect. Because the FCA, Kia, and Mitsubishi Class Vehicles contain defective ACUs, the Class Vehicles are not in merchantable condition and thus not fit for ordinary purposes.

816.   The FCA, Kia, and Mitsubishi Class Vehicles are not adequately labeled because the labeling fails to disclose defects in the FCA, Kia, and Mitsubishi Class Vehicles' ACUs. The Class Vehicles do not conform to the promises and affirmations made by the FCA, Kia, and Mitsubishi Defendants reading safety.

817. The FCA, Kia, and Mitsubishi Defendants' breach of the implied warranty of merchantability caused damage to the California Plaintiffs and California State Class members who purchased or leased the defective FCA, Kia, and Mitsubishi Class Vehicles. The amount of damages due will be proven at trial.

818. Pursuant to Cal. Civ. Code §§ 1791.1(d) and 1794, the California Plaintiffs and California State Class members seek an order enjoining the FCA, Kia, and Mitsubishi Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and any other just and proper relief available under the Song-Beverly Consumer Warranty Act.

> **e.    California Count 5: False Advertising Under the California False Advertising Law (Cal. Bus. & Prof. Code § 17500, *et seq.*) Against the FCA, Kia, and Mitsubishi Defendants**

819. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

820. Plaintiffs Remigiusz Rundzio and Steve Laveaux bring this count individually and on behalf of members of the California State Class who purchased or leased FCA Class Vehicles, against the FCA Defendants.

821. Plaintiff Lore VanHouten brings this count individually and on behalf of members of the California State Class who purchased or leased Kia Class Vehicles, against the Kia Defendants.

822.    Plaintiffs Donna Ronan and Tiffany Ecklor bring this count individually and on behalf of members of the California State Class who purchased or leased Mitsubishi Class Vehicles, against the Mitsubishi Defendants.

823.    The FCA, Kia, and Mitsubishi Defendants, the California Plaintiffs, and California State Class members are "persons" within the meaning of Cal. Bus. & Prof. Code § 17506.

824.    The California False Advertising Law ("California FAL") prohibits false advertising. California Bus. & Prof. Code § 17500.

825.    In the course of their business, the FCA, Kia, and Mitsubishi Defendants, through their agents, employees, and/or subsidiaries, violated the California FAL by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the FCA, Kia, and Mitsubishi Class Vehicles and/or the defective ACUs, as detailed above.

826.    Specifically, by misrepresenting the FCA, Kia, and Mitsubishi Class Vehicles and/or the defective ACUs installed in them as being safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the FCA, Kia, and Mitsubishi Class Vehicles and/or the ACU defect, the FCA, Kia, and Mitsubishi Defendants engaged in untrue and misleading advertising prohibited by California Bus. & Prof. Code § 17500.

827.   The FCA, Kia, and Mitsubishi Defendants made or caused to be made and disseminated throughout California advertising, marketing, and other publications containing numerous statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to the FCA, Kia, and Mitsubishi Defendants, to be untrue and misleading to consumers, including the California Plaintiffs and California State Class members. Numerous examples of these statements and advertisements appear in the preceding paragraphs throughout this Complaint and in Exhibits 1, 5, 7, 9-10, 17, and 19.

828.   The FCA, Kia, and Mitsubishi Defendants' unfair or deceptive acts or practices, including their misrepresentations, concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the California Plaintiffs and California State Class members, about the true safety and reliability of FCA, Kia, and Mitsubishi Class Vehicles and/or the defective ACUs installed in them, the quality of the FCA, Kia, and Mitsubishi Defendants' brands, and the true value of the Class Vehicles.

829.   The FCA, Kia, and Mitsubishi Defendants' scheme and concealment of the ACU defect and true characteristics of the Occupant Restraint Systems in the

FCA, Kia, and Mitsubishi Class Vehicles were material to the California Plaintiffs and California State Class members, as the FCA, Kia, and Mitsubishi Defendants intended. Had they known the truth, the California Plaintiffs and California State Class members would not have purchased or leased the FCA, Kia, and Mitsubishi Class Vehicles, or would have paid significantly less for them.

830.    The California Plaintiffs and California State Class members relied on the FCA, Kia, and Mitsubishi Defendants and had no way of discerning that those representations were false and misleading, or otherwise learning the facts that the FCA, Kia, and Mitsubishi Defendants had concealed or failed to disclose. The California Plaintiffs and California State Class members did not, and could not, unravel the FCA, Kia, and Mitsubishi Defendants' deception on their own.

831.    The FCA, Kia, and Mitsubishi Defendants had an ongoing duty to the California Plaintiffs and California State Class members to refrain from unfair or deceptive practices under the California FAL in the course of their business. Specifically, the FCA, Kia, and Mitsubishi Defendants owed the California Plaintiffs and California State Class members a duty to disclose all the material facts concerning the ACU defect in the FCA, Kia, and Mitsubishi Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the ACU defect from the California Plaintiffs and California State Class members,

and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

832.    The California Plaintiffs and California State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the FCA, Kia, and Mitsubishi Defendants' concealment, misrepresentations, and/or failure to disclose material information.

833.    The FCA, Kia, and Mitsubishi Defendants' violations present a continuing risk to the California Plaintiffs and California State Class members, as well as to the general public. The FCA, Kia, and Mitsubishi Defendants' unlawful acts and practices complained of herein affect the public interest.

834.    The California Plaintiffs and California State Class members seek an order enjoining the FCA, Kia, and Mitsubishi Defendants' false advertising, any such orders or judgments as may be necessary to restore to the California Plaintiffs and California State Class members any money acquired by unfair competition, including restitution and/or restitutionary disgorgement, and any other just and proper relief available under the false advertising provisions of the California FAL.

f.   **California Count 6: Violation of the Consumer Legal Remedies Act (Cal. Civ. Code § 1750, *et seq.*) Against the FCA, Kia, Mitsubishi, ZF TRW, and STMicro Defendants, and Hyundai MOBIS**

835.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

836.   Plaintiffs Remigiusz Rundzio and Steve Laveaux bring this count individually and on behalf of members of the California State Class who purchased or leased FCA Class Vehicles, against the FCA, ZF TRW, and STMicro Defendants.

837.   Plaintiff Lore VanHouten brings this count individually and on behalf of members of the California State Class who purchased or leased Kia Class Vehicles, against the Kia, ZF TRW, STMicro Defendants, and Hyundai MOBIS.

838.   Plaintiffs Donna Ronan and Tiffany Ecklor bring this count individually and on behalf of members of the California State Class who purchased or leased Mitsubishi Class Vehicles, against the Mitsubishi, ZF TRW, and STMicro Defendants.

839.   For purposes of this count, the FCA, Kia, Mitsubishi, ZF TRW, and STMicro Defendants, and Hyundai MOBIS, shall be referred to as "Defendants."

840. The FCA, Kia, and Mitsubishi Class Vehicles and ACUs installed in them are "goods" within the meaning of Cal. Civ. Code § 1761(a).

841. Defendants, the California Plaintiffs, and California State Class members are "persons" within the meaning of Cal. Civ. Code § 1761(c).

842. The California Plaintiffs and California State Class members are "consumers" within the meaning of Cal. Civ. Code § 1761(d).

843. The California Legal Remedies Act ("CLRA") prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770.

844. In the course of their business, Defendants, through their agents, employees, and/or subsidiaries, violated the CLRA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the FCA, Kia, and Mitsubishi Class Vehicles and/or the defective ACUs, as detailed above.

845. Specifically, by misrepresenting the FCA, Kia, and Mitsubishi Class Vehicles and/or the defective ACUs installed in them as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the FCA, Kia, and Mitsubishi Class Vehicles and/or the ACU defect,

Defendants engaged in one or more of the following unfair or deceptive business
practices as defined in Cal. Civ. Code § 1770(a):

    a.    Representing that the FCA, Kia, and Mitsubishi Class Vehicles
and/or the defective ACUs installed in them have
characteristics, uses, benefits, and qualities which they do not
have.

    b.    Representing that the FCA, Kia, and Mitsubishi Class Vehicles
and/or the defective ACUs installed in them are of a particular
standard, quality, and grade when they are not.

    c.    Advertising the FCA, Kia, and Mitsubishi Class Vehicles
and/or the defective ACUs installed in them with the intent not
to sell or lease them as advertised.

    d.    Representing that the subject of a transaction has been supplied
in accordance with a previous representation when it has not.

Cal. Civ. Code §§ 1770(a)(5), (7), (9), and (16).

846.   Defendants' unfair or deceptive acts or practices, including their
misrepresentations, concealments, omissions, and/or suppressions of material facts,
had a tendency or capacity to mislead and create a false impression in consumers,
and were likely to and did in fact deceive reasonable consumers, including the
California Plaintiffs and California State Class members, about the true safety and

reliability of the FCA, Kia, and Mitsubishi Class Vehicles and/or the defective
ACUs installed in them, the quality of the FCA, Kia, and Mitsubishi Class
Vehicles, and the true value of the FCA, Kia, and Mitsubishi Class Vehicles.

847.   Defendants' scheme and concealment of the ACU defect and true
characteristics of the Occupant Restraint Systems in the FCA, Kia, and Mitsubishi
Class Vehicles were material to the California Plaintiffs and California State Class
members, as Defendants intended. Had they known the truth, the California
Plaintiffs and California State Class members would not have purchased or leased
the FCA, Kia, and Mitsubishi Class Vehicles, or would have paid significantly less
for them.

848.   The California Plaintiffs and California State Class members had no
way of discerning that Defendants' representations were false and misleading, or
otherwise learning the facts that Defendants had concealed or failed to disclose.
The California Plaintiffs and California State Class members did not, and could
not, unravel Defendants' deception on their own.

849.   Defendants had an ongoing duty to the California Plaintiffs and
California State Class members to refrain from unfair or deceptive practices under
the CLRA in the course of their business. Specifically, Defendants owed the
California Plaintiffs and California State Class members a duty to disclose all the
material facts concerning the ACU defect in the FCA, Kia, and Mitsubishi Class

Vehicles because they possessed exclusive knowledge, they intentionally concealed the ACU defect from California Plaintiffs and the California State Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

850.   The California Plaintiffs and California State Class members suffered ascertainable losses and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

851.   Defendants' violations present a continuing risk to the California Plaintiffs and California State Class members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

852.   Defendants were provided notice of the issues raised in this count and this Complaint by the NHTSA investigations, the numerous complaints filed against them, and the individual notice letters sent by California State Class members within a reasonable amount of time after the ACU defect became public. Additionally, on May 23, 2019, California State Class members sent a notice letter pursuant to Cal. Civ. Code § 1782 to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, and ZF TRW Defendants. Moreover, a second notice letter was sent

on behalf of the California Plaintiffs and California State Class members pursuant to Cal. Civ. Code § 1782 to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020. Because Defendants failed to adequately remedy their unlawful conduct within the requisite time period, the California Plaintiffs seek all damages and relief to which the California Plaintiffs and California State Class members are entitled.

853.   Pursuant to Cal. Civ. Code § 1780(a), the California Plaintiffs and California State Class members seek an order enjoining Defendants' unfair or deceptive acts or practices and awarding actual damages, treble damages, restitution, attorneys' fees, and any other just and proper relief available under the CLRA against all Defendants.

**g.    California Count 7: Unlawful, Unfair, or Fraudulent Business Practices Under the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq.*) Against the FCA, Kia, Mitsubishi, ZF TRW, and STMicro Defendants, and Hyundai MOBIS**

854.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

855.    Plaintiffs Remigiusz Rundzio and Steve Laveaux bring this count individually and on behalf of members of the California State Class who purchased or leased FCA Class Vehicles, against the FCA, ZF TRW, and STMicro Defendants.

856.    Plaintiff Lore VanHouten brings this count individually and on behalf of members of the California State Class who purchased or leased Kia Class Vehicles, against the Kia, ZF TRW, STMicro Defendants, and Hyundai MOBIS.

857.    Plaintiffs Donna Ronan and Tiffany Ecklor bring this count individually and on behalf of members of the California State Class who purchased or leased Mitsubishi Class Vehicles, against the Mitsubishi, ZF TRW, and STMicro Defendants.

858.    For purposes of this count, the FCA, Kia, Mitsubishi, ZF TRW, and STMicro Defendants, and Hyundai MOBIS, shall be referred to as "Defendants."

859.    California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200, prohibits any "unlawful, unfair, or fraudulent business act or practices."

860.    As detailed in the allegations above, Defendants knowingly and intentionally designed, developed, tested, manufactured, and/or installed defective ACUs into FCA, Kia, and Mitsubishi Class Vehicles, and marketed and sold those Class Vehicles with the defective ACUs installed, while misrepresenting the safety

of the Class Vehicles and fraudulently concealing that the ACU defect from

regulators and the California Plaintiffs and California State Class members alike.

In doing so, Defendants have engaged in at least one of the following unlawful,

fraudulent, and unfair business acts and practices in violation of the UCL:

      a.    knowingly and intentionally concealing from the California

               Plaintiffs and California State Class members that the FCA,

               Kia, and Mitsubishi Class Vehicles suffer from a defective

               ACU while obtaining money from the California Plaintiffs and

               California State Class members;

      b.    marketing FCA, Kia, and Mitsubishi Class Vehicles as

               possessing functional and defect-free airbag systems and

               seatbelt pretensioners, including ACUs; and/or

      c.    violating both federal and California laws, including the federal

               RICO statute, as alleged above.

861.    Defendants' misrepresentations, omissions, and concealment of the

true characteristics defective ACUs were material to the California Plaintiffs and

California State Class members, and Defendants misrepresented, concealed, or

failed to disclose the truth with the intention that consumers would rely on the

misrepresentations, concealment, and omissions. Had they known the truth, the

California Plaintiffs and California State Class members who purchased or leased

the FCA, Kia, and Mitsubishi Class Vehicles would not have purchased or leased them at all, or would have paid significantly less for them.

862.   The California Plaintiffs and California State Class members suffered ascertainable losses as a direct and proximate result of Defendants' misrepresentations, concealment of and failure to disclose material information, and violation of the laws alleged above.

863.   Pursuant to Cal. Bus. & Prof. Code § 17200, the California Plaintiffs and California State Class members seek an order enjoining Defendants' unfair and/or deceptive acts or practices, any such orders or judgments as may be necessary to restore to the California Plaintiffs and California State Class members any money acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code §§ 17203, and any other just and proper relief available under the California UCL.

**iii.    Colorado**

**a.    Colorado Count 1: Breach of Express Warranty (Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-210) Against the Mitsubishi Defendants**

864.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

865.    Plaintiff Michael Nearing (hereinafter, "Colorado Plaintiff") brings this count individually and on behalf of members of the Colorado State Class who purchased or leased Mitsubishi Class Vehicles, against the Mitsubishi Defendants.

866.    The Mitsubishi Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and "sellers" of motor vehicles under § 4-2-103(1)(d).

867.    With respect to leases, the Mitsubishi Defendants are and were at all relevant times "lessors" of motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

868.    All Colorado State Class members who purchased Mitsubishi Class Vehicles in Colorado are "buyers" within the meaning of Colo. Rev. Stat. § 4-2-103(1)(a).

869.    All Colorado State Class members who leased Mitsubishi Class Vehicles in Colorado are "lessees" within the meaning of Colo. Rev. Stat. § 4-2.5-103(1)(p).

870.    The Mitsubishi Class Vehicles are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

871.    In connection with the purchase or lease of Mitsubishi Class Vehicles, the Mitsubishi Defendants provided the Colorado Plaintiff and Colorado State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

872.   The Mitsubishi Defendants' warranties formed the basis of the bargain that was reached when the Colorado Plaintiff and Colorado State Class members unknowingly purchased or leased Mitsubishi Class Vehicles that came equipped with the ACU defect.

873.   The Mitsubishi Defendants' warranties formed the basis of the bargain that was reached when the Colorado Plaintiff and Colorado State Class members unknowingly purchased or leased Mitsubishi Class Vehicles that came equipped with a defective ACU.

874.   However, the Mitsubishi Defendants knew or should have known that the warranties were false and/or misleading. Specifically, the Mitsubishi Defendants were aware of the ACU defect in the Mitsubishi Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to the Colorado Plaintiff and Colorado State Class members.

875.   The Colorado Plaintiff and Colorado State Class members reasonably relied on the Mitsubishi Defendants' express warranties when purchasing or leasing their Mitsubishi Class Vehicles.

876.   The Mitsubishi Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the ACU defect or replace the defective ACUs in the Mitsubishi Class Vehicles. The Mitsubishi Defendants also breached their express warranties by providing a

product containing defects that were never disclosed to the Colorado Plaintiff and Colorado State Class members.

877.   The Colorado Plaintiff and Colorado State Class members have provided the Mitsubishi Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of the numerous NHTSA complaints filed against them, and the individual notice letters sent by Colorado State Class members within a reasonable amount of time after the ACU defect became public. Additionally, a notice letter was sent on behalf of the Colorado Plaintiff and Colorado State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

878.   Alternatively, any opportunity to cure the breach is unnecessary and futile.

879.   As a direct and proximate result of the Mitsubishi Defendants' breach of their express warranties, the Colorado Plaintiff and Colorado State Class members have been damaged in an amount to be proven at trial.

### b.  Colorado Count 2: Breach of Implied Warranty of Merchantability (Colo. Rev. Stat. §§ 4-2-314 and 4-2.5-212) Against the Mitsubishi Defendants

880.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

881.   The Colorado Plaintiff brings this count individually and on behalf of members of the Colorado State Class who purchased or leased Mitsubishi Class Vehicles, against the Mitsubishi Defendants.

882.   A warranty that the Mitsubishi Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Colo. Rev. Stat. §§ 4-2-314 and 4-2.5-212.

883.   The Mitsubishi Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Mitsubishi Class Vehicles suffer from the ACU defect, which may cause the airbags and seatbelt pretensioners to fail to deploy during an accident, rendering the Mitsubishi Class Vehicles inherently defective and dangerous.

884.    The Mitsubishi Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and "sellers" of motor vehicles under § 4-2-103(1)(d).

885.    With respect to leases, the Mitsubishi Defendants are and were at all relevant times "lessors" of motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

886.    All Colorado State Class members who purchased Mitsubishi Class Vehicles in Colorado are "buyers" within the meaning of Colo. Rev. Stat. § 4-2-103(1)(a).

887.    All Colorado State Class members who leased Mitsubishi Class Vehicles in Colorado are "lessees" within the meaning of Colo. Rev. Stat. § 4-2.5-103(1)(p).

888.    The Mitsubishi Class Vehicles are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

889.    The Colorado Plaintiff and Colorado State Class members have provided the Mitsubishi Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of the numerous NHTSA complaints filed against them, and the individual notice letters sent by Colorado State Class members within a reasonable amount of time after the ACU defect became public. Additionally, a notice letter was sent on behalf of the Colorado Plaintiff and Colorado State Class members to FCA US LLC, Honda Defendants,

Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

890.   Alternatively, any opportunity to cure the breach is unnecessary and futile.

891.   As a direct and proximate result of the Mitsubishi Defendants' breach of the implied warranty of merchantability, the Colorado Plaintiff and Colorado State Class members have been damaged in an amount to be proven at trial.

### c.   Colorado Count 3: Violation of the Colorado Consumer Protection Act (Colo. Rev. Stat. § 6-1-101, *et seq.*) Against the Mitsubishi Defendants

892.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

893.   The Colorado Plaintiff brings this count individually and on behalf of members of the Colorado State Class who purchased or leased Mitsubishi Class Vehicles, against the Mitsubishi Defendants.

894.   The Mitsubishi Defendants, the Colorado Plaintiff, and Colorado State Class members are "persons" within the meaning of Colo. Rev. Stat. § 6-1-102(6).

895.   The Colorado Consumer Protection Act ("Colorado CPA") prohibits unfair, unconscionable, and deceptive acts or practices in the course of the person's business, vocation, or occupation. Colo. Rev. Stat. § 6-1-105.

896.   In the course of their business, the Mitsubishi Defendants, through their agents, employees, and/or subsidiaries, violated the Colorado CPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Mitsubishi Class Vehicles and/or the defective ACUs, as detailed above.

897.   Specifically, by misrepresenting the Mitsubishi Class Vehicles and/or the defective ACUs installed in them as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Mitsubishi Class Vehicles and/or the ACU defect, the Mitsubishi Defendants engaged in one or more of the following unfair or deceptive business practices prohibited by Colo. Rev. Stat. § 6-1-105:

  a.   Representing that the Mitsubishi Class Vehicles and/or the defective ACUs installed in them have characteristics, uses, benefits, and qualities which they do not have;

  b.   Making false representations about the approval or certification of the Mitsubishi Class Vehicles and/or the defective ACUs installed in them;

c.      Making false representations regarding the characteristics, uses, and benefits of the Mitsubishi Class Vehicles and/or the defective ACUs installed in them;

d.      Representing that the Mitsubishi Class Vehicles and/or the defective ACUs installed in them are of a particular standard, quality, and grade when they are not;

e.      Advertising the Mitsubishi Class Vehicles and/or the defective ACUs installed in them with the intent not to sell or lease them as advertised;

f.      Engaging in the other unconscionable, false, misleading, or deceptive acts or practices pertaining to the Mitsubishi Class Vehicles and/or the defective ACUs installed in them alleged above.

Colo. Rev. Stat. §§ 6-1-105(1)(b), (e), (g), (i), , and (3).

898.   The Mitsubishi Defendants' unfair or deceptive acts or practices, including their misrepresentations, concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Colorado Plaintiff and Colorado State Class members, about the true safety and reliability of Mitsubishi Class Vehicles and/or the defective ACUs

installed in them, the quality of the Mitsubishi Class Vehicles, and the true value of

the Mitsubishi Class Vehicles.

899.   The Mitsubishi Defendants' scheme and concealment of the ACU

defect and true characteristics of the Occupant Restraint Systems in the Mitsubishi

Class Vehicles were material to the Colorado Plaintiff and Colorado State Class

members, as the Mitsubishi Defendants intended. Had they known the truth, the

Colorado Plaintiff and Colorado State Class members would not have purchased or

leased the Mitsubishi Class Vehicles, or would have paid significantly less for

them.

900.   The Colorado Plaintiff and Colorado State Class members had no way

of discerning that the Mitsubishi Defendants' representations were false and

misleading, or otherwise learning the facts that the Mitsubishi Defendants had

concealed or failed to disclose. The Colorado Plaintiff and Colorado State Class

members did not, and could not, unravel the Mitsubishi Defendants' deception on

their own.

901.   The Mitsubishi Defendants had an ongoing duty to the Colorado

Plaintiff and Colorado State Class members to refrain from unfair or deceptive

practices under the Colorado DTPA in the course of their business. Specifically,

the Mitsubishi Defendants owed the Colorado Plaintiff and Colorado State Class

members a duty to disclose all the material facts concerning the ACU defect in the

Mitsubishi Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the ACU defect from the Colorado Plaintiff and Colorado State Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

902.    The Colorado Plaintiff and Colorado State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the Mitsubishi Defendants' concealment, misrepresentations, and/or failure to disclose material information.

903.    The Mitsubishi Defendants' violations present a continuing risk to the Colorado Plaintiff and Colorado State Class members, as well as to the general public. The Mitsubishi Defendants' unlawful acts and practices complained of herein affect the public interest.

904.    Pursuant to Colo. Rev. Stat. § 6-1-113, the Colorado Plaintiff and the Colorado State Class members seek an order enjoining Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Colorado CPA.

d.    **Colorado Count 4: Violation of the Colorado Consumer Protection Act (Colo. Rev. Stat. § 6-1-101, *et seq.*) Against the ZF TRW and STMicro Defendants**

905.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

906.    The Colorado Plaintiff brings this count individually and on behalf of members of the Colorado State Class against the ZF TRW and STMicro Defendants.

907.    The ZF TRW Defendants, the STMicro Defendants, the Colorado Plaintiff, and Colorado State Class members are "persons" within the meaning of Colo. Rev. Stat. § 6-1-102(6).

908.    The Colorado Consumer Protection Act ("Colorado CPA") prohibits unfair, unconscionable, and deceptive acts or practices in the course of the person's business, vocation, or occupation. Colo. Rev. Stat. § 6-1-105.

909.    In the course of their business, the ZF TRW and STMicro Defendants, through their agents, employees, and/or subsidiaries, violated the Colorado CPA by knowingly and intentionally omitting, concealing, and failing to disclose material facts regarding the existence, nature, and scope of the defect with ZF TRW ACUs installed in the Class Vehicles, as detailed above.

910.   Specifically, by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles due to the ACU defect, the ZF TRW and STMicro Defendants engaged in deceptive trade practices prohibited by Colo. Rev. Stat. § 6-1-105, including failing to disclose material information.

911.   The ZF TRW and STMicro Defendants' unfair or deceptive acts or practices, including their concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Colorado Plaintiff and Colorado State Class members, about the true safety and reliability of Class Vehicles and/or the defective ACUs installed in them.

912.   The ZF TRW and STMicro Defendants' scheme and concealment of the ACU defect and true characteristics of the defective ACUs in the Class Vehicles were material to the Colorado Plaintiff and Colorado State Class members, as the ZF TRW and STMicro Defendants intended. Had they known the truth, the Colorado Plaintiff and Colorado State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

913.   The Colorado Plaintiff and Colorado State Class members had no way of learning the facts that the ZF TRW and STMicro Defendants had concealed or

failed to disclose. The Colorado Plaintiff and Colorado State Class members did not, and could not, unravel the ZF TRW and STMicro Defendants' deception on their own.

914.   The ZF TRW and STMicro Defendants had an ongoing duty to the Colorado Plaintiff and Colorado State Class members to refrain from unfair or deceptive practices under the Colorado DTPA in the course of their business. Specifically, the ZF TRW and STMicro Defendants owed the Colorado Plaintiff and Colorado State Class members a duty to disclose all the material facts concerning the ACU defect in the Class Vehicles because they possessed exclusive knowledge and they intentionally concealed the ACU defect from the Colorado Plaintiff and Colorado State Class members.

915.   The Colorado Plaintiff and Colorado State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the ZF TRW and STMicro Defendants' concealment and/or failure to disclose material information.

916.   The ZF TRW and STMicro Defendants' violations present a continuing risk to the Colorado Plaintiff and Colorado State Class members, as well as to the general public. The ZF TRW and STMicro Defendants' unlawful acts and practices complained of herein affect the public interest.

917.    Pursuant to Colo. Rev. Stat. § 6-1-113, the Colorado Plaintiff and Colorado State Class members seek an order enjoining the ZF TRW and STMicro Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Colorado CPA.

### iv.    Connecticut

#### a.    Connecticut Count 1: Breach of Express Warranty (Conn. Gen. Stat. Ann. §§ 42A-2-313 and 42a-2A-503) Against the Honda Defendants

918.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

919.    Plaintiff Paul Huitzil (hereinafter, "Connecticut Plaintiff") brings this count individually and on behalf of members of the Connecticut State Class who purchased or leased Honda Class Vehicles, against the Honda Defendants.

920.    The Honda Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Conn. Gen. Stat. Ann. §§ 42a-2-104(1) and 42a-2-103(2), and "sellers" of motor vehicles under § 42a-2-103(1)(c).

921.    With respect to leases, the Honda Defendants are and were at all relevant times "lessors" of motor vehicles under Conn. Gen. Stat. Ann. § 42a-2A-102(a)(23).

922.   All Connecticut State Class members who purchased Honda Class Vehicles in Connecticut are "buyers" within the meaning of Conn. Gen. Stat. Ann. § 42a-2-103(1)(a).

923.   All Connecticut State Class members who leased Honda Class Vehicles in Connecticut are "lessees" within the meaning of Conn. Gen. Stat. Ann. § 42a-2A-102(a)(21).

924.   The Honda Class Vehicles are and were at all relevant times "goods" within the meaning of Conn. Gen. Stat. Ann. §§ 42a-2-105(1) and 42a-2-103(2).

925.   In connection with the purchase or lease of Honda Class Vehicles, the Honda Defendants provided the Connecticut Plaintiff and Connecticut State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

926.   The Honda Defendants' warranties formed the basis of the bargain that was reached when the Connecticut Plaintiff and Connecticut State Class members unknowingly purchased or leased Honda Class Vehicles that came equipped with the ACU defect.

927.   The Honda Defendants' warranties formed the basis of the bargain that was reached when the Connecticut Plaintiff and Connecticut State Class members unknowingly purchased or leased Honda Class Vehicles that came equipped with a defective ACU.

928.   However, the Honda Defendants knew or should have known that the warranties were false and/or misleading. Specifically, the Honda Defendants were aware of the ACU defect in the Honda Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to the Connecticut Plaintiff and Connecticut State Class members.

929.   The Connecticut Plaintiff and Connecticut State Class members reasonably relied on the Honda Defendants' express warranties when purchasing or leasing their Honda Class Vehicles.

930.   The Honda Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the ACU defect or replace the defective ACUs in the Honda Class Vehicles. The Honda Defendants also breached their express warranties by providing a product containing defects that were never disclosed to the Connecticut Plaintiff and Connecticut State Class members.

931.   The Connecticut Plaintiff and Connecticut State Class members have provided the Honda Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of the numerous NHTSA complaints filed against them, and individual notice letters sent by the Connecticut State Class members within a reasonable amount of time after the ACU defect became public. Additionally, a notice letter was sent on behalf of the Connecticut Plaintiff and

Connecticut State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

932.    Alternatively, any opportunity to cure the breach is unnecessary and futile.

933.    As a direct and proximate result of the Honda Defendants' breach of their express warranties, the Connecticut Plaintiff and Connecticut State Class members have been damaged in an amount to be proven at trial.

> **b.    Connecticut Count 2: Breach of Implied Warranty of Merchantability (Conn. Gen. Stat. Ann. §§ 42a-2-314 and § 42a-2a-504) Against the Honda Defendants**

934.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

935.    The Connecticut Plaintiff brings this count individually and on behalf of members of the Connecticut State Class who purchased or leased Honda Class Vehicles, against the Honda Defendants.

936.    A warranty that the Honda Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Conn. Gen. Stat. Ann. §§ 42A-2-314 and § 42a-2a-504.

937.   The Honda Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Honda Class Vehicles suffer from the ACU defect, which may cause the airbags and seatbelt pretensioners to fail to deploy during an accident, rendering the Honda Class Vehicles inherently defective and dangerous.

938.   The Honda Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Conn. Gen. Stat. Ann. §§ 42a-2-104(1) and 42a-2-103(2), and "sellers" of motor vehicles under § 42a-2-103(1)(c).

939.   With respect to leases, the Honda Defendants are and were at all relevant times "lessors" of motor vehicles under Conn. Gen. Stat. Ann. § 42a-2A-102(a)(23).

940.   All Connecticut State Class members who purchased Honda Class Vehicles in Connecticut are "buyers" within the meaning of Conn. Gen. Stat. Ann. § 42a-2-103(1)(a).

941.   All Connecticut State Class members who leased Honda Class Vehicles in Connecticut are "lessees" within the meaning of Conn. Gen. Stat. Ann. § 42a-2A-102(a)(21).

942.   The Honda Class Vehicles are and were at all relevant times "goods" within the meaning of Conn. Gen. Stat. Ann. §§ 42a-2-105(1) and 42a-2-103(2).

943.   The Connecticut Plaintiff and Connecticut State Class members have provided the Honda Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of the numerous NHTSA complaints filed against them, and individual notice letters sent by the Connecticut State Class members within a reasonable amount of time after the ACU defect became public. Additionally, a notice letter was sent on behalf of the Connecticut Plaintiff and Connecticut State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

944.   Alternatively, any opportunity to cure the breach is unnecessary and futile.

945.   As a direct and proximate result of the Honda Defendants' breach of the implied warranty of merchantability, the Connecticut Plaintiff and Connecticut State Class members have been damaged in an amount to be proven at trial.

c.    **Connecticut Count 3: Violation of the Connecticut Unlawful Trade Practices Act (Conn. Gen. Stat. Ann. § 42-110a, *et seq.*) Against the Honda Defendants**

946.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

947.    The Connecticut Plaintiff brings this count individually and on behalf of members of the Connecticut State Class who purchased or leased Honda Class Vehicles, against the Honda Defendants.

948.    The Honda Defendants, the Connecticut Plaintiff, and Connecticut State Class members are "persons" within the meaning of Conn. Gen. Stat. Ann. § 42-110a(3).

949.    The Honda Defendants were and are engaged in "trade" or "commerce" within the meaning of Conn. Gen. Stat. Ann. § 42-110a(4).

950.    The Connecticut Unfair Trade Practices Act ("Connecticut UTPA") prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. Ann. § 42-110b(a).

951.    In the course of their business, the Honda Defendants, through their agents, employees, and/or subsidiaries, violated the Connecticut UTPA knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose

material facts regarding the reliability, safety, and performance of the Honda Class

Vehicles and/or the defective ACUs, as detailed above.

952.   Specifically, by misrepresenting the Honda Class Vehicles and/or the

defective ACUs installed in them as safe and/or free from defects, and by failing to

disclose and actively concealing the dangers and risk posed by the Honda Class

Vehicles and/or the ACU defect, the Honda Defendants engaged in unfair methods

of competition and unfair or deceptive acts or practices in the conduct of trade or

commerce, as prohibited by Conn. Gen. Stat. § 42-110b(a).

953.   The Honda Defendants' unfair or deceptive acts or practices,

including misrepresentations, concealments, omissions, and suppressions of

material facts, had a tendency or capacity to mislead and create a false impression

in consumers, and were likely to and did in fact deceive reasonable consumers,

including the Connecticut Plaintiff and Connecticut State Class members, about the

true safety and reliability of Honda Class Vehicles and/or the defective ACUs

installed in them, the quality of the Honda Class Vehicles, and the true value of the

Honda Class Vehicles.

954.   The Honda Defendants' scheme and concealment of the ACU defect

and true characteristics of the Occupant Restraint Systems in the Honda Class

Vehicles were material to the Connecticut Plaintiff and Connecticut State Class

members, as the Honda Defendants intended. Had they known the truth, the

Connecticut Plaintiff and Connecticut State Class members would not have purchased or leased the Honda Class Vehicles, or would have paid significantly less for them.

955.   The Connecticut Plaintiff and Connecticut State Class members had no way of discerning that the Honda Defendants' representations were false and misleading, or otherwise learning the facts that the Honda Defendants had concealed or failed to disclose. The Connecticut Plaintiff and Connecticut State Class members did not, and could not, unravel the Honda Defendants' deception on their own.

956.   The Honda Defendants had an ongoing duty to the Connecticut Plaintiff and Connecticut State Class members to refrain from unfair or deceptive practices under the Connecticut UTPA in the course of their business. Specifically, the Honda Defendants owed the Connecticut Plaintiff and Connecticut State Class members a duty to disclose all the material facts concerning the ACU defect in the Honda Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the ACU defect from the Connecticut Plaintiff and the Connecticut State Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

957.   The Connecticut Plaintiff and Connecticut State Class members suffered ascertainable losses and actual damages as a direct and proximate result of

the Honda Defendants' concealment, misrepresentations, and/or failure to disclose material information.

958.   The Honda Defendants' violations present a continuing risk to the Connecticut Plaintiff and Connecticut State Class members, as well as to the general public. The Honda Defendants' unlawful acts and practices complained of herein affect the public interest.

959.   Pursuant to Conn. Gen. Stat. Ann. § 42-110g, the Connecticut Plaintiff and Connecticut State Class members seek an order enjoining the Honda Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Connecticut UTPA.

### d. Connecticut Count 4: Violation of the Connecticut Unlawful Trade Practices Act (Conn. Gen. Stat. Ann. § 42-110a, *et seq.*) Against the ZF TRW and STMicro Defendants

960.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

961.   The Connecticut Plaintiff brings this count individually and on behalf of members of the Connecticut State Class against the ZF TRW and STMicro Defendants.

962.    The ZF TRW Defendants, the STMicro Defendants, the Connecticut Plaintiff, and Connecticut State Class members are "persons" within the meaning of Conn. Gen. Stat. Ann. § 42-110a(3).

963.    The ZF TRW and STMicro Defendants were and are engaged in "trade" or "commerce" within the meaning of Conn. Gen. Stat. Ann. § 42-110a(4).

964.    The Connecticut Unfair Trade Practices Act ("Connecticut UTPA") prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. Ann. § 42-110b(a).

965.    In the course of their business the ZF TRW and STMicro Defendants, through their agents, employees, and/or subsidiaries, violated the Connecticut UTPA knowingly and intentionally omitting, concealing, and failing to disclose material facts regarding the existence, nature, and scope of the defect with ZF TRW ACUs installed in the Class Vehicles, as detailed above.

966.    Specifically, by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles due to the ACU defect, the ZF TRW and STMicro Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce prohibited by Conn. Gen. Stat. § 42-110b.

967.    The ZF TRW and STMicro Defendants' unfair or deceptive acts or practices, including concealments, omissions, and suppressions of material facts,

had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Connecticut Plaintiff and Connecticut State Class members, about the true safety and reliability of Class Vehicles and/or the defective ACUs installed in them.

968.    The ZF TRW and STMicro Defendants' scheme and concealment of the ACU defect and true characteristics of the defective ACUs in the Class Vehicles were material to the Connecticut Plaintiff and Connecticut State Class members, as the ZF TRW and STMicro Defendants intended. Had they known the truth, the Connecticut Plaintiff and Connecticut State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

969.    The Connecticut Plaintiff and Connecticut State Class members had no way of learning the facts that the ZF TRW and STMicro Defendants had concealed or failed to disclose. The Connecticut Plaintiff and Connecticut State Class members did not, and could not, unravel the ZF TRW and STMicro Defendants' deception on their own.

970.    The ZF TRW and STMicro Defendants had an ongoing duty to the Connecticut Plaintiff and Connecticut State Class members to refrain from unfair or deceptive practices under the Connecticut UTPA in the course of their business. Specifically, the ZF TRW and STMicro Defendants owed the Connecticut Plaintiff

and Connecticut State Class members a duty to disclose all the material facts concerning the ACU defect in the Class Vehicles because they possessed exclusive knowledge and they intentionally concealed the ACU defect from the Connecticut Plaintiff and the Connecticut State Class members.

971.    The Connecticut Plaintiff and Connecticut State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the ZF TRW and STMicro Defendants' concealment and/or failure to disclose material information.

972.    The ZF TRW and STMicro Defendants' violations present a continuing risk to the Connecticut Plaintiff and Connecticut State Class members, as well as to the general public. The ZF TRW and STMicro Defendants' unlawful acts and practices complained of herein affect the public interest.

973.    Pursuant to Conn. Gen. Stat. Ann. § 42-110g, the Connecticut Plaintiff and Connecticut State Class members seek an order enjoining the ZF TRW and STMicro Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Connecticut UTPA.

v.      **Florida**

a.      **Florida Count 1: Breach of Express Warranty (Fla. Stat. §§ 672.313 and 680.21) Against the Kia and Toyota Defendants**

974.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

975.   Plaintiffs John Colbert and Lawrence Graziano bring this count individually and on behalf of members of the Florida State Class who purchased or leased Kia Class Vehicles, against the Kia Defendants.

976.   Plaintiffs Tatiana Gales and Dorothy Cooks bring this count individually and on behalf of members of the Florida State Class who purchased or leased Toyota Class Vehicles, against the Toyota Defendants.

977.   For purposes of the count, Plaintiffs Colbert, Graziano, Gales, and Cooks shall be referred to as the "Florida Plaintiffs."

978.   The Kia and Toyota Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Fla. Stat. §§ 672.104(1) and 680.1031(3)(k), and "sellers" of motor vehicles under § 672.103(1)(d).

979.   With respect to leases, the Kia and Toyota Defendants are and were at all relevant times "lessors" of motor vehicles under Fla. Stat. § 680.1031(1)(p).

980.   All Florida State Class members who purchased Class Vehicles (for purposes of this count, "Class Vehicles" are limited to the Kia and Toyota Class Vehicles) in Florida are "buyers" within the meaning of Fla. Stat. §§ 672.103(1)(a).

981.   All Florida State Class members who leased Class Vehicles in Florida are "lessees" within the meaning of Fla. Stat. § 680.1031(1)(n).

982.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. §§ 672.105(1) and 680.1031(1)(h).

983.   In connection with the purchase or lease of Class Vehicles, the Kia and Toyota Defendants provided the Florida Plaintiffs and Florida State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

984.   The Kia and Toyota Defendants' warranties formed the basis of the bargain that was reached when the Florida Plaintiffs and Florida State Class members unknowingly purchased or leased Class Vehicles that came equipped with a defective ACU.

985.   The Kia and Toyota Defendants' warranties formed the basis of the bargain that was reached when the Florida Plaintiffs and Florida State Class members unknowingly purchased or leased Class Vehicles that came equipped with a defective ACU.

986.    However, the Kia and Toyota Defendants knew or should have known that the warranties were false and/or misleading. Specifically, the Kia and Toyota Defendants were aware of the ACU defect in the Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to the Florida Plaintiffs and Florida State Class members.

987.    The Florida Plaintiffs and Florida State Class members reasonably relied on the Kia and Toyota Defendants' express warranties when purchasing or leasing their Class Vehicles.

988.    The Kia and Toyota Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the ACU defect or replace the defective ACUs in the Class Vehicles. The Kia and Toyota Defendants also breached their express warranties by providing a product containing defects that were never disclosed to the Florida Plaintiffs and Florida State Class members.

989.    The Florida Plaintiffs and Florida State Class members have provided the Kia and Toyota Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of the numerous NHTSA complaints filed against them, and individual notice letters sent by the Florida State Class members within a reasonable amount of time after the ACU defect became public. Additionally, a notice letter was sent on behalf of the Florida Plaintiffs and Florida

State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

990.    Alternatively, any opportunity to cure the breach is unnecessary and futile.

991.    As a direct and proximate result of the Kia and Toyota Defendants' breach of their express warranties, the Florida Plaintiffs and Florida State Class members have been damaged in an amount to be proven at trial.

### b.    Florida Count 2: Breach of Implied Warranty of Merchantability (Fla. Stat. §§ 672.314 and 680.212) Against the Kia and Toyota Defendants

992.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

993.    Plaintiffs John Colbert and Lawrence Graziano bring this count individually and on behalf of members of the Florida State Class who purchased or leased Kia Class Vehicles, against the Kia Defendants.

994.    Plaintiffs Tatiana Gales and Dorothy Cooks bring this count individually and on behalf of members of the Florida State Class who purchased or leased Toyota Class Vehicles, against the Toyota Defendants.

995.    For purposes of the count, Plaintiffs Colbert, Graziano, Gales, and Cooks shall be referred to as the "Florida Plaintiffs."

996.    A warranty that the Class Vehicles (for purposes of this count, "Class Vehicles" are limited to the Kia and Toyota Class Vehicles) were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Fla. Stat. §§ 672.314 and 680.212.

997.    The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the ACU defect, which may cause the airbags and seatbelt pretensioners to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

998.    The Kia and Toyota Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Fla. Stat. §§ 672.104(1) and 680.1031(3)(k), and "sellers" of motor vehicles under § 672.103(1)(d).

999.    With respect to leases, the Kia and Toyota Defendants are and were at all relevant times "lessors" of motor vehicles under Fla. Stat. § 680.1031(1)(p).

1000. All Florida State Class members who purchased Class Vehicles in Florida are "buyers" within the meaning of Fla. Stat. §§ 672.103(1)(a).

1001. All Florida State Class members who leased Class Vehicles in Florida are "lessees" within the meaning of Fla. Stat. § 680.1031(1)(n).

1002. The Class Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. §§ 672.105(1) and 680.1031(1)(h).

1003. The Florida Plaintiffs and Florida State Class members have provided the Kia and Toyota Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of the numerous NHTSA complaints filed against them, and individual notice letters sent by the Florida State Class members within a reasonable amount of time after the ACU defect became public. Additionally, a notice letter was sent on behalf of the Florida Plaintiffs and Florida State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

1004. As a direct and proximate result of the Kia and Toyota Defendants' breach of the implied warranty of merchantability, the Florida Plaintiffs and Florida State Class members have been damaged in an amount to be proven at trial.

c.      **Florida Count 3: Violation of the Florida Deceptive & Unfair Trade Practices Act (Fla. Stat. § 501.201, *et seq.*) Against the Kia and Toyota Defendants, and Hyundai MOBIS**

1005. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1006. Plaintiffs John Colbert and Lawrence Graziano bring this count individually and on behalf of members of the Florida State Class who purchased or leased Kia Class Vehicles, against the Kia Defendants and Hyundai MOBIS.

1007. Plaintiffs Tatiana Gales and Dorothy Cooks bring this count individually and on behalf of members of the Florida State Class who purchased or leased Toyota Class Vehicles, against the Toyota Defendants.

1008. For purposes of the count, Plaintiffs Colbert, Graziano, Gales, and Cooks shall be referred to as the "Florida Plaintiffs."

1009. The Florida Plaintiffs and Florida State Class members are "consumers" within the meaning of Fla. Stat. § 501.203(7).

1010. The Kia and Toyota Defendants, and Hyundai MOBIS were and are engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

1011. The Florida Unfair and Deceptive Trade Practices Act ("Florida UDTPA") prohibits "[u]nfair methods of competition, unconscionable acts or

practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

1012. In the course of their business, the Kia and Toyota Defendants, and Hyundai MOBIS, through their agents, employees, and/or subsidiaries, violated the Florida UDTPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Class Vehicles (for purposes of this count, "Class Vehicles" are limited to the Kia and Toyota Class Vehicles) or the defective ACUs, as detailed above.

1013. Specifically, by misrepresenting the Class Vehicles and/or the defective ACUs installed in them as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles and/or the ACU defect, the Kia and Toyota Defendants, and Hyundai MOBIS engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce, as prohibited by Fla. Stat. § 501.204(1).

1014. The Kia and Toyota Defendants, and Hyundai MOBIS's unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive

reasonable consumers, including the Florida Plaintiffs and Florida State Class members, about the true safety and reliability of Class Vehicles and/or the defective ACUs installed in them, the quality of the Class Vehicles, and the true value of the Class Vehicles.

1015. The Kia and Toyota Defendants, and Hyundai MOBIS's scheme and concealment of the ACU defect and true characteristics of the Occupant Restraint Systems in the Class Vehicles were material to the Florida Plaintiffs and Florida State Class members, as the Kia and Toyota Defendants, and Hyundai MOBIS intended. Had they known the truth, the Florida Plaintiffs and Florida State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1016. The Florida Plaintiffs and Florida State Class members had no way of discerning that the Kia and Toyota Defendants' representations were false and misleading and/or otherwise learning the facts that the Kia and Toyota Defendants, and Hyundai MOBIS had concealed or failed to disclose. The Florida Plaintiffs and Florida State Class members did not, and could not, unravel the Kia and Toyota Defendants, and Hyundai MOBIS's deception on their own.

1017. The Kia and Toyota Defendants, and Hyundai MOBIS had an ongoing duty to the Florida Plaintiffs and Florida State Class members to refrain from unfair or deceptive practices under the Florida UDTPA in the course of their

business. Specifically, the Kia and Toyota Defendants, and Hyundai MOBIS owed the Florida Plaintiffs and Florida State Class members a duty to disclose all the material facts concerning the ACU defect in the Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the ACU defect from the Florida Plaintiffs and Florida State Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1018. The Florida Plaintiffs and Florida State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the Kia and Toyota Defendants, and Hyundai MOBIS's concealment, misrepresentations, and/or failure to disclose material information.

1019. The Kia and Toyota Defendants, and Hyundai MOBIS's violations present a continuing risk to the Florida Plaintiffs and Florida State Class members, as well as to the general public. The Kia and Toyota Defendants, and Hyundai MOBIS's unlawful acts and practices complained of herein affect the public interest.

1020. Pursuant to Fla. Stat. § 501.211, the Florida Plaintiffs and Florida State Class members seek an order enjoining the Kia and Toyota Defendants, and Hyundai MOBIS's unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Florida UDTPA.

d.     **Florida Count 4: Violation of the Florida Deceptive & Unfair Trade Practices Act (Fla. Stat. § 501.201, *et seq.*) Against the ZF TRW and STMicro Defendants**

1021. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1022. Plaintiffs John Colbert, Lawrence Graziano, Tatiana Gales, and Dorothy Cooks bring this count individually and on behalf of members of the Florida State Class against the ZF TRW and STMicro Defendants.

1023. For purposes of the count, Plaintiffs Colbert, Graziano, Gales, and Cooks shall be referred to as the "Florida Plaintiffs."

1024. The Florida Plaintiffs and Florida State Class members are "consumers" within the meaning of Fla. Stat. § 501.203(7).

1025. The ZF TRW and STMicro Defendants were and are engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

1026. The Florida Unfair and Deceptive Trade Practices Act ("Florida UDTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

1027. In the course of their business the ZF TRW and STMicro Defendants, through their agents, employees, and/or subsidiaries, violated the Florida UDTPA

by knowingly and intentionally omitting, concealing, and failing to disclose material facts regarding the existence, nature, and scope of the defect with ZF TRW ACUs installed in the Class Vehicles, as detailed above.

1028. Specifically, by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles due to the ACU defect, the ZF TRW and STMicro Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of trade or commerce prohibited by Fla. Stat. § 501.204(1).

1029. The ZF TRW and STMicro Defendants' unfair or deceptive acts or practices, including concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Florida Plaintiffs and Florida State Class members, about the true safety and reliability of Class Vehicles and/or the defective ACUs installed in them.

1030. The ZF TRW and STMicro Defendants' scheme and concealment of the ACU defect and true characteristics of the defective ACUs in the Class Vehicles were material to the Florida Plaintiffs and Florida State Class members, as the ZF TRW and STMicro Defendants intended. Had they known the truth, the Florida Plaintiffs and Florida State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1031. The Florida Plaintiffs and Florida State Class members had no way of learning the facts that the ZF TRW and STMicro Defendants had concealed or failed to disclose. The Florida Plaintiffs and Florida State Class members did not, and could not, unravel the ZF TRW and STMicro Defendants' deception on their own.

1032. The ZF TRW and STMicro Defendants had an ongoing duty to the Florida Plaintiffs and Florida State Class members to refrain from unfair or deceptive practices under the Florida UDTPA in the course of their business. Specifically, the ZF TRW and STMicro Defendants owed the Florida Plaintiffs and Florida State Class members a duty to disclose all the material facts concerning the ACU defect in the Class Vehicles because they possessed exclusive knowledge and they intentionally concealed the ACU defect from the Florida Plaintiffs and Florida State Class members.

1033. The Florida Plaintiffs and Florida State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the ZF TRW and STMicro Defendants' concealment and/or failure to disclose material information.

1034. The ZF TRW and STMicro Defendants' violations present a continuing risk to the Florida Plaintiffs and Florida State Class members, as well as

to the general public. The ZF TRW and STMicro Defendants' unlawful acts and practices complained of herein affect the public interest.

1035. Pursuant to Fla. Stat. § 501.211, the Florida Plaintiffs and Florida State Class members seek an order enjoining the ZF TRW and STMicro Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Florida UDTPA.

### vi. Illinois

#### a. Illinois Count 1: Breach of Express Warranty (810 Ill. Comp. Stat. 5/2-313 and 5/2A-210) Against the Hyundai and Kia Defendants

1036. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1037. Plaintiff Ricky Gerischer brings this count individually and on behalf of members of the Illinois State Class who purchased or leased Hyundai Class Vehicles, against the Hyundai Defendants.

1038. Plaintiff Brian Collins brings this count individually and on behalf of members of the Illinois State Class who purchased or leased Kia Class Vehicles, against the Kia Defendants.

1039. For purposes of this count, Plaintiffs Gerischer and Collins shall be referred to as the "Illinois Plaintiffs."

1040. The Hyundai and Kia Defendants are and were at all relevant times "merchants" with respect to motor vehicles under 810 ILCS 5/2-104(1) and 5/2A-103(3), and "sellers" of motor vehicles under 5/2-103(1)(d).

1041. With respect to leases, the Hyundai and Kia Defendants are and were at all relevant times "lessors" of motor vehicles under 810 ILCS 5/2A-103(1)(p).

1042. All Illinois State Class members who purchased Class Vehicles (for purposes of this count, "Class Vehicles" are limited to the Hyundai and Kia Class Vehicles) in Illinois are "buyers" within the meaning of 810 ILCS 5/2-103(1)(a).

1043. All Illinois State Class members who leased Class Vehicles in Illinois "lessees" within the meaning of 810 ILCS 5/2A-103(1)(n).

1044. The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 ILCS 5/2-105(1) and 5/2A-103(1)(h).

1045. In connection with the purchase or lease of Class Vehicles, the Hyundai and Kia Defendants provided the Illinois Plaintiffs and Illinois State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

1046. The Hyundai and Kia Defendants' warranties formed the basis of the bargain that was reached when the Illinois Plaintiffs and Illinois State Class

members unknowingly purchased or leased Class Vehicles that came equipped with a defective ACU.

1047. The Hyundai and Kia Defendants' warranties formed the basis of the bargain that was reached when the Illinois Plaintiffs and Illinois State Class members unknowingly purchased or leased Class Vehicles that came equipped with a defective ACU. However, the Hyundai and Kia Defendants knew or should have known that the warranties were false and/or misleading. Specifically, the Hyundai and Kia Defendants were aware of the ACU defect in the Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to the Illinois Plaintiffs and Illinois State Class members.

1048. The Illinois Plaintiff and Illinois State Class members reasonably relied on the Hyundai and Kia Defendants' express warranties when purchasing or leasing their Class Vehicles.

1049. The Hyundai and Kia Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the ACU defect or replace the defective ACUs in the Class Vehicles. The Hyundai and Kia Defendants also breached their express warranties by providing a product containing defects that were never disclosed to the Illinois Plaintiff and Illinois State Class members

1050. The Illinois Plaintiffs and Illinois State Class members have provided the Hyundai and Kia Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of the numerous NHTSA complaints filed against them, and individual notice letters sent by the Illinois State Class members within a reasonable amount of time after the ACU defect became public. Additionally, a notice letter was sent on behalf of the Illinois Plaintiffs and Illinois State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

1051. Alternatively, any opportunity to cure the breach is unnecessary and futile.

1052. As a direct and proximate result of the Hyundai and Kia Defendants' breach of their express warranties, the Illinois Plaintiffs and Illinois State Class members have been damaged in an amount to be proven at trial.

### b. Illinois Count 2: Breach of Implied Warranty of Merchantability (810 Ill. Comp. Stat. 5/2-314 and 5/2A-212) Against the Hyundai and Kia Defendants

1053. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1054. Plaintiff Ricky Gerischer brings this count individually and on behalf of members of the Illinois State Class who purchased or leased Hyundai Class Vehicles, against the Hyundai Defendants.

1055. Plaintiff Brian Collins brings this count individually and on behalf of members of the Illinois State Class who purchased or leased Kia Class Vehicles, against the Kia Defendants.

1056. For purposes of this count, Plaintiffs Gerischer and Collins shall be referred to as the "Illinois Plaintiffs."

1057. A warranty that the Class Vehicles (for purposes of this count, "Class Vehicles" are limited to the Hyundai and Kia Class Vehicles) were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to 810 ILCS 5/2-314 and 5/2A-212.

1058. The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the ACU defect, may cause the airbags and seatbelt pretensioners to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

1059. The Hyundai and Kia Defendants are and were at all relevant times
"merchants" with respect to motor vehicles under 810 ILCS 5/2-104(1) and 5/2A-103(3), and "sellers" of motor vehicles under 5/2-103(1)(d).

1060. With respect to leases, the Hyundai and Kia Defendants are and were at all relevant times "lessors" of motor vehicles under 810 ILCS 5/2A-103(1)(p).

1061. All Illinois State Class members who purchased Class Vehicles in Illinois are "buyers" within the meaning of 810 ILCS 5/2-103(1)(a).

1062.  All Illinois State Class members who leased Class Vehicles in Illinois "lessees" within the meaning of 810 ILCS 5/2A-103(1)(n).

1063. The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 ILCS 5/2-105(1) and 5/2A-103(1)(h).

1064. The Illinois Plaintiffs and Illinois State Class members have provided the Hyundai and Kia Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of the numerous NHTSA complaints filed against them, and individual notice letters sent by the Illinois State Class members within a reasonable amount of time after the ACU defect became public. Additionally, a notice letter was sent on behalf of the Illinois Plaintiffs and Illinois State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota

Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

1065. Alternatively, any opportunity to cure the breach is unnecessary and futile.

1066. As a direct and proximate result of the Hyundai and Kia Defendants' breach of the implied warranty of merchantability, the Illinois Plaintiffs and Illinois State Class members have been damaged in an amount to be proven at trial.

  **c.**  **Illinois Count 3: Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 Ill. Comp. Stat. 505/1, *et seq.*) Against the Hyundai and Kia Defendants and Hyundai MOBIS**

1067. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1068. Plaintiff Ricky Gerischer brings this count individually and on behalf of members of the Illinois State Class who purchased or leased Hyundai Class Vehicles, against the Hyundai Defendants and Hyundai MOBIS.

1069. Plaintiff Brian Collins brings this count individually and on behalf of members of the Illinois State Class who purchased or leased Kia Class Vehicles, against the Kia Defendants and Hyundai MOBIS.

1070. For purposes of this count, Plaintiffs Gerischer and Collins shall be referred to as the "Illinois Plaintiffs."

1071. The Hyundai Defendants, the Kia Defendants, Hyundai MOBIS, the Illinois Plaintiffs, and Illinois State Class members are "persons" within the meaning of 815 ILCS 505/1(c).

1072. The Illinois Plaintiffs and Illinois State Class members are "consumers" within the meaning of 815 ILCS 505/1(e).

1073. The Class Vehicles (for purposes of this count, "Class Vehicles" are limited to the Hyundai and Kia Class Vehicles) and the ACUs installed in them are "merchandise" within the meaning of 815 ILCS 505/1(b).

1074. The Hyundai and Kia Defendants and Hyundai MOBIS were and are engaged in "trade" and "commerce" within the meaning of 815 ILCS 505/1(f).

1075. The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFDBPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices[.]" 815 ILCS 505/2.

1076. In the course of their business, the Hyundai and Kia Defendants and Hyundai MOBIS, through their agents, employees, and/or subsidiaries, violated the Illinois CFDBPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety,

and performance of the Class Vehicles and/or the defective ACUs, as detailed above.

1077. Specifically, by misrepresenting the Class Vehicles and/or the defective ACUs installed in them as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles and/or the ACU defect, the Hyundai and Kia Defendants and Hyundai MOBIS engaged in one or more of the following unfair or deceptive business practices prohibited by 815 ILCS 505/2 and 510/2:

    a.    Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

    b.    Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

    c.    Representing that the Class Vehicles are of a particular standard, quality, and grade when they are not;

    d.    Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

    e.    Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

    f.    Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression

or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

ILCS 505/2, 815 ILCS 510/2

1078. The Hyundai and Kia Defendants and Hyundai MOBIS's unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Illinois Plaintiffs and Illinois State Class members, about the true safety and reliability of Class Vehicles and/or the defective ACUs installed in them, the quality of the Class Vehicles, and the true value of the Class Vehicles.

1079. The Hyundai and Kia Defendants and Hyundai MOBIS's scheme and concealment of the ACU defect and true characteristics of the Occupant Restraint Systems in the Class Vehicles were material to the Illinois Plaintiffs and Illinois State Class members, as the Hyundai and Kia Defendants and Hyundai MOBIS intended. Had they known the truth, the Illinois Plaintiffs and Illinois State Class

members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1080. The Illinois Plaintiffs and Illinois State Class members had no way of discerning that the Hyundai and Kia Defendants' representations were false and misleading and/or otherwise learning the facts that the Hyundai and Kia Defendants and Hyundai MOBIS had concealed or failed to disclose. The Illinois Plaintiffs and Illinois State Class members did not, and could not, unravel the Hyundai and Kia Defendants and Hyundai MOBIS's deception on their own.

1081. The Hyundai and Kia Defendants and Hyundai MOBIS had an ongoing duty to the Illinois Plaintiffs and Illinois State Class members to refrain from unfair or deceptive practices under the Illinois CFDBPA in the course of their business. Specifically, the Hyundai and Kia Defendants and Hyundai MOBIS owed the Illinois Plaintiffs and Illinois State Class members a duty to disclose all the material facts concerning the ACU defect in the Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the ACU defect from the Illinois Plaintiffs and Illinois State Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1082. The Illinois Plaintiffs and Illinois State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the

Hyundai and Kia Defendants and Hyundai MOBIS's concealment, misrepresentations, and/or failure to disclose material information.

1083. The Hyundai and Kia Defendants and Hyundai MOBIS's violations present a continuing risk to the Illinois Plaintiffs and Illinois State Class members, as well as to the general public. The Hyundai and Kia Defendants and Hyundai MOBIS's unlawful acts and practices complained of herein affect the public interest.

1084. Pursuant to 815 ILCS 505/10a, the Illinois Plaintiffs and Illinois State Class members seek an order enjoining the Hyundai and Kia Defendants and Hyundai MOBIS's unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Illinois CFDBPA.

> **d.     Illinois Count 4: Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 Ill. Comp. Stat. 505/1, *et seq.*) Against the ZF TRW and STMicro Defendants**

1085. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1086. Plaintiffs Ricky Gerischer and Brian Collins bring this count individually and behalf of members of the Illinois State Class against the ZF TRW and STMicro Defendants.

1087. For purposes of this count, Plaintiffs Gerischer and Collins shall be referred to as the "Illinois Plaintiffs."

1088. The ZF TRW Defendants, the STMicro Defendants, the Illinois Plaintiffs, and Illinois State Class members are "persons" within the meaning of 815 ILCS 505/1(c).

1089. The Illinois Plaintiffs and Illinois State Class members are "consumers" within the meaning of 815 ILCS 505/1(e).

1090. The Class Vehicles and the ACUs installed in them are "merchandise" within the meaning of 815 ILCS 505/1(b).

1091. The ZF TRW and STMicro Defendants were and are engaged in "trade" and "commerce" within the meaning of 815 ILCS 505/1(f).

1092. The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFDBPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices[.]" 815 ILCS 505/2.

1093. In the course of their business the ZF TRW and STMicro Defendants, through their agents, employees, and/or subsidiaries, violated the Illinois CFDBPA by knowingly and intentionally omitting, concealing, and failing to disclose material facts regarding the existence, nature, and scope of the defect with ZF TRW ACUs installed in the Class Vehicles, as detailed above.

1094. Specifically, by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles due to the ACU defect, the ZF TRW and STMicro Defendants engaged in unfair or deceptive business practices prohibited by 815 ILCS 505/2, including the use or employment of deception and fraud, and/or the concealment, suppression or omission of material facts, and engaging in conduct which creates a likelihood of confusion or misunderstanding.

1095. The ZF TRW and STMicro Defendants' unfair or deceptive acts or practices, including concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Illinois Plaintiffs and Illinois State Class members, about the true safety and reliability of Class Vehicles and/or the defective ACUs installed in them.

1096. The ZF TRW and STMicro Defendants' scheme and concealment of the ACU defect and true characteristics of the defective ACUs in the Class Vehicles were material to the Illinois Plaintiffs and Illinois State Class members, as the ZF TRW and STMicro Defendants intended. Had they known the truth, the Illinois Plaintiffs and Illinois State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1097. The Illinois Plaintiffs and Illinois State Class members had no way of learning the facts that the ZF TRW and STMicro Defendants had concealed or

failed to disclose. The Illinois Plaintiffs and Illinois State Class members did not, and could not, unravel the ZF TRW and STMicro Defendants' deception on their own.

1098. The ZF TRW and STMicro Defendants had an ongoing duty to the Illinois Plaintiffs and Illinois State Class members to refrain from unfair or deceptive practices under the Illinois CFDBPA in the course of their business. Specifically, the ZF TRW and STMicro Defendants owed the Illinois Plaintiffs and Illinois State Class members a duty to disclose all the material facts concerning the ACU defect in the Class Vehicles because they possessed exclusive knowledge and they intentionally concealed the ACU defect from the Illinois Plaintiffs and Illinois State Class members.

1099. The Illinois Plaintiffs and Illinois State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the ZF TRW and STMicro Defendants' concealment and/or failure to disclose material information.

1100. The ZF TRW and STMicro Defendants' violations present a continuing risk to the Illinois Plaintiffs and Illinois State Class members, as well as to the general public. The ZF TRW and STMicro Defendants' unlawful acts and practices complained of herein affect the public interest.

1101. Pursuant to 815 ILCS 505/10a, the Illinois Plaintiffs and Illinois State Class members seek an order enjoining the ZF TRW and STMicro Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Illinois CFDBPA.

> **e.** **Illinois Count 5: Violation of the Illinois Uniform Deceptive Trade Practices Act (815 Ill. Comp. Stat. 510/1, *et seq.*) Against the Hyundai and Kia Defendants and Hyundai MOBIS**

1102. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1103. Plaintiff Ricky Gerischer brings this count individually and on behalf of members of the Illinois State Class who purchased or leased Hyundai Class Vehicles, against the Hyundai Defendants and Hyundai MOBIS.

1104. Plaintiff Brian Collins brings this count individually and on behalf of members of the Illinois State Class who purchased or leased Kia Class Vehicles, against the Kia Defendants and Hyundai MOBIS.

1105. For purposes of this count, Plaintiffs Gerischer and Collins shall be referred to as the "Illinois Plaintiffs."

1106. The Hyundai Defendants, the Kia Defendants, Hyundai MOBIS, the Illinois Plaintiffs, and Illinois State Class members are "persons" within the meaning of 815 ILCS 510/1(5).

1107. The Illinois Uniform Deceptive Trade Practices Act ("Illinois UDTPA") prohibits deceptive trade practices in the course of a business, vocation, or occupation. 815 ILCS 510/2(a).

1108. In the course of their business, the Hyundai and Kia Defendants and Hyundai MOBIS, through their agents, employees, and/or subsidiaries, violated the Illinois UDTPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Class Vehicles (for purposes of this count, "Class Vehicles" are limited to the Hyundai and Kia Class Vehicles) or the defective ACUs, as detailed above.

1109. Specifically, by misrepresenting the Class Vehicles and/or the defective ACUs installed in them as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles and/or the ACU defect, the Hyundai and Kia Defendants and Hyundai MOBIS engaged in one or more of the following unfair or deceptive business practices prohibited by 815 ILCS 510/2(a):

a.      Representing that the Class Vehicles and/or the defective ACUs installed in them have characteristics, uses, benefits, and qualities which they do not have;

b.      Representing that the Class Vehicles and/or the defective ACUs installed in them are of a particular standard, quality, and grade when they are not;

c.      Advertising the Class Vehicles and/or the defective ACUs installed in them with the intent not to sell or lease them as advertised; and

d.      engaging in other conduct which similarly creates a likelihood of confusion or misunderstanding.

815 ILCS 510/2(a)(5), (7), (9), and (12)

1110.   The Hyundai and Kia Defendants and Hyundai MOBIS's unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Illinois Plaintiffs and Illinois State Class members, about the true safety and reliability of Class Vehicles and/or the defective ACUs installed in them, the quality of the Class Vehicles, and the true value of the Class Vehicles.

1111. The Hyundai and Kia Defendants and Hyundai MOBIS's scheme and concealment of the ACU defect and true characteristics of the Occupant Restraint Systems in the Class Vehicles were material to the Illinois Plaintiffs and Illinois State Class members, as the Hyundai and Kia Defendants and Hyundai MOBIS intended. Had they known the truth, the Illinois Plaintiffs and Illinois State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1112. The Illinois Plaintiffs and Illinois State Class members had no way of discerning that the Hyundai and Kia Defendants' representations were false and misleading and/or otherwise learning the facts that the Hyundai and Kia Defendants and Hyundai MOBIS had concealed or failed to disclose. The Illinois Plaintiffs and Illinois State Class members did not, and could not, unravel the Hyundai and Kia Defendants and Hyundai MOBIS's deception on their own.

1113. The Hyundai and Kia Defendants and Hyundai MOBIS had an ongoing duty to the Illinois Plaintiffs and Illinois State Class members to refrain from unfair or deceptive practices under the Illinois UDTPA in the course of their business. Specifically, the Hyundai and Kia Defendants and Hyundai MOBIS owed the Illinois Plaintiffs and Illinois State Class members a duty to disclose all the material facts concerning the ACU defect in the Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the ACU defect from

the Illinois Plaintiffs and Illinois State Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1114. The Illinois Plaintiffs and Illinois State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the Hyundai and Kia Defendants and Hyundai MOBIS's concealment, misrepresentations, and/or failure to disclose material information.

1115. The Hyundai and Kia Defendants and Hyundai MOBIS's violations present a continuing risk to the Illinois Plaintiffs and Illinois State Class members, as well as to the general public. The Hyundai and Kia Defendants and Hyundai MOBIS's unlawful acts and practices complained of herein affect the public interest.

1116. Pursuant to 815 ILCS 510/3, the Illinois Plaintiffs and Illinois State Class members seek an order enjoining the Hyundai and Kia Defendants and Hyundai MOBIS's unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Illinois UDTPA.

**f.    Illinois Count 6: Violation of the Illinois Uniform Deceptive Trade Practices Act (815 Ill. Comp. Stat. 510/1, *et seq.*) Against the ZF TRW and STMicro Defendants**

1117. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1118. Plaintiffs Ricky Gerischer and Brian Collins bring this count individually and behalf of members of the Illinois State Class against the ZF TRW and STMicro Defendants.

1119. For purposes of this count, Plaintiffs Gerischer and Collins shall be referred to as the "Illinois Plaintiffs."

1120. The ZF TRW Defendants, the STMicro Defendants, the Illinois Plaintiffs, and Illinois State Class members are "persons" within the meaning of 815 ILCS 510/1(5).

1121. The Illinois Uniform Deceptive Trade Practices Act ("Illinois UDTPA") prohibits deceptive trade practices in the course of a business, vocation, or occupation. 815 ILCS 510/2(a).

1122. In the course of their business the ZF TRW and STMicro Defendants, through their agents, employees, and/or subsidiaries, violated the Illinois UDTPA by knowingly and intentionally omitting, concealing, and failing to disclose

material facts regarding the existence, nature, and scope of the defect with ZF TRW ACUs installed in the Class Vehicles, as detailed above.

1123. Specifically, by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles due to the ACU defect, the ZF TRW and STMicro Defendants engaged in unfair or deceptive business practices prohibited by 815 ILCS 510/2, including engaging in conduct which creates a likelihood of confusion or misunderstanding.

1124. The ZF TRW and STMicro Defendants' unfair or deceptive acts or practices, including concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Illinois Plaintiffs and Illinois State Class members, about the true safety and reliability of Class Vehicles and/or the defective ACUs installed in them.

1125. The ZF TRW and STMicro Defendants' scheme and concealment of the ACU defect and true characteristics of the defective ACUs in the Class Vehicles were material to the Illinois Plaintiffs and Illinois State Class members, as the ZF TRW and STMicro Defendants intended. Had they known the truth, the Illinois Plaintiffs and Illinois State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1126. The Illinois Plaintiffs and Illinois State Class members had no way of learning the facts that the ZF TRW and STMicro Defendants had concealed or failed to disclose. The Illinois Plaintiffs and Illinois State Class members did not, and could not, unravel the ZF TRW and STMicro Defendants' deception on their own.

1127. The ZF TRW and STMicro Defendants had an ongoing duty to the Illinois Plaintiffs and Illinois State Class members to refrain from unfair or deceptive practices under the Illinois UDTPA in the course of their business. Specifically, the ZF TRW and STMicro Defendants owed the Illinois Plaintiffs and Illinois State Class members a duty to disclose all the material facts concerning the ACU defect in the Class Vehicles because they possessed exclusive knowledge and they intentionally concealed the ACU defect from the Illinois Plaintiffs and Illinois State Class members.

1128. The Illinois Plaintiffs and Illinois State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the ZF TRW and STMicro Defendants' concealment and/or failure to disclose material information.

1129. The ZF TRW and STMicro Defendants' violations present a continuing risk to the Illinois Plaintiffs and Illinois State Class members, as well as

to the general public. The ZF TRW and STMicro Defendants' unlawful acts and practices complained of herein affect the public interest.

1130. Pursuant to 815 ILCS 510/3, the Illinois Plaintiffs and Illinois State Class members seek an order enjoining the ZF TRW and STMicro Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Illinois UDTPA.

### vii.   Indiana

#### a.    Indiana Count 1: Breach of Express Warranty (Ind. Code §§ 26-1-2-313 and 26-1-2.1-210) Against the Kia Defendants

1131. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1132. Plaintiff Carl Miller (hereinafter, "Indiana Plaintiff") brings this count individually and on behalf of members of the Indiana State Class who purchased or leased Kia Class Vehicles, against the Kia Defendants.

1133. The Kia Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Ind. Code §§ 26-1-2.1-103(3) and 26-1-2-104(1), and "sellers" of motor vehicles under § 26-1-2-103(1)(d).

1134. With respect to leases, the Kia Defendants are and were at all relevant times "lessors" of motor vehicles under Ind. Code § 26-1-2.1-103(1)(p).

1135. All Indiana State Class members who purchased Kia Class Vehicles in Indiana are "buyers" within the meaning of Ind. Code § 26-1-2-103(1)(a).

1136. All Indiana State Class members who leased Kia Class Vehicles in Indiana are "lessees" within the meaning of Ind. Code § 26-1-2.1-103(1)(n).

1137. The Kia Class Vehicles are and were at all relevant times "goods" within the meaning of Ind. Code §§ 26-1-2.1-103(1)(h) and 26-1-2-105(1).

1138. In connection with the purchase or lease of Kia Class Vehicles, the Kia Defendants provided the Indiana Plaintiff and Indiana State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

1139. The Kia Defendants' warranties formed the basis of the bargain that was reached when the Indiana Plaintiff and Indiana State Class members unknowingly purchased or leased Kia Class Vehicles that came equipped with a defective ACU.

1140. The Kia Defendants' warranties formed the basis of the bargain that was reached when the Indiana Plaintiff and Indiana State Class members unknowingly purchased or leased Kia Class Vehicles that came equipped with a defective ACU.

1141. However, the Kia Defendants knew or should have known that the warranties were false and/or misleading. Specifically, the Kia Defendants were

aware of the ACU defect in the Kia Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to the Indiana Plaintiff and Indiana State Class members.

1142. The Indiana Plaintiff and Indiana State Class members reasonably relied on the Kia Defendants' express warranties when purchasing or leasing their Kia Class Vehicles.

1143. The Kia Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the ACU defect or replace the defective ACUs in the Kia Class Vehicles. The Kia Defendants also breached their express warranties by providing a product containing defects that were never disclosed to the Indiana Plaintiff and Indiana State Class members.

1144. The Indiana Plaintiff and Indiana State Class members have provided the Kia Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of the numerous NHTSA complaints filed against them, and individual notice letters sent by the Indiana State Class members within a reasonable amount of time after the ACU defect became public. Additionally, on May 23, 2019, Indiana State Class members sent a notice letter pursuant to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, and ZF TRW Defendants. Moreover, a notice letter was sent on behalf of the Indiana Plaintiff and Indiana

State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

1145. Alternatively, any opportunity to cure the breach is unnecessary and futile.

1146. As a direct and proximate result of the Kia Defendants' breach of their express warranties, the Indiana Plaintiff and Indiana State Class members have been damaged in an amount to be proven at trial.

   **b.**  **Indiana Count 2: Breach of Implied Warranty of Merchantability (IND. CODE §§ 26-1-2-314 and 26-1-2.1-212) Against the Kia Defendants**

1147. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1148. The Indiana Plaintiff brings this count individually and on behalf of members of the Indiana State Class who purchased or leased Kia Class Vehicles, against the Kia Defendants.

1149. A warranty that the Kia Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Ind. Code §§ 26-1-2-314 and 26-1-2.1-212.

1150. The Kia Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Kia Class Vehicles suffer from the ACU defect, which may cause the airbags and seatbelt pretensioners to fail to deploy during an accident, rendering the Kia Class Vehicles inherently defective and dangerous.

1151. The Kia Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Ind. Code §§ 26-1-2.1-103(3) and 26-1-2-104(1), and "sellers" of motor vehicles under § 26-1-2-103(1)(d).

1152. With respect to leases, the Kia Defendants are and were at all relevant times "lessors" of motor vehicles under Ind. Code § 26-1-2.1-103(1)(p).

1153. All Indiana State Class members who purchased Kia Class Vehicles in Indiana are "buyers" within the meaning of Ind. Code § 26-1-2-103(1)(a).

1154. All Indiana State Class members who leased Kia Class Vehicles in Indiana are "lessees" within the meaning of Ind. Code § 26-1-2.1-103(1)(n).

1155. The Kia Class Vehicles are and were at all relevant times "goods" within the meaning of Ind. Code §§ 26-1-2.1-103(1)(h) and 26-1-2-105(1).

1156. The Indiana Plaintiff and Indiana State Class members have provided the Kia Defendants with reasonable notice and opportunity to cure the breaches of

their implied warranties by way of the numerous NHTSA complaints filed against them, and individual notice letters sent by Indiana State Class members within a reasonable amount of time after the ACU defect became public. Additionally, on May 23, 2019, Indiana State Class members sent a notice letter pursuant to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, and ZF TRW Defendants. Moreover, a notice letter was sent on behalf of the Indiana Plaintiff and Indiana State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

1157. As a direct and proximate result of the Kia Defendants' breach of the implied warranty of merchantability, the Indiana Plaintiff and Indiana State Class members have been damaged in an amount to be proven at trial.

### c.    Indiana Count 3: Violation of the Indiana Deceptive Consumer Sales Act (Ind. Code § 24-5-0.5-3, *et seq.*) Against the Kia Defendants and Hyundai MOBIS

1158. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1159. The Indiana Plaintiff brings this count individually and on behalf of members of the Indiana State Class who purchased or leased Kia Class Vehicles, against the Kia Defendants and Hyundai MOBIS.

1160. The Kia Defendants and Hyundai MOBIS are "suppliers" within the meaning of Ind. Code § 24-5-0.5-2(a)(3).

1161. The Kia Defendants, Hyundai MOBIS, the Indiana Plaintiff, and the Indiana State Class members are "persons" within the meaning of Ind. Code § 24-5-0.5-2(a)(2).

1162. The Kia Defendants and Hyundai MOBIS were and are engaged in "consumer transactions" within the meaning of Ind. Code § 24-5-0.5-2(a)(1).

1163. The Indiana Deceptive Consumer Sales Act ("Indiana DCSA") prohibits a supplier from committing an "unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction." Ind. Code § 24-5-0.5-3(a).

1164. In the course of their business, the Kia Defendants and Hyundai MOBIS, through their agents, employees, and/or subsidiaries, violated the Indiana DCSA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Kia Class Vehicles or the defective ACUs, as detailed above.

1165. Specifically, by misrepresenting the Kia Class Vehicles and/or the defective ACUs installed in them as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Kia Class Vehicles and/or the ACU defect, the Kia Defendants and Hyundai MOBIS engaged in one or more of the following unfair or deceptive business practices prohibited by Ind. Code § 24-5-0.5-3:

      a.     Representing that the Kia Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

      b.     Representing that the Kia Class Vehicles are of a particular standard, quality, and grade when they are not; and

      c.     Advertising the Kia Class Vehicles with the intent not to sell or lease them as advertised.

Ind. Code §§ 24-5-0.5-3(b)(1), (2), and (11).

1166. The Kia Defendants and Hyundai MOBIS's unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Indiana Plaintiff and Indiana State Class members, about the true safety and reliability of Kia Class Vehicles and/or the

defective ACUs installed in them, the quality of the Kia Class Vehicles, and the true value of the Kia Class Vehicles.

1167. The Kia Defendants and Hyundai MOBIS's scheme and concealment of the ACU defect and true characteristics of the Occupant Restraint Systems in the Kia Class Vehicles were material to the Indiana Plaintiff and Indiana State Class members, as the Kia Defendants and Hyundai MOBIS intended. Had they known the truth, the Indiana Plaintiff and Indiana State Class members would not have purchased or leased the Kia Class Vehicles, or would have paid significantly less for them.

1168. The Indiana Plaintiff and Indiana State Class members had no way of discerning that the Kia Defendants' representations were false and misleading and/or otherwise learning the facts that the Kia Defendants and Hyundai MOBIS had concealed or failed to disclose. The Indiana Plaintiff and Indiana State Class members did not, and could not, unravel the Kia Defendants and Hyundai MOBIS's deception on their own.

1169. The Kia Defendants and Hyundai MOBIS had an ongoing duty to the Indiana Plaintiff and Indiana State Class members to refrain from unfair or deceptive practices under the Indiana DCSA in the course of their business. Specifically, the Kia Defendants and Hyundai MOBIS owed the Indiana Plaintiff and Indiana State Class members a duty to disclose all the material facts

concerning the ACU defect in the Kia Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the ACU defect from the Indiana Plaintiff and Indiana State Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1170. The Indiana Plaintiff and Indiana State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the Kia Defendants and Hyundai MOBIS's concealment, misrepresentations, and/or failure to disclose material information.

1171. The Kia Defendants and Hyundai MOBIS's violations present a continuing risk to the Indiana Plaintiff and Indiana State Class members, as well as to the general public. The Kia Defendants and Hyundai MOBIS's unlawful acts and practices complained of herein affect the public interest.

1172. The Kia Defendants and Hyundai MOBIS were provided notice of the issues raised in this count and this Complaint by the NHTSA investigations, the numerous complaints filed against them, and the individual notice letters sent by the Indiana State Class members within a reasonable amount of time after the ACU defect became public. Additionally, on May 23, 2019, Indiana State Class members sent a notice letter pursuant to Ind. Code § 24-5-0.5-5(a) to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors

North America, Inc., Toyota Defendants, and ZF TRW Defendants. Moreover, a second notice letter was sent on behalf of the Indiana Plaintiff and Indiana State Class members pursuant to Ind. Code § 24-5-0.5-5(a) to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020. Because the Kia Defendants and Hyundai MOBIS failed to adequately remedy their unlawful conduct within the requisite time period, the Indiana Plaintiff seeks all damages and relief to which they and the Indiana State Class members are entitled.

1173. Pursuant to Ind. Code § 24-5-0.5-4, the Indiana Plaintiff and Indiana State Class members seek an order enjoining the Kia Defendants and Hyundai MOBIS's unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Indiana DCSA.

### d. Indiana Count 4: Violation of the Indiana Deceptive Consumer Sales Act (Ind. Code § 24-5-0.5-3, *et seq.*) Against the ZF TRW and STMicro Defendants

1174. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1175. The Indiana Plaintiff brings this count on behalf individually and on behalf of members of the Indiana State Class against the ZF TRW and STMicro Defendants.

1176. Defendants are "suppliers" within the meaning of Ind. Code § 24-5-0.5-2(a)(3).

1177. The ZF TRW and STMicro Defendants, the Indiana Plaintiff, and the Indiana State Class members are "persons" within the meaning of Ind. Code § 24-5-0.5-2(a)(2).

1178. The ZF TRW and STMicro Defendants were and are engaged in "consumer transactions" within the meaning of Ind. Code § 24-5-0.5-2(a)(1).

1179. The Indiana Deceptive Consumer Sales Act ("Indiana DCSA") prohibits a supplier from committing an "unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction." Ind. Code § 24-5-0.5-3(a).

1180. In the course of their business, the ZF TRW and STMicro Defendants, through their agents, employees, and/or subsidiaries, violated the Indiana DCSA by knowingly and intentionally omitting, concealing, and/or failing to disclose material facts regarding the existence, nature, and scope of the defect with ZF TRW ACUs installed in the Class Vehicles, as detailed above.

1181. Specifically, by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles due to the ACU defect, the ZF TRW and STMicro Defendants engaged in an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction prohibited by Ind. Code § 24-5-0.5-3(a).

1182. The ZF TRW and STMicro Defendants' unfair or deceptive acts or practices, including concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Indiana Plaintiff and Indiana State Class members, about the true safety and reliability of Class Vehicles and/or the defective ACUs installed in them.

1183. The ZF TRW and STMicro Defendants' scheme and concealment of the ACU defect and true characteristics of the defective ACUs in the Class Vehicles were material to the Indiana Plaintiff and Indiana State Class members, as the ZF TRW and STMicro Defendants intended. Had they known the truth, the Indiana Plaintiff and Indiana State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1184. The Indiana Plaintiff and Indiana State Class members had no way of learning the facts that the ZF TRW and STMicro Defendants had concealed or failed to disclose. The Indiana Plaintiff and Indiana State Class members did not,

and could not, unravel the ZF TRW and STMicro Defendants' deception on their own.

1185. The ZF TRW and STMicro Defendants had an ongoing duty to the Indiana Plaintiff and Indiana State Class members to refrain from unfair or deceptive practices under the Indiana DCSA in the course of their business. Specifically, the ZF TRW and STMicro Defendants owed the Indiana Plaintiff and Indiana State Class members a duty to disclose all the material facts concerning the ACU defect in the Class Vehicles because they possessed exclusive knowledge and they intentionally concealed the ACU defect from the Indiana Plaintiff and Indiana State Class members.

1186. The Indiana Plaintiff and Indiana State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the ZF TRW and STMicro Defendants' concealment and/or failure to disclose material information.

1187. The ZF TRW and STMicro Defendants' violations present a continuing risk to the Indiana Plaintiff and Indiana State Class members, as well as to the general public. The ZF TRW and STMicro Defendants' unlawful acts and practices complained of herein affect the public interest.

1188. The ZF TRW and STMicro Defendants were provided notice of the issues raised in this count and this Complaint by the NHTSA investigations, the

numerous complaints filed against them, and the individual notice letters sent by the Indiana State Class members within a reasonable amount of time after the ACU defect became public. Additionally, on May 23, 2019, Indiana State Class members sent a notice letter pursuant to Ind. Code § 24-5-0.5-5(a) to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, and ZF TRW Defendants. Moreover, a second notice letter was sent on behalf of the Indiana Plaintiff and Indiana State Class members pursuant to Ind. Code § 24-5-0.5-5(a) to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai Mobis, and ZF TRW Defendants on April 24, 2020. Because the ZF TRW and STMicro Defendants failed to adequately remedy their unlawful conduct within the requisite time period, the Indiana Plaintiff seeks all damages and relief to which they and the Indiana State Class members are entitled.

1189. Alternatively, any requirement to give notice to the Defendants under Ind. Code §§ 24-5-0.5-5 is excused because the ACU defect is incurable and Defendants behavior was done as part of a scheme, artifice, or device with intent to defraud and mislead.

1190. Pursuant to Ind. Code § 24-5-0.5-4, the Indiana Plaintiff and Indiana State Class members seek an order enjoining the ZF TRW and STMicro

Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Indiana DCSA.

### viii. Massachusetts

#### a. Massachusetts Count 1: Breach of Express Warranty (Mass. Gen. Laws ch. 106, §§ 2-313 and 2A-210) Against the Kia Defendants

1191. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1192. Plaintiff Dylan DeMoranville (hereinafter, "the Massachusetts Plaintiff") brings this count individually and on behalf of members of the Massachusetts State Class who purchased or leased Kia Class Vehicles, against the Kia Defendants.

1193. The Kia Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Mass. Gen. Laws ch. 106, §§ 2-104(1) and 2A-103(3), and "sellers" of motor vehicles under § 2-103(1)(d).

1194. With respect to leases, the Kia Defendants are and were at all relevant times "lessors" of motor vehicles under Mass. Gen. Laws ch. 106, § 2A-103(1)(p).

1195. All Massachusetts State Class members who purchased Kia Class Vehicles in Massachusetts are "buyers" within the meaning of Mass. Gen. Laws ch. 106, § 2-103(1)(a).

1196. All Massachusetts State Class members who leased Kia Class Vehicles in Massachusetts are "lessees" within the meaning of Mass. Gen. Laws ch. 106, § 2A-103(1)(n).

1197. The Kia Class Vehicles are and were at all relevant times "goods" within the meaning of Mass. Gen. Laws ch. 106, §§ 2-105(1) and 2A-103(1)(h).

1198. In connection with the purchase or lease of Kia Class Vehicles, the Kia Defendants provided the Massachusetts Plaintiff and Massachusetts State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

1199. The Kia Defendants' warranties formed the basis of the bargain that was reached when the Massachusetts Plaintiff and Massachusetts State Class members unknowingly purchased or leased Kia Class Vehicles that came equipped with a defective ACU.

1200. However, the Kia Defendants knew or should have known that the warranties were false and/or misleading. Specifically, the Kia Defendants were aware of the ACU defect in the Kia Class Vehicles, which made the vehicles

inherently defective and dangerous at the time that they were sold and leased to the Massachusetts Plaintiff and Massachusetts State Class members.

1201. The Massachusetts Plaintiff and Massachusetts State Class members reasonably relied on the Kia Defendants' express warranties when purchasing or leasing their Kia Class Vehicles.

1202. The Kia Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the ACU defect or replace the defective ACUs in the Kia Class Vehicles. The Kia Defendants also breached their express warranties by providing a product containing defects that were never disclosed to the Massachusetts Plaintiff and Massachusetts State Class members.

1203. The Massachusetts Plaintiff and Massachusetts State Class members have provided the Kia Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of the numerous NHTSA complaints filed against them, and individual notice letters sent by the Massachusetts State Class members within a reasonable amount of time after the ACU defect became public. Additionally, on May 23, 2019, Massachusetts State Class members sent a notice letter to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, and ZF TRW Defendants. Moreover, a second notice letter was sent

on behalf of the Massachusetts Plaintiff and Massachusetts State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

1204. Alternatively, any opportunity to cure the breach is unnecessary and futile.

1205. As a direct and proximate result of the Kia Defendants' breach of their express warranties, the Massachusetts Plaintiff and Massachusetts State Class members have been damaged in an amount to be proven at trial.

> **b.** **Massachusetts Count 2: Breach of Implied Warranty of Merchantability (Mass. Gen. Laws ch. 106, §§ 2-314 and 2A-212) Against the Kia Defendants**

1206. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1207. The Massachusetts Plaintiff brings this count individually and on behalf of members of the Massachusetts State Class who purchased or leased Kia Class Vehicles, against the Kia Defendants.

1208. A warranty that the Kia Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Mass. Gen. Laws ch. 106, §§ 2-314 and 2A-212.

1209. The Kia Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Kia Class Vehicles suffer from the ACU defect, which may cause the airbags and seatbelt pretensioners to fail to deploy during an accident, rendering the Kia Class Vehicles inherently defective and dangerous.

1210. The Kia Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Mass. Gen. Laws ch. 106, §§ 2-104(1) and 2A-103(3), and "sellers" of motor vehicles under § 2-103(1)(d).

1211. With respect to leases, the Kia Defendants are and were at all relevant times "lessors" of motor vehicles under Mass. Gen. Laws ch. 106, § 2A-103(1)(p).

1212. All Massachusetts State Class members who purchased Kia Class Vehicles in Massachusetts are "buyers" within the meaning of Mass. Gen. Laws ch. 106, § 2-103(1)(a).

1213. All Massachusetts State Class members who leased Kia Class Vehicles in Massachusetts are "lessees" within the meaning of Mass. Gen. Laws ch. 106, § 2A-103(1)(n).

1214. The Kia Class Vehicles are and were at all relevant times "goods" within the meaning of Mass. Gen. Laws ch. 106, §§ 2-105(1) and 2A-103(1)(h).

1215. The Massachusetts Plaintiff and Massachusetts State Class members have provided the Kia Defendants with reasonable notice and opportunity to cure the breaches of their implied warranties by way of the numerous NHTSA complaints filed against them, and individual notice letters sent by the Massachusetts State Class members within a reasonable amount of time after the ACU defect became public. Additionally, on May 23, 2019, Massachusetts State Class members sent a notice letter to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, and ZF TRW Defendants. Moreover, a second notice letter was sent on behalf of the Massachusetts Plaintiff and Massachusetts State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

1216. Alternatively, any opportunity to cure the breach is unnecessary and futile.

1217. As a direct and proximate result of the Kia Defendants' breach of the implied warranty of merchantability, the Massachusetts Plaintiff and Massachusetts State Class members have been damaged in an amount to be proven at trial.

c.       **Massachusetts Count 3: Violation of the Deceptive Acts or Practices Prohibited By Massachusetts Law (Mass. Gen. Laws ch. 93a, § 1, *et seq.*) Against the Kia Defendants and Hyundai MOBIS**

1218. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1219. The Massachusetts Plaintiff brings this count individually and on behalf of members of the Massachusetts State Class who purchased or leased Kia Class Vehicles, against the Kia Defendants and Hyundai MOBIS.

1220. The Kia Defendants, Hyundai MOBIS, the Massachusetts Plaintiff, and Massachusetts State Class members are "persons" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

1221. The Kia Defendants and Hyundai MOBIS were and are engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

1222. The Massachusetts consumer protection law ("Massachusetts Act") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Mass. Gen. Laws ch. 93A, § 2.

1223. In the course of their business, the Kia Defendants and Hyundai MOBIS, through their agents, employees, and/or subsidiaries, violated the Massachusetts Act by knowingly and intentionally misrepresenting, omitting,

concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Kia Class Vehicles or the defective ACUs, as detailed above.

1224. Specifically, by misrepresenting the Kia Class Vehicles and/or the defective ACUs installed in them as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Kia Class Vehicles and/or the ACU defect, the Kia Defendants and Hyundai MOBIS engaged in unfair or deceptive business practices in the conduct of any trade or commerce, as prohibited by Mass. Gen. Laws ch. 93A, § 2.

1225. The Kia Defendants and Hyundai MOBIS's unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Massachusetts Plaintiff and Massachusetts State Class members, about the true safety and reliability of Kia Class Vehicles and/or the defective ACUs installed in them, the quality of the Kia Class Vehicles, and the true value of the Kia Class Vehicles.

1226. The Kia Defendants and Hyundai MOBIS's scheme and concealment of the ACU defect and true characteristics of the Occupant Restraint Systems in the Kia Class Vehicles were material to the Massachusetts Plaintiff and Massachusetts

State Class members, as the Kia Defendants and Hyundai MOBIS intended. Had they known the truth, the Massachusetts Plaintiff and Massachusetts State Class members would not have purchased or leased the Kia Class Vehicles, or would have paid significantly less for them.

1227. The Massachusetts Plaintiff and Massachusetts State Class members had no way of discerning that the Kia Defendants' representations were false and misleading and/or otherwise learning the facts that the Kia Defendants and Hyundai MOBIS had concealed or failed to disclose. The Massachusetts Plaintiff and Massachusetts State Class members did not, and could not, unravel the Kia Defendants and Hyundai MOBIS's deception on their own.

1228. The Kia Defendants and Hyundai MOBIS had an ongoing duty to the Massachusetts Plaintiff and Massachusetts State Class members to refrain from unfair or deceptive practices under the Massachusetts Act in the course of their business. Specifically, the Kia Defendants and Hyundai MOBIS owed the Massachusetts Plaintiff and Massachusetts State Class members a duty to disclose all the material facts concerning the ACU defect in the Kia Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the ACU defect from the Massachusetts Plaintiff and Massachusetts State Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1229. The Massachusetts Plaintiff and Massachusetts State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the Kia Defendants and Hyundai MOBIS's concealment, misrepresentations, and/or failure to disclose material information.

1230. The Kia Defendants and Hyundai MOBIS's violations present a continuing risk to the Massachusetts Plaintiff and Massachusetts State Class members, as well as to the general public. The Kia Defendants and Hyundai MOBIS's unlawful acts and practices complained of herein affect the public interest.

1231. The Kia Defendants and Hyundai MOBIS were provided notice of the issues raised in this count and this Complaint by the NHTSA investigations, the numerous complaints filed against them, and the many individual notice letters sent by Massachusetts State Class members within a reasonable amount of time after the ACU defect became public. Additionally, on May 23, 2019, Massachusetts State Class members sent a notice letter pursuant to Mass. Gen. Laws ch. 93A, § 9(3) to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, and ZF TRW Defendants. Moreover, a second notice letter was sent on behalf of the Massachusetts Plaintiff and Massachusetts State Class members pursuant to Mass. Gen. Laws ch. 93A, § 9(3) to FCA US LLC, Honda Defendants, Hyundai

Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020. Because the Kia Defendants and Hyundai MOBIS failed to adequately remedy their unlawful conduct within the requisite time period, the Massachusetts Plaintiff seeks all damages and relief to which the Massachusetts Plaintiff and Massachusetts State Class members are entitled.

1232. Pursuant to Mass. Gen. Laws ch. 93A, § 9, the Massachusetts Plaintiff and Massachusetts State Class members seek an order enjoining the Kia Defendants and Hyundai MOBIS's unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Massachusetts Act.

> **d.      Massachusetts Count 4: Violation of the Deceptive Acts or Practices Prohibited By Massachusetts Law (Mass. Gen. Laws ch. 93a, § 1, *et seq.*) Against the ZF TRW and STMicro Defendants**

1233. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1234. The Massachusetts Plaintiff brings this count individually and on behalf of members of the Massachusetts State Class against the ZF TRW and STMicro Defendants.

1235. The ZF TRW Defendants, the STMicro Defendants, the Massachusetts Plaintiff, and Massachusetts State Class members are "persons" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

1236. The ZF TRW and STMicro Defendants were and are engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

1237. The Massachusetts consumer protection law ("Massachusetts Act") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Mass. Gen. Laws ch. 93A, § 2.

1238. In the course of their business the ZF TRW and STMicro Defendants, through their agents, employees, and/or subsidiaries, violated the Massachusetts Act by knowingly and intentionally omitting, concealing, and failing to disclose material facts regarding the existence, nature, and scope of the defect with ZF TRW ACUs installed in the Class Vehicles, as detailed above.

1239. Specifically, by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles and/or the ACU defect, the ZF TRW and STMicro Defendants engaged in unfair and/or deceptive business practices in the conduct of any trade or commerce as prohibited by Mass. Gen. Laws ch. 93A, § 2.

1240. The ZF TRW and STMicro Defendants' unfair or deceptive acts or practices, including concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers,

and were likely to and did in fact deceive reasonable consumers, including the Massachusetts Plaintiff and Massachusetts State Class members, about the true safety and reliability of Class Vehicles and/or the defective ACUs installed in them.

1241. The ZF TRW and STMicro Defendants' scheme and concealment of the ACU defect and true characteristics of the defective ACUs in the Class Vehicles were material to the Massachusetts Plaintiff and Massachusetts State Class members, as the ZF TRW and STMicro Defendants intended. Had they known the truth, the Massachusetts Plaintiff and Massachusetts State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1242. The Massachusetts Plaintiff and Massachusetts State Class members had no way of learning the facts that the ZF TRW and STMicro Defendants had concealed or failed to disclose. The Massachusetts Plaintiff and Massachusetts State Class members did not, and could not, unravel the ZF TRW and STMicro Defendants' deception on their own.

1243. The ZF TRW and STMicro Defendants had an ongoing duty to the Massachusetts Plaintiff and Massachusetts State Class members to refrain from unfair or deceptive practices under the Massachusetts Act in the course of their business. Specifically, the ZF TRW and STMicro Defendants owed the

Massachusetts Plaintiff and Massachusetts State Class members a duty to disclose all the material facts concerning the ACU defect in the Class Vehicles because they possessed exclusive knowledge and they intentionally concealed the ACU defect from the Massachusetts Plaintiff and Massachusetts State Class members.

1244. The Massachusetts Plaintiff and Massachusetts State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the ZF TRW and STMicro Defendants' concealment and/or failure to disclose material information.

1245. The ZF TRW and STMicro Defendants' violations present a continuing risk to the Massachusetts Plaintiff and Massachusetts State Class members, as well as to the general public. The ZF TRW and STMicro Defendants' unlawful acts and practices complained of herein affect the public interest.

1246. The ZF TRW and STMicro Defendants were provided notice of the issues raised in this count and this Complaint by the NHTSA investigations, the numerous complaints filed against them, and the many individual notice letters sent by Massachusetts State Class members within a reasonable amount of time after the allegations of Class Vehicle defects became public. Additionally, on May 23, 2019, Massachusetts State Class members sent a notice letter pursuant to Mass. Gen. Laws ch. 93A, § 9(3) to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota

Defendants, and ZF TRW Defendants. Moreover, a second notice letter was sent on behalf of the Massachusetts Plaintiff and Massachusetts State Class members pursuant to Mass. Gen. Laws ch. 93A, § 9(3) to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co., Ltd., and ZF TRW Defendants on April 24, 2020. Because Defendants failed to adequately remedy their unlawful conduct within the requisite time period, the Massachusetts Plaintiff seeks all damages and relief to which the Massachusetts Plaintiff and Massachusetts State Class members are entitled.

1247.  Alternatively, any requirement to give notice to the Defendants under Mass. Gen. Laws ch. 93A, § 9(3) is excused because, *inter alia*, on information and belief the ZF TRW and STMicro Defendants do not maintain a place of business or do not keep assets within Massachusetts.

1248.  Pursuant to Mass. Gen. Laws ch. 93A, § 9, the Massachusetts Plaintiff and Massachusetts State Class members seek an order enjoining the ZF TRW and STMicro Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Massachusetts Act.

### ix.    Minnesota

#### a.    Minnesota Count 1: Breach of Express Warranty (Minn. Stat. §§ 336.2-313 and 336.2A-210) Against the Kia Defendants

1249. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1250. Plaintiff Bobbi Jo Birk-LaBarge (hereinafter, "Minnesota Plaintiff") brings this count individually and on behalf of members of the Minnesota State Class who purchased or leased Kia Class Vehicles, against the Kia Defendants.

1251. The Kia Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Minn. Stat. §§ 336.2-104(1) and 336.2A-103(3), and "sellers" of motor vehicles under § 336.2-103(1)(d).

1252. With respect to leases, the Kia Defendants are and were at all relevant times "lessors" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

1253. All Minnesota State Class members who purchased Class Vehicles (for purposes of this count, "Class Vehicles" are limited to the Kia Class Vehicles) in Minnesota are "buyers" within the meaning of Minn. Stat. § 336.2-103(1)(a).

1254. All Minnesota State Class members who leased Class Vehicles in Minnesota are "lessees" within the meaning of Minn. Stat. § 336.2A-103(1)(n).

1255. The Class Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

1256. In connection with the purchase or lease of Class Vehicles, the Kia Defendants provided the Minnesota Plaintiff and Minnesota State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

1257. The Kia Defendants' warranties formed the basis of the bargain that was reached when the Minnesota Plaintiff and Minnesota State Class members unknowingly purchased or leased Class Vehicles that came equipped with a defective ACU.

1258. However, the Kia Defendants knew or should have known that the warranties were false and/or misleading. Specifically, the Kia Defendants were aware of the ACU defect in the Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to the Minnesota Plaintiff and Minnesota State Class members.

1259. The Minnesota Plaintiff and Minnesota State Class members reasonably relied on the Kia Defendants' express warranties when purchasing or leasing their Class Vehicles.

1260. The Kia Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the ACU defect or

replace the defective ACUs in the Class Vehicles. The Kia Defendants also breached their express warranties by providing a product containing defects that were never disclosed to the Minnesota Plaintiff and Minnesota State Class members.

1261. The Minnesota Plaintiff and Minnesota State Class members have provided the Kia Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of the numerous NHTSA complaints filed against them, and individual notice letters sent by the Minnesota State Class members within a reasonable amount of time after the ACU defect became public. Additionally, a notice letter was sent on behalf of the Minnesota Plaintiff and Minnesota State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

1262. Alternatively, any opportunity to cure the breach is unnecessary and futile.

1263. As a direct and proximate result of the Kia Defendants' breach of their express warranties, the Minnesota Plaintiff and Minnesota State Class members have been damaged in an amount to be proven at trial.

### b.    Minnesota Count 2: Breach of Implied Warranty of Merchantability (Minn. Stat. §§ 336.2-314 and 336.2A-212) Against the Kia Defendants

1264. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1265. The Minnesota Plaintiff brings this count individually and on behalf of members of the Minnesota State Class who purchased or leased Kia Class Vehicles, against the Kia Defendants.

1266. A warranty that the Class Vehicles (for purposes of this count, "Class Vehicles" are limited to the Kia Class Vehicles) were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Minn. Stat. §§ 336.2-314 and 336.2A-212.

1267. The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the ACU defect, which may cause the airbags and seatbelt pretensioners to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

1268. The Kia Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Minn. Stat. §§ 336.2-104(1) and 336.2A-103(3), and "sellers" of motor vehicles under § 336.2-103(1)(d).

1269. With respect to leases, the Kia Defendants are and were at all relevant times "lessors" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

1270. All Minnesota State Class members who purchased Class Vehicles in Minnesota are "buyers" within the meaning of Minn. Stat. § 336.2-103(1)(a),

1271. All Minnesota State Class members who leased Class Vehicles in Minnesota are "lessees" within the meaning of Minn. Stat. § 336.2A-103(1)(n).

1272. The Class Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

1273. The Minnesota Plaintiff and Minnesota State Class members have provided the Kia Defendants with reasonable notice and opportunity to cure the breaches of their implied warranties by way of the numerous NHTSA complaints filed against them, and individual notice letters sent by the Minnesota State Class members within a reasonable amount of time after the ACU defect became public. Additionally, a notice letter was sent on behalf of the Minnesota Plaintiff and Minnesota State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota

Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

1274. Alternatively, any opportunity to cure the breach is unnecessary and futile.

1275. As a direct and proximate result of the Kia Defendants' breach of the implied warranty of merchantability, the Minnesota Plaintiff and Minnesota State Class members have been damaged in an amount to be proven at trial.

> c.    **Minnesota Count 3: Violation of the Minnesota Prevention of Consumer Fraud Act (Minn. Stat. § 325F.68, *et seq.* and Minn. Stat. § 8.31, subd. 3a) Against the Kia Defendants and Hyundai MOBIS**

1276. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1277. The Minnesota Plaintiff brings this count individually and on behalf of members of the Minnesota State Class who purchased or leased Kia Class Vehicles, against the Kia Defendants and Hyundai MOBIS.

1278. The Kia Defendants, Hyundai MOBIS, the Minnesota Plaintiff, and Minnesota State Class members are "persons" within the meaning of Minn. Stat. § 325F.68(3).

1279. The Class Vehicles (for purposes of this count, "Class Vehicles" are limited to the Kia Class Vehicles) and ACUs installed in them are "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

1280. The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged[.]" Minn. Stat. § 325F.69(1).

1281. In the course of their business, the Kia Defendants and Hyundai MOBIS, through their agents, employees, and/or subsidiaries, violated the Minnesota CFA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Class Vehicles or the defective ACUs, as detailed above.

1282. Specifically, by misrepresenting the Class Vehicles and/or the defective ACUs installed in them as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles and/or the ACU defect, the Kia Defendants and Hyundai MOBIS engaged in one or more of the unfair or deceptive business practices prohibited by Minn. Stat. § 325F.69, including use, or employment by any person of any fraud, false

pretense, false promise, misrepresentation, misleading statement or deceptive

practice, with the intent that others rely thereon in connection with the sale of any

merchandise.

1283. The Kia Defendants and Hyundai MOBIS's unfair or deceptive acts or

practices, including misrepresentations, concealments, omissions, and/or

suppressions of material facts, had a tendency or capacity to mislead and create a

false impression in consumers, and were likely to and did in fact deceive

reasonable consumers, including the Minnesota Plaintiff and Minnesota State Class

members, about the true safety and reliability of Class Vehicles and/or the

defective ACUs installed in them, the quality of the Class Vehicles, and the true

value of the Class Vehicles.

1284. The Kia Defendants and Hyundai MOBIS's scheme and concealment

of the ACU defect and true characteristics of the Occupant Restraint Systems in the

Class Vehicles were material to the Minnesota Plaintiff and Minnesota State Class

members, as the Kia Defendants and Hyundai MOBIS intended. Had they known

the truth, the Minnesota Plaintiff and Minnesota State Class members would not

have purchased or leased the Class Vehicles, or would have paid significantly less

for them.

1285. The Minnesota Plaintiff and Minnesota State Class members had no

way of discerning that the Kia Defendants' representations were false and

misleading and/or otherwise learning the facts that the Kia Defendants and Hyundai MOBIS had concealed or failed to disclose. The Minnesota Plaintiff and Minnesota State Class members did not, and could not, unravel the Kia Defendants and Hyundai MOBIS's deception on their own.

1286. The Kia Defendants and Hyundai MOBIS had an ongoing duty to the Minnesota Plaintiff and Minnesota State Class members to refrain from unfair or deceptive practices under the Minnesota CFA in the course of their business. Specifically, the Kia Defendants and Hyundai MOBIS owed the Minnesota Plaintiff and Minnesota State Class members a duty to disclose all the material facts concerning the ACU defect in the Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the ACU defect from the Minnesota Plaintiff and Minnesota State Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1287. The Minnesota Plaintiff and Minnesota State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the Kia Defendants and Hyundai MOBIS's concealment, misrepresentations, and/or failure to disclose material information.

1288. The Kia Defendants and Hyundai MOBIS's violations present a continuing risk to the Minnesota Plaintiff and Minnesota State Class members, as

well as to the general public. The Kia Defendants and Hyundai MOBIS's unlawful acts and practices complained of herein affect the public interest.

1289. Pursuant to Minn. Stat. §§ 8.31(3a) and 549.20(1)(a), the Minnesota Plaintiff and Minnesota State Class members seek an order enjoining the Kia Defendants and Hyundai MOBIS's unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Minnesota CFA.

### d. Minnesota Count 4: Violation of the Minnesota Uniform Deceptive Trade Practices Act (Minn. Stat. § 325D.43, *et seq.*) Against the Kia Defendants and Hyundai MOBIS

1290. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1291. The Minnesota Plaintiff brings this count individually and on behalf of members of the Minnesota State Class who purchased or leased Kia Class Vehicles, against the Kia Defendants and Hyundai MOBIS.

1292. The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices in the course of a business, vocation, or occupation. Minn. Stat. § 325D.44, Subd. 1.

1293. In the course of their business, the Kia Defendants and Hyundai MOBIS, through their agents, employees, and/or subsidiaries, violated the

Minnesota DTPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Class Vehicles (for purposes of this count, "Class Vehicles" are limited to the Kia Class Vehicles) or the defective ACUs, as detailed above.

1294. Specifically, by misrepresenting the Class Vehicles and/or the defective ACUs installed in them as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles and/or the ACU defect, the Kia Defendants and Hyundai MOBIS engaged in one or more of the following unfair or deceptive business practices prohibited by Minn. Stat. § 325D.44, Subd. 1:

   a.   Representing that the Class Vehicles and/or the defective ACUs installed in them have characteristics, uses, benefits, and qualities which they do not have;

   b.   Representing that the Class Vehicles and/or the defective ACUs installed in them are of a particular standard, quality, and grade when they are not;

   c.   Advertising the Class Vehicles and/or the defective ACUs installed in them with the intent not to sell or lease them as advertised; and

     d.    Engaging in any other false, misleading, or deceptive act or practice in the conduct of trade or commerce pertaining to the Class Vehicles and/or the defective ACUs installed in them.

Minn. Stat. §§ 325D.44, Subd. 1(5), (7), (9), and (13).

1295. The Kia Defendants and Hyundai MOBIS's unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Minnesota Plaintiff and Minnesota State Class members, about the true safety and reliability of Class Vehicles and/or the defective ACUs installed in them, the quality of the Class Vehicles, and the true value of the Class Vehicles.

1296. The Kia Defendants and Hyundai MOBIS's scheme and concealment of the ACU defect and true characteristics of the Occupant Restraint Systems in the Class Vehicles were material to the Minnesota Plaintiff and Minnesota State Class members, as the Kia Defendants and Hyundai MOBIS intended. Had they known the truth, the Minnesota Plaintiff and Minnesota State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1297. The Minnesota Plaintiff and Minnesota State Class members had no way of discerning that the Kia Defendants' representations were false and misleading and/or otherwise learning the facts that the Kia Defendants and Hyundai MOBIS had concealed or failed to disclose. The Minnesota Plaintiff and Minnesota State Class members did not, and could not, unravel the Kia Defendants and Hyundai MOBIS's deception on their own.

1298. The Kia Defendants and Hyundai MOBIS had an ongoing duty to the Minnesota Plaintiff and Minnesota State Class members to refrain from unfair or deceptive practices under the Minnesota DTPA in the course of their business. Specifically, the Kia Defendants and Hyundai MOBIS owed the Minnesota Plaintiff and Minnesota State Class members a duty to disclose all the material facts concerning the ACU defect in the Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the ACU defect from the Minnesota Plaintiff and Minnesota State Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1299. The Minnesota Plaintiff and Minnesota State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the Kia Defendants and Hyundai MOBIS's concealment, misrepresentations, and/or failure to disclose material information.

1300. The Kia Defendants and Hyundai MOBIS's violations present a continuing risk to the Minnesota Plaintiff and Minnesota State Class members, as well as to the general public. The Kia Defendants and Hyundai MOBIS's unlawful acts and practices complained of herein affect the public interest.

1301. Pursuant to Minn. Stat. §§ 8.31(3a), 325D.45, and 549.20(1)(a), the Minnesota Plaintiff and Minnesota State Class members seek an order enjoining the Kia Defendants and Hyundai MOBIS's unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Minnesota DTPA.

> **e.    Minnesota Count 5: Violation of the Minnesota Prevention of Consumer Fraud Act (Minn. Stat. § 325F.68, *et seq.* and Minn. Stat. § 8.31, subd. 3a) Against the ZF TRW and STMicro Defendants**

1302. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1303. The Minnesota Plaintiff brings this count individually and on behalf of members of the Minnesota State Class against the ZF TRW and STMicro Defendants.

1304. The ZF TRW Defendants, the STMicro Defendants, the Minnesota Plaintiff, and Minnesota State Class members are "persons" within the meaning of Minn. Stat. § 325F.68(3).

1305. The Class Vehicles and ACUs installed in them are "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

1306. The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged[.]" Minn. Stat. § 325F.69(1).

1307. In the course of their business, the ZF TRW and STMicro Defendants, through their agents, employees, and/or subsidiaries, violated the Minnesota CFA by knowingly and intentionally omitting, concealing, and/or failing to disclose material facts regarding the existence, nature, and scope of the defect with ZF TRW ACUs installed in the Class Vehicles, as detailed above.

1308. Specifically, by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles due to the ACU defect, the ZF TRW and STMicro Defendants engaged in unfair or deceptive business practices prohibited

by Minn. Stat. § 325F.69, including the use or employment of fraud, false pretense, and deceptive practices.

1309. The ZF TRW and STMicro Defendants' unfair or deceptive acts or practices, including concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Minnesota Plaintiff and Minnesota State Class members, about the true safety and reliability of Class Vehicles and/or the defective ACUs installed in them.

1310. The ZF TRW and STMicro Defendants' scheme and concealment of the ACU defect and true characteristics of the defective ACUs in the Class Vehicles were material to the Minnesota Plaintiff and Minnesota State Class members, as the ZF TRW and STMicro Defendants intended. Had they known the truth, the Minnesota Plaintiff and Minnesota State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1311. The Minnesota Plaintiff and Minnesota State Class members had no way of learning the facts that the ZF TRW and STMicro Defendants had concealed or failed to disclose. The Minnesota Plaintiff and Minnesota State Class members did not, and could not, unravel the ZF TRW and STMicro Defendants' deception on their own.

1312. The ZF TRW and STMicro Defendants had an ongoing duty to the Minnesota Plaintiff and Minnesota State Class members to refrain from unfair or deceptive practices under the Minnesota CFA in the course of their business. Specifically, the ZF TRW and STMicro Defendants owed the Minnesota Plaintiff and Minnesota State Class members a duty to disclose all the material facts concerning the ACU defect in the Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the ACU defect from the Minnesota Plaintiff and Minnesota State Class members.

1313. The Minnesota Plaintiff and Minnesota State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the ZF TRW and STMicro Defendants' concealment and/or failure to disclose material information.

1314. The ZF TRW and STMicro Defendants' violations present a continuing risk to the Minnesota Plaintiff and Minnesota State Class members, as well as to the general public. The ZF TRW and STMicro Defendants' unlawful acts and practices complained of herein affect the public interest.

1315. Pursuant to Minn. Stat. §§ 8.31(3a) and 549.20(1)(a), the Minnesota Plaintiff and Minnesota State Class members seek an order enjoining the ZF TRW and STMicro Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Minnesota CFA.

### f. Minnesota Count 6: Violation of the Minnesota Uniform Deceptive Trade Practices Act (Minn. Stat. § 325D.43, *et seq.*) Against the ZF TRW and STMicro Defendants

1316. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1317. The Minnesota Plaintiff brings this count individually and on behalf of members of the Minnesota State Class against the ZF TRW and STMicro Defendants.

1318. The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices in the course of a business, vocation, or occupation. Minn. Stat. § 325D.44, Subd. 1.

1319. In the course of their business, the ZF TRW and STMicro Defendants, through their agents, employees, and/or subsidiaries, violated the Minnesota DTPA by knowingly and intentionally omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Class Vehicles or the defective ACUs, as detailed above.

1320. Specifically, by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles due to the ACU defect, the ZF TRW and STMicro Defendants engaged in unfair or deceptive business practices prohibited by Minn. Stat. § 325D.44, Subd. 1, including engaging in false, misleading, or

deceptive acts or practices in the conduct of trade or commerce pertaining to the defective ACUs installed in the Class Vehicles.

1321. The ZF TRW and STMicro Defendants' unfair or deceptive acts or practices, including concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Minnesota Plaintiff and Minnesota State Class members, about the true safety and reliability of Class Vehicles and/or the defective ACUs installed in them.

1322. The ZF TRW and STMicro Defendants' scheme and concealment of the ACU defect and true characteristics of the defective ACUs in the Class Vehicles were material to the Minnesota Plaintiff and Minnesota State Class members, as the ZF TRW and STMicro Defendants intended. Had they known the truth, the Minnesota Plaintiff and Minnesota State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1323. The Minnesota Plaintiff and Minnesota State Class members had no way of learning the facts that the ZF TRW and STMicro Defendants had concealed or failed to disclose. The Minnesota Plaintiff and Minnesota State Class members did not, and could not, unravel the ZF TRW and STMicro Defendants' deception on their own.

1324. The ZF TRW and STMicro Defendants had an ongoing duty to the Minnesota Plaintiff and Minnesota State Class members to refrain from unfair or deceptive practices under the Minnesota DTPA in the course of their business. Specifically, the ZF TRW and STMicro Defendants owed the Minnesota Plaintiff and Minnesota State Class members a duty to disclose all the material facts concerning the ACU defect in the Class Vehicles because they possessed exclusive knowledge, and they intentionally concealed the ACU defect from the Minnesota Plaintiff and Minnesota State Class members.

1325. The Minnesota Plaintiff and Minnesota State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the ZF TRW and STMicro Defendants' concealment and/or failure to disclose material information.

1326. The ZF TRW and STMicro Defendants' violations present a continuing risk to the Minnesota Plaintiff and Minnesota State Class members, as well as to the general public. The ZF TRW and STMicro Defendants' unlawful acts and practices complained of herein affect the public interest.

1327. Pursuant to Minn. Stat. §§ 8.31(3a), 325D.45, and 549.20(1)(a), the Minnesota Plaintiff and Minnesota State Class members seek an order enjoining the ZF TRW and STMicro Defendants' unfair or deceptive acts or practices and

awarding damages and any other just and proper relief available under the
Minnesota DTPA.

### x.    Missouri

#### a.    Missouri Count 1: Breach of Express Warranty (Mo. Rev. Stat. §§ 400.2-313 and 400.2A-210) Against the Kia Defendants

1328. Plaintiffs reallege and incorporate by reference all preceding
allegations as though fully set forth herein.

1329. Plaintiff Dan Sutterfield (hereinafter, "Missouri Plaintiff") brings this
count individually and on behalf of members of the Missouri State Class who
purchased or leased Kia Class Vehicles, against the Kia Defendants.

1330. The Kia Defendants are and were at all relevant times "merchants"
with respect to motor vehicles under Mo. Rev. Stat. §§ 400.2-104(1) and 400.2A-
103(3), and "sellers" of motor vehicles under § 400.2-103(1)(d).

1331. With respect to leases, the Kia Defendants are and were at all relevant
times "lessors" of motor vehicles under Mo. Rev. Stat. § 400.2A-103(1)(p).

1332. All Missouri State Class members who purchased Kia Class Vehicles
in Missouri are "buyers" within the meaning of Mo. Rev. Stat. § 400.2-103(1)(a).

1333. All Missouri State Class members who leased Kia Class Vehicles in Missouri are "lessees" within the meaning of Mo. Rev. Stat. § 400.2A-103(1)(n).

1334. The Kia Class Vehicles are and were at all relevant times "goods" within the meaning of Mo. Rev. Stat. §§ 400.2-105(1) and 400.2A-103(1)(h).

1335. In connection with the purchase or lease of Kia Class Vehicles, the Kia Defendants provided the Missouri Plaintiff and Missouri State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

1336. The Kia Defendants' warranties formed the basis of the bargain that was reached when the Missouri Plaintiff and the Missouri State Class members unknowingly purchased or leased Kia Class Vehicles that came equipped with a defective ACU.

1337. However, the Kia Defendants knew or should have known that the warranties were false and/or misleading. Specifically, the Kia Defendants were aware of the ACU defect in the Kia Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to the Missouri Plaintiff and Missouri State Class members.

1338. The Missouri Plaintiff and Missouri State Class members reasonably relied on the Kia Defendants' express warranties when purchasing or leasing their Kia Class Vehicles.

1339. The Kia Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the ACU defect or replace the defective ACUs in the Kia Class Vehicles. The Kia Defendants also breached their express warranties by providing a product containing defects that were never disclosed to the Missouri Plaintiff and Missouri State Class members.

1340. The Missouri Plaintiff and the Missouri State Class members have provided the Kia Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of the numerous NHTSA complaints filed against them, and individual notice letters sent by the Missouri State Class members within a reasonable amount of time after the ACU defect became public. Additionally, a notice letter was sent on behalf of the Missouri Plaintiff and Missouri State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

1341. Alternatively, any opportunity to cure the breach is unnecessary and futile.

1342. As a direct and proximate result of the Kia Defendants' breach of their express warranties, the Missouri Plaintiff and the Missouri State Class members have been damaged in an amount to be proven at trial.

b.     **Missouri Count 2: Breach of Implied Warranty of Merchantability (Mo. Rev. Stat. §§ 400.2-314 and 400.2A-212) Against the Kia Defendants**

1343. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1344. The Missouri Plaintiff brings this count individually and on behalf of members of the Missouri State Class who purchased or leased Kia Class Vehicles, against the Kia Defendants.

1345. A warranty that the Kia Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Mo. Rev. Stat. §§ 400.2-314 and 400.2A-212.

1346. The Kia Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Kia Class Vehicles suffer from the ACU defect, which may cause the airbags and seatbelt pretensioners to fail to deploy during an accident, rendering the Kia Class Vehicles inherently defective and dangerous.

1347. The Kia Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Mo. Rev. Stat. §§ 400.2-104(1) and 400.2A-103(3), and "sellers" of motor vehicles under § 400.2-103(1)(d).

1348. With respect to leases, the Kia Defendants are and were at all relevant times "lessors" of motor vehicles under Mo. Rev. Stat. § 400.2A-103(1)(p).

1349. All Missouri State Class members who purchased Kia Class Vehicles in Missouri are "buyers" within the meaning of Mo. Rev. Stat. § 400.2-103(1)(a).

1350. All Missouri State Class members who leased Kia Class Vehicles in Missouri are "lessees" within the meaning of Mo. Rev. Stat. § 400.2A-103(1)(n).

1351. The Kia Class Vehicles are and were at all relevant times "goods" within the meaning of Mo. Rev. Stat. §§ 400.2-105(1) and 400.2A-103(1)(h).

1352. The Missouri Plaintiff and Missouri State Class members have provided the Kia Defendants with reasonable notice and opportunity to cure the breaches of their implied warranties by way of the numerous NHTSA complaints filed against them, and individual notice letters sent by the Missouri State Class members within a reasonable amount of time after the ACU defect became public. Additionally, a notice letter was sent on behalf of the Missouri Plaintiff and Missouri State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota

Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

1353. Alternatively, any opportunity to cure the breach is unnecessary and futile.

1354. As a direct and proximate result of the Kia Defendants' breach of the implied warranty of merchantability, the Missouri Plaintiff and the Missouri State Class members have been damaged in an amount to be proven at trial.

>  **c.**    **Missouri Count 3: Violation of the Missouri Merchandising Practices Act (Mo. Rev. Stat. § 407.010, *et seq.*) Against the Kia Defendants and Hyundai MOBIS**

1355. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1356. The Missouri Plaintiff brings this count individually and on behalf of members of the Missouri State Class who purchased or leased Kia Class Vehicles, against the Kia Defendants and Hyundai MOBIS.

1357. The Kia Defendants, Hyundai MOBIS, the Missouri Plaintiff, and Missouri State Class members are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

1358. The Kia Defendants and Hyundai MOBIS were and are engaged in "trade or commerce" within the meaning of Mo. Rev. Stat. § 407.010(7).

1359. The Missouri Merchandising Practices Act ("Missouri MPA") prohibits unlawful business practices. Mo. Rev. Stat. § 407.020(1).

1360. In the course of their business, the Kia Defendants and Hyundai MOBIS, through their agents, employees, and/or subsidiaries, violated the Missouri MPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Kia Class Vehicles or the defective ACUs, as detailed above.

1361. Specifically, by misrepresenting the Kia Class Vehicles and/or the defective ACUs installed in them as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Kia Class Vehicles and/or the ACU defect, the Kia Defendants and Hyundai MOBIS engaged in one or more of the following unfair or deceptive acts or practices prohibited by Mo. Rev. Stat. § 407.020(1): using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Kia Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1362. The Kia Defendants and Hyundai MOBIS's unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Missouri Plaintiff and Missouri State Class members, about the true safety and reliability of Kia Class Vehicles and/or the defective ACUs installed in them, the quality of the Kia Class Vehicles, and the true value of the Kia Class Vehicles.

1363. The Kia Defendants and Hyundai MOBIS's scheme and concealment of the ACU defect and true characteristics of the Occupant Restraint Systems in the Kia Class Vehicles were material to the Missouri Plaintiff and Missouri State Class members, as the Kia Defendants and Hyundai MOBIS intended. Had they known the truth, the Missouri Plaintiff and Missouri State Class members would not have purchased or leased the Kia Class Vehicles, or would have paid significantly less for them.

1364. The Missouri Plaintiff and Missouri State Class members had no way of discerning that the Kia Defendants' representations were false and misleading and/or otherwise learning the facts that the Kia Defendants and Hyundai MOBIS had concealed or failed to disclose. The Missouri Plaintiff and Missouri State Class

members did not, and could not, unravel the Kia Defendants and Hyundai MOBIS's deception on their own.

1365. The Kia Defendants and Hyundai MOBIS had an ongoing duty to the Missouri Plaintiff and Missouri State Class members to refrain from unfair or deceptive practices under the Missouri MPA in the course of their business. Specifically, the Kia Defendants and Hyundai MOBIS owed the Missouri Plaintiff and Missouri State Class members a duty to disclose all the material facts concerning the ACU defect in the Kia Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the ACU defect from the Missouri Plaintiff and Missouri State Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1366. The Missouri Plaintiff and Missouri State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the Kia Defendants and Hyundai MOBIS's concealment, misrepresentations, and/or failure to disclose material information.

1367. The Kia Defendants and Hyundai MOBIS's violations present a continuing risk to the Missouri Plaintiff and Missouri State Class members, as well as to the general public. The Kia Defendants and Hyundai MOBIS's unlawful acts and practices complained of herein affect the public interest.

1368. Pursuant to Mo. Rev. Stat. § 407.025, the Missouri Plaintiff and Missouri State Class members seek an order enjoining the Kia Defendants and Hyundai MOBIS's unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Missouri MPA.

> **d.      Missouri Count 4: Violation of the Missouri Merchandising Practices Act (Mo. Rev. Stat. § 407.010, *et seq.*) Against the ZF TRW and STMicro Defendants**

1369. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1370. The Missouri Plaintiff brings this count individually and on behalf of members of the Missouri State Class against the ZF TRW and STMicro Defendants.

1371. The ZF TRW Defendants, the STMicro Defendants, the Missouri Plaintiff, and Missouri State Class members are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

1372. The ZF TRW and STMicro Defendants were and are engaged in "trade or commerce" within the meaning of Mo. Rev. Stat. § 407.010(7).

1373. The Missouri Merchandising Practices Act ("Missouri MPA") prohibits unlawful business practices. Mo. Rev. Stat. § 407.020(1).

1374. In the course of their business the ZF TRW and STMicro Defendants, through their agents, employees, and/or subsidiaries, violated the Missouri MPA by knowingly and intentionally omitting, concealing, and failing to disclose material facts regarding the existence, nature, and scope of the defect with ZF TRW ACUs installed in the Class Vehicles, as detailed above.

1375. Specifically, by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles due to the ACU defect, the ZF TRW and STMicro Defendants engaged in unlawful business practices prohibited by Mo. Rev. Stat. § 407.020(1), including using or employing deception and fraud, and/or or the concealment, suppression or omission of material facts regarding the ACU defect.

1376. The ZF TRW and STMicro Defendants' unfair or deceptive acts or practices, including concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Missouri Plaintiff and Missouri State Class members, about the true safety and reliability of Class Vehicles and/or the defective ACUs installed in them.

1377. The ZF TRW and STMicro Defendants' scheme and concealment of the ACU defect and true characteristics of the defective ACUs in the Class Vehicles were material to the Missouri Plaintiff and Missouri State Class members,

as the ZF TRW and STMicro Defendants intended. Had they known the truth, the Missouri Plaintiff and Missouri State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1378. The Missouri Plaintiff and Missouri State Class members had no way of learning the facts that the ZF TRW and STMicro Defendants had concealed or failed to disclose. The Missouri Plaintiff and Missouri State Class members did not, and could not, unravel the ZF TRW and STMicro Defendants' deception on their own.

1379. The ZF TRW and STMicro Defendants had an ongoing duty to the Missouri Plaintiff and Missouri State Class members to refrain from unfair or deceptive practices under the Missouri MPA in the course of their business. Specifically, the ZF TRW and STMicro Defendants owed Plaintiff and Missouri State Class members a duty to disclose all the material facts concerning the ACU defect in the Class Vehicles because they possessed exclusive knowledge and they intentionally concealed the ACU defect from the Missouri Plaintiff and Missouri State Class members.

1380. The Missouri Plaintiff and Missouri State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the ZF TRW and STMicro Defendants' concealment and/or failure to disclose material information.

1381. The ZF TRW and STMicro Defendants' violations present a continuing risk to the Missouri Plaintiff and Missouri State Class members, as well as to the general public. The ZF TRW and STMicro Defendants' unlawful acts and practices complained of herein affect the public interest.

1382. Pursuant to Mo. Rev. Stat. § 407.025, the Missouri Plaintiff and Missouri State Class members seek an order enjoining the ZF TRW and STMicro Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Missouri MPA.

### xi.   Montana

#### a.   Montana Count 1: Breach of Express Warranty (Mont. Code Ann. §§ 30-2-313 and 30-2A-210) Against the FCA Defendants

1383. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1384. Plaintiff Barry Adams (hereinafter, "Montana Plaintiff") brings this count individually and on behalf of members of the Montana State Class who purchased or leased FCA Class Vehicles, against the FCA Defendants.

1385. The FCA Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Mont. Code Ann. §§ 30-2-104(1) and 30-2A-103(3)(k), and "sellers" of motor vehicles under § 30-2-103(1)(d).

1386. With respect to leases, the FCA Defendants are and were at all relevant times "lessors" of motor vehicles under Mont. Code Ann. § 30-2A-103(1)(p).

1387. All Montana State Class members who purchased FCA Class Vehicles in Montana are "buyers" within the meaning of Mont. Code Ann. § 30-2-103(1)(a).

1388. All Montana State Class members who leased FCA Class Vehicles in Montana are "lessees" within the meaning of Mont. Code Ann. § 30-2A-103(1)(n).

1389. The FCA Class Vehicles are and were at all relevant times "goods" within the meaning of Mont. Code Ann. §§ 30-2-105(1) and 30-2A-103(1)(h).

1390. In connection with the purchase or lease of FCA Class Vehicles, the FCA Defendants provided the Montana Plaintiff and the Montana State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

1391. The FCA Defendants' warranties formed the basis of the bargain that was reached when the Montana Plaintiff and Montana State Class members

unknowingly purchased or leased FCA Class Vehicles that came equipped with the
ACU defect.

1392. The FCA Defendants' warranties formed the basis of the bargain that
was reached when the Montana Plaintiff and Montana State Class members
unknowingly purchased or leased FCA Class Vehicles that came equipped with a
defective ACU.

1393. However, the FCA Defendants knew or should have known that the
warranties were false and/or misleading. Specifically, the FCA Defendants were
aware of the ACU defect in the FCA Class Vehicles, which made the vehicles
inherently defective and dangerous at the time that they were sold and leased to the
Montana Plaintiff and Montana State Class members.

1394. The Montana Plaintiff and Montana State Class members reasonably
relied on the FCA Defendants' express warranties when purchasing or leasing their
FCA Class Vehicles.

1395. The FCA Defendants knowingly breached their express warranties to
repair defects in materials and workmanship by failing to repair the ACU defect or
replace the defective ACUs in the FCA Class Vehicles. The FCA Defendants also
breached their express warranties by providing a product containing defects that
were never disclosed to the Montana Plaintiff and Montana State Class members.

1396. The Montana Plaintiff and Montana State Class members have provided the FCA Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of the numerous NHTSA complaints filed against them, and the individual notice letters sent by Montana State Class members within a reasonable amount of time after the ACU defect became public. Additionally, a notice letter was sent on behalf of the Montana Plaintiff and Montana State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

1397. Alternatively, any opportunity to cure the breach is unnecessary and futile.

1398. As a direct and proximate result of the FCA Defendants' breach of their express warranties, the Montana Plaintiff and Montana State Class members have been damaged in an amount to be proven at trial.

**b.    Montana Count 2: Breach of Implied Warranty of Merchantability (Mont. Code Ann. §§ 30-2-314, 30-2A-212) Against the FCA Defendants**

1399. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1400. The Montana Plaintiff brings this count individually and on behalf of members of the Montana State Class who purchased or leased FCA Class Vehicles, against the FCA Defendants.

1401. A warranty that the FCA Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Mont. Code Ann. §§ 30-2-314 and 30-2A-212.

1402. The FCA Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the FCA Class Vehicles suffer from the ACU defect, which may cause the airbags and seatbelt pretensioners to fail to deploy during an accident, rendering the FCA Class Vehicles inherently defective and dangerous.

1403. The FCA Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Mont. Code Ann. §§ 30-2-104(1) and 30-2A-103(3)(k), and "sellers" of motor vehicles under § 30-2-103(1)(d).

1404. With respect to leases, the FCA Defendants are and were at all relevant times "lessors" of motor vehicles under Mont. Code Ann. § 30-2A-103(1)(p).

1405. All Montana State Class members who purchased FCA Class Vehicles in Montana are "buyers" within the meaning of Mont. Code Ann. § 30-2-103(1)(a).

1406. All Montana State Class members who leased FCA Class Vehicles in Montana are "lessees" within the meaning of Mont. Code Ann. § 30-2A-103(1)(n).

1407. The FCA Class Vehicles are and were at all relevant times "goods" within the meaning of Mont. Code Ann. §§ 30-2-105(1) and 30-2A-103(1)(h).

1408. The Montana Plaintiff and Montana State Class members have provided the FCA Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of the numerous NHTSA complaints filed against them, and the individual notice letters sent by Montana State Class members within a reasonable amount of time after the ACU defect became public. Additionally, a notice letter was sent on behalf of the Montana Plaintiff and Montana State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

1409. Alternatively, any opportunity to cure the breach is unnecessary and futile.

1410. As a direct and proximate result of the FCA Defendants' breach of the implied warranty of merchantability, the Montana Plaintiff and Montana State Class members have been damaged in an amount to be proven at trial.

> **c.** **Montana Count 3: Violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1973 (Mont. Code Ann. § 30-14-101, *et seq.*) Against the FCA Defendants**

1411. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1412. The Montana Plaintiff brings this count individually and on behalf of members of the Montana State Class who purchased or leased FCA Class Vehicles, against the FCA Defendants.

1413. The FCA Defendants, the Montana Plaintiff, and Montana State Class members are "persons" within the meaning of Mont. Code Ann. § 30-14-102(6).

1414. The Montana Unfair Trade Practices and Consumer Protection Act of 1973 ("Montana CPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Mont. Code Ann. § 30-14-103.

1415. In the course of their business, the FCA Defendants, through their agents, employees, and/or subsidiaries, violated the Montana CPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose

material facts regarding the reliability, safety, and performance of the FCA Class Vehicles and/or the defective ACUs, as detailed above.

1416. Specifically, by misrepresenting the FCA Class Vehicles and/or the defective ACUs installed in them as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the FCA Class Vehicles and/or the ACU defect, the FCA Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce, as prohibited by Mont. Code Ann. § 30-14-103.

1417. The FCA Defendants' unfair or deceptive acts or practices, including their misrepresentations, concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Montana Plaintiff and Montana State Class members, about the true safety and reliability of FCA Class Vehicles and/or the defective ACUs installed in them, the quality of the FCA Class Vehicles, and the true value of the FCA Class Vehicles.

1418. The FCA Defendants' scheme and concealment of the ACU defect and true characteristics of the Occupant Restraint Systems in the FCA Class Vehicles were material to the Montana Plaintiff and Montana State Class members, as the FCA Defendants intended. Had they known the truth, the Montana Plaintiff

and Montana State Class members would not have purchased or leased the FCA Class Vehicles, or would have paid significantly less for them.

1419. The Montana Plaintiff and Montana State Class members had no way of discerning that the FCA Defendants' representations were false and misleading and/or otherwise learning the facts that the FCA Defendants had concealed or failed to disclose. The Montana Plaintiff and Montana State Class members did not, and could not, unravel the FCA Defendants' deception on their own.

1420. The FCA Defendants had an ongoing duty to the Montana Plaintiff and Montana State Class members to refrain from unfair or deceptive practices under the Montana DTPA in the course of their business. Specifically, the FCA Defendants owed the Montana Plaintiff and Montana State Class members a duty to disclose all the material facts concerning the ACU defect in the FCA Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the ACU defect from the Montana Plaintiff and Montana State Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1421. The Montana Plaintiff and Montana State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the FCA Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1422. The FCA Defendants' violations present a continuing risk to the Montana Plaintiff and Montana State Class members, as well as to the general public. The FCA Defendants' unlawful acts and practices complained of herein affect the public interest.

1423. Pursuant to Mont. Code Ann. § 30-14-133, Plaintiffs and the Montana State Class members seek an order enjoining the FCA Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Montana CPA.

### d.    Montana Count 4: Violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1973 (Mont. Code Ann. § 30-14-101, *et seq.*) Against the ZF TRW and STMicro Defendants

1424. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1425. The Montana Plaintiff brings this count individually and on behalf of members of the Montana State Class against the ZF TRW and STMicro Defendants.

1426. The ZF TRW Defendants, the STMicro Defendants, the Montana Plaintiff, and Montana State Class members are "persons" within the meaning of Mont. Code Ann. § 30-14-102(6).

1427.  The Montana Unfair Trade Practices and Consumer Protection Act of 1973 ("Montana CPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Mont. Code Ann. § 30-14-103.

1428.  In the course of their business, the ZF TRW and STMicro Defendants, through their agents, employees, and/or subsidiaries, violated the Montana CPA by knowingly and intentionally omitting, concealing, and failing to disclose material facts regarding the existence, nature, and scope of the defect with ZF TRW ACUs installed in the Class Vehicles, as detailed above.

1429.  Specifically, by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles due to the ACU defect, the ZF TRW and STMicro Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce prohibited by Mont. Code Ann. § 30-14-103.

1430.  The ZF TRW and STMicro Defendants' unfair or deceptive acts or practices, including their concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Montana Plaintiff and Montana State Class members, about the true

safety and reliability of Class Vehicles and/or the defective ACUs installed in them.

1431. The ZF TRW and STMicro Defendants' scheme and concealment of the ACU defect and true characteristics of the defective ACUs in the Class Vehicles were material to the Montana Plaintiff and Montana State Class members, as the ZF TRW and STMicro Defendants intended. Had they known the truth, the Montana Plaintiff and Montana State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1432. The Montana Plaintiff and Montana State Class members had no way of learning the facts that the ZF TRW and STMicro Defendants had concealed or failed to disclose. The Montana Plaintiff and Montana State Class members did not, and could not, unravel the ZF TRW and STMicro Defendants' deception on their own.

1433. The ZF TRW and STMicro Defendants had an ongoing duty to the Montana Plaintiff and Montana State Class members to refrain from unfair or deceptive practices under the Montana DTPA in the course of their business. Specifically, the ZF TRW and STMicro Defendants owed the Montana Plaintiff and Montana State Class members a duty to disclose all the material facts concerning the ACU defect in the Class Vehicles because they possessed exclusive

knowledge and they intentionally concealed the ACU defect from the Montana Plaintiff and Montana State Class members.

1434. The Montana Plaintiff and Montana State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the ZF TRW and STMicro Defendants' concealment and/or failure to disclose material information.

1435. The ZF TRW and STMicro Defendants' violations present a continuing risk to the Montana Plaintiff and Montana State Class members, as well as to the general public. The ZF TRW and STMicro Defendants' unlawful acts and practices complained of herein affect the public interest.

1436. Pursuant to Mont. Code Ann. § 30-14-133, the Montana Plaintiff and Montana State Class members seek an order enjoining the ZF TRW and STMicro Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Montana CPA.

xii.    **New Jersey**

a.    **New Jersey Count 1: Breach of Express Warranty (N.J. Stat. Ann. §§ 12A:2-313 and 12A:2-210) Against the Kia Defendants**

1437. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1438. Plaintiff Gersen Damens (hereinafter, "New Jersey Plaintiff") brings this count individually and on behalf of members of the New Jersey State Class who purchased or leased Kia Class Vehicles, against the Kia Defendants.

1439. The Kia Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.J. Stat. Ann. §§ 12A:2-104(1) and 12A:2A-103(3), and "sellers" of motor vehicles under § 12A:2-103(1)(d).

1440. With respect to leases, the Kia Defendants are and were at all relevant times "lessors" of motor vehicles under N.J. Stat. Ann. § 12A:2A-103(1)(p).

1441. All New Jersey State Class members who purchased Kia Class Vehicles in New Jersey are "buyers" within the meaning of N.J. Stat. Ann. § 12A:2-103(1)(a).

1442. All New Jersey State Class members who leased Kia Class Vehicles in New Jersey are "lessees" within the meaning of N.J. Stat. Ann. § 12A:2A-103(1)(n).

1443. The Kia Class Vehicles are and were at all relevant times "goods" within the meaning of N.J. Stat. Ann. §§ 12A:2-105(1) and 2A-103(1)(h).

1444. In connection with the purchase or lease of Kia Class Vehicles, the Kia Defendants provided the New Jersey Plaintiff and New Jersey State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

1445. The Kia Defendants' warranties formed the basis of the bargain that was reached when the New Jersey Plaintiff and New Jersey State Class members unknowingly purchased or leased Kia Class Vehicles that came equipped with a defective ACU.

1446. However, the Kia Defendants knew or should have known that the warranties were false and/or misleading. Specifically, the Kia Defendants were aware of the ACU defect in the Kia Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to the New Jersey Plaintiff and New Jersey State Class members.

1447. The New Jersey Plaintiff and New Jersey State Class members reasonably relied on the Kia Defendants' express warranties when purchasing or leasing their Kia Class Vehicles.

1448. The Kia Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the ACU defect or

replace the defective ACUs in the Kia Class Vehicles. The Kia Defendants also breached their express warranties by providing a product containing defects that were never disclosed to the New Jersey Plaintiff and New Jersey State Class members.

1449. The New Jersey Plaintiff and New Jersey State Class members have provided the Kia Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of the numerous NHTSA complaints filed against them, and individual notice letters sent by the New Jersey State Class members within a reasonable amount of time after the ACU defect became public. Additionally, a notice letter was sent on behalf of the New Jersey Plaintiff and New Jersey State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

1450. Alternatively, any opportunity to cure the breach is unnecessary and futile.

1451. As a direct and proximate result of the Kia Defendants' breach of their express warranties, the New Jersey Plaintiff and New Jersey State Class members have been damaged in an amount to be proven at trial.

**b.    New Jersey Count 2: Breach of Implied Warranty of Merchantability (N.J. Stat. Ann. §§ 12A:2-314 and 12A:2A-212) Against the Kia Defendants**

1452. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1453. The New Jersey Plaintiff brings this count individually and on behalf of members of the New Jersey State Class who purchased or leased Kia Class Vehicles, against the Kia Defendants.

1454. A warranty that the Kia Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to N.J. Stat. Ann. §§ 12A:2-314 and 12A:2A-212.

1455. The Kia Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Kia Class Vehicles suffer from the ACU defect, which causes the airbags and seatbelt pretensioners to fail to deploy during an accident, rendering the Kia Class Vehicles inherently defective and dangerous.

1456. The Kia Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.J. Stat. Ann. §§ 12A:2-104(1) and 12A:2A-103(3), and "sellers" of motor vehicles under § 12A:2-103(1)(d).

1457. With respect to leases, the Kia Defendants are and were at all relevant times "lessors" of motor vehicles under N.J. Stat. Ann. § 12A:2A-103(1)(p).

1458. All New Jersey State Class members who purchased Kia Class Vehicles in New Jersey are "buyers" within the meaning of N.J. Stat. Ann. § 12A:2-103(1)(a).

1459. All New Jersey State Class members who leased Kia Class Vehicles in New Jersey are "lessees" within the meaning of N.J. Stat. Ann. § 12A:2A-103(1)(n).

1460. The Kia Class Vehicles are and were at all relevant times "goods" within the meaning of N.J. Stat. Ann. §§ 12A:2-105(1) and 2A-103(1)(h).

1461. The New Jersey Plaintiff and New Jersey State Class members have provided the Kia Defendants with reasonable notice and opportunity to cure the breaches of their implied warranties by way of the numerous NHTSA complaints filed against them, and individual notice letters sent by the New Jersey State Class members within a reasonable amount of time after the ACU defect became public. Additionally, a notice letter was sent on behalf of the New Jersey Plaintiff and New Jersey State Class members to FCA US LLC, Honda Defendants, Hyundai

Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

1462. Alternatively, any opportunity to cure the breach is unnecessary and futile.

1463. As a direct and proximate result of the Kia Defendants' breach of the implied warranty of merchantability, the New Jersey Plaintiff and New Jersey State Class members have been damaged in an amount to be proven at trial.

### c.    New Jersey Count 3: Violation of New Jersey Consumer Fraud Act (N.J. Stat. Ann. § 56:8-1, *et seq.*) Against the Kia Defendants and Hyundai MOBIS

1464. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1465. The New Jersey Plaintiff brings this count individually and on behalf of members of the New Jersey State Class who purchased or leased Kia Class Vehicles, against the Kia Defendants and Hyundai MOBIS.

1466. The Kia Defendants, Hyundai MOBIS, the New Jersey Plaintiff, and New Jersey State Class members are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

1467. The Kia Class Vehicles and ACUs installed in them are "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c).

1468. The New Jersey Consumer Fraud Act ("New Jersey CFA") prohibits unfair trade practices. N.J. Stat. Ann. § 56:8-2.

1469. In the course of their business, the Kia Defendants and Hyundai MOBIS, through their agents, employees, and/or subsidiaries, violated the New Jersey CFA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Kia Class Vehicles or the defective ACUs, as detailed above.

1470. Specifically, by misrepresenting the Kia Class Vehicles and/or the defective ACUs installed in them as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Kia Class Vehicles and/or the ACU defect, the Kia Defendants and Hyundai MOBIS engaged in in the following unfair or deceptive acts or practices as prohibited by N.J. Stat. Ann. § 56:8-2: using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Kia Class Vehicles.

1471. The Kia Defendants and Hyundai MOBIS's unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the New Jersey Plaintiff and New Jersey State Class members, about the true safety and reliability of Kia Class Vehicles and/or the defective ACUs installed in them, the quality of the Kia Class Vehicles, and the true value of the Kia Class Vehicles.

1472. The Kia Defendants and Hyundai MOBIS's scheme and concealment of the ACU defect and true characteristics of the Occupant Restraint Systems in the Kia Class Vehicles were material to the Plaintiff and New Jersey State Class members, as the Kia Defendants and Hyundai MOBIS intended. Had they known the truth, the New Jersey Plaintiff and New Jersey State Class members would not have purchased or leased the Kia Class Vehicles, or would have paid significantly less for them.

1473. The New Jersey Plaintiff and New Jersey State Class members had no way of discerning that the Kia Defendants' representations were false and misleading and/or otherwise learning the facts that the Kia Defendants and Hyundai MOBIS had concealed or failed to disclose. The New Jersey Plaintiff and

New Jersey State Class members did not, and could not, unravel the Kia Defendants and Hyundai MOBIS's deception on their own.

1474. The Kia Defendants and Hyundai MOBIS had an ongoing duty to the New Jersey Plaintiff and New Jersey State Class members to refrain from unfair and deceptive practices under the New Jersey CFA in the course of their business. Specifically, the Kia Defendants and Hyundai MOBIS owed the New Jersey Plaintiff and New Jersey State Class members a duty to disclose all the material facts concerning the ACU defect in the Kia Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the ACU defect from the New Jersey Plaintiff and New Jersey State Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1475. The New Jersey Plaintiff and New Jersey State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the Kia Defendants and Hyundai MOBIS's concealment, misrepresentations, and/or failure to disclose material information.

1476. The Kia Defendants and Hyundai MOBIS's violations present a continuing risk to the New Jersey Plaintiff and New Jersey State Class members, as well as to the general public. The Kia Defendants and Hyundai MOBIS's unlawful acts and practices complained of herein affect the public interest.

1477. Pursuant to N.J. Stat. Ann. § 56:8-19, the New Jersey Plaintiff and New Jersey State Class members seek an order enjoining the Kia Defendants and Hyundai MOBIS's unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the New Jersey CFA.

### d. New Jersey Count 4: Violation of New Jersey Consumer Fraud Act (N.J. Stat. Ann. § 56:8-1, *et seq.*) Against the ZF TRW and STMicro Defendants

1478. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1479. The New Jersey Plaintiff brings this count individually and on behalf of members of the New Jersey State Class against the ZF TRW and STMicro Defendants.

1480. The ZF TRW Defendants, the STMicro Defendants, the New Jersey Plaintiff, and New Jersey State Class members are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

1481. The Class Vehicles and ACUs installed in them are "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c).

1482. The New Jersey Consumer Fraud Act ("New Jersey CFA") prohibits unfair trade practices. N.J. Stat. Ann. § 56:8-2.

1483. In the course of their business the ZF TRW and STMicro Defendants, through their agents, employees, and/or subsidiaries, violated the New Jersey CFA by knowingly and intentionally omitting, concealing, and failing to disclose material facts regarding the existence, nature, and scope of the defect with ZF TRW ACUs installed in the Class Vehicles, as detailed above.

1484. Specifically, by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles due to the ACU defect, the ZF TRW and STMicro Defendants engaged in one or more of the unlawful practices prohibited by N.J. Stat. Ann. § 56:8-2, including the act, use, or employment of any unconscionable commercial practice, and/or concealment, suppression or omission of material facts.

1485. The ZF TRW and STMicro Defendants' unfair or deceptive acts or practices, including concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the New Jersey Plaintiff and New Jersey State Class members, about the true safety and reliability of Class Vehicles and/or the defective ACUs installed in them.

1486. The ZF TRW and STMicro Defendants' scheme and concealment of the ACU defect and true characteristics of the defective ACUs in the Class Vehicles were material to the Plaintiff and New Jersey State Class members, as the

ZF TRW and STMicro Defendants intended. Had they known the truth, the New Jersey Plaintiff and New Jersey State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1487. The New Jersey Plaintiff and New Jersey State Class members had no way of learning the facts that the ZF TRW and STMicro Defendants had concealed or failed to disclose. The New Jersey Plaintiff and New Jersey State Class members did not, and could not, unravel the ZF TRW and STMicro Defendants' deception on their own.

1488. The ZF TRW and STMicro Defendants had an ongoing duty to the New Jersey Plaintiff and New Jersey State Class members to refrain from unfair and deceptive practices under the New Jersey CFA in the course of their business. Specifically, the ZF TRW and STMicro Defendants owed the New Jersey Plaintiff and New Jersey State Class members a duty to disclose all the material facts concerning the ACU defect in the Class Vehicles because they possessed exclusive knowledge and they intentionally concealed the ACU defect from the New Jersey Plaintiff and New Jersey State Class members.

1489. The New Jersey Plaintiff and New Jersey State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the ZF TRW and STMicro Defendants' concealment and/or failure to disclose material information.

1490. The ZF TRW and STMicro Defendants' violations present a continuing risk to the New Jersey Plaintiff and New Jersey State Class members, as well as to the general public. The ZF TRW and STMicro Defendants' unlawful acts and practices complained of herein affect the public interest.

1491. Pursuant to N.J. Stat. Ann. § 56:8-19, the New Jersey Plaintiff and New Jersey State Class members seek an order enjoining the ZF TRW and STMicro Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the New Jersey CFA.

### xiii.   New York

#### a.    New York Count 1: Breach of Express Warranty (N.Y. U.C.C. Law §§ 2-313 and 2-A-210) Against the Honda Defendants

1492. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1493. Plaintiff Ravichandran Namakkal (hereinafter, "New York Plaintiff") brings this count individually and on behalf of members of the New York State Class who purchased or leased Honda Class Vehicles, against the Honda Defendants.

1494. The Honda Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.Y. U.C.C. Law §§ 2-104(1) and 2-A-103(3), and "sellers" of motor vehicles under § 2-103(1)(d).

1495. With respect to leases, the Honda Defendants are and were at all relevant times "lessors" of motor vehicles under N.Y. U.C.C. Law § 2-A-103(1)(p).

1496. All New York State Class members who purchased Class Vehicles (for purposes of this count, "Class Vehicles" are limited to the Honda Class Vehicles) in New York are "buyers" within the meaning of N.Y. U.C.C. Law § 2-103(1)(a).

1497.  All New York State Class members who leased Class Vehicles in New York are "lessees" within the meaning of N.Y. U.C.C. Law § 2-A-103(1)(n).

1498. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. U.C.C. Law §§ 2-105(1) and 2A-103(1)(h).

1499. In connection with the purchase or lease of Class Vehicles, the Honda Defendants provided the New York Plaintiff and New York State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

1500. The Honda Defendants' warranties formed the basis of the bargain that was reached when the New York Plaintiff and New York State Class members

unknowingly purchased or leased Class Vehicles that came equipped with a defective ACU.

1501. However, the Honda Defendants knew or should have known that the warranties were false and/or misleading. Specifically, the Honda Defendants were aware of the ACU defect in the Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to the New York Plaintiff and New York State Class members.

1502. The New York Plaintiff and New York State Class members reasonably relied on the Honda Defendants' express warranties when purchasing or leasing their Class Vehicles.

1503. The Honda Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the ACU defect or replace the defective ACUs in the Class Vehicles. The Honda Defendants also breached their express warranties by providing a product containing defects that were never disclosed to the New York Plaintiff and New York State Class members.

1504. The New York Plaintiff and New York State Class members have provided the Honda Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of the numerous NHTSA complaints filed against them, and individual notice letters sent by the New York State Class

members within a reasonable amount of time after the ACU defect became public. Additionally, a notice letter was sent on behalf of the New York Plaintiff and New York State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

1505. Alternatively, any opportunity to cure the breach is unnecessary and futile.

1506. As a direct and proximate result of the Honda Defendants' breach of their express warranties, the New York Plaintiff and New York State Class members have been damaged in an amount to be proven at trial.

**b.**   **New York Count 2: Breach of Implied Warranty of Merchantability (N.Y. U.C.C. Law §§ 2-314 and 2-A-212) Against the Honda Defendants**

1507. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1508. The New York Plaintiff brings this count individually and on behalf of members of the New York State Class who purchased or leased Honda Class Vehicles, against the Honda Defendants.

1509. A warranty that the Class Vehicles (for purposes of this count, "Class Vehicles" are limited to the Honda Class Vehicles) were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to N.Y. U.C.C. Law §§ 2-314 and 2-A-212.

1510. The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the ACU defect, which causes the airbags and seatbelt pretensioners to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

1511. The Honda Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.Y. U.C.C. Law §§ 2-104(1) and 2-A-103(3), and "sellers" of motor vehicles under § 2-103(1)(d).

1512. With respect to leases, the Honda Defendants are and were at all relevant times "lessors" of motor vehicles under N.Y. U.C.C. Law § 2-A-103(1)(p).

1513. All New York State Class members who purchased Class Vehicles in New York are "buyers" within the meaning of N.Y. U.C.C. Law § 2-103(1)(a).

1514.  All New York State Class members who leased Class Vehicles in New York are "lessees" within the meaning of N.Y. U.C.C. Law § 2-A-103(1)(n).

1515.  The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. U.C.C. Law §§ 2-105(1) and 2A-103(1)(h).

1516.  The New York Plaintiff and New York State Class members have provided the Honda Defendants with reasonable notice and opportunity to cure the breaches of their implied warranties by way of the numerous NHTSA complaints filed against them, and individual notice letters sent by the New York State Class members within a reasonable amount of time after the ACU defect became public. Additionally, a notice letter was sent on behalf of the New York Plaintiff and New York State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

1517.  Alternatively, any opportunity to cure the breach is unnecessary and futile.

1518.  As a direct and proximate result of the Honda Defendants' breach of the implied warranty of merchantability, the New York Plaintiff and New York State Class members have been damaged in an amount to be proven at trial.

c.    New York Count 3: Violation of New York General Business Law § 349 (N.Y. Gen. Bus. Law § 349) Against the Honda Defendants

1519. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1520. The New York Plaintiff brings this count individually and on behalf of members of the New York State Class who purchased or leased Honda Class Vehicles, against the Honda Defendants.

1521. The New York Plaintiff and New York State Class members are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

1522. The Honda Defendants are each a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.

1523. The New York Deceptive Acts and Practices Act ("New York DAPA") prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce[.]" N.Y. Gen. Bus. Law. § 349.

1524. In the course of their business, the Honda Defendants, through their agents, employees, and/or subsidiaries, violated the New York DAPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the

Class Vehicles (for purposes of this count, "Class Vehicles" are limited to the Honda Class Vehicles) or the defective ACUs, as detailed above.

1525. Specifically, by misrepresenting the Class Vehicles and/or the defective ACUs installed in them as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles and/or the ACU defect, the Honda Defendants engaged in deceptive acts or practices in the conduct of business, trade or commerce, and/or in the furnishing of any service, as prohibited by N.Y. Gen. Bus. Law § 349.

1526. The Honda Defendants' unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the New York Plaintiff and New York State Class members, about the true safety and reliability of Class Vehicles and/or the defective ACUs installed in them, the quality of the Class Vehicles, and the true value of the Class Vehicles.

1527. The Honda Defendants' scheme and concealment of the ACU defect and true characteristics of the Occupant Restraint Systems in the Class Vehicles were material to the New York Plaintiff and New York State Class members, as the Honda Defendants intended. Had they known the truth, the New York Plaintiff

and New York State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1528. The New York Plaintiff and New York State Class members had no way of discerning that the Honda Defendants' representations were false and misleading and/or otherwise learning the facts that the Honda Defendants had concealed or failed to disclose. The New York Plaintiff and New York State Class members did not, and could not, unravel the Honda Defendants' deception on their own.

1529. The Honda Defendants had an ongoing duty to the New York Plaintiff and New York State Class members to refrain from unfair and deceptive practices under the New York DAPA in the course of their business. Specifically, the Honda Defendants owed the New York Plaintiff and New York State Class members a duty to disclose all the material facts concerning the ACU defect in the Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the ACU defect from the New York Plaintiff and New York State Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1530. The New York Plaintiff and New York State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the

Honda Defendants' concealment, misrepresentations, and/or failure to disclose
material information.

1531. The Honda Defendants' violations present a continuing risk to the
New York Plaintiff and New York State Class members, as well as to the general
public. The Honda Defendants' unlawful acts and practices complained of herein
affect the public interest.

1532. Pursuant to N.Y. Gen. Bus. Law § 349, the New York Plaintiff and
New York State Class members seek an order enjoining the Honda Defendants'
unfair or deceptive acts or practices and awarding damages and any other just and
proper relief available under the New York DAPA.

> **d.    New York Count 4: Violation of New York General
> Business Law § 349 (N.Y. Gen. Bus. Law § 349) Against the
> ZF TRW and STMicro Defendants**

1533. Plaintiffs reallege and incorporate by reference all preceding
allegations as though fully set forth herein.

1534. The New York Plaintiff brings this count individually and on behalf
of members of the New York State Class against the ZF TRW and STMicro
Defendants.

1535. The New York Plaintiff and New York State Class members are
"persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

1536. The ZF TRW Defendants and the STMicro Defendants are each a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.

1537. The New York Deceptive Acts and Practices Act ("New York DAPA") prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce[.]" N.Y. Gen. Bus. Law. § 349.

1538. In the course of their business the ZF TRW and STMicro Defendants, through their agents, employees, and/or subsidiaries, violated the New York DAPA by knowingly and intentionally omitting, concealing, and failing to disclose material facts regarding the existence, nature, and scope of the defect with ZF TRW ACUs installed in the Class Vehicles, as detailed above.

1539. Specifically, by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles due to the ACU defect, the ZF TRW and STMicro Defendants engaged in deceptive acts or practices in the conduct of business, trade or commerce prohibited by N.Y. Gen. Bus. Law § 349.

1540. The ZF TRW and STMicro Defendants' unfair or deceptive acts or practices, including concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the

New York Plaintiff and New York State Class members, about the true safety and reliability of Class Vehicles and/or the defective ACUs installed in them.

1541. The ZF TRW and STMicro Defendants' scheme and concealment of the ACU defect and true characteristics of the defective ACUs in the Class Vehicles were material to the New York Plaintiff and New York State Class members, as the ZF TRW and STMicro Defendants intended. Had they known the truth, the New York Plaintiff and New York State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1542. The New York Plaintiff and New York State Class members had no way of learning the facts that the ZF TRW and STMicro Defendants had concealed or failed to disclose. The New York Plaintiff and New York State Class members did not, and could not, unravel the ZF TRW and STMicro Defendants' deception on their own.

1543. The ZF TRW and STMicro Defendants had an ongoing duty to the New York Plaintiff and New York State Class members to refrain from unfair and deceptive practices under the New York DAPA in the course of their business. Specifically, the ZF TRW and STMicro Defendants owed the New York Plaintiff and New York State Class members a duty to disclose all the material facts concerning the ACU defect in the Class Vehicles because they possessed exclusive

knowledge and they intentionally concealed the ACU defect from the New York Plaintiff and New York State Class members.

1544. The New York Plaintiff and New York State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the ZF TRW and STMicro Defendants' concealment and/or failure to disclose material information.

1545. The ZF TRW and STMicro Defendants' violations present a continuing risk to the New York Plaintiff and New York State Class members, as well as to the general public. The ZF TRW and STMicro Defendants' unlawful acts and practices complained of herein affect the public interest.

1546. Pursuant to N.Y. Gen. Bus. Law § 349, the New York Plaintiff and New York State Class members seek an order enjoining the ZF TRW and STMicro Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the New York DAPA.

**e.    New York Count 5: Violation of New York General Business Law § 350 (N.Y. Gen. Bus. Law § 350) Against the Honda Defendants**

1547. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1548. The New York Plaintiff brings this count individually and on behalf of members of the New York State Class who purchased or leased Honda Class Vehicles, against the Honda Defendants.

1549. The Honda Defendants were and are engaged in "conduct of business, trade or commerce" within the meaning of N.Y. Gen. Bus. Law § 350.

1550. The New York False Advertising Act ("New York FAA") prohibits "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 350.

1551. The Honda Defendants caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by exercise of reasonable care should have been known to the Honda Defendants, to be untrue and misleading to consumers, including the New York Plaintiff and New York State Class members. Numerous examples of these statements and advertisements appear in the preceding paragraphs throughout this Complaint and Exhibits 1, 4-7, 9-10, 12-13, 15-16, 17, and 19.

1552. In the course of their business, the Honda Defendants, through their agents, employees, and/or subsidiaries, violated the New York FAA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Class

Vehicles (for purposes of this count, "Class Vehicles" are limited to the Honda
Class Vehicles) or the defective ACUs, as detailed above.

1553. Specifically, by misrepresenting the Class Vehicles and/or the
defective ACUs installed in them as safe and/or free from defects, and by failing to
disclose and actively concealing the dangers and risk posed by the Class Vehicles
and/or the ACU defect, the Honda Defendants engaged in the false and misleading
advertising practices prohibited by N.Y. Gen. Bus. Law § 350.

1554. The Honda Defendants' false advertising practices, including
misrepresentations, concealments, omissions, and suppressions of material facts,
had a tendency or capacity to mislead and create a false impression in consumers,
and were likely to and did in fact deceive reasonable consumers, including the
New York Plaintiff and New York State Class members, about the true safety and
reliability of Class Vehicles and/or the defective ACUs installed in them, the
quality of the Class Vehicles, and the true value of the Class Vehicles.

1555. The Honda Defendants' scheme and concealment of the ACU defect
and true characteristics of the Occupant Restraint Systems in the Class Vehicles
were material to the New York Plaintiff and New York State Class members, as
the Honda Defendants intended. Had they known the truth, the New York Plaintiff
and New York State Class members would not have purchased or leased the Class
Vehicles, or would have paid significantly less for them.

1556. The New York Plaintiff and New York State Class members relied on the Honda Defendants and had no way of discerning that those representations were false and misleading and/or otherwise learning the facts that the Honda Defendants' had concealed or failed to disclose. The New York Plaintiff and New York State Class members did not, and could not, unravel the Honda Defendants' deception on their own.

1557. The Honda Defendants had an ongoing duty to the New York Plaintiff and New York State Class members to refrain from false advertising practices under the New York FAA in the course of their business. Specifically, the Honda Defendants owed the New York Plaintiff and New York State Class members a duty to disclose all the material facts concerning the ACU defect in the Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the ACU defect from the New York Plaintiff and New York State Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1558. The New York Plaintiff and New York State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the Honda Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1559. The Honda Defendants' violations present a continuing risk to the New York Plaintiff and New York State Class members, as well as to the general public. The Honda Defendants' unlawful acts and practices complained of herein affect the public interest.

1560. Pursuant to New York FAA, the New York Plaintiff and New York State Class members seek an order enjoining the Honda Defendants' false advertising practices and awarding damages and any other just and proper relief available under the New York FAA.

    **xiv.    North Carolina**

        **a.    North Carolina Count 1: Breach of Express Warranty (N.C. Gen. Stat. §§ 25-2-313 and 25-2A-210) Against the FCA Defendants**

1561. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1562. Plaintiff Constanza Gonzalez (hereinafter, "North Carolina Plaintiff") brings this count individually and on behalf of members of the North Carolina State Class who purchased or leased FCA Class Vehicles, against the FCA Defendants.

1563. The FCA Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.C. Gen. Stat. §§ 25-2-104(1) and 25-2A-103(3), and "sellers" of motor vehicles under § 25-2-103(1)(d).

1564. With respect to leases, the FCA Defendants are and were at all relevant times "lessors" of motor vehicles under N.C. Gen. Stat. § 25-2A-103(1)(p).

1565. All North Carolina State Class members who purchased Class Vehicles (for purposes of this count, "Class Vehicles" are limited to the FCA Class Vehicles) in North Carolina are "buyers" within the meaning of N.C. Gen. Stat. § 25-2-103(1)(a).

1566. All North Carolina State Class members who leased Class Vehicles in North Carolina are "lessees" within the meaning of N.C. Gen. Stat. § 25-2A-103(1)(n).

1567. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.C. Gen. Stat. §§ 25-2-105(1) and 25-2A-103(1)(h).

1568. In connection with the purchase or lease of Class Vehicles, the FCA Defendants provided the North Carolina Plaintiff and North Carolina State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

1569. The FCA Defendants' warranties formed the basis of the bargain that was reached when the North Carolina Plaintiff and North Carolina State Class members unknowingly purchased or leased Class Vehicles that came equipped with a defective ACU.

1570. However, the FCA Defendants knew or should have known that the warranties were false and/or misleading. Specifically, the FCA Defendants were aware of the ACU defect in the Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to the North Carolina Plaintiff and North Carolina State Class members.

1571. The North Carolina Plaintiff and North Carolina State Class members reasonably relied on the FCA Defendants' express warranties when purchasing or leasing their Class Vehicles.

1572. The FCA Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the ACU defect or replace the defective ACUs in the Class Vehicles. The FCA Defendants also breached their express warranties by providing a product containing defects that were never disclosed to the North Carolina Plaintiff and North Carolina State Class members.

1573. The North Carolina Plaintiff and North Carolina State Class members have provided the FCA Defendants with reasonable notice and opportunity to cure

the breaches of their express warranties by way of the numerous NHTSA complaints filed against them, and individual notice letters sent by the North Carolina State Class members within a reasonable amount of time after the ACU defect became public. Additionally, a notice letter was sent on behalf of the North Carolina Plaintiff and North Carolina State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

1574. Alternatively, any opportunity to cure the breach is unnecessary and futile.

1575. As a direct and proximate result of the FCA Defendants' breach of their express warranties, the North Carolina Plaintiff and North Carolina State Class members have been damaged in an amount to be proven at trial.

### b.    North Carolina Count 2: Breach of Implied Warranty of Merchantability (N.C. Gen. Stat. §§ 25-2-314 and 25-2A-212) Against the FCA Defendants

1576. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1577. The North Carolina Plaintiff brings this count individually and on behalf of members of the North Carolina State Class who purchased or leased FCA Class Vehicles, against the FCA Defendants.

1578. A warranty that the Class Vehicles (for purposes of this count, "Class Vehicles" are limited to the FCA Class Vehicles) were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to N.C. Gen. Stat. §§ 25-2-314 and 25-2A-212.

1579. The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the ACU defect, which causes the airbags and seatbelt pretensioners to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

1580. The FCA Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.C. Gen. Stat. §§ 25-2-104(1) and 25-2A-103(3), and "sellers" of motor vehicles under § 25-2-103(1)(d).

1581. With respect to leases, the FCA Defendants are and were at all relevant times "lessors" of motor vehicles under N.C. Gen. Stat. § 25-2A-103(1)(p).

1582. All North Carolina State Class members who purchased Class Vehicles in North Carolina are "buyers" within the meaning of N.C. Gen. Stat. § 25-2-103(1)(a).

1583. All North Carolina State Class members who leased Class Vehicles in North Carolina are "lessees" within the meaning of N.C. Gen. Stat. § 25-2A-103(1)(n).

1584. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.C. Gen. Stat. §§ 25-2-105(1) and 25-2A-103(1)(h).

1585. The North Carolina Plaintiff and North Carolina State Class members have provided the FCA Defendants with reasonable notice and opportunity to cure the breaches of their implied warranties by way of the numerous NHTSA complaints filed against them, and individual notice letters sent by the North Carolina State Class members within a reasonable amount of time after the ACU defect became public. Additionally, a notice letter was sent on behalf of the North Carolina Plaintiff and North Carolina State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

1586. Alternatively, any opportunity to cure the breach is unnecessary and futile.

1587. As a direct and proximate result of the FCA Defendants' breach of the implied warranty of merchantability, the North Carolina Plaintiff and North Carolina State Class members have been damaged in an amount to be proven at trial.

### c. North Carolina Count 3: Violation of the North Carolina Unfair and Deceptive Trade Practices Act (N.C. Gen. Stat. § 75-1.1, *et seq.*) Against the FCA Defendants

1588. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1589. The North Carolina Plaintiff brings this count individually and on behalf of members of the North Carolina State Class who purchased or leased FCA Class Vehicles, against the FCA Defendants.

1590. The FCA Defendants were and are engaged in "commerce" within the meaning of N.C. Gen. Stat. § 75-1.1(b).

1591. In the course of their business, the FCA Defendants, through their agents, employees, and/or subsidiaries, violated the North Carolina Unfair and Deceptive Trade Practices Act ("North Carolina UDTPA") by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Class

Vehicles (for purposes of this count, "Class Vehicles" are limited to the FCA Class Vehicles) or the defective ACUs, as detailed above.

1592. Specifically, by misrepresenting the Class Vehicles and/or the defective ACUs installed in them as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles and/or the ACU defect, the FCA Defendants engaged the unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce prohibited by N.C. Gen. Stat. § 75-16.

1593. The FCA Defendants' unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the North Carolina Plaintiff and North Carolina State Class members, about the true safety and reliability of Class Vehicles and/or the defective ACUs installed in them, the quality of the Class Vehicles, and the true value of the Class Vehicles.

1594. The FCA Defendants' scheme and concealment of the ACU defect and true characteristics of the Occupant Restraint Systems in the Class Vehicles were material to the North Carolina Plaintiff and North Carolina State Class members, as the FCA Defendants intended. Had they known the truth, the North Carolina Plaintiff and North Carolina State Class members would not have

purchased or leased the Class Vehicles, or would have paid significantly less for them.

1595. The North Carolina Plaintiff and North Carolina State Class members had no way of discerning that the FCA Defendants' representations were false and misleading and/or otherwise learning the facts that the FCA Defendants had concealed or failed to disclose. The North Carolina Plaintiff and North Carolina State Class members did not, and could not, unravel the FCA Defendants' deception on their own.

1596. The FCA Defendants had an ongoing duty to the North Carolina Plaintiff and North Carolina State Class members to refrain from unfair and deceptive practices under the North Carolina UDTPA in the course of their business. Specifically, the FCA Defendants owed the North Carolina Plaintiff and North Carolina State Class members a duty to disclose all the material facts concerning the ACU defect in the Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the ACU defect from the North Carolina Plaintiff and North Carolina State Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1597. The North Carolina Plaintiff and North Carolina State Class members suffered ascertainable losses and actual damages as a direct and proximate result of

the FCA Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1598. The FCA Defendants' violations present a continuing risk to the North Carolina Plaintiff and North Carolina State Class members, as well as to the general public. The FCA Defendants' unlawful acts and practices complained of herein affect the public interest.

1599. Pursuant to N.C. Gen. Stat. § 75-16, the North Carolina Plaintiff and North Carolina State Class members seek an order enjoining the FCA Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the North Carolina UDTPA.

> **d.     North Carolina Count 4: Violation of the North Carolina Unfair and Deceptive Trade Practices Act (N.C. Gen. Stat. § 75-1.1, *et seq.*) Against the ZF TRW and STMicro Defendants**

1600. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1601. The North Carolina Plaintiff brings this count individually and on behalf of members of the North Carolina State Class against the ZF TRW and STMicro Defendants.

1602. The ZF TRW and STMicro Defendants were and are engaged in "commerce" within the meaning of N.C. Gen. Stat. § 75-1.1(b).

1603. In the course of their business the ZF TRW and STMicro Defendants, through their agents, employees, and/or subsidiaries, violated the North Carolina Unfair and Deceptive Trade Practices Act ("North Carolina UDTPA") by knowingly and intentionally omitting, concealing, and failing to disclose material facts regarding the existence, nature, and scope of the defect with ZF TRW ACUs installed in the Class Vehicles, as detailed above.

1604. Specifically, by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles due to the ACU defect, the ZF TRW and STMicro Defendants engaged in unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce prohibited by N.C. Gen. Stat. § 75-1.1(a).

1605. The ZF TRW and STMicro Defendants' unfair or deceptive acts or practices, including concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the North Carolina Plaintiff and North Carolina State Class members, about the true safety and reliability of Class Vehicles and/or the defective ACUs installed in them.

1606. The ZF TRW and STMicro Defendants' scheme and concealment of the ACU defect and true characteristics of the defective ACUs in the Class Vehicles were material to the North Carolina Plaintiff and North Carolina State Class members, as the ZF TRW and STMicro Defendants intended. Had they known the truth, the North Carolina Plaintiff and North Carolina State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1607. The North Carolina Plaintiff and North Carolina State Class members had no way of learning the facts that the ZF TRW and STMicro Defendants had concealed or failed to disclose. The North Carolina Plaintiff and North Carolina State Class members did not, and could not, unravel the ZF TRW and STMicro Defendants' deception on their own.

1608. The ZF TRW and STMicro Defendants had an ongoing duty to the North Carolina Plaintiff and North Carolina State Class members to refrain from unfair and deceptive practices under the North Carolina UDTPA in the course of their business. Specifically, the ZF TRW and STMicro Defendants owed the North Carolina Plaintiff and North Carolina State Class members a duty to disclose all the material facts concerning the ACU defect in the Class Vehicles because they possessed exclusive knowledge and they intentionally concealed the ACU defect from the North Carolina Plaintiff and North Carolina State Class members.

1609. The North Carolina Plaintiff and North Carolina State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the ZF TRW and STMicro Defendants' concealment and/or failure to disclose material information.

1610. The ZF TRW and STMicro Defendants' violations present a continuing risk to the North Carolina Plaintiff and North Carolina State Class members, as well as to the general public. The ZF TRW and STMicro Defendants' unlawful acts and practices complained of herein affect the public interest.

1611. Pursuant to N.C. Gen. Stat. § 75-1.1(a), the North Carolina Plaintiff and North Carolina State Class members seek an order enjoining the ZF TRW and STMicro Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the North Carolina UDTPA.

**xv.    Oklahoma**

**a.    Oklahoma Count 1: Breach of Express Warranty (Okla. Stat. Ann. tit. 12A, §§ 2-313 and 2A-210) Against the FCA Defendants**

1612. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1613. Plaintiff James Dean (hereinafter, "Oklahoma Plaintiff") brings this count individually and on behalf of members of the Oklahoma State Class who purchased or leased FCA Class Vehicles, against the FCA Defendants.

1614. The FCA Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Okla. Stat. Ann. tit. 12A, §§ 2-104(1) and 2-A-103(3), and "sellers" of motor vehicles under § 2-103(1)(c).

1615. With respect to leases, the FCA Defendants are and were at all relevant times "lessors" of motor vehicles under Okla. Stat. Ann. tit. 12A, § 2A-103(1)(p).

1616. All Oklahoma State Class members who purchased FCA Class Vehicles in Oklahoma are "buyers" within the meaning of Okla. Stat. Ann. tit. 12A, § 2-103(1)(a).

1617. All Oklahoma State Class members who leased FCA Class Vehicles in Oklahoma are "lessees" within the meaning of Okla. Stat. Ann. tit. 12A, § 2A-103(1)(n).

1618. The FCA Class Vehicles are and were at all relevant times "goods" within the meaning of Okla. Stat. Ann. tit. 12A, §§ 2-105(1) and 2A-103(1)(h).

1619. In connection with the purchase or lease of FCA Class Vehicles, the FCA Defendants provided the Oklahoma Plaintiff and Oklahoma State Class

members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

1620. The FCA Defendants' warranties formed the basis of the bargain that was reached when the Oklahoma Plaintiff and Oklahoma State Class members unknowingly purchased or leased FCA Class Vehicles that came equipped with a defective ACU.

1621. However, the FCA Defendants knew or should have known that the warranties were false and/or misleading. Specifically, the FCA Defendants were aware of the ACU defect in the FCA Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to the Oklahoma Plaintiff and Oklahoma State Class members.

1622. The Oklahoma Plaintiff and Oklahoma State Class members reasonably relied on the FCA Defendants' express warranties when purchasing or leasing their FCA Class Vehicles.

1623. The FCA Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the ACU defect or replace the defective ACUs in the FCA Class Vehicles. The FCA Defendants also breached their express warranties by providing a product containing defects that were never disclosed to the Oklahoma Plaintiff and Oklahoma State Class members.

1624. The Oklahoma Plaintiff and Oklahoma State Class members have provided the FCA Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of the numerous NHTSA complaints filed against them, and individual notice letters sent by the Oklahoma State Class members within a reasonable amount of time after the ACU defect became public. Additionally, a notice letter was sent on behalf of the Oklahoma Plaintiff and Oklahoma State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

1625. Alternatively, any opportunity to cure the breach is unnecessary and futile.

1626. As a direct and proximate result of the FCA Defendants' breach of their express warranties, the Oklahoma Plaintiff and Oklahoma State Class members have been damaged in an amount to be proven at trial.

**b.      Oklahoma Count 2: Breach of Implied Warranty of Merchantability (Okla. Stat. Ann. tit. 12A, §§ 2-314 and 2A-212) Against the FCA Defendants**

1627. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1628. The Oklahoma Plaintiff brings this count individually and on behalf of members of the Oklahoma State Class who purchased or leased FCA Class Vehicles, against the FCA Defendants.

1629. A warranty that the FCA Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Okla. Stat. Ann. tit. 12A, §§ 2-314 and 2A-212.

1630. The FCA Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the FCA Class Vehicles suffer from the ACU defect, which causes the airbags and seatbelt pretensioners to fail to deploy during an accident, rendering the FCA Class Vehicles inherently defective and dangerous.

1631. The FCA Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Okla. Stat. Ann. tit. 12A, §§ 2-104(1) and 2-A-103(3), and "sellers" of motor vehicles under § 2-103(1)(c).

1632. With respect to leases, the FCA Defendants are and were at all relevant times "lessors" of motor vehicles under Okla. Stat. Ann. tit. 12A, § 2A-103(1)(p).

1633. All Oklahoma State Class members who purchased FCA Class Vehicles in Oklahoma are "buyers" within the meaning of Okla. Stat. Ann. tit. 12A, § 2-103(1)(a).

1634. All Oklahoma State Class members who leased FCA Class Vehicles in Oklahoma are "lessees" within the meaning of Okla. Stat. Ann. tit. 12A, § 2A-103(1)(n).

1635. The FCA Class Vehicles were at all relevant times "goods" within the meaning of Okla. Stat. Ann. tit. 12A, §§ 2-105(1) and 2A-103(1)(h).

1636. The Oklahoma Plaintiff and Oklahoma State Class members have provided the FCA Defendants with reasonable notice and opportunity to cure the breaches of their implied warranties by way of the numerous NHTSA complaints filed against them, and individual notice letters sent by the Oklahoma State Class members within a reasonable amount of time after the ACU defect became public. Additionally, a notice letter was sent on behalf of the Oklahoma Plaintiff and Oklahoma State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

1637. Alternatively, any opportunity to cure the breach is unnecessary and futile.

1638. As a direct and proximate result of the FCA Defendants' breach of the implied warranty of merchantability, the Oklahoma Plaintiff and Oklahoma State Class members have been damaged in an amount to be proven at trial.

c.    **Oklahoma Count 3: Violation of the Oklahoma Consumer Protection Act (Okla. Stat. Ann. tit. 15, § 751, *et seq.*) Against the FCA Defendants**

1639. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1640. The Oklahoma Plaintiff brings this count individually and on behalf of members of the Oklahoma State Class who purchased or leased FCA Class Vehicles, against the FCA Defendants.

1641. The FCA Defendants, the Oklahoma Plaintiff, and the Oklahoma State Class members are "persons" within the meaning of Okla. Stat. tit. 15, § 752(1).

1642. The FCA Defendants were and are engaged in "consumer transactions" within the meaning of Okla. Stat. tit. 15, § 752(2).

1643. The FCA Class Vehicles and ACUs installed in them are "merchandise" within the meaning of Okla. Stat. tit. 15, § 752(7).

1644. The Oklahoma Consumer Protection Act ("Oklahoma CPA") prohibits deceptive and unfair trade practices.

1645. In the course of their business, the FCA Defendants, through their agents, employees, and/or subsidiaries, violated the Oklahoma CPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the FCA Class Vehicles or the defective ACUs, as detailed above.

1646. Specifically, by misrepresenting the FCA Class Vehicles and/or the defective ACUs installed in them as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the FCA Class Vehicles and/or the ACU defect, the FCA Defendants engaged in one or more of the following unfair or deceptive business practices prohibited by Okla. Stat. tit. 15, § 753:

    a.    Representing that the FCA Class Vehicles and/or the defective ACUs installed in them are approved and certified as safe and reliable;

    b.    Representing that the FCA Class Vehicles and/or the defective ACUs installed in them are of a particular standard, quality, and grade when they are not;

    c.    Advertising the FCA Class Vehicles and/or the defective ACUs installed in them as safe and free from defects, with the intent not to sell or lease them as advertised; and

d.      Engaging in the immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers described above, which offends established public policy.

Okla. Stat. tit. 15, §§ 753(5), (7), (8), and (20).

1647. The FCA Defendants' unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Oklahoma Plaintiff and Oklahoma State Class members, about the true safety and reliability of FCA Class Vehicles and/or the defective ACUs installed in them, the quality of the FCA Class Vehicles, and the true value of the FCA Class Vehicles.

1648. The FCA Defendants' scheme and concealment of the ACU defect and true characteristics of the Occupant Restraint Systems in the FCA Class Vehicles were material to the Oklahoma Plaintiff and Oklahoma State Class members, as the FCA Defendants intended. Had they known the truth, the Oklahoma Plaintiff and Oklahoma State Class members would not have purchased or leased the FCA Class Vehicles, or would have paid significantly less for them.

1649. The Oklahoma Plaintiff and Oklahoma State Class members had no way of discerning that the FCA Defendants' representations were false and misleading and/or otherwise learning the facts that the FCA Defendants had

concealed or failed to disclose. The Oklahoma Plaintiff and Oklahoma State Class members did not, and could not, unravel the FCA Defendants' deception on their own.

1650. The FCA Defendants had an ongoing duty to the Oklahoma Plaintiff and Oklahoma State Class members to refrain from unfair and deceptive practices under the Oklahoma CPA in the course of their business. Specifically, the FCA Defendants owed the Oklahoma Plaintiff and Oklahoma State Class members a duty to disclose all the material facts concerning the ACU defect in the FCA Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the ACU defect from the Oklahoma Plaintiff and Oklahoma State Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1651. The Oklahoma Plaintiff and Oklahoma State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the FCA Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1652. The FCA Defendants' violations present a continuing risk to the Oklahoma Plaintiff and Oklahoma State Class members, as well as to the general public. The FCA Defendants' unlawful acts and practices complained of herein affect the public interest.

1653. Pursuant to Okla. Stat. tit. 15, § 761.1, the Oklahoma Plaintiff and Oklahoma State Class members seek an order enjoining the FCA Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Oklahoma CPA.

### d.    Oklahoma Count 4: Violation of the Oklahoma Consumer Protection Act (Okla. Stat. Ann. tit. 15, § 751, *et seq.*)

### Against the ZF TRW and STMicro Defendants

1654. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1655. The Oklahoma Plaintiff brings this count individually and on behalf of members of the Oklahoma State Class against the ZF TRW and STMicro Defendants.

1656. The ZF TRW Defendants, the STMicro Defendants, the Oklahoma Plaintiff, and Oklahoma State Class members are "persons" within the meaning of Okla. Stat. tit. 15, § 752(1).

1657. The ZF TRW and STMicro Defendants were and are engaged in "consumer transactions" within the meaning of Okla. Stat. tit. 15, § 752(2).

1658. The Class Vehicles and ACUs installed in them are "merchandise" within the meaning of Okla. Stat. tit. 15, § 752(7).

1659. The Oklahoma Consumer Protection Act ("Oklahoma CPA") prohibits deceptive and unfair trade practices.

1660. In the course of their business the ZF TRW and STMicro Defendants, through their agents, employees, and/or subsidiaries, violated the Oklahoma CPA by knowingly and intentionally omitting, concealing, and failing to disclose material facts regarding the existence, nature, and scope of the defect with ZF TRW ACUs installed in the Class Vehicles, as detailed above.

1661. Specifically, by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles due to the ACU defect, the ZF TRW and STMicro Defendants engaged in one or more of the deceptive trade practices prohibited by Okla. Stat. tit. 15, § 753, including engaging in omissions or other practices that have deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person.

1662. The ZF TRW and STMicro Defendants' unfair or deceptive acts or practices, including concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Oklahoma Plaintiff and Oklahoma State Class members, about the true safety and reliability of Class Vehicles and/or the defective ACUs installed in them.

1663. The ZF TRW and STMicro Defendants' scheme and concealment of the ACU defect and true characteristics of the defective ACUs in the Class Vehicles were material to the Oklahoma Plaintiff and Oklahoma State Class members, as the ZF TRW and STMicro Defendants intended. Had they known the truth, the Oklahoma Plaintiff and Oklahoma State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1664. The Oklahoma Plaintiff and Oklahoma State Class members had no way of learning the facts that the ZF TRW and STMicro Defendants had concealed or failed to disclose. The Oklahoma Plaintiff and Oklahoma State Class members did not, and could not, unravel the ZF TRW and STMicro Defendants' deception on their own.

1665. The ZF TRW and STMicro Defendants had an ongoing duty to the Oklahoma Plaintiff and Oklahoma State Class members to refrain from unfair and deceptive practices under the Oklahoma CPA in the course of their business. Specifically, the ZF TRW and STMicro Defendants owed the Oklahoma Plaintiff and Oklahoma State Class members a duty to disclose all the material facts concerning the ACU defect in the Class Vehicles because they possessed exclusive knowledge and they intentionally concealed the ACU defect from the Oklahoma Plaintiff and Oklahoma State Class members.

1666. The Oklahoma Plaintiff and Oklahoma State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the ZF TRW and STMicro Defendants' concealment and/or failure to disclose material information.

1667. The ZF TRW and STMicro Defendants' violations present a continuing risk to the Oklahoma Plaintiff and Oklahoma State Class members, as well as to the general public. The ZF TRW and STMicro Defendants' unlawful acts and practices complained of herein affect the public interest.

1668. Pursuant to Okla. Stat. tit. 15, § 761.1, the Oklahoma Plaintiff and Oklahoma State Class members seek an order enjoining the ZF TRW and STMicro Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Oklahoma CPA.

### xvi.   Pennsylvania

#### a.   Pennsylvania Count 1: Breach of Express Warranty (13 Pa. Cons. Stat. §§ 2313 and 2A210) Against the Hyundai and Kia Defendants

1669. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1670. Plaintiff Larae Angel brings this count individually and on behalf of members of the Pennsylvania State Class who purchased or leased Hyundai Class Vehicles, against the Hyundai Defendants.

1671. Plaintiff Richard Kintzel brings this count individually and on behalf of members of the Pennsylvania State Class who purchased or leased Kia Class Vehicles, against the Kia Defendants.

1672. For purposes of this count, Plaintiffs Angel and Kintzel shall be referred to as the "Pennsylvania Plaintiffs."

1673. The Hyundai and Kia Defendants are and were at all relevant times "merchants" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(c), and "sellers" of motor vehicles under § 2103(a).

1674. With respect to leases, the Hyundai and Kia Defendants are and were at all relevant times "lessors" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

1675. All Pennsylvania State Class members who purchased Class Vehicles (for purposes of this count, "Class Vehicles" are limited to the Hyundai and Kia Class Vehicles) in Pennsylvania are "buyers" within the meaning of 13 Pa. Cons. Stat. § 2103(a).

1676. All Pennsylvania State Class members who leased Class Vehicles in Pennsylvania are "lessees" within the meaning of 13 Pa. Cons. Stat. § 2A103(a).

1677. The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. §§ 2105(a) and 2A103(a).

1678. In connection with the purchase or lease of Class Vehicles, the Hyundai and Kia Defendants provided the Pennsylvania Plaintiffs and Pennsylvania State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

1679. The Hyundai and Kia Defendants' warranties formed the basis of the bargain that was reached when the Pennsylvania Plaintiffs and Pennsylvania State Class members unknowingly purchased or leased Class Vehicles that came equipped with a defective ACU.

1680. However, the Hyundai and Kia Defendants knew or should have known that the warranties were false and/or misleading. Specifically, the Hyundai and Kia Defendants were aware of the ACU defect in the Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to the Pennsylvania Plaintiffs and Pennsylvania State Class members.

1681. The Pennsylvania Plaintiffs and Pennsylvania State Class members reasonably relied on the Hyundai and Kia Defendants' express warranties when purchasing or leasing their Class Vehicles.

1682. The Hyundai and Kia Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the ACU defect or replace the defective ACUs in the Class Vehicles. The Hyundai and Kia Defendants also breached their express warranties by providing a product containing defects that were never disclosed to the Pennsylvania Plaintiffs and Pennsylvania State Class members.

1683. The Pennsylvania Plaintiffs and Pennsylvania State Class members have provided the Hyundai and Kia Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of the numerous NHTSA complaints filed against them, and individual notice letters sent by the Pennsylvania State Class members within a reasonable amount of time after the ACU defect became public. Additionally, a notice letter was sent on behalf of the Pennsylvania Plaintiffs and Pennsylvania State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

1684. Alternatively, any opportunity to cure the breach is unnecessary and futile.

1685. As a direct and proximate result of the Hyundai and Kia Defendants' breach of their express warranties, the Pennsylvania Plaintiffs and Pennsylvania State Class members have been damaged in an amount to be proven at trial.

### b.  Pennsylvania Count 2: Breach of Implied Warranty of Merchantability (13 Pa. Cons. Stat. §§ 2314 and 2A212) Against the Hyundai and Kia Defendants

1686. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1687. Plaintiff Larae Angel brings this count individually and on behalf of members of the Pennsylvania State Class who purchased or leased Hyundai Class Vehicles, against the Hyundai Defendants.

1688. Plaintiff Richard Kintzel brings this count individually and on behalf of members of the Pennsylvania State Class who purchased or leased Kia Class Vehicles, against the Kia Defendants.

1689. For purposes of this count, Plaintiffs Angel and Kintzel shall be referred to as the "Pennsylvania Plaintiffs."

1690. A warranty that the Class Vehicles (for purposes of this count, "Class Vehicles" are limited to the Hyundai and Kia Class Vehicles) were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to 13 Pa. Cons. Stat. §§ 2314 and 2A212.

1691. The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the ACU defect, which causes the airbags and seatbelt pretensioners to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

1692. The Hyundai and Kia Defendants are and were at all relevant times "merchants" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(c), and "sellers" of motor vehicles under § 2103(a).

1693. With respect to leases, the Hyundai and Kia Defendants are and were at all relevant times "lessors" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

1694. All Pennsylvania State Class members who purchased Class Vehicles in Pennsylvania are "buyers" within the meaning of 13 Pa. Cons. Stat. § 2103(a).

1695. All Pennsylvania State Class members who leased Class Vehicles in Pennsylvania are "lessees" within the meaning of 13 Pa. Cons. Stat. § 2A103(a).

1696. The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. §§ 2105(a) and 2A103(a).

1697. The Pennsylvania Plaintiffs and Pennsylvania State Class members have provided the Hyundai and Kia Defendants with reasonable notice and opportunity to cure the breaches of their implied warranties by way of the numerous NHTSA complaints filed against them, and individual notice letters sent by the Pennsylvania State Class members within a reasonable amount of time after the ACU defect became public. Additionally, a notice letter was sent on behalf of the Pennsylvania Plaintiffs and Pennsylvania State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

1698. Alternatively, any opportunity to cure the breach is unnecessary and futile.

1699. As a direct and proximate result of the Hyundai and Kia Defendants' breach of the implied warranty of merchantability, the Pennsylvania Plaintiffs and Pennsylvania State Class members have been damaged in an amount to be proven at trial.

      c.      **Pennsylvania Count 3: Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (73 Pa. Cons. Stat. §§ 201-1, *et seq.*) Against the Hyundai and Kia Defendants and Hyundai MOBIS**

1700. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1701. Plaintiff Larae Angel brings this count individually and on behalf of members of the Pennsylvania State Class who purchased or leased Hyundai Class Vehicles, against the Hyundai Defendants and Hyundai MOBIS.

1702. Plaintiff Richard Kintzel brings this count individually and on behalf of members of the Pennsylvania State Class who purchased or leased Kia Class Vehicles, against the Kia Defendants and Hyundai MOBIS.

1703. For purposes of this count, Plaintiffs Angel and Kintzel shall be referred to as the "Pennsylvania Plaintiffs."

1704. The Hyundai Defendants, the Kia Defendants, Hyundai MOBIS, the Pennsylvania Plaintiffs, and Pennsylvania State Class members are "persons" within the meaning of 73 Pa. Cons. Stat. § 201-2(2).

1705. The Pennsylvania Plaintiffs and Pennsylvania State Class Members purchased the Class Vehicles (for purposes of this count, "Class Vehicles" are limited to the Hyundai and Kia Class Vehicles) and the ACUs installed in them

primarily for personal, family, or household purposes within the meaning of 73 Pa. Cons. Stat. § 201-9.2(a).

1706. The Hyundai Defendants, the Kia Defendants and Hyundai MOBIS were and are engaged in "trade" or "commerce" within the meaning of 73 Pa. Cons. Stat. § 201-2(3).

1707. The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" 73 Pa. Cons. Stat. § 201-3.

1708. In the course of their business, the Hyundai and Kia Defendants and Hyundai MOBIS, through their agents, employees, and/or subsidiaries, violated the Pennsylvania CPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Class Vehicles or the defective ACUs, as detailed above.

1709. Specifically, by misrepresenting the Class Vehicles and/or the defective ACUs installed in them as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles and/or the ACU defect, the Hyundai and Kia Defendants and Hyundai MOBIS engaged in one or more of the following unfair or deceptive business practices prohibited by 73 Pa. Cons. Stat. § 201-2(3):

a.      Representing that the Class Vehicles and/or the defective ACUs installed in them have characteristics, uses, benefits, and qualities which they do not have.

b.      Representing that the Class Vehicles and/or the defective ACUs installed in them are of a particular standard, quality, and grade when they are not.

c.      Advertising the Class Vehicles and/or the defective ACUs installed in them with the intent not to sell or lease them as advertised.

d.      Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

73 Pa. Cons. Stat. § 201-2(4)(v), (vii), (ix) and (xxi).

1710. The Hyundai and Kia Defendants and Hyundai MOBIS's unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Pennsylvania Plaintiffs and Pennsylvania State Class members, about the true safety and reliability of Class Vehicles and/or the defective ACUs installed in them, the quality of the Class Vehicles, and the true value of the Class Vehicles.

1711. The Hyundai and Kia Defendants and Hyundai MOBIS's scheme and concealment of the ACU defect and true characteristics of the Occupant Restraint Systems in the Class Vehicles were material to the Pennsylvania Plaintiffs and Pennsylvania State Class members, as the Hyundai and Kia Defendants and Hyundai MOBIS intended. Had they known the truth, the Pennsylvania Plaintiffs and Pennsylvania State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1712. The Pennsylvania Plaintiffs and Pennsylvania State Class members had no way of discerning that the Hyundai and Kia Defendants' representations were false and misleading and/or otherwise learning the facts that the Hyundai and Kia Defendants and Hyundai MOBIS had concealed or failed to disclose. The Pennsylvania Plaintiffs and Pennsylvania State Class members did not, and could not, unravel the Hyundai and Kia Defendants and Hyundai MOBIS's deception on their own.

1713. The Hyundai and Kia Defendants and Hyundai MOBIS had an ongoing duty to the Pennsylvania Plaintiffs and Pennsylvania State Class members to refrain from unfair and deceptive practices under the Pennsylvania CPL in the course of their business. Specifically, the Hyundai and Kia Defendants and Hyundai MOBIS owed the Pennsylvania Plaintiffs and Pennsylvania State Class members a duty to disclose all the material facts concerning the ACU defect in the

Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the ACU defect from the Pennsylvania Plaintiffs and Pennsylvania State Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1714. The Pennsylvania Plaintiffs and Pennsylvania State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the Hyundai and Kia Defendants and Hyundai MOBIS's concealment, misrepresentations, and/or failure to disclose material information.

1715. The Hyundai and Kia Defendants and Hyundai MOBIS's violations present a continuing risk to the Pennsylvania Plaintiffs and Pennsylvania State Class members, as well as to the general public. The Hyundai and Kia Defendants and Hyundai MOBIS's unlawful acts and practices complained of herein affect the public interest.

1716. Pursuant to 73 Pa. Cons. Stat. § 201-9.2(a), the Pennsylvania Plaintiffs and Pennsylvania State Class members seek an order enjoining the Hyundai and Kia Defendants and Hyundai MOBIS's unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Pennsylvania CPA.

### d. Pennsylvania Count 4: Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (73 Pa. Cons. Stat. §§ 201-1, *et seq.*) Against the ZF TRW and STMicro Defendants

1717. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1718. Plaintiffs Larae Angel and Richard Kintzel bring this count individually and on behalf of members of the Pennsylvania State Class against the ZF TRW and STMicro Defendants.

1719. For purposes of this count, Plaintiffs Angel and Kintzel shall be referred to as the "Pennsylvania Plaintiffs."

1720. The ZF TRW Defendants, the STMicro Defendants, the Pennsylvania Plaintiffs, and Pennsylvania State Class members are "persons" within the meaning of 73 Pa. Cons. Stat. § 201-2(2).

1721. The Pennsylvania Plaintiffs and Pennsylvania State Class Members purchased the Class Vehicles and the ACUs installed in them primarily for personal, family, or household purposes within the meaning of 73 Pa. Cons. Stat. § 201-9.2(a).

1722. The ZF TRW and STMicro Defendants were and are engaged in "trade" or "commerce" within the meaning of 73 Pa. Cons. Stat. § 201-2(3).

1723. The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" 73 Pa. Cons. Stat. § 201-3.

1724. In the course of their business the ZF TRW and STMicro Defendants, through their agents, employees, and/or subsidiaries, violated the Pennsylvania CPA by knowingly and intentionally omitting, concealing, and failing to disclose material facts regarding the existence, nature, and scope of the defect with ZF TRW ACUs installed in the Class Vehicles, as detailed above.

1725. Specifically, by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles due to the ACU defect, the ZF TRW and STMicro Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce prohibited by 73 Pa. Cons. Stat. § 201-3, including engaging in any fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

1726. The ZF TRW and STMicro Defendants' unfair or deceptive acts or practices, including concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Pennsylvania Plaintiffs and Pennsylvania State Class members, about the true

safety and reliability of Class Vehicles and/or the defective ACUs installed in them.

1727. The ZF TRW and STMicro Defendants' scheme and concealment of the ACU defect and true characteristics of the defective ACUs in the Class Vehicles were material to the Pennsylvania Plaintiffs and Pennsylvania State Class members, as the ZF TRW and STMicro Defendants intended. Had they known the truth, the Pennsylvania Plaintiffs and Pennsylvania State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1728. The Pennsylvania Plaintiffs and Pennsylvania State Class members had no way of learning the facts that the ZF TRW and STMicro Defendants had concealed or failed to disclose. The Pennsylvania Plaintiffs and Pennsylvania State Class members did not, and could not, unravel the ZF TRW and STMicro Defendants' deception on their own.

1729. The ZF TRW and STMicro Defendants had an ongoing duty to the Pennsylvania Plaintiffs and Pennsylvania State Class members to refrain from unfair and deceptive practices under the Pennsylvania CPL in the course of their business. Specifically, the ZF TRW and STMicro Defendants owed the Pennsylvania Plaintiffs and Pennsylvania State Class members a duty to disclose all the material facts concerning the ACU defect in the Class Vehicles because they

possessed exclusive knowledge and they intentionally concealed the ACU defect from the Pennsylvania Plaintiffs and Pennsylvania State Class members.

1730. The Pennsylvania Plaintiffs and Pennsylvania State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the ZF TRW and STMicro Defendants' concealment and/or failure to disclose material information.

1731. The ZF TRW and STMicro Defendants' violations present a continuing risk to the Pennsylvania Plaintiffs and Pennsylvania State Class members, as well as to the general public. The ZF TRW and STMicro Defendants' unlawful acts and practices complained of herein affect the public interest.

1732. Pursuant to 73 Pa. Cons. Stat. § 201-9.2(a), the Pennsylvania Plaintiffs and Pennsylvania State Class members seek an order enjoining the ZF TRW and STMicro Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Pennsylvania CPA.

### xvii.  Tennessee

#### a.    Tennessee Count 1: Breach of Express Warranty (Tenn. Code Ann. §§ 47-2-313 and 47-2A-210) Against the Hyundai Defendants

1733.  Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1734.  Plaintiff Deloras McMurray (hereinafter, "Tennessee Plaintiff") brings this count individually and on behalf of members of the Tennessee State Class who purchased or leased Hyundai Class Vehicles, against the Hyundai Defendants.

1735.  The Hyundai Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Tenn. Code Ann. §§ 47-2-104(1) and 47-2A-103(1)(t), and "sellers" of motor vehicles under § 47-2-103(a)(d).

1736.  With respect to leases, the Hyundai Defendants are and were at all relevant times "lessors" of motor vehicles under Tenn. Code Ann. § 47-2A-103(1)(p).

1737.  All Tennessee State Class members who purchased Hyundai Class Vehicles in Tennessee are "buyers" within the meaning of Tenn. Code Ann. § 47-2-313(1).

1738.  All Tennessee State Class members who leased Hyundai Class Vehicles in Tennessee are "lessees" within the meaning of Tenn. Code Ann. § 47-2A-103(1)(n).

1739. The Hyundai Class Vehicles are and were at all relevant times "goods" within the meaning of Tenn. Code Ann. §§ 47-2-105(1) and 47-2A-103(1)(h).

1740. In connection with the purchase or lease of Hyundai Class Vehicles, the Hyundai Defendants provided the Tennessee Plaintiff and Tennessee State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

1741. The Hyundai Defendants' warranties formed the basis of the bargain that was reached when the Tennessee Plaintiff and Tennessee State Class members unknowingly purchased or leased Hyundai Class Vehicles that came equipped with a defective ACU.

1742. However, the Hyundai Defendants knew or should have known that the warranties were false and/or misleading. Specifically, the Hyundai Defendants were aware of the ACU defect in the Hyundai Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to the Tennessee Plaintiff and Tennessee State Class members.

1743. The Tennessee Plaintiff and Tennessee State Class members reasonably relied on the Hyundai Defendants' express warranties when purchasing or leasing their Hyundai Class Vehicles.

1744. The Hyundai Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the ACU defect or replace the defective ACUs in the Hyundai Class Vehicles. The Hyundai Defendants also breached their express warranties by providing a product containing defects that were never disclosed to the Tennessee Plaintiff and Tennessee State Class members.

1745. The Tennessee Plaintiff and Tennessee State Class members have provided the Hyundai Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of the numerous NHTSA complaints filed against them, and individual notice letters sent by the Tennessee State Class members within a reasonable amount of time after the ACU defect became public. Additionally, a notice letter was sent on behalf of the Tennessee Plaintiff and Tennessee State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

1746. Alternatively, any opportunity to cure the breach is unnecessary and futile.

1747. As a direct and proximate result of the Hyundai Defendants' breach of their express warranties, the Tennessee Plaintiff and Tennessee State Class members have been damaged in an amount to be proven at trial.

**b.    Tennessee Count 2: Breach of Implied Warranty of Merchantability (Tenn. Code Ann. §§ 47-2-314 and 47-2A-212) Against the Hyundai Defendants**

1748. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1749. The Tennessee Plaintiff brings this count individually and on behalf of members of the Tennessee State Class who purchased or leased Hyundai Class Vehicles, against the Hyundai Defendants.

1750. A warranty that the Hyundai Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Tenn. Code Ann. §§ 47-2-314 and 47-2A-212.

1751. The Hyundai Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles

were used. Specifically, the Hyundai Class Vehicles suffer from the ACU defect, which causes the airbags and seatbelt pretensioners to fail to deploy during an accident, rendering the Hyundai Class Vehicles inherently defective and dangerous.

1752. The Hyundai Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Tenn. Code Ann. §§ 47-2-104(1) and 47-2A-103(1)(t), and "sellers" of motor vehicles under § 47-2-103(a)(d).

1753. With respect to leases, the Hyundai Defendants are and were at all relevant times "lessors" of motor vehicles under Tenn. Code Ann. § 47-2A-103(1)(p).

1754. All Tennessee State Class members who purchased Hyundai Class Vehicles in Tennessee are "buyers" within the meaning of Tenn. Code Ann. § 47-2-313(1).

1755. All Tennessee State Class members who leased Hyundai Class Vehicles in Tennessee are "lessees" within the meaning of Tenn. Code Ann. § 47-2A-103(1)(n).

1756. The Hyundai Class Vehicles are and were at all relevant times "goods" within the meaning of Tenn. Code Ann. §§ 47-2-105(1) and 47-2A-103(1)(h).

1757. The Tennessee Plaintiff and Tennessee State Class members have provided the Hyundai Defendants with reasonable notice and opportunity to cure the breaches of their implied warranties by way of the numerous NHTSA complaints filed against them, and individual notice letters sent by the Tennessee State Class members within a reasonable amount of time after the ACU defect became public. Additionally, a notice letter was sent on behalf of the Tennessee Plaintiff and Tennessee State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

1758. Alternatively, any opportunity to cure the breach is unnecessary and futile.

1759. As a direct and proximate result of the Hyundai Defendants' breach of the implied warranty of merchantability, the Tennessee Plaintiff and Tennessee State Class members have been damaged in an amount to be proven at trial.

> c.  **Tennessee Count 3: Violation of the Tennessee Consumer Protection Act of 1977 (Tenn. Code Ann. § 47-18-101, *et seq.*) Against the Hyundai Defendants and Hyundai MOBIS**

1760. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1761. The Tennessee Plaintiff brings this count individually and on behalf of members of the Tennessee State Class who purchased or leased Hyundai Class Vehicles, against the Hyundai Defendants and Hyundai MOBIS.

1762. The Hyundai Defendants, Hyundai MOBIS, the Tennessee Plaintiff, and Tennessee State Class members are "persons" within the meaning of Tenn. Code Ann. § 47-18-103(14).

1763. The Tennessee Plaintiff and Tennessee State Class members are "consumers" within the meaning of Tenn. Code Ann. § 47-18-103(3).

1764. The Hyundai Class Vehicles and ACUs installed in them are "goods" within the meaning of Tenn. Code Ann. § 47-18-103(8).

1765. The Hyundai Defendants and Hyundai MOBIS were and are engaged in "trade" or "commerce" or "consumer transactions" within the meaning of Tenn. Code Ann. § 47-18-103(20).

1766. The Tennessee Consumer Protection Act of 1977 ("Tennessee CPA") prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce[.]" Tenn. Code Ann. § 47-18-104(a).

1767. In the course of their business, the Hyundai Defendants and Hyundai MOBIS, through their agents, employees, and/or subsidiaries, violated the Tennessee CPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the durability,

reliability, safety, and performance of the Hyundai Class Vehicles or the defective ACUs, as detailed above.

1768. Specifically, by misrepresenting the Hyundai Class Vehicles and/or the defective ACUs installed in them as safe, and by failing to disclose and actively concealing the dangers and risk posed by the Hyundai Class Vehicles and/or the ACU defect, the Hyundai Defendants and Hyundai MOBIS engaged in one or more of the following unfair or deceptive business practices prohibited by Tenn. Code Ann. § 47-18-104:

      a.    Representing that the Hyundai Class Vehicles and/or the defective ACUs installed in them have characteristics, uses, benefits, and qualities which they do not have;

      b.    Representing that the Hyundai Class Vehicles and/or the defective ACUs installed in them are of a particular standard, quality, and grade when they are not; and

      c.    Advertising the Hyundai Class Vehicles and/or the defective ACUs installed in them with the intent not to sell or lease them as advertised.

Tenn. Code Ann. §§ 47-18-104(b)(5), (7), and (9).

1769. The Hyundai Defendants and Hyundai MOBIS's unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and/or

suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Tennessee Plaintiff and Tennessee State Class members, about the true safety and reliability of Hyundai Class Vehicles and/or the defective ACUs installed in them, the quality of the Hyundai Class Vehicles, and the true value of the Hyundai Class Vehicles.

1770. The Hyundai Defendants and Hyundai MOBIS's scheme and concealment of the ACU defect and true characteristics of the Occupant Restraint Systems in the Hyundai Class Vehicles were material to the Tennessee Plaintiff and Tennessee State Class members, as the Hyundai Defendants and Hyundai MOBIS intended. Had they known the truth, the Tennessee Plaintiff and Tennessee State Class members would not have purchased or leased the Hyundai Class Vehicles, or would have paid significantly less for them.

1771. The Tennessee Plaintiff and Tennessee State Class members had no way of discerning that the Hyundai Defendants' representations were false and misleading and/or otherwise learning the facts that the Hyundai Defendants and Hyundai MOBIS had concealed or failed to disclose. The Tennessee Plaintiff and Tennessee State Class members did not, and could not, unravel the Hyundai Defendants and Hyundai MOBIS's deception on their own.

1772. The Hyundai Defendants and Hyundai MOBIS had an ongoing duty to the Tennessee Plaintiff and Tennessee State Class members to refrain from unfair and deceptive practices under the Tennessee CPA in the course of their business. Specifically, the Hyundai Defendants and Hyundai MOBIS owed the Tennessee Plaintiff and Tennessee State Class members a duty to disclose all the material facts concerning the ACU defect in the Hyundai Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the ACU defect from the Tennessee Plaintiff and Tennessee State Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1773. The Tennessee Plaintiff and Tennessee State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the Hyundai Defendants and Hyundai MOBIS's concealment, misrepresentations, and/or failure to disclose material information.

1774. The Hyundai Defendants and Hyundai MOBIS's violations present a continuing risk to the Tennessee Plaintiff and Tennessee State Class members, as well as to the general public. The Hyundai Defendants and Hyundai MOBIS's unlawful acts and practices complained of herein affect the public interest.

1775. Pursuant to Tenn. Code Ann. § 47-18-109(a), the Tennessee Plaintiff and the Tennessee State Class members seek an order enjoining the Hyundai

Defendants and Hyundai MOBIS's unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Tennessee CPA.

> **d.    Tennessee Count 4: Violation of the Tennessee Consumer Protection Act of 1977 (Tenn. Code Ann. § 47-18-101, *et seq.*) Against the ZF TRW and STMicro Defendants**

1776. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1777. The Tennessee Plaintiff brings this count individually and on behalf of members of the Tennessee State Class against the ZF TRW and STMicro Defendants.

1778. The ZF TRW Defendants, the STMicro Defendants, the Tennessee Plaintiff, and Tennessee State Class members are "persons" within the meaning of Tenn. Code Ann. § 47-18-103(14).

1779. Plaintiffs and the Tennessee State Class members are "consumers" within the meaning of Tenn. Code Ann. § 47-18-103(3).

1780. The Class Vehicles and ACUs installed in them are "goods" within the meaning of Tenn. Code Ann. § 47-18-103(8).

1781. The ZF TRW and STMicro Defendants were and are engaged in "trade" or "commerce" or "consumer transactions" within the meaning of Tenn. Code Ann. § 47-18-103(20).

1782. The Tennessee Consumer Protection Act of 1977 ("Tennessee CPA") prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce[.]" Tenn. Code Ann. § 47-18-104(a).

1783. In the course of their business the ZF TRW and STMicro Defendants, through their agents, employees, and/or subsidiaries, violated the Tennessee CPA by knowingly and intentionally omitting, concealing, and failing to disclose material facts regarding the durability, existence, nature, and scope of the defect with ZF TRW ACUs installed in the Class Vehicles, as detailed above.

1784. Specifically, by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles due to the ACU defect, the ZF TRW and STMicro Defendants engaged in unfair or deceptive acts or practices affecting the conduct of any trade or commerce prohibited by Tenn. Code Ann. § 47-18-104.

1785. The ZF TRW and STMicro Defendants' unfair or deceptive acts or practices, including concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the

Tennessee Plaintiff and Tennessee State Class members, about the true safety and reliability of Class Vehicles and/or the defective ACUs installed in them.

1786. The ZF TRW and STMicro Defendants' scheme and concealment of the ACU defect and true characteristics of the defective ACUs in the Class Vehicles were material to the Tennessee Plaintiff and Tennessee State Class members, as the ZF TRW and STMicro Defendants intended. Had they known the truth, the Tennessee Plaintiff and Tennessee State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1787. The Tennessee Plaintiff and Tennessee State Class members had no way of learning the facts that the ZF TRW and STMicro Defendants had concealed or failed to disclose. The Tennessee Plaintiff and Tennessee State Class members did not, and could not, unravel the ZF TRW and STMicro Defendants' deception on their own.

1788. The ZF TRW and STMicro Defendants had an ongoing duty to the Tennessee Plaintiff and Tennessee State Class members to refrain from unfair and deceptive practices under the Tennessee CPA in the course of their business. Specifically, the ZF TRW and STMicro Defendants owed the Tennessee Plaintiff and Tennessee State Class members a duty to disclose all the material facts concerning the ACU defect in the Class Vehicles because they possessed exclusive

knowledge and they intentionally concealed the ACU defect from the Tennessee Plaintiff and Tennessee State Class members.

1789. The Tennessee Plaintiff and Tennessee State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the ZF TRW and STMicro Defendants' concealment and/or failure to disclose material information.

1790. The ZF TRW and STMicro Defendants' violations present a continuing risk to the Tennessee Plaintiff and Tennessee State Class members, as well as to the general public. The ZF TRW and STMicro Defendants' unlawful acts and practices complained of herein affect the public interest.

1791. Pursuant to Tenn. Code Ann. § 47-18-109(a), the Tennessee Plaintiff and Tennessee State Class members seek an order enjoining the ZF TRW and STMicro Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Tennessee CPA.

xviii.  **Texas**

   a.    **Texas Count 1: Breach of Express Warranty (Tex. Bus. & Com. Code Ann. §§ 2.313 and 2A.210) Against the Hyundai and Toyota Defendants**

1792. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1793. Plaintiff Burton Reckles brings this count individually and on behalf of members of the Texas State Class who purchased or leased Hyundai Class Vehicles, against the Hyundai Defendants.

1794. Plaintiffs Danny Hunt and Joy Davis bring this count individually and on behalf of members of the Texas State Class who purchased or leased Toyota Class Vehicles, against the Toyota Defendants.

1795. For purposes of this count, Plaintiffs Reckles, Hunt, and Davis shall be referred to as the "Texas Plaintiffs."

1796. The Hyundai and Toyota Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Tex. Bus. & Com. Code Ann. §§ 2.104(a) and 2A.103(c), and "sellers" of motor vehicles under § 2.103(a)(4).

1797. With respect to leases, the Hyundai and Toyota Defendants are and were at all relevant times "lessors" of motor vehicles under Tex. Bus. & Com. Code Ann. § 2A.103(a)(16).

1798. All Texas State Class members who purchased Class Vehicles (for purposes of this count, "Class Vehicles" are limited to the Hyundai and Toyota Class Vehicles) in Texas are "buyers" within the meaning of Tex. Bus. & Com. Code Ann. § 2.103(a)(1).

1799. All Texas State Class members who leased Class Vehicles in Texas are "lessees" within the meaning of Tex. Bus. & Com. Code Ann. § 2A.103(a)(14).

1800. The Class Vehicles are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code Ann. §§ 2.105(a) and 2A.103(a)(8).

1801. In connection with the purchase or lease of Class Vehicles, the Hyundai and Toyota Defendants provided the Texas Plaintiffs and Texas State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

1802. The Hyundai and Toyota Defendants' warranties formed the basis of the bargain that was reached when the Texas Plaintiffs and Texas State Class members unknowingly purchased or leased Class Vehicles that came equipped with a defective ACU.

1803. However, the Hyundai and Toyota Defendants knew or should have known that the warranties were false and/or misleading. Specifically the Hyundai and Toyota Defendants were aware of the ACU defect in the Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to the Texas Plaintiffs and Texas State Class members.

1804. The Texas Plaintiffs and Texas State Class members reasonably relied on the Hyundai and Toyota Defendants' express warranties when purchasing or leasing their Class Vehicles.

1805. The Hyundai and Toyota Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the ACU defect or replace the defective ACUs in the Class Vehicles. The Hyundai and Toyota Defendants also breached their express warranties by providing a product containing defects that were never disclosed to the Texas Plaintiffs and Texas State Class members.

1806. The Texas Plaintiffs and Texas State Class members have provided the Hyundai and Toyota Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of the numerous NHTSA complaints filed against them, and individual notice letters sent by the Texas State Class members within a reasonable amount of time after the ACU defect became public. Additionally, on May 23, 2019, Texas State Class members sent a notice

letter to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, and ZF TRW Defendants. Moreover, a second notice letter was sent on behalf of the Texas Plaintiffs and Texas State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

1807. Alternatively, any opportunity to cure the breach is unnecessary and futile.

1808. As a direct and proximate result of the Hyundai and Toyota Defendants' breach of their express warranties, the Texas Plaintiffs and Texas State Class members have been damaged in an amount to be proven at trial.

**b.** **Texas Count 2: Breach of Implied Warranty of Merchantability (Tex. Bus. & Com. Code Ann. §§ 2.314 and 2A.212) Against the Hyundai and Toyota Defendants**

1809. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1810. Plaintiff Burton Reckles brings this count individually and on behalf of members of the Texas State Class who purchased or leased Hyundai Class Vehicles, against the Hyundai Defendants.

1811. Plaintiffs Danny Hunt and Joy Davis bring this count individually and on behalf of members of the Texas State Class who purchased or leased Toyota Class Vehicles, against the Toyota Defendants.

1812. For purposes of this count, Plaintiffs Reckles, Hunt, and Davis shall be referred to as the "Texas Plaintiffs."

1813. A warranty that the Class Vehicles (for purposes of this count, "Class Vehicles" are limited to the Hyundai and Toyota Class Vehicles) were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Tex. Bus. & Com. Code Ann. §§ 2.314 and 2A.212.

1814. The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the ACU defect, which causes the airbags and seatbelt pretensioners to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

1815. The Hyundai and Toyota Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Tex. Bus. & Com. Code

Ann. §§ 2.104(a) and 2A.103(c), and "sellers" of motor vehicles under

§ 2.103(a)(4).

1816. With respect to leases, the Hyundai and Toyota Defendants are and

were at all relevant times "lessors" of motor vehicles under Tex. Bus. & Com.

Code Ann. § 2A.103(a)(16).

1817. All Texas State Class members who purchased Class Vehicles in

Texas are "buyers" within the meaning of Tex. Bus. & Com. Code Ann.

§ 2.103(a)).

1818. All Texas State Class members who leased Class Vehicles in Texas

are "lessees" within the meaning of Tex. Bus. & Com. Code Ann. § 2A.103(a)(14).

1819. The Class Vehicles are and were at all relevant times "goods" within

the meaning of Tex. Bus. & Com. Code Ann. §§ 2.105(a) and 2A.103(a)(8).

1820. The Texas Plaintiffs and Texas State Class members have provided

the Hyundai and Toyota Defendants with reasonable notice and opportunity to cure

the breaches of their implied warranties by way of the numerous NHTSA

complaints filed against them, and individual notice letters sent by the Texas State

Class members within a reasonable amount of time after the ACU defect became

public. Additionally, on May 23, 2019, Texas State Class members sent a notice

letter to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants,

Mitsubishi Motors North America, Inc., Toyota Defendants, and ZF TRW

Defendants. Moreover, a second notice letter was sent on behalf of the Texas Plaintiffs and Texas State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

1821. Alternatively, any opportunity to cure the breach is unnecessary and futile.

1822. As a direct and proximate result of the Hyundai and Toyota Defendants' breach of the implied warranty of merchantability, the Texas Plaintiffs and Texas State Class members have been damaged in an amount to be proven at trial.

> **c.** **Texas Count 3: Violation of the Deceptive Trade Practices-Consumer Protection Act (Tex. Bus. & Com. Code Ann. § 17.41, *et seq.*) Against the Hyundai and Toyota Defendants and Hyundai MOBIS**

1823. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1824. Plaintiff Burton Reckles brings this count individually and on behalf of members of the Texas State Class who purchased or leased Hyundai Class Vehicles, against the Hyundai Defendants and Hyundai MOBIS.

1825. Plaintiffs Danny Hunt and Joy Davis bring this count individually and on behalf of members of the Texas State Class who purchased or leased Toyota Class Vehicles, against the Toyota Defendants.

1826. For purposes of this count, Plaintiffs Reckles, Hunt, and Davis shall be referred to as the "Texas Plaintiffs."

1827. The Hyundai Defendants, Toyota Defendants, the Texas Plaintiffs, and Texas State Class members are "persons" within the meaning of Tex. Bus. & Com. Code Ann. § 17.45(3).

1828. The Texas Plaintiffs and Texas State Class members are "consumers" within the meaning of Tex. Bus. & Com. Code Ann. § 17.45(4).

1829. The Class Vehicles (for purposes of this count, "Class Vehicles" are limited to the Hyundai and Toyota Class Vehicles) are "goods" within the meaning of Tex. Bus. & Com. Code Ann. § 17.45(1).

1830. The Hyundai and Toyota Defendants were and are engaged in "trade" or "commerce" within the meaning of Tex. Bus. & Com. Code Ann. § 17.45(6).

1831. The Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce[,]" Tex. Bus. & Com. Code Ann. § 17.46(a), and an "unconscionable action or course of action[,]" Tex. Bus. & Com. Code Ann. §§ 17.45(5) and 17.50(a)(3).

1832. In the course of their business, the Hyundai and Toyota Defendants, and Hyundai MOBIS, through their agents, employees, and/or subsidiaries, violated the Texas DTPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Class Vehicles or the defective ACUs, as detailed above. These acts and practices were unconscionable, and to the Texas Plaintiffs' and Texas State Class members' detriment, took advantage of their lack of knowledge, ability, experience, or capacity to a grossly unfair degree.

1833. Specifically, by misrepresenting the Class Vehicles and/or the defective ACUs installed in them as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles and/or the ACU defect, the Hyundai and Toyota Defendants, and Hyundai MOBIS engaged in one or more of the following unfair or deceptive business practices prohibited by Tex. Bus. & Com. Code Ann. §§ 17.46:

a.    Representing that the Class Vehicles and/or the defective ACUs installed in them have characteristics, uses, benefits, and qualities which they do not have;

b.    Representing that the Class Vehicles and/or the defective ACUs installed in them are of a particular standard, quality, and grade when they are not; and

  c.  Advertising the Class Vehicles and/or the defective ACUs installed in them with the intent not to sell or lease them as advertised.

Tex. Bus. & Com. Code Ann. §§ 17.46(5), (7), and (9).

1834. The Hyundai and Toyota Defendants and Hyundai MOBIS's unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Texas Plaintiffs and Texas State Class members, about the true safety and reliability of Class Vehicles and/or the defective ACUs installed in them, the quality of the Class Vehicles, and the true value of the Class Vehicles.

1835. The Hyundai and Toyota Defendants, and Hyundai MOBIS's scheme and concealment of the ACU defect and true characteristics of the Occupant Restraint Systems in the Class Vehicles were material to the Texas Plaintiffs and Texas State Class members, as the Hyundai and Toyota Defendants, and Hyundai MOBIS intended. Had they known the truth, the Texas Plaintiffs and Texas State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1836. The Texas Plaintiffs and Texas State Class members had no way of discerning that the Hyundai and Toyota Defendants' representations were false and misleading and/or otherwise learning the facts that the Hyundai and Toyota Defendants, and Hyundai MOBIS had concealed or failed to disclose. The Texas Plaintiffs and Texas State Class members did not, and could not, unravel the Hyundai and Toyota Defendants and Hyundai MOBIS's deception on their own.

1837. The Hyundai and Toyota Defendants, and Hyundai MOBIS had an ongoing duty to the Texas Plaintiffs and Texas State Class members to refrain from unfair and deceptive practices under the Texas DTPA in the course of their business. Specifically, the Hyundai and Toyota Defendants and Hyundai MOBIS owed the Texas Plaintiffs and Texas State Class members a duty to disclose all the material facts concerning the ACU defect in the Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the ACU defect from the Texas Plaintiffs and Texas State Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1838. The Texas Plaintiffs and Texas State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the Hyundai and Toyota Defendants and Hyundai MOBIS's concealment, misrepresentations, and/or failure to disclose material information.

1839. The Hyundai and Toyota Defendants and Hyundai MOBIS's violations present a continuing risk to the Texas Plaintiffs and Texas State Class members, as well as to the general public. The Hyundai and Toyota Defendants and Hyundai MOBIS's unlawful acts and practices complained of herein affect the public interest.

1840. The Hyundai and Toyota Defendants and Hyundai MOBIS were provided notice of the issues raised in this count and this Complaint by the NHTSA investigations, the numerous complaints filed against them, and the many individual notice letters sent by Plaintiffs within a reasonable amount of time after the ACU defect became public. Additionally, on May 23, 2019, Texas State Class members sent a notice letter pursuant to Tex. Bus. & Com. Code Ann. § 17.505(a) to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, and ZF TRW Defendants. Moreover, a second notice letter was sent on behalf of the Texas Plaintiffs and Texas State Class members pursuant to Tex. Bus. & Com. Code Ann. § 17.505(a) to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020. Because Defendants failed to adequately remedy their unlawful conduct within the requisite time

period, the Texas Plaintiffs seek all damages and relief to which the Texas Plaintiffs and Texas State Class members are entitled.

1841. Pursuant to Tex. Bus. & Com. Code Ann. § 17.50, the Texas Plaintiffs and Texas State Class members seek an order enjoining the Hyundai and Toyota Defendants and Hyundai MOBIS's unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Texas DTPA.

> ### d. Texas Count 4: Violation of the Deceptive Trade Practices-Consumer Protection Act (Tex. Bus. & Com. Code Ann. § 17.41, *et seq.*) Against the ZF TRW and STMicro Defendants

1842. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1843. Plaintiffs John Robinson, Burton Reckles, Danny Hunt, and Joy Davis bring this count individually and on behalf of members of the Texas State Class against the ZF TRW and STMicro Defendants.

1844. For purposes of this count, Plaintiffs Robinson, Reckles, Hunt, and Davis shall be referred to as the Texas Plaintiffs.

1845. The ZF TRW Defendants, the STMicro Defendants, the Texas Plaintiffs, and Texas State Class members are "persons" within the meaning of Tex. Bus. & Com. Code Ann. § 17.45(3).

1846. The Texas Plaintiffs and Texas State Class members are "consumers" within the meaning of Tex. Bus. & Com. Code Ann. § 17.45(4).

1847. The Class Vehicles are "goods" within the meaning of Tex. Bus. & Com. Code Ann. § 17.45(1).

1848. The ZF TRW and STMicro Defendants were and are engaged in "trade" or "commerce" within the meaning of Tex. Bus. & Com. Code Ann. § 17.45(6).

1849. The Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce[,]" Tex. Bus. & Com. Code Ann. § 17.46(a), and an "unconscionable action or course of action[,]" Tex. Bus. & Com. Code Ann. §§ 17.45(5) and 17.50(a)(3).

1850. In the course of their business the ZF TRW and STMicro Defendants, through their agents, employees, and/or subsidiaries, violated the Texas DTPA by knowingly and intentionally omitting, concealing, and failing to disclose material facts regarding the existence, nature, and scope of the defect with ZF TRW ACUs installed in the Class Vehicles, as detailed above. These acts and practices were

unconscionable, and to the Texas Plaintiffs' and Texas State Class members' detriment, took advantage of their lack of knowledge, ability, experience, or capacity to a grossly unfair degree.

1851. Specifically, by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles due to the ACU defect, the ZF TRW and STMicro Defendants engaged in deceptive acts or practices in the conduct of trade or commerce prohibited by Tex. Bus. & Com. Code Ann. §§ 17.46.

1852. The ZF TRW and STMicro Defendants' unfair or deceptive acts or practices, including concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Texas Plaintiffs and Texas State Class members, about the true safety and reliability of Class Vehicles and/or the defective ACUs installed in them.

1853. The ZF TRW and STMicro Defendants' scheme and concealment of the ACU defect and true characteristics of the defective ACUs in the Class Vehicles were material to the Texas Plaintiffs and Texas State Class members, as the ZF TRW and STMicro Defendants intended. Had they known the truth, the Texas Plaintiffs and Texas State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1854. The Texas Plaintiffs and Texas State Class members had no way of learning the facts that the ZF TRW and STMicro Defendants had concealed or failed to disclose. The Texas Plaintiffs and Texas State Class members did not, and could not, unravel the ZF TRW and STMicro Defendants' deception on their own.

1855. The ZF TRW and STMicro Defendants had an ongoing duty to the Texas Plaintiffs and Texas State Class members to refrain from unfair and deceptive practices under the Texas DTPA in the course of their business. Specifically, the ZF TRW and STMicro Defendants owed the Texas Plaintiffs and Texas State Class members a duty to disclose all the material facts concerning the ACU defect in the Class Vehicles because they possessed exclusive knowledge and they intentionally concealed the ACU defect from the Texas Plaintiffs and Texas State Class members.

1856. The Texas Plaintiffs and Texas State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the ZF TRW and STMicro Defendants' concealment and/or failure to disclose material information.

1857. The ZF TRW and STMicro Defendants' violations present a continuing risk to the Texas Plaintiffs and Texas State Class members, as well as to the general public. The ZF TRW and STMicro Defendants' unlawful acts and practices complained of herein affect the public interest.

1858. The ZF TRW and STMicro Defendants were provided notice of the issues raised in this count and this Complaint by the NHTSA investigations, the numerous complaints filed against them, and the many individual notice letters sent by Texas State Class members within a reasonable amount of time after the allegations of Class Vehicle defects became public. Additionally, on May 23, 2019, Texas State Class members sent a notice letter pursuant to Tex. Bus. & Com. Code Ann. § 17.505(a) to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, and ZF TRW Defendants. Moreover, a second notice letter was sent on behalf of the Texas Plaintiffs and Texas State Class members pursuant to Tex. Bus. & Com. Code Ann. § 17.505(a) to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai Mobis, and ZF TRW Defendants on April 24, 2020. Because Defendants failed to adequately remedy their unlawful conduct within the requisite time period, the Texas Plaintiffs seek all damages and relief to which the Texas Plaintiffs and Texas State Class members are entitled.

1859. Alternatively, any requirement to give notice to the Defendants under Tex. Bus. & Com. Code Ann. § 17.505(a) is excused because, *inter alia*, notice was impracticable due to the necessity of filing suit in order to prevent the

expiration of the statute of limitations on certain Texas Plaintiffs' and Texas State Class Members' claims.

1860. Pursuant to Tex. Bus. & Com. Code Ann. § 17.50, the Texas Plaintiffs and Texas State Class members seek an order enjoining the ZF TRW and STMicro Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Texas DTPA.

### xix.    Wisconsin

#### a.    Wisconsin Count 1: Breach of Express Warranty (Wis. Stat. §§ 402.313 and 411.210) Against the Mitsubishi Defendants

1861. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1862. Plaintiff John Sancomb (hereinafter, "Wisconsin Plaintiff") brings this count individually and on behalf of members of the Wisconsin State Class who purchased or leased Mitsubishi Class Vehicles, against the Mitsubishi Defendants.

1863. The Mitsubishi Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Wis. Stat. §§ 402.104(3) and 411.103(1)(t), and "sellers" of motor vehicles under § 402.103(1)(d).

1864. With respect to leases, the Mitsubishi Defendants are and were at all relevant times "lessors" of motor vehicles under Wis. Stat. § 411.103(1)(p).

1865. All Wisconsin State Class members who purchased Mitsubishi Class Vehicles in Wisconsin are "buyers" within the meaning of Wis. Stat. § 402.103(1)(a).

1866. All Wisconsin State Class members who leased Mitsubishi Class Vehicles in Wisconsin are "lessees" within the meaning of Wis. Stat. § 411.103(1)(n).

1867. The Mitsubishi Class Vehicles are and were at all relevant times "goods" within the meaning of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h).

1868. In connection with the purchase or lease of Mitsubishi Class Vehicles, the Mitsubishi Defendants provided the Wisconsin Plaintiff and Wisconsin State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

1869. The Mitsubishi Defendants' warranties formed the basis of the bargain that was reached when the Wisconsin Plaintiff and Wisconsin State Class members unknowingly purchased or leased Mitsubishi Class Vehicles that came equipped with a defective ACU.

1870. However, the Mitsubishi Defendants knew or should have known that the warranties were false and/or misleading. Specifically, the Mitsubishi Defendants were aware of the ACU defect in the Mitsubishi Class Vehicles, which

made the vehicles inherently defective and dangerous at the time that they were sold and leased to the Wisconsin Plaintiff and Wisconsin State Class members.

1871. The Wisconsin Plaintiff and Wisconsin State Class members reasonably relied on the Mitsubishi Defendants' express warranties when purchasing or leasing their Mitsubishi Class Vehicles.

1872. The Mitsubishi Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the ACU defect or replace the defective ACUs in the Mitsubishi Class Vehicles. The Mitsubishi Defendants also breached their express warranties by providing a product containing defects that were never disclosed to the Wisconsin Plaintiff and Wisconsin State Class members.

1873. The Wisconsin Plaintiff and Wisconsin State Class members have provided the Mitsubishi Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of the numerous NHTSA complaints filed against them, and individual notice letters sent by the Wisconsin State Class members within a reasonable amount of time after the ACU defect became public. Additionally, a notice letter was sent on behalf of the Wisconsin Plaintiff and Wisconsin State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc.,

Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

1874. Alternatively, any opportunity to cure the breach is unnecessary and futile.

1875. As a direct and proximate result of the Mitsubishi Defendants' breach of their express warranties, the Wisconsin Plaintiff and Wisconsin State Class members have been damaged in an amount to be proven at trial.

> **b.**   **Wisconsin Count 2: Breach of Implied Warranty of Merchantability (Wis. Stat. §§ 402.314 and 411.212) Against the Mitsubishi Defendants**

1876. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1877. The Wisconsin Plaintiff brings this count individually and on behalf of members of the Wisconsin State Class who purchased or leased Mitsubishi Class Vehicles, against the Mitsubishi Defendants.

1878. A warranty that the Mitsubishi Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Wis. Stat. §§ 402.314 and 411.212.

1879. The Mitsubishi Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter,

they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Mitsubishi Class Vehicles suffer from the ACU defect, which causes the airbags and seatbelt pretensioners to fail to deploy during an accident, rendering the Mitsubishi Class Vehicles inherently defective and dangerous.

1880. The Mitsubishi Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Wis. Stat. §§ 402.104(3) and 411.103(1)(t), and "sellers" of motor vehicles under § 402.103(1)(d).

1881. With respect to leases, the Mitsubishi Defendants are and were at all relevant times "lessors" of motor vehicles under Wis. Stat. § 411.103(1)(p).

1882. All Wisconsin State Class members who purchased Mitsubishi Class Vehicles in Wisconsin are "buyers" within the meaning of Wis. Stat. § 402.103(1)(a).

1883. All Wisconsin State Class members who leased Mitsubishi Class Vehicles in Wisconsin are "lessees" within the meaning of Wis. Stat. § 411.103(1)(n).

1884. The Mitsubishi Class Vehicles were at all relevant times "goods" within the meaning of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h).

1885. The Wisconsin Plaintiff and Wisconsin State Class members have provided the Mitsubishi Defendants with reasonable notice and opportunity to cure the breaches of their implied warranties by way of the numerous NHTSA complaints filed against them, and individual notice letters sent by the Wisconsin State Class members within a reasonable amount of time after the ACU defect became public. Additionally, a notice letter was sent on behalf of the Wisconsin Plaintiff and Wisconsin State Class members to FCA US LLC, Honda Defendants, Hyundai Defendants, Kia Defendants, Mitsubishi Motors North America, Inc., Toyota Defendants, Hyundai MOBIS Co. Ltd., and ZF TRW Defendants on April 24, 2020.

1886. Alternatively, any opportunity to cure the breach is unnecessary and futile.

1887. As a direct and proximate result of the Mitsubishi Defendants' breach of the implied warranty of merchantability, the Wisconsin Plaintiff and Wisconsin State Class members have been damaged in an amount to be proven at trial.

c.    **Wisconsin Count 3: Violation of the Wisconsin Deceptive Trade Practices Act (Wis. Stat. § 100.18, *et seq.*) Against the Mitsubishi Defendants**

1888. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1889. The Wisconsin Plaintiff brings this count individually and on behalf of members of the Wisconsin State Class who purchased or leased Mitsubishi Class Vehicles, against the Mitsubishi Defendants.

1890. The Mitsubishi Defendants are "person[s], firm[s], corporation[s], or association[s]" within the meaning of Wis. Stat. § 100.18(1).

1891. The Wisconsin Plaintiff and Wisconsin State Class are members of "the public" within the meaning of Wis. Stat. § 100.18(1).

1892. The Mitsubishi Class Vehicles and the defective ACUs installed in them are "merchandise" within the meaning of Wis. Stat. § 100.18(1).

1893. The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA") prohibits any "assertion, representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1).

1894. In the course of their business, the Mitsubishi Defendants, through their agents, employees, and/or subsidiaries, violated the Wisconsin DTPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Mitsubishi Class Vehicles or the defective ACUs, as detailed above.

1895. Specifically, by misrepresenting the Mitsubishi Class Vehicles and/or the defective ACUs installed in them as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the

Mitsubishi Class Vehicles and/or the ACU defect, the Mitsubishi Defendants violated the DTPA by making assertions, representations and statements of fact which are untrue, deceptive or misleading, as prohibited by Wis. Stat. § 100.18(1).

1896. The Mitsubishi Defendants' unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Wisconsin Plaintiff and Wisconsin State Class members, about the true safety and reliability of Mitsubishi Class Vehicles and/or the defective ACUs installed in them, the quality of the Mitsubishi Class Vehicles, and the true value of the Mitsubishi Class Vehicles.

1897. The Mitsubishi Defendants' misrepresentations and concealment of the ACU defect and true characteristics of the Occupant Restraint Systems in the Mitsubishi Class Vehicles were material to the Wisconsin Plaintiff and Wisconsin State Class members, as the Mitsubishi Defendants intended. Had they known the truth, the Wisconsin Plaintiff and Wisconsin State Class members would not have purchased or leased the Mitsubishi Class Vehicles, or would have paid significantly less for them.

1898. The Wisconsin Plaintiff and Wisconsin State Class members had no way of discerning that the Mitsubishi Defendants' representations were false and

misleading, or otherwise learning the facts that the Mitsubishi Defendants had concealed or failed to disclose. The Wisconsin Plaintiff and Wisconsin State Class members did not, and could not, unravel the Mitsubishi Defendants' deception on their own.

1899. The Mitsubishi Defendants had an ongoing duty to the Wisconsin Plaintiff and Wisconsin State Class members to refrain from unfair and deceptive practices under the Wisconsin DTPA in the course of their business. Specifically, the Mitsubishi Defendants owed the Wisconsin Plaintiff and Wisconsin State Class members a duty to disclose all the material facts concerning the ACU defect in the Mitsubishi Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the ACU defect from the Wisconsin Plaintiff and Wisconsin State Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1900. The Wisconsin Plaintiff and Wisconsin State Class members suffered ascertainable losses and actual damages as a direct and proximate result of the Mitsubishi Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1901. The Mitsubishi Defendants' violations present a continuing risk to the Wisconsin Plaintiff and Wisconsin State Class members, as well as to the general

public. The Mitsubishi Defendants' unlawful acts and practices complained of herein affect the public interest.

1902. Pursuant to Wis. Stat. § 100.18(11)(b)(2), the Wisconsin Plaintiff and Wisconsin State Class members seek an order enjoining the Mitsubishi Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Wisconsin DTPA.

## VIII.  <u>PRAYER FOR RELIEF</u>

1903. Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request the Court to grant certification of the proposed Classes and enter judgment against the Defendants, as follows:

  a.   An order certifying the proposed Class and Subclasses, designating Plaintiffs as the named representatives of the Class, designating the undersigned as Class Counsel, and making such further orders for the protection of Class members as the Court deems appropriate, under Fed. R. Civ. P. 23;

  b.   An order enjoining the Vehicle Manufacturer Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles and such other injunctive relief that the Court deems just and proper;

c.      An award to Plaintiffs and Class Members of compensatory, exemplary, treble, and punitive remedies and damages and statutory penalties, including interest, in an amount to be proven at trial;

d.      An award to Plaintiffs and Class Members for the return of the purchase prices of the Class Vehicles, with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale, for damages, and for reasonable attorney fees;

e.      A Defendant-funded program, using transparent, consistent, and reasonable protocols, under which out-of-pocket and loss-of-use expenses and damages claims associated with the Defective ACUs in Plaintiffs' and Class Members' Class Vehicles, can be made and paid, such that the Defendants, not the Class Members, absorb the losses and expenses fairly traceable to the recalls of the vehicles and correction of the defective ZF TRW ACUs;

f.      A declaration that the Defendants must disgorge, for the benefit of Plaintiffs and Class Members, all or part of the ill-gotten profits they received from the sale or lease of the Class

Vehicles or make full restitution to Plaintiffs and Class Members;

g.   An award of attorneys' fees and costs, as allowed by law;

h.   An award of any and all applicable statutory and civil penalties;

i.   An award of prejudgment and post judgment interest, as provided by law;

j.   Leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

k.   Such other relief as may be appropriate, just, and equitable under the circumstances.

## IX.   <u>DEMAND FOR JURY TRIAL</u>

1904. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Respectfully submitted,

<u>/s/ Gretchen Freeman Cappio</u>
KELLER ROHRBACK L.L.P
Gretchen Freeman Cappio #P84390
gcappio@kellerrohrback.com
Ryan McDevitt #P84389
rmcdevitt@kellerrohrback.com
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone: (206) 623-1900
Facsimile: (206) 623-3384

BARON & BUDD, P.C.

Roland Tellis
rtellis@baronbudd.com
David Fernandes
dfernandes@baronbudd.com
Adam Tamburelli
atamburelli@baronbudd.com
Elizabeth Smiley
esmiley@baronbudd.com
15910 Ventura Boulevard, Suite 1600
Encino, CA 91436
Telephone: 818-839-2333
Facsimile: 818-986-9698

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
David Stellings
dstellings@lchb.com
John T. Nicolaou
jnicolaou@lchb.com
Katherine McBride
kmcbride@lchb.com
250 Hudson Street, 8th Floor
New York, New York 10013-1413
Telephone: 212.355.9500

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
Elizabeth J. Cabraser
ecabraser@lchb.com
Nimish R. Desai
ndesai@lchb.com
Phong-Chau G. Nguyen
pgnguyen@lchb.com
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415.956.1000


AHDOOT & WOLFSON, PC

Tina Wolfson
twolfson@ahdootwolfson.com
10728 Lindbrook Drive
Los Angeles, CA 90024
Telephone: 310.474.9111
Facsimile: 310.474.8585

BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
W. Daniel "Dee" Miles, III
Dee.Miles@Beasleyallen.com
H. Clay Barnett, III
Clay.Barnett@Beasleyallen.com
J. Mitch Williams
Mitch.Wlliams@Beasleyallen.com
272 Commerce Street
Montgomery, Alabama 36104
Telephone: 334-269-2343

BLEICHMAR FONTI & AULD LLP
Lesley E. Weaver
lweaver@bfalaw.com
Anne K. Davis
adavis@bfalaw.com
Joshua Samra
jsamra@bfalaw.com
555 12th Street, Suite 1600
Oakland, CA 94607
Telephone: (415) 445-4003
Facsimile: (415) 445-4020

BOIES SCHILLER FLEXNER LLP
Stephen N. Zack
szack@bsfllp.com
Tyler E. Ulrich
tulrich@bsfllp.com
Ryan B. Witte
rwitte@bsfllp.com
100 South East 2nd Street, Suite 2800
Miami, FL 33131

Telephone: 305-539-8400

CASEY GERRY SCHENK
FRANCAVILLA BLATT &
PENFIELD, LLP
Gayle M. Blatt
gmb@cglaw.com
Patricia Camille Guerra
camille@cglaw.com
110 Laurel Street
San Diego, CA 92101
Telephone: (619) 238-1811
Facsimile: (619) 544-9232

DICELLO LEVITT GUTZLER LLC
Adam J. Levitt
alevitt@dicellolevitt.com
Ten North Dearborn Street, Eleventh
Floor
Chicago, Illinois 60602
Telephone: 312-214-7900

KESSLER TOPAZ MELTZER AND
CHECK LLP
Joseph H Meltzer
jmeltzer@ktmc.com
280 King of Prussia Road
Radnor, PA 19807
Telephone: 610-667-7706
Facsimile: 610-667-7056

LEVI & KORSINSKY, LLP
Rosemary M. Rivas
Email: rrivas@zlk.com
388 Market Street, Suite 1300
San Francisco, California 94111
Telephone: (415) 373-1671
Facsimile: (415) 484-1294

LEVI & KORSINSKY, LLP

Joseph E. Levi
Email: jlevi@zlk.com
55 Broadway, 10th Floor
New York, New York 10006
Telephone: (212) 363-7500
Facsimile: (212) 363-7171

PODHURST ORSECK, P.A.
Peter Prieto
pprieto@podhurst.com
SunTrust International Center
One S.E. Third Ave., Suite 2300
Miami, FL 33131
Telephone: (305) 358-2800
Facsimile: (305) 358-2382

PRITZKER LEVINE LLP
Jonathan K. Levine
jkl@pritkzkerlevine.com
Elizabeth C. Pritzker
ecp@pritzkerlevine.com
1900 Powell Street, Suite 450
Emeryville, California 94608
Telephone: (415) 692-0772
Facsimile: (415) 366-6110

ROBBINS GELLER RUDMAN
& DOWD LLP
Mark J. Dearman
mdearman@rgrdlaw.com
Jason H. Alperstein
jalperstein@rgrdlaw.com
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone:  561/750-3000
561/750-3364 (fax)

ROBBINS GELLER RUDMAN

& DOWD LLP
Rachel L. Jensen
rjensen@rgrdlaw.com
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

ROBINS KAPLAN LLP
Stacey P. Slaughter
Sslaughter@robinskaplan.com
J. Austin Hurt
Ahurt@robinskaplan.com
Michael J. Pacelli
Mpacelli@robinskaplan.com
800 LaSalle Avenue
Suite 2800
Minneapolis, MN 55402
Telephone: 612 349 8500
Facsimile: 612 339 4181

SEEGER WEISS LLP
Christopher A. Seeger
cseeger@seegerweiss.com
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660

HELLMUTH & JOHNSON
Richard M. Hagstrom
rhagstrom@hjlawfirm.com
Michael R. Cashman
mcashman@hjlawfirm.com
8050 West 78th Street
Edina, MN 55439
Telephone: 952-941-4005
Facsimile: 952-941-2337

*Counsel for Plaintiffs*